# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOCAL INSIGHT MEDIA HOLDINGS, INC., et al.,[1] | ) Case No. 10-13677 |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## MOTION OF LOCAL INSIGHT MEDIA HOLDINGS, INC., ET AL. FOR THE ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THE CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) CONTINUE TO INVEST IN THE INVESTMENT ACCOUNTS AND (D) MAINTAIN EXISTING BUSINESS FORMS

Local Insight Media Holdings, Inc. and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "Local Insight" or the "Debtors"), file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors, in their sole discretion, to: (a) continue to operate the Cash Management System (as defined herein); (b) honor certain prepetition obligations related thereto; (c) continue to invest funds in the Investment Accounts (as defined herein); and (d) maintain existing business forms. In support of this Motion, the Debtors respectfully state as follows:[2]

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are: Local Insight Media Holdings, Inc. (2696); Local Insight Media Holdings II, Inc. (8133); Local Insight Media Holdings III, Inc. (8134); LIM Finance Holdings, Inc. (8135); LIM Finance, Inc. (8136); LIM Finance II, Inc. (5380); Local Insight Regatta Holdings, Inc. (6735); The Berry Company LLC (7899); Local Insight Listing Management, Inc. (7524); Regatta Investor Holdings, Inc. (8137); Regatta Investor Holdings II, Inc. (8138); Regatta Investor LLC; Regatta Split-off I LLC; Regatta Split-off II LLC; Regatta Split-off III LLC; Regatta Holding I, L.P.; Regatta Holding II, L.P.; and Regatta Holding III, L.P. For the purpose of these chapter 11 cases, the service address for all Debtors is: 188 Inverness Drive West, Suite 800, Englewood, CO 80112.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Richard C. Jenkins, the Debtors' Interim Chief Financial Officer, in Support of First Day Motions* (the "First Day Declaration"), filed on the date hereof (the "Petition Date").

## Jurisdiction

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 345(b) and 363 of title 11 of the United States Code 11 U.S.C. §§101-1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

4. By this Motion, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors, in their sole discretion, to: (a) continue to operate the Cash Management System, as illustrated on **Exhibit 1** annexed to **Exhibit A** attached hereto; (b) honor certain prepetition obligations related thereto in an amount not to exceed $6,000; (c) continue to invest funds in the Investment Accounts; and (d) maintain existing business forms.

## Background

5. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

6. As set forth in the First Day Declaration, the Debtors, along with their non-Debtor affiliates and subsidiaries (collectively, the "Company"), are the fifth-largest Yellow Pages directory publisher in the United States and serve as a leading provider of local search advertising products and services. The Debtors' headquarters are located in Englewood, Colorado. The Debtors currently employ approximately 729 employees throughout the United States.

7. The Company operates three different business units, each of which is owned, indirectly, by Debtor Local Insight Media Holdings, Inc. The "Regatta" business unit, which consists entirely of Debtor entities, sells advertising and coordinates publication and distribution of approximately 870 different print directories and for approximately 30 Internet Yellow Pages directories. The Debtors' second business unit includes several Debtor holding companies that own, directly or indirectly, non-Debtor Local Insight Media, Inc. ("LIMI"), which employs most of the Company's senior management and provides management services to Regatta under an intercompany management agreement. LIMI is also the indirect parent company of several non-Debtor entities that own directory publishing rights in Alaska, Cincinnati and Hawaii; these entities outsource the sale of advertising, production and distribution of their directories to Regatta. The Debtors' third business unit, "Caribe," is composed entirely of non-Debtor entities that own publication rights for certain print and internet directories in the Dominican Republic and Puerto Rico and provide essential back-office support and services to Regatta.

I. **The Debtors' Cash Management System**

8. As described in the First Day Declaration, in the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to: (a) collect, transfer and disburse funds generated from their operations; (b) facilitate cash monitoring, forecasting and reporting; and (c) enable the Debtors to maintain control over their

3

bank accounts (collectively, the "Bank Accounts") located at the banks (the "Banks") identified on **Exhibit 2** annexed to **Exhibit A** attached hereto.

9. The Cash Management System consists of approximately 20 Bank Accounts and is used to receive incoming payments, deposit checks and remit disbursements in the ordinary course of the Debtors' businesses. The Debtors disburse funds maintained in the Cash Management System through one of three primary methods: (a) traditional written checks; (b) wire transfers from the Bank Accounts; or (c) automatic clearing house payments ("ACH Payments").[3]

10. The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors' economic scope and geographic reach. Large, multiple-entity businesses use such systems because of their numerous benefits, including, the ability to: (a) quickly create status reports that contain the location and amount of funds, thereby allowing management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds. These controls are particularly important given that, on a monthly basis, a total of approximately $36 million flows through the Debtors' integrated Cash Management System to service the Debtors' operations.

---

[3] ACH Payments are electronic fund transfers conducted by a third-party administrator, the National Automated Clearing House Association. ACH Payments are generally used as a substitute for checks and to remit electronic payments of a repetitive nature at a reduced cost as compared to wire transfers.

## II. The Bank Accounts[4]

### A. Concentration Accounts

11. The Debtors' Cash Management System contains two Concentration Accounts (as defined herein), both of which are owned by Debtor The Berry Company LLC ("Berry"). The first Concentration Account is a legacy Local Insight Yellow Pages, Inc. account (the "LIYP Concentration Account") maintained at U.S. Bank, N.A. ("U.S. Bank"). The LIYP Concentration Account funds, on average, approximately $5 million per month into a Berry concentration account (the "Berry Concentration Account," and, together with the LIYP Concentration Account, the "Concentration Accounts"). The Debtors maintain the Berry Concentration Account at U.S. Bank. The Concentration Accounts are the backbone of the Cash Management System and serve as the primary repository for the Debtors' cash from which the Debtors fund their other Bank Accounts. Before the Banks' close of business on November 15, 2010, the LIYP Concentration Account held approximately $8.4 million and the Berry Concentration Account held approximately $4.8 million.

### B. Investment Accounts

12. The Debtors maintain two investment accounts at U.S. Bank (the "Investment Accounts"). The Debtors utilize the Investment Accounts to participate in an overnight, investment sweep service provided by U.S. Bank.[5] Funds that remain in the Concentration Accounts at the close of each business day are automatically transferred from the Concentration Accounts to the Investment Accounts and then invested in a U.S. Bank Eurodollar overnight

---

[4] As of the Petition Date, all of the Bank Accounts are located in banks that are designated as authorized depositories (the "Authorized Depositories") by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") in accordance with the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines" or "Guidelines").

[5] A full description of the investment sweep service, as provided by U.S. Bank, is attached hereto as **Exhibit B**.

deposit at the U.S. Bank National Association Grand Cayman Branch. The funds in the Eurodollar overnight deposit accounts are then automatically returned to the Investment Accounts, and subsequently the Concentration Accounts, the next business day.

13. Although the Eurodollar overnight deposits are not insured by the FDIC, because the Investment Accounts are held with the U.S. Bank Cayman Island branch, the deposit is an obligation of U.S. Bank. The financial strength of U.S. Bank is rated Prime-1 by Moody's Short Term Prim Rating System for Taxable Debt & Deposits Globally. Prime-1 is the highest rating in this category and denotes issuers having superior ability for repayment of senior short-term debt obligation.

14. The Debtors' investment practices allow the Debtors to invest their cash with the primary goal of protecting principal and a secondary goal of maximizing yield and liquidity. The Debtors intend to maintain those same investment goals during these chapter 11 cases. Accordingly, the Debtors seek the authority, in their sole discretion, to continue their prepetition investment practices on a postpetition basis.

C. **Lockbox and E-Pay Accounts**

15. The Debtors maintain four lockbox accounts (the "Lockbox Accounts"). Two of the Lockbox Accounts are maintained at U.S. Bank and two are maintained with KeyBank, N.A. ("KeyBank"). The Lockbox Accounts receive check or electronic fund transfers from the Debtors' customers. For those customers who have authorized the Debtors to automatically debit their accounts, the Debtors maintain two e-pay accounts (the "E-Pay Accounts") at U.S. Bank.

16. The Lockbox Accounts maintained at U.S. Bank are zero-balance accounts that are automatically swept at the close of each business day into the appropriate Concentration Account. Approximately $600,000 is swept on a daily basis from the U.S. Bank Lockbox

6
DOCS_DE:165483.1

Accounts into the Concentration Accounts. The Lockbox Accounts maintained at KeyBank are manually transferred on a monthly basis into the appropriate Concentration Account. Approximately $1.1 million is transferred from these Lockbox Accounts to the Concentration Accounts on a monthly basis. The Debtors maintain a minimum balance of approximately $110,000, in the aggregate, in the Lockbox Accounts to satisfy any fees, refunds, returns or other miscellaneous obligations.

### D.  Disbursement Accounts

17. The Debtors maintain seven disbursement accounts (the "Disbursement Accounts"), which are comprised of: (a) two payroll disbursement accounts (the "Payroll Accounts"); (b) two accounts payable disbursement accounts (the "Accounts Payable Accounts"); (c) two employee insurance claims accounts (each, an "Insurance Claim Account" and collectively, the "Insurance Claims Accounts"); and (d) a direct debit disbursement account (the "Direct Debit Account").

18. The Debtors transfer approximately $1.8 million from the Concentration Accounts into the Payroll Accounts on a bi-weekly basis in anticipation of payment of their employee payroll. Local Insight Listing Management, Inc. ("LILM"), a debtor, holds one of the Payroll Accounts and Berry holds the other. Both of the Payroll Accounts are maintained at U.S. Bank. Before the Banks' close of business on November 15, 2010, LILM's Payroll Account maintained a balance of approximately $180,000 and Berry's Payroll Account maintained a balance of approximately $925,000.

19. On an as-needed basis, the Debtors transfer from the Concentration Accounts to the Accounts Payable Accounts an amount equal the total value of checks presented for payment from the Accounts Payable Accounts in a given business day. Both Accounts Payable Accounts are held at U.S. Bank and both maintain a zero balance.

7

20. The Debtors transfer approximately $85,000 from the Berry Concentration Account into the Insurance Claims Accounts on a weekly basis to satisfy medical and dental claims filed by the Debtors' employees. Both Insurance Claims Accounts are held by Berry and both are maintained at JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>"). Before the Banks' close of business on November 15, 2010, the medical Insurance Claim Account maintained a balance of approximately $20,000 and the dental Insurance Claim Account maintained a balance of approximately $25,000.

21. The Debtors transfer approximately $60,000 from the Berry Concentration Account into the Direct Debit Account on a weekly basis to fund vision benefits, 401K contributions, flexible spending accounts funding and medical premiums. The account is held by Berry and maintained at U.S. Bank. Before the Banks' close of business on November 15, 2010 the Direct Debit Account maintained a balance of approximately $80,000.

### III. The Debtors' Existing Business Forms and Checks

22. In the ordinary course of business, the Debtors use customized checks and other business forms. To minimize expenses incurred by their estates, the Debtors seek to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms and check stock; provided, however, that after running out of the current stock of forms and checks the Debtors will add new stock stamped with "Debtor in Possession."

8

DOCS_DE:165483.1

## Basis for Relief

I. **The Continued Use of the Debtors' Cash Management System and Existing Bank Accounts is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

23. The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and the type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

24. Considering, however, that the Debtors' businesses and financial affairs are exceedingly complex and require the collection, disbursement and movement of funds through their numerous Bank Accounts, enforcement of the Guidelines during these chapter 11 cases would severely disrupt, and likely cripple, the Debtors' ordinary financial operations. Indeed, the Debtors have utilized their Cash Management System, substantially in the structure illustrated on **Exhibit 1** annexed to **Exhibit A** attached hereto, as a mainstay of their ordinary, usual and essential business practices for a number of years, and thus, respectfully request that the Court allow them to operate each of the Bank Accounts listed on **Exhibit 2** annexed to **Exhibit A** attached hereto as such were maintained in the ordinary course of business before the Petition Date.

25. In addition, requiring the Debtors to maintain separate accounts would decentralize their Cash Management System. Courts in this and other districts have noted that an

9

integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." Columbia Gas, 997 F.2d at 1061; see also In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (finding a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

## II. Maintaining the Existing Cash Management System Will Not Harm Parties in Interest

26. The Debtors' continued use of their Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition obligations. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

27. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors. In addition, the Cash Management System is similar to those commonly

10

employed by corporate entities of comparable size and complexity to the Debtors and is designed to achieve efficiency and minimize unnecessary delay and expense.

### III. The Court Should Authorize the Debtors to Continue Using Debit, Wire and Automatic Clearing House Payments

28. The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH Payments and other similar methods. In addition, a certain percentage of the Debtors' customer receipts are received through wire transfer payments. If the Debtors' ability to conduct transactions by debit, wire, ACH Payment or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

### IV. The Court Should Authorize the Banks to Continue to Maintain, Service and Administer the Debtors' Bank Accounts in the Ordinary Course of Business

29. The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. The Debtors believe that replacing their existing Bank Accounts with new accounts pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

30. Thus, the Debtors respectfully request that the Court authorize and direct the Banks to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized and directed to receive, process, honor and pay any

11
DOCS_DE:165483.1

and all checks, ACH Payments and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; provided, however, that any check, advise, draft or other notification that the Debtors advised the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

31. The Debtors further request that the Court authorize and direct the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires or ACH Payments should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires or ACH Payments are dated before or subsequent to the Petition Date. The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of an innocent mistake made despite the above-described protective measures, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

32. Moreover, the Debtors request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank

12

DOCS_DE:165483.1

Accounts granted to creditors will not have priority over the Bank Fees of the respective Bank at which the Bank Account is located.

33. Courts in this district, in similar large chapter 11 cases, have regularly waived the U.S. Trustee Guidelines on the grounds that they are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring effort. See, e.g., In re U.S. Concrete, Inc., No. 10-11407 (PJW) (Bankr. D. Del. Apr. 30, 2010); In re Atrium Corp., No. 10-10150 (BLS) (Bankr. D. Del. Feb. 23, 2010); In re The Majestic Star Casino, LLC, No. 09-14136 (KG) (Bankr. D. Del. Nov. 25, 2009); In re Questex Media Group, Inc., No. 09-13423 (MFW) (Bankr. D. Del. Oct. 23, 2009); In re Visteon Corp., No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009); In re Masonite Corp., No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re Muzak Holdings LLC, No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009); In re Portola Packaging, Inc., No. 08-12001 (CSS) (Bankr. D. Del. Aug. 29, 2008); In re Hines Horticulture, Inc., No. 08-11922 (KJC) (Bankr. D. Del. Aug. 22, 2008); In re Pierre Foods, Inc., No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re ACG Holdings, Inc., No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); In re Tropicana Entm't, LLC, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods., Inc., No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008).[6]

## V. The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms

34. The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their business forms substantially in the forms existing immediately before the Petition Date. Parties doing business with the Debtors undoubtedly will

---

[6] Because of the voluminous nature of the orders cited herein, such orders are not attached to the Motion. Copies of these orders are available upon request of the Debtors' counsel.

13

be aware of their status as debtors in possession and, thus, changing business forms is unnecessary and unduly burdensome.

35. In other large chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label. See, e.g., In re U.S. Concrete, Inc., No. 10-11407 (PJW) (Bankr. D. Del. Apr. 30, 2010); In re Atrium Corp., No. 10-10150 (BLS) (Bankr. D. Del. Feb. 23, 2010); In re The Majestic Star Casino, LLC, No. 09-14136 (KG) (Bankr. D. Del. Nov. 25, 2009); In re Questex Media Group, Inc., No. 09-13423 (MFW) (Bankr. D. Del. Oct. 23, 2009); In re Masonite Corp., No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re Muzak Holdings LLC, No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009); In re Portola Packaging, Inc., No. 08-12001 (CSS) (Bankr. D. Del. Aug. 29, 2008); In re Hines Horticulture, Inc., No. 08-11922 (KJC) (Bankr. D. Del. Aug. 22, 2008); In re Pierre Foods, Inc., No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re ACG Holdings, Inc., No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); In re Tropicana Entm't, LLC, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods., Inc., No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008).

## VI. Cause Exists for Waiving the Investment and Deposit Guidelines Under Section 345 of the Bankruptcy Code

36. Before the Petition Date, the Debtors invested funds not needed for the day-to-day operation of the Debtors' businesses in the Investment Accounts. As noted above, funds are periodically transferred from the Concentration Accounts into the Investment Accounts to maximize income, which movement and investment is an integral component of the Debtors' Cash Management System.

37. The Debtors respectfully submit that their investment practices comply with the requirements of section 345(b) of the Bankruptcy Code. Out of an abundance of caution,

however, the Debtors request the authority to continue to invest excess cash in the Investment Accounts even if the Debtors' investment practices do not strictly adhere to the requirements of section 345(b) of the Bankruptcy Code.

38. Section 345(a) of the Bankruptcy Code authorizes deposit or investment of the money of the estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Although section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee approved corporate surety, the court is permitted to dispense with this undertaking "for cause." 11 U.S.C. § 345(b).

39. The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code. The legislative history of that amendment provides as follows:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purpose is to make sure that funds of a bankrupt (sic) that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, *it can work to needlessly handcuff larger, more sophisticated debtors*. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling In re Columbia Gas Systems, Inc., 33 F.3d 294 (3d Cir. 1994).

In re Service Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. REP. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994) (emphasis in the original); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

40. In determining whether the "for cause" standard under section 345(b) of the Bankruptcy Code has been met, the Court should consider a "totality of the circumstances analysis," utilizing the following factors:

(a) the sophistication of the debtor's business;

(b) the size of the debtor's business operations;

(c) the amount of the investments involved;

(d) the bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held;

(e) the complexity of the case;

(f) the safeguards in place within the debtor's own business of insuring the safety of the funds;

(g) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h) the benefit to the debtor;

(i) the harm, if any, to the estate; and

(j) the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

Service Merch., 240 B.R. at 896.

41. Here, the Debtors submit that strict adherence to the requirements under section 345(b) of the Bankruptcy Code is not required. The Debtors submit that the Investment Accounts provide sufficient protection for their cash and that it would be in the best interests of their estates and creditors for the Debtors to utilize their Investment Accounts according to their prepetition investment practices.

16
DOCS_DE:165483.1

42. Moreover, if granted a waiver, the Debtors will not be burdened with the significant administrative difficulties and expenses relating to opening new accounts in a manner that ensures all of their funds are fully insured or invested strictly in accordance with the restrictions established by section 345 of the Bankruptcy Code.

43. Thus, the Debtors submit that cause exists for the Court to allow the Debtors to invest certain funds in the Investment Account. The Debtors further request that U.S. Bank be authorized and directed, to accept and hold or invest such funds in accordance with the Debtors' prepetition investment practices, without the need for any additional agreements not otherwise utilized before the Petition Date.

44. In other large, complex chapter 11 cases, courts in this jurisdiction have often found that cause exists to excuse compliance with the requirement of section 345(b) of the Bankruptcy Code that the debtor in possession obtain a bond from any entity with which their money is deposited or invested. In those instances, courts have waived the requirements of section 345(b) of the Bankruptcy Code and replaced them with alternative procedures. See, e.g., In re The Majestic Star Casino, LLC, No. 09-14136 (KG) (Bankr. D. Del. Nov. 25, 2009); In re Questex Media Group, Inc., No. 09-13423 (MFW) (Bankr. D. Del. Oct. 23, 2009); In re Masonite Corp., No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re Muzak Holdings LLC, No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009); In re Pierre Foods, Inc., No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re Tropicana Entm't, LLC, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods., Inc., No. 08-10446 (CSS) (Bankr. D. Del. Mar. 12, 2008); In re Pope & Talbot, Inc., No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); In re

Joan Fabrics Corp., No. 07-10479 (CSS) (Bankr. D. Del. May 7, 2007); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006).[7]

### The Requirements of Bankruptcy Rule 6003(b) are Satisfied

45. Bankruptcy Rule 6003(b) empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would seriously harm the Debtors and their estates. Indeed, without the Cash Management System, payments may not be made in a timely fashion and the Debtors would be unable to track incoming receipts. This would likely result in the refusal of essential services, thereby causing a diminution in the value of the Debtors' estates to the detriment of all parties in interest, and thus, result in immediate and irreparable harm. Accordingly, the Debtors meet the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b).

### Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

46. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

---

[7] Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any claim related to the relief sought herein. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

18

## Notice

47. Notice of the first day hearing on this Motion has been provided to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) the agent for the proposed postpetition financing agreement; (d) the administrative agent for Local Insight Regatta Holdings, Inc.'s prepetition senior credit facility; (e) the indenture trustee for Local Insight Regatta Holdings, Inc.'s 11% Senior Subordinated Notes due 2017; (f) the *ad hoc* committee of noteholders of Local Insight Regatta Holdings, Inc.'s 11% Senior Subordinated Notes due 2017; (g) Welsh, Carson, Anderson & Stowe; (h) the Banks; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) the Office of the United States Attorney General for the State of Delaware. Following the first day hearing in these cases, the Motion and, any order entered on the Motion, will be given to: (a) the foregoing parties; (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (c) any other persons as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the relief requested, no other or further notice need be provided.

## No Prior Request

48. No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of the Page Intentionally Left Blank]*

DOCS_DE:165483.1

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: November 17, 2010
Wilmington, Delaware

/s/ Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Curtis A. Hehn (Bar No. 4264)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

- and -

Richard M. Cieri (*pro hac vice* pending)
Christopher J. Marcus (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Proposed Attorneys for the
Debtors and Debtors in Possession