# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOCAL INSIGHT MEDIA HOLDINGS, INC., <u>et al.</u>,[1] | ) Case No. 10-13677 (   ) |
| | ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## MOTION OF LOCAL INSIGHT MEDIA HOLDINGS, INC., <u>ET AL.</u> FOR THE ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING CERTAIN OF THE DEBTORS TO OBTAIN SECURED POSTPETITION FINANCING ON SUPER-PRIORITY PRIMING LIEN BASIS, GRANTING ADEQUATE PROTECTION FOR PRIMING AND MODIFYING THE AUTOMATIC STAY, (B) AUTHORIZING CERTAIN OF THE DEBTORS TO USE CASH COLLATERAL OF PREPETITION SECURED LENDERS AND GRANTING ADEQUATE PROTECTION FOR THE USE THEREOF, AND (C) PRESCRIBING THE FORM AND MANNER OF NOTICE AND SETTING TIME FOR THE FINAL HEARING

Local Insight Media Holdings, Inc. and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "<u>Local Insight</u>" or the "<u>Debtors</u>"), file this motion (the "<u>Motion</u>") for entry of an interim order, substantially in the form attached hereto as **<u>Exhibit A</u>**, and a final order, respectively:  (a) authorizing Local Insight Regatta Holdings Inc. ("<u>LIRH</u>" or the "<u>Borrower</u>") and the Guarantors (as defined herein, together with the Borrower, the "<u>Loan Parties</u>") to obtain secured postpetition financing on a

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are:  Local Insight Media Holdings, Inc. (2696); Local Insight Media Holdings II, Inc. (8133); Local Insight Media Holdings III, Inc. (8134); LIM Finance Holdings, Inc. (8135); LIM Finance, Inc. (8136); LIM Finance II, Inc. (5380); Local Insight Regatta Holdings, Inc. (6735); The Berry Company LLC (7899); Local Insight Listing Management, Inc. (7524); Regatta Investor Holdings, Inc. (8137); Regatta Investor Holdings II, Inc. (8138); Regatta Investor LLC; Regatta Split-off I LLC; Regatta Split-off II LLC; Regatta Split-off III LLC; Regatta Holding I, L.P.; Regatta Holding II, L.P.; and Regatta Holding III, L.P.  For the purpose of these chapter 11 cases, the service address for all Debtors is:  188 Inverness Drive West, Suite 800, Englewood, CO 80112.

super-priority administrative claim and first priority priming lien basis, granting adequate protection to existing secured lenders for, among other things, the priming of their existing liens and modifying the automatic stay; (b) authorizing the Loan Parties to use the cash collateral of existing secured lenders and granting adequate protection to existing secured lenders for the use of their cash collateral; and (c) prescribing the form and manner of notice and setting the time for the final hearing on the Motion. In support of the Motion, the Debtors respectfully state as follows.[2]

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

4.     By this Motion, the Loan Parties request that the Court grant the following relief as provided for in the interim order (the "Interim Order") and the final order (the "Final Order," and, together with the Interim Order, the "DIP Orders"):

---

[2]   The facts and circumstances supporting this Motion are set forth in the *Declaration of Richard C. Jenkins, the Debtors' Interim Chief Financial Officer, in Support of First Day Motions* (the "First Day Declaration"), filed on the date hereof (the "Petition Date").

a.  pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules:

   i.  authorization for the Loan Parties to obtain postpetition loans, advances and other financial accommodations pursuant to the DIP Agreement (as defined herein and attached hereto as **Exhibit B**) in an amount up to $7.5 million on an interim basis under the Interim Order and up to $25 million on a final basis under the Final Order;

   ii.  approval of all of the terms and conditions of the DIP Agreement and authorization for the Loan Parties to enter into, and comply in all respects with, the DIP Agreement and all other related documents (including the Fee Letters);

   iii.  the granting in favor of the DIP Lenders (as defined herein) of super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations (as defined herein);

   iv.  as security for the DIP Obligations, the granting in favor of the DIP Lenders of perfected, valid, enforceable and non-avoidable liens upon, and security interests in, all of the DIP Collateral (as defined herein) having the priorities described in sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

   v.  as further security for the DIP Obligations, the granting of perfected, valid, enforceable and non-avoidable senior priming liens upon, and security interests in, the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code; and

   vi.  upon entry of the Final Order, the waiver of the Loan Parties' right to surcharge the DIP Collateral securing the DIP Obligations pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity;

b.  pursuant to sections 361, 362 and 363 of the Bankruptcy Code, authorization for the Loan Parties to use Cash Collateral (as defined herein) pursuant to the terms and conditions set forth in the DIP Orders and the granting of adequate protection to the applicable Prepetition Secured Lenders (as defined herein) for use of such Cash Collateral, including payment of the Prepetition Secured Lenders' costs and expenses, the granting of administrative priority claims and Adequate Protection Liens (as defined herein), and the additional rights provided in the Interim Order (including the waiver of the Loan Parties' right to surcharge the collateral securing the existing indebtedness under the Prepetition Credit

3

Agreement (as defined herein) pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity);

c.    the scheduling of the final hearing on the Motion to consider entry of the Final Order authorizing and granting the relief requested in the Motion; and

d.    the granting of certain related relief.

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)

5.    Pursuant to Bankruptcy Rule 4001(c), the Loan Parties submit this concise statement listing certain material terms contained in the DIP Agreement and DIP Orders. As discussed in detail herein, the Loan Parties believe that the terms of the contemplated DIP Facility are appropriate and justified in the context of, and the circumstances relating to, these chapter 11 cases:[3]

| | |
|---|---|
| **Interest Rate** | Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin. <u>See</u> DIP Agreement § 2.15(a). |
| | Each Base Rate Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for such day plus the Applicable Margin. <u>See</u> DIP Agreement § 2.15(b). |
| **Maturity** | The first anniversary of the closing date. <u>See</u> DIP Agreement Def. of "Maturity Date". |
| **Events of Default** | Usual and customary Events of Default for financing of this kind. <u>See</u> DIP Agreement § 8.1. |
| **Liens** | All property of the Loan Parties, now or hereafter acquired, as more particularly described and referred to as "<u>DIP Collateral</u>" in the DIP Orders, and shall include any property upon which a Lien is purported to be created by the DIP Agreement, any Security Document, the Orders or |

---

[3]    Capitalized terms used in this concise statement and not otherwise defined shall have the meanings ascribed to such terms in the DIP Orders or DIP Agreement, as applicable. This concise statement is qualified in its entirety by reference to the provisions of the DIP Agreement and Interim Order. To the extent of any inconsistency between this concise statement and the DIP Agreement or the Interim Order, the DIP Agreement or Interim Order, as applicable, shall govern.

4

any additional orders of the Bankruptcy Court under the Cases (but shall exclude the Carve Out, the Lien Avoidance Carve Out and any Excluded Equity Interests). <u>See</u> DIP Agreement Def. of "Collateral".

| | |
|---|---|
| **Borrowing Limits** | Prior to the entry of the Final Order and the satisfaction of the conditions in section 5.2, the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued will not exceed $7,500,000, (ii) Loans may not be borrowed on more than four separate Borrowing Dates and (iii) the aggregate amount of Loans made on any Borrowing Date after the First Availability Date shall not exceed $5,850,000. <u>See</u> DIP Agreement § 2.1 |
| **Borrowing Conditions** | Usual and customary borrowing conditions for financing of this kind. <u>See</u> DIP Agreement § 5. |
| **364(c) Liens** | The DIP Agreement provides for the following benefits under section 364(c) of the Bankruptcy Code: (a) an allowed administrative expense entitled to super-priority over any and all other administrative expenses, pursuant to section 364(c)(1); (b) a perfected first priority (subject to permitted exceptions) lien on all present and after-acquired property (and all proceeds thereof) not subject to an existing, valid, perfected and non-avoidable Lien, pursuant to section 364(c)(2); and (c) a perfected junior lien on all present and after-acquired property (and all proceeds thereof) that is otherwise subject to a valid, perfected and non-avoidable Lien (other than Liens of the Prepetition Secured Lenders), pursuant to section 364(c)(3). <u>See</u> DIP Agreement, Preliminary Statement. |
| **364(d) Liens** | The DIP Agreement provides, pursuant to Bankruptcy Code section 364(d)(1) a perfected first priority (subject to permitted exceptions), senior priming Lien on (x) all present and after-acquired property (and all proceeds thereof) of the Loan Parties that is subject to a Lien to secure the Loan Parties' Prepetition Obligations, excluding, in all cases, the Excluded Equity Interests, (y) all present and after-acquired assets (and all proceeds thereof) that are presently subject to Liens that are junior to the Liens that secure the Loan Parties' Prepetition Obligations, excluding, in all cases, any Excluded Equity Interests and (z) the Liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations |
| **Waiver of Automatic Stay** | The DIP Agreement contemplates that the Interim Order will, among other things, provide for the modification of the automatic stay to permit the creation and perfection of Liens on the DIP Collateral and to permit the DIP Lenders to exercise remedies if an Event of Default occurs subject to the terms of the Interim Order. <u>See</u> Interim Order ¶ 8(a); DIP Agreement § 2.25. |

| | |
|---|---|
| **Letters of Credit** | Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Lenders, agrees to issue letters of credit ("<u>Letters of Credit</u>") for the account of the Borrower on any Business Day during the Commitment Period in such form as may be approved from time to time by the Issuing Lender; <u>provided</u> that, after giving effect to such issuance, (i) the L/C Obligations shall not exceed the L/C Commitment, (ii) the aggregate amount of the Available Commitments shall not be less than zero, (iii) each such letter of credit shall be fully cash collateralized and (iv) prior to the Second Availability Date the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued shall not exceed $7,500,000. <u>See</u> DIP Agreement § 3.1 and § 5.3. |
| **Section 506(c) Waiver** | The Final Order shall contain a waiver of the Loan Parties' rights under section 506(c) of the Bankruptcy Code. <u>See</u> Interim Order ¶ 9. |
| **Lien on Proceeds of Avoidance Action** | The Final Order shall provide the DIP Lenders with a lien on the proceeds of claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. <u>See</u> Interim Order ¶ 7(a). |

6.     A more complete summary of the material terms of the DIP Agreement is contained herein.

<u>**Background**</u>

7.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

8.     As set forth in the First Day Declaration, the Debtors, along with their non-Debtor affiliates and subsidiaries (collectively, the "<u>Company</u>"), are the fifth-largest Yellow Pages directory publisher in the United States and serve as a leading provider of local search advertising products and services. The Debtors' offices are located in Englewood, Colorado. The Debtors currently employ approximately 729 employees throughout the United States.

9.     The Company operates three different business units, each of which is owned, indirectly, by Debtor Local Insight Media Holdings, Inc. The "Regatta" business unit, which consists entirely of Debtor entities, sells advertising and coordinates publication and distribution of approximately 870 different print directories and for approximately 30 Internet Yellow Pages directories. The Debtors' second business unit includes several Debtor holding companies that own, directly or indirectly, non-Debtor Local Insight Media, Inc. ("LIMI"), which employs most of the Company's senior management and provides management services to Regatta under an intercompany management agreement. LIMI is also the indirect parent company of several non-Debtor entities that own directory publishing rights in Alaska, Cincinnati and Hawaii; these entities outsource the sale of advertising, production and distribution of their directories to Regatta. The Debtors' third business unit, "Caribe," is composed entirely of non-Debtor entities that own publication rights for certain print and internet directories in the Dominican Republic and Puerto Rico and provide essential back-office support and services to Regatta.

### The Borrower's Prepetition Capital Structure

10.    The Borrower's prepetition capital structure consists of secured revolving and term loans, and senior subordinated notes. As of the Petition Date, the Borrower maintained consolidated funded debt of approximately $558 million, consisting of a secured term loan in the approximate amount of $311 million, a secured revolver drawn in the approximate amount of $26 million and senior subordinated notes in the approximate amount of $221 million.

### I.     Senior Credit Facility

11.    On or about April 23, 2008, LIRH, as borrower, entered into that certain Credit Agreement (as amended on May 6, 2008 and June 16, 2008, the "Prepetition Credit Agreement"), with JPMorgan Chase Bank, N.A., ("JPMorgan") as administrative agent (the

7

"Prepetition Agent") for the lenders parties thereto (collectively, the "Prepetition Secured Lenders") and as collateral agent for the secured parties thereto.

12.     The Prepetition Credit Agreement provides for a $337 million senior secured term loan facility (the "Prepetition Term Loan"), of which approximately $311 million is outstanding as of the Petition Date, and a $30 million senior secured revolving loan facility, of which approximately $26 million is outstanding as of the Petition Date (the "Prepetition Revolver Loan," and, together with the Prepetition Term Loan, the "Prepetition Credit Facility").

13.     Pursuant to that certain Guaranty and Collateral Agreement, dated as of April 23, 2008, among LIRH, as borrower, and JPMorgan as collateral agent (the "Guaranty and Collateral Agreement") and Supplement No. 1 to the Guaranty and Collateral Agreement, dated as of June 30, 2008 (the "Guaranty and Collateral Agreement Supplement"), the guarantors under the Prepetition Credit Agreement include Debtors The Berry Company LLC ("Berry"), Local Insight Listing Management, Inc. ("LILM"), Regatta Holding I, L.P., Regatta Holding II, L.P., Regatta Holding III, L.P. and Regatta Investor LLC (collectively, the "Prepetition Credit Agreement Guarantors"). The Prepetition Credit Facility is secured by substantially all of the assets of LIRH and the Prepetition Credit Agreement Guarantors as well as pledges of all the issued and outstanding capital stock and other equity interests of LIRH and the Prepetition Credit Agreement Guarantors.

II.     **Senior Subordinated Notes**

14.     On or about November 30, 2007, LIRH issued $210.5 million aggregate principal amount of 11% Senior Subordinated Notes due November 30, 2017 (the "Unsecured Subordinated Notes"), pursuant to an Indenture (the "LIRH Indenture") with Windstream

8

Regatta Holdings, Inc.,[4] as issuer, Wells Fargo Bank, N.A. ("Wells Fargo") as trustee (the "Indenture Trustee"). The Prepetition Credit Agreement Guarantors also guarantee the LIRH Indenture.

15.     In November 2008, LIRH completed an offer to exchange all of the Unsecured Subordinated Notes for 11% Series B Senior Subordinated Notes, due November 30, 2017 (the "Unsecured Exchange Notes"). The terms of the Unsecured Exchange Notes are identical in all material respects to the Unsecured Subordinated Notes, except that the Unsecured Exchange Notes have been registered under the Securities Act of 1933, as amended, under a registration statement that was declared effective by the SEC on October 10, 2008.

16.     The Loan Parties have stipulated that the obligations under the Prepetition Credit Agreement and related documents constitute the legal, valid and binding obligations of the Loan Parties, enforceable in accordance with their terms and constitute "Senior Indebtedness" and "Guarantor Senior Indebtedness," as applicable, under and as defined in the Unsecured Subordinated Note Indenture. Furthermore, the Loan Parties have stipulated that the Prepetition Secured Lenders hold "Designated Senior Indebtedness" within the meaning of the subordination provisions set forth in Article XII of the Unsecured Subordinated Note Indenture and that the Loan Parties have not assigned any other "Designated Senior Indebtedness" since the closing of the Prepetition Credit Agreement. Moreover, the Loan Parties have stipulated that, pursuant to the Unsecured Subordinated Note Indenture, the holders of the Notes thereunder (and as defined therein) are not entitled to receive or retain any payments or other recoveries until and unless the obligations under the Prepetition Credit Agreement and related documents (whether or not

---

[4]     On or about November 30, 2007, Windstream Regatta Holdings, Inc. was renamed Local Insight Regatta Holdings, Inc.

deemed to be secured) have been paid in full, in cash, unless the Prepetition Secured Lenders otherwise consent.

### Defect in Perfection of Collateral Under Prepetition Credit Agreement

17.     When LIRH entered into the Prepetition Credit Agreement on April 23, 2008, the guarantors of the Prepetition Credit Agreement were Local Insight Yellow Pages, Inc., Local Insight Berry Holdings, LLC and LILM.  On closing, the Prepetition Agent filed UCC financing statements against each of these entities.  On May 23, 2008, Local Insight Berry Holdings, LLC was merged into Berry, with Berry being the surviving entity.  On June 30, 2009, Local Insight Yellow Pages, Inc. was merged into Berry, with Berry being the surviving entity.  As a result of these mergers, Berry held substantially all material assets of the Regatta business.   The Prepetition Agent did not record a UCC financing statement against Berry until August 20, 2010. The Debtors commenced these chapter 11 cases less than 90 days following the August 20, 2010 perfection to preserve the right to avoid the August 20, 2010 perfection against Berry as a preferential transfer.

18.     Notwithstanding the foregoing, the Prepetition Agent and Prepetition Secured Lenders retain, and have not waived or otherwise prejudiced, any of their rights, claims, defenses or counterclaims at law or in equity in connection with or relating to any Avoidance Action with respect to the liens and security interests granted by the Loan Parties to secure the obligations under the Prepetition Credit Agreement.

### The Loan Parties' Marketing Process for Postpetition Financing

19.     To best assess the Debtors' funding needs during these chapter 11 cases, the Loan Parties have, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work towards a successful reorganization.  To that end, on July 15, 2010, the Debtors retained Lazard Frères & Co. LLC

10

("Lazard") as their investment banker. Lazard, together with the Debtors' management team, analyzed the Debtors' cash needs to determine if there was a need for additional liquidity. More specifically, and considering the ongoing dialogue the Debtors had been engaged in with the Prepetition Agent and advisors for an *ad hoc* committee of bondholders, Lazard considered the incremental liquidity that would be necessary to maintain operations in connection with the filing of these chapter 11 cases.

20.     Beginning in October, 2010, Lazard contacted approximately twelve financing sources, including banks, hedge funds and certain of the Prepetition Secured Lenders, to gauge their interest in providing debtor in possession financing. Seven of the parties executed non-disclosure agreements, each of which obtained access to a dataroom established by the Debtors in connection with the contemplated financing. Ultimately, Lazard's efforts bore five proposals for financing these chapter 11 cases.

21.     The Loan Parties, with the assistance of Lazard and their other professionals, reviewed each of the proposals. No prospective third-party lenders were willing to make a loan without either priming the liens of the Prepetition Secured Lenders or without the Loan Parties first having avoided the liens of the Prepetition Secured Lenders, including JPMorgan, who agreed to provide a loan that preserved the Loan Parties' ability to prosecute all Avoidance Actions, including with respect to the liens securing the Prepetition Credit Agreement. In light of this accommodation, and considering the favorable economic terms in the JPMorgan DIP proposal, the Loan Parties, in consultation with their advisors, concluded that the JPMorgan DIP proposal was the best financing alternative available.

**The DIP Proposal Preserves the Loan Parties' Ability to Prosecute a Lien Avoidance Action**

22.     Notably, the Orders provide for a "Lien Avoidance Carve Out" in an amount equal to $500,000 (subject to increase for cause and approval of the Court), which sum shall be segregated from the Loan Parties' cash on hand as of the Petition Date. The Lien Avoidance Carve Out shall be available only to the Loan Parties in accordance with the provisions of the DIP Agreement, the Interim Order and the Final Order and only to investigate and, if necessary, prosecute an Avoidance Action to avoid one or more prepetition liens securing the Prepetition Obligations. The Lien Avoidance Carve Out shall be senior to all liens securing the DIP Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Secured Lenders. If the Loan Parties commence an action to avoid liens securing the Prepetition Obligations, such action constitutes an Event of Default under the DIP Agreement. Notwithstanding this Event of Default, the DIP Agreement provides the Loan Parties with sixty days from the commencement of the Avoidance Action to continue to use Cash Collateral. The Loan Parties believe that such period is sufficient to prosecute an Avoidance Action, if necessary, and secure replacement debtor in possession financing secured by the assets that would become unencumbered as a result of such Avoidance Action. Other than as proscribed in section 546 of the Bankruptcy Code, neither the DIP Agreement nor the Interim Order establish a time limit to commence an Avoidance Action.

**Principal Terms of DIP Facility**

23.     Beginning on or about November 1, 2010, the Loan Parties and JPMorgan began to negotiate the terms of the proposed DIP Facility, Interim Order and related documents. The

12

Loan Parties have negotiated and reached agreement to enter into, subject to approval of the Court pursuant to the DIP Orders, that certain Credit and Guarantee Agreement (the "DIP Credit Agreement"),[5] by and among LIRH, as borrower, the Guarantors[6] thereto, JPMorgan, as administrative agent and collateral agent (in such capacity, the "DIP Agent"), JPMorgan Securities LLC, as sole arranger and sole bookrunner, and the several lenders from time to time parties thereto (collectively, the "DIP Lenders").

24.      The DIP Agreement consists of a multi-draw term loan and letter of credit facility in an aggregate principal amount not to exceed $25 million (the "DIP Facility"). The Loan Parties' obligations under the DIP Facility (the "DIP Obligations") are secured by:

a.    a guarantee from each of the Loan Parties other than the Borrower of the due and punctual payment and performance of the Obligations of the Borrower hereunder;

b.    an allowed administrative expense claim entitled to the benefits of Bankruptcy Code section 364(c)(1) in each of the Cases, having a superpriority claim over any and all administrative expenses, including as specified in Bankruptcy Code sections 503(b) and 507(b);

c.    pursuant to Bankruptcy Code section 364(c)(2) a perfected first priority (subject to permitted exceptions) Lien on all present and after-acquired property (and all proceeds thereof) of the Loan Parties not subject to a valid, perfected and non-avoidable Lien on the Petition Date, excluding, in all cases, with respect to the obligations of Loan Parties under any Loan Document, (x) 35% of the issued and outstanding Capital Stock of any new or existing Foreign Subsidiary (and, for the avoidance of doubt, 100% of the issued and outstanding Capital Stock of any new or existing Foreign

---

[5]   This summary of the DIP Credit Agreement is provided for the benefit of the Court and other parties in interest. The DIP Credit Agreement proposed to be executed by the parties will be substantially in the form attached hereto as **Exhibit B** and incorporated herein by reference. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Moreover, to the extent there are any conflicts between this summary and the DIP Orders, the terms of the DIP Orders shall govern. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

[6]   The Guarantors include Debtor Regatta Investor LLC and each of its subsidiary Debtors: The Berry Company LLC, Local Insight Listing Management, Inc., Regatta Split-off I LLC, Regatta Split-off II LLC, Regatta Split-off III LLC, Regatta Holding I, L.P., Regatta Holding II, L.P. and Regatta Holding III, L.P.

Subsidiary not owned directly by a Debtor) and (y) any Capital Stock of any Subsidiary substantially all of whose assets consist of Equity Interests in one or more Foreign Subsidiaries (any Equity Interests so excluded, collectively, the "Excluded Equity Interests");

d.  pursuant to Bankruptcy Code section 364(c)(3) a perfected junior Lien on all present and after-acquired property(and all proceeds thereof) of the Loan Parties that is otherwise subject to a valid, perfected and non-avoidable Lien on the Petition Date (other than Liens securing the Loan Parties' Prepetition Obligations and Liens that are junior to the Liens securing the Loan Parties' Prepetition Obligations) or a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, excluding, in all cases, any Excluded Equity Interests; and

e.  pursuant to Bankruptcy Code section 364(d)(1) a perfected first priority (subject to permitted exceptions), senior priming Lien on (x) all present and after-acquired property (and all proceeds thereof) of the Loan Parties that is subject to a Lien on or after the Petition Date to secure the Loan Parties' Prepetition Obligations, excluding, in all cases, the Excluded Equity Interests, (y) all present and after-acquired assets (and all proceeds thereof) that are presently subject to Liens that are junior to the Liens that secure the Loan Parties' Prepetition Obligations, excluding, in all cases, any Excluded Equity Interests and (z) the Liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations.

25.  Upon receiving interim approval of the DIP Facility, the Loan Parties plan to use the proceeds from the DIP Facility to, among other things, fund the Loan Parties' ongoing business operations and the costs of these chapter 11 cases.

26.  Additional significant terms of the proposed DIP Agreement are summarized as follows:

| | |
|---|---|
| Borrower: | Local Insight Regatta Holdings, Inc. |
| Guarantors: | Regatta Investor LLC, The Berry Company LLC, Local Insight Listing Management, Inc. Regatta Split-off I LLC, Regatta Split-off II LLC, Regatta Split-off III LLC, Regatta Holding I, L.P., Regatta Holding II, L.P. and Regatta Holding III, L.P. |
| DIP Agent: | JPMorgan Chase Bank, N.A. |

52928-001\DOCS_DE:165488.1

| | |
|---|---|
| Type, Amount and <br> Availability of Funds: | Type and Amount of Facilities: |
| | DIP Term Facility: $25 million. |
| | Availability: Up to $7.5 million upon entry of the Interim Order by the Bankruptcy Court, with the remaining $17.5 million available upon entry of the Final Order and subject to the terms of the DIP Agreement. |
| Maturity Date: | On or about November 18, 2011. |
| Interest Rate: | Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin. |
| | Each Base Rate Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for such day plus the Applicable Margin. |
| Interest Payments: | Interest shall be payable in arrears on each Interest Payment Date, _provided_ that upon an Event of Default interest shall be payable from time to time on demand. |
| Default Interest: | Upon the occurrence and during the continuance of an Event of Default, (i) the principal amount of each Loan or Reimbursement Obligation (to the extent legally permitted) shall bear interest at a rate per annum that is equal to (x), in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to Base Rate Loans plus 2%, and (ii) any interest payable on any Loan or Reimbursement Obligation or any Commitment Fee or other amount payable hereunder or under any other Loan Document shall bear interest at a rate per annum equal to the rate then applicable to Base Rate Loans plus 2% (or, in the case of any other amounts, the rate then applicable to Base Rate Loans plus 2%), in each case, with respect to clauses (i) and (ii) above, from the date of such Event of Default until such amount is paid in full (after as well as before judgment). |
| Fees: | The Borrower has agreed to the following: |
| | • _Commitment Fee_: The Borrower agrees to pay to the DIP Agent for the account of each Lender a commitment fee (the "Commitment Fee") for the period from and including the Closing Date to the last day of the Commitment Period, computed at the Commitment Fee Rate on the average daily |

15

amount of the Available Commitment of such Lender during the period for which payment is made, payable monthly in arrears on the last Business Day of each calendar month after December 31, 2010 and on the Termination Date, commencing on the first of such dates to occur after the date hereof; provided, that the Borrower shall not be obligated to pay a Commitment Fee to any Defaulting Lender as long as such Lender is a Defaulting Lender;

- Arrangement Fee: as set forth in a separate fee letter among the Borrower and the DIP Agent and one or more of the DIP Agent's affiliates;[7] and

- DIP Agent Fee: as set forth in a separate fee letter among the Borrower and the DIP Agent and one or more of the DIP Agent's affiliates.

Carve Out:   Under the Interim Order, the Carve Out means the sum of:

- all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and

- at any time after the first Business Day after the occurrence and during the continuance of an Event of Default under this Agreement and delivery hereof to the United States Trustee and each of the lead counsel for the Debtors and the statutory committee of unsecured creditors (the "Committee") in the Cases (once such Committee is appointed) (the "Carve Out Notice"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms (collectively, the "Professional Persons") retained by the Debtors and the Committee (if any) after the Business Day following delivery of the Carve Out Notice and allowed by the Bankruptcy Court, in an aggregate amount not exceeding $2,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed by the Bankruptcy Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice, whether paid or unpaid ); provided that (x) except with respect to the

---

[7] The Debtors have provided a copy of the fee letter to the United States Trustee on a confidential basis.

52928-001\DOCS_DE:165488.1

Lien Avoidance Carveout (as defined below), the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the Lenders, the Prepetition Lenders or the Prepetition Agent, (y) so long as no Event of Default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by Bankruptcy Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (z) nothing in the Orders shall impair the right of any Person to object to any such fees or expenses to be paid by the Debtors' estates.

For the avoidance of doubt and notwithstanding anything to the contrary herein, in the DIP Documents, or in the Prepetition Credit Agreement and related documents and agreements, the Carve Out shall be senior to all liens securing the DIP Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Secured Lenders.

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |
|--------------------------|------|

Lien Avoidance Carve Out

An amount equal to $500,000 (subject to increase for cause and approval of the Court), which sum shall be segregated from the Loan Parties' cash on hand as of the Petition Date. The Lien Avoidance Carve Out shall be available only to the Loan Parties in accordance with the provisions of the DIP Agreement, the Interim Order and the Final Order and only to investigate and, if necessary, prosecute an Avoidance Action to avoid one or more prepetition liens securing the Prepetition Obligations. The Lien Avoidance Carve Out shall be senior to all liens securing the DIP Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Secured Lenders.

Adequate Protection

As security for the payment of the Adequate Protection Obligations, the Loan Parties have provided the Prepetition Agent with a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the DIP Liens, (iii) the Carve Out and (iv) the Lien Avoidance Carve Out.

Events of Default:

The DIP Agreement contains such Events of Default (and in some

cases, grace periods) as are usual and customary for financings of this kind, including, without limitation:

- the Borrower shall fail to pay (i) any principal of any Loan or Reimbursement Obligation, or (ii) interest on any Loan or Reimbursement Obligation, any Commitment Fee payable hereunder or any other fees or other amount payable hereunder or under any other Loan Documents;

- any representation or warranty shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished;

- any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this section 8.1 of the DIP Agreement), and such default shall continue unremedied for a period of 30 days after notice of such default shall have been given to the Borrower by the DIP Agent or the Required Lenders;

- any Loan Party shall, after giving effect to applicable cure periods and consents and waivers obtained during such cure periods, (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Guarantee Obligation, but excluding the Loans and Reimbursement Obligations and pre-Petition Date Indebtedness) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition, after giving effect to applicable cure periods and consents and waivers obtained during such cure periods, exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to or mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee

52928-001\DOCS_DE:165488.1

Obligation) to become payable; provided that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $2,000,000;

- one or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any Debtor involving in the aggregate liabilities for all Loan Parties (not paid or fully covered by insurance as to which the relevant insurance company has not disputed coverage) in excess of $3,000,000, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within twenty (20) days from the entry thereof;

- there shall be rendered against any Group Member a nonmonetary judgment with respect to any post petition event which causes or could reasonably be expected to have a Material Adverse Effect;

- any Change of Control shall occur;

- there shall exist any Lien on any or all of the Capital Stock of the Borrower, except as created under the Security Documents, the DIP Orders or the Prepetition Loan Documents; or

- an order of the Bankruptcy Court shall be entered granting another Superpriority Claim (other than the Carve Out or Lien Avoidance Carveout) or Lien *pari passu* with or senior to that granted (x) to the Lenders and the DIP Agent pursuant to this DIP Agreement and the Interim Order (or the Final Order, as applicable), or (y) to the Prepetition Secured Parties pursuant to the Interim Order (or the Final Order, as applicable);

- an order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of five (5) days, vacating or otherwise amending, supplementing or modifying the Interim Order (or the Final Order, as applicable) without the written consent of the DIP Agent

and the Required Lenders;

- the Prepetition Secured Parties' Cash Collateral shall be used in a manner inconsistent with the Interim Order (or the Final Order, as applicable);

- an order of a court of competent jurisdiction shall be entered terminating the use of the Prepetition Secured Parties' Cash Collateral;

- an order of the Bankruptcy Court shall be entered under section 1106(b) of the Bankruptcy Code in any of the Cases appointing a Chapter 11 trustee with plenary powers, a responsible officer or an examiner having enlarged powers relating to the operation of the business of the Loan Parties;

- the Final Order Entry Date shall not have occurred by the dated that is 45 days after the Petition Date or such later date as the Required Lenders may agree;

- a plan shall be confirmed in any of the Cases of the Loan Parties that does not provide for termination of the Commitments and payment in full in cash of the Obligations on the Effective Date of such plan of reorganization or any order shall be entered which dismisses any of the Cases of the Loan Parties or converts any of the Cases to a case under Chapter 7 of the Bankruptcy Code and which order does not provide for termination of the Commitments, payment in full in cash of the Obligations and termination or replacement of Letters of Credit or any of the Loan Parties shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

- any Debtor shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Interim Order (or the Final Order, as applicable), (ii) in respect of and in accordance with, and to the extent authorized by, a "first day" order reasonably satisfactory to the DIP Agent, (iii) as otherwise permitted under this DIP Agreement, including pursuant to the Orders and in connection with adequate protection payments described in section 2.25(c) and (iv) other orders that the Bankruptcy Court enters throughout the Cases (provided that any payments pursuant to such orders identified in clause (iv) shall not exceed, in aggregate principal amount,

20

$1,000,000 and shall not be made to an Affiliate of such Debtor);

- the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any property of any Debtor which has a value in excess of $1,000,000 in the aggregate or to permit other actions that could reasonably be expected to have a Material Adverse Effect on the Loan Parties or their estates; or

- any Loan Party or any Subsidiary thereof shall fail to comply with the Interim Order or the Final Order;

- any proceeding shall be commenced by any Loan Party seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations, (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral or (iii) the invalidation, subordination or other challenge to the Prepetition Obligations or the avoidance of any or all of the Liens securing the Prepetition Obligations (this clause (iii) being the "Avoidance Action Default");

- any Debtor files a plan of reorganization that does not provide for either (i) the termination of the Commitments and payment in full in cash of the Obligations on the Effective Date or (ii) which does not contain terms and conditions otherwise reasonably acceptable to the DIP Agent and the Required Lenders;

- the Loan Parties or any of their Affiliates shall breach or otherwise violate any of the provisions of the DIP Orders or any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Liens or Superpriority Claims created by the DIP Orders or any Security Documents or Prepetition Loan Documents in favor of the Lenders or the Prepetition Secured Parties (as applicable) shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms thereof;

- the Guarantee Obligations contained in the DIP Orders or in this DIP Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or the Sponsors or

any of their Affiliates shall so assert in writing (except in accordance with the terms hereof or thereof); or

- subject to certain conditions and review, any amounts the Sponsor is contractually entitled to receive pursuant to agreements as in effect on the Petition Date are not paid solely out of the Monthly Management Fee Amount (as defined in the Base Indenture Definitions List for the WBS securitization) to the extent actually paid from time to time by WBS.

Remedies:   During the continuance of any Event of Default, the DIP Agent:

- may, and, at the request of the Required Lenders, the DIP Agent shall, by notice to the Borrower (with a copy to the Prepetition Agent, counsel for any statutory committee appointed in the Cases and to the United States Trustee), take one or more of the following actions:
  - terminate forthwith the Commitments;
  - declare the Loans (including, without limitation, all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) then outstanding to be forthwith due and payable, whereupon the principal of the Loans, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; and
  - subject to the Interim Order (including paragraph 8 (c) thereof) (or Final Order, as applicable), (a) set-off amounts held as cash collateral or in the accounts of the Loan Parties and apply such amounts to the Obligations of the Loan Parties hereunder and under the other Loan Documents in accordance with section 11.3 of the DIP Agreement; and (b) exercise any and all remedies under this DIP Agreement, the Interim Order (or Final Order, as applicable), and applicable law available to the DIP Agent and the Lenders.

22

**Covenants:** The DIP Credit Agreement contains such financial, reporting, affirmative and negative covenants as are usual and customary for financings of this kind—in each case subject to carve outs thresholds and materiality qualifiers as set forth in the DIP Agreement—including, without limitation:

- not later than 90 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated and unaudited consolidating balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated and consolidating statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year by Deloitte & Touche LLP, another "Big Four" firm of independent certified public accountants or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Administrative Agent;

- not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated and consolidating balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated and consolidating statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments and the absence of footnotes);

- not later than 30 days after the end of each fiscal month (or 45 days after the end of the third, sixth, ninth and twelfth fiscal months in each fiscal year), commencing with the fiscal month ended November 30, 2010, the unaudited consolidated statements of income for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year and setting forth in each case in comparative form the figures from the statements of income set forth in the Budget for such month and the figures for the previous year;

- a certificate of the independent certified public accountants

23

reporting on such financial statements;

- a certificate of a Responsible Officer stating that each Loan Party has observed or performed all of its covenants and other agreements;

- a listing of any material registrations for Intellectual Property;

- each location of real Property where material Collateral is located but is not owned by the applicable Loan Party (whether such real Property is leased or otherwise);

- a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for each fiscal quarter, and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, in each case, as compared to the portion of the Budget covering such period;

- all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may submit to, or file with, the SEC;

- notice of any development, event or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount not contained in the business plan of the Borrower delivered to the Lenders;

- a 26-week cash flow forecast;

- a variance report in form reasonably satisfactory to the DIP Agent;

- (x) beginning no later than the fifth Friday following the Closing Date and continuing on every fourth Friday thereafter, a certificate of a Responsible Officer of the Borrower containing all information and calculations necessary for determining compliance with section 7.1 and section 7.7 as of the close of business on Friday of the previous calendar week and (y) concurrently with the delivery of any financial statements pursuant to section 6.1(a) and (b), a certificate of a Responsible Officer of the Borrower containing all information and calculations necessary for determining compliance with section 7.7;

- copies of all orders, pleadings and motions, applications,

24

judicial information, financial information, plan of reorganization or liquidation and/or any disclosure statement related to such plan and other documents to be filed by or on behalf of any Group Member with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of any Group Member to any Committee;

- pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be,

  - (i) all its post-petition material Taxes and other material obligations of whatever nature that constitute administrative expenses under section 503(b) of the Bankruptcy Code in the Cases; and

  - (ii) all material obligations arising from Contractual Obligations entered into after the Petition Date or from Contractual Obligations entered into prior to the Petition Date and assumed;

- keep all tangible material Property and systems useful and/or necessary in its business (other than Property referenced in section 6.4(a)(ii)) in good working order and condition, ordinary wear and tear (and damage caused by casualty) excepted;

- keep books of records and account in accordance with GAAP;

- permit representatives of the DIP Agent, the Collateral Agent or any Lender to visit, upon reasonable prior notice and during normal business hours, and inspect any of its properties and examine and make abstracts from any of its books and records at a mutually agreeable reasonable time and as often as may reasonably be desired;

- discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public;

- promptly give notice to the DIP Agent of the occurrence of any Default or Event of Default;

- subject to certain conditions and review, use the proceeds of the Loans only for the purposes set forth in section 4.16 and request the issuance of Letters of Credit only for purposes reasonably satisfactory to the Issuing Lender; and

- maintain at all times all of the cash and Cash Equivalents of the Loan Parties (other than cash and Cash Equivalents not exceeding $500,000 in the aggregate) at an account or

25

accounts with the DIP Agent or at an account the entire balance of which is swept at least once every three (3) Business Days to an account described above.

## Basis for Relief

27.     The Loan Parties bring this Motion on an expedited basis in light of the immediate and irreparable harm that will likely be suffered by their estates if the Loan Parties cannot obtain approval of the DIP Facility.  Indeed, the Loan Parties have an urgent need to obtain the DIP Facility and use Cash Collateral for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers and customers, paying employees and satisfying other working capital and operational needs — all of which are necessary to preserve and maintain going-concern values.

28.     In light of the foregoing, the Loan Parties must immediately access the DIP Facility and Cash Collateral to satisfy certain obligations, which will enable the Loan Parties to demonstrate to their customers, suppliers, employees and vendors that they have sufficient capital to ensure ongoing operations.  If approved by the Court on an interim basis, the Loan Parties will immediately have initial availability of up to $7.5 million under the terms and conditions of the DIP Agreement, as well as access to Cash Collateral.  Thus, the DIP Agreement provides the Loan Parties with funding needed to operate and maintain their businesses and to pay necessary expenses.  Absent approval of the DIP Orders, the Loan Parties may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest.

29.     The Loan Parties were unsuccessful in their attempts to obtain financing:  (a) as unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy Code; (b) allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; or (c) as secured credit pursuant to section 364(c) of the Bankruptcy Code on more favorable terms from other sources.

52928-001\DOCS_DE:165488.1

Accordingly, pursuant to the terms set forth in the DIP Agreement, the DIP Lenders have agreed to provide the Loan Parties with funding needed to sustain their business operations. In exchange, the DIP Agreement provides the DIP Lenders with reasonable protections under the circumstances.

## I.     <u>Applicable Authority for Approval to Use Cash Collateral</u>

30.     The Loan Parties' use of estate property is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 .S.C. § 363(c)(1).

31.     A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. <u>See</u> 11 U.S.C. § 1107(a).

32.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Loan Parties to use cash collateral as long as the applicable secured creditors are adequately protected. <u>In re Mellor</u>, 734 F.2d 1396, 1400 (9th Cir. 1984); <u>see also</u> <u>In re McCormick</u>, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with respect to "cash collateral," by providing that a debtor may not use, sell or lease "cash collateral" under subsection (c)(1) unless: each entity that has an interest in such collateral consents; or the court, after notice and a hearing,

27

authorizes such use, sale or lease in accordance with the provisions of this section. "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

## II. The Loan Parties Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and (d) of the Bankruptcy Code

33.     As set forth above, the Loan Parties' ability to continue operating their businesses in the ordinary course and complete their financial restructuring hinges upon their ability to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. For the reasons discussed below, the Loan Parties must be able to access postpetition financing on a secured basis pursuant to section 364(c) of the Bankruptcy Code.

34.     Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c). A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the

28

remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

35.     Moreover, pursuant to section 364(d), a court may authorize postpetition credit secured by a senior or equal lien on encumbered property (i.e., a "priming" lien) without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

36.     Where, as here, few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2) of the Bankruptcy Code after notice and a hearing, and upon a showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refusal to grant unsecured loans was sufficient to support conclusion that section 364 requirement was satisfied); In re

29

52928-001\DOCS_DE:165488.1

Ames Dep't Stores, Inc., 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     As described above, the DIP Agreement and DIP Facility was the result of an extensive prepetition marketing process conducted by Lazard. The Loan Parties were unable to obtain more favorable postpetition financing in the form of unsecured credit, an administrative expense or credit secured solely by junior liens on the Loan Parties' assets. Accordingly, the Loan Parties respectfully submit that their efforts to obtain postpetition financing satisfy the standards set forth under section 364(c) and 364(d) of the Bankruptcy Code.

**III.     Provisions To Be Highlighted Pursuant to Local Bankruptcy Rule 4001-2**

38.     Local Rule 4001-2 requires the Loan Parties to highlight certain provisions included in the DIP Agreement and the DIP Orders. The only such provisions under Local Rule 4001-2 included in the DIP Orders and DIP Documents are as follows:

      **a.**     **Subject to entry of the Final Order, a grant to the DIP Lenders of a secured first priority lien on the proceeds of the Loan Parties' avoidance actions arising under sections 544, 545, 547, 548, and 549, as set forth in paragraph 7(a) of the Interim Order;**

      **b.**     **Subject to entry of the Final Order, the waiver of the Loan Parties' right to surcharge the collateral under section 506 of the Bankruptcy Code, as set forth in paragraph 9 of the Interim Order; and**

      **c.**     **Provisions that prime any secured lien without the consent of that lienor.**

39.     These provisions are typically found in debtor in possession financing agreements of this nature, and the DIP Lenders would not have agreed to provide financing to the Loan Parties absent such provisions.

40.     <u>Lien on Avoidance Action Proceeds</u>. The proposed Final Order will provide that the DIP Lenders will be granted a lien on the proceeds of chapter 5 avoidance actions (the

"Avoidance Actions"), but not the actual Avoidance Actions. Courts in this jurisdiction and elsewhere have supported the granting of liens on avoidance action proceeds. See In re Source Interlink Cos., No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (approving the granting of liens on avoidance actions to postpetition lenders); In re Ritz Camera Centers, Inc., No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27, 2009) (same); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (same); In re Silver Cinemas Int'l, Inc., No. 00-1978 (Bankr. D. Del. Aug. 11, 2000) (same); In re Trans World Airlines, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving the granting of liens on avoidance actions to postpetition lenders); In re Movie Gallery, Inc., No. 07-33849 (Bankr. E.D. Va. Nov. 16, 2007) (secured lenders' collateral includes proceeds and property that is the subject of successful avoidance actions); In re NTELOS Inc., No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); In re Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. July 2, 2002) (granting secured lenders liens on avoidance action proceeds); In re AMF Bowling Worldwide, Inc., No. 01-61119 (Bankr. E.D. Va. Aug. 8, 2001) (secured lenders' collateral includes avoidance actions and proceeds); In re Ellingsen MacLean Oil Co., 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989). Accordingly, the Loan Parties believe that granting liens on the proceeds of the Avoidance Actions, subject to entry of the Final Order, is appropriate.[8]

41.    506(c) Waiver. The Interim Order provides that subject to entry of the Final Order, the Loan Parties shall waive their rights under section 506(c) of the Bankruptcy Code.

42.    Section 506(c) of the Bankruptcy Code allows the estate to surcharge the collateral of a secured creditor to pay the reasonable and necessary costs and expenses of

---

[8]    Due to the voluminous nature of the orders referenced herein, such orders are not attached to the Motion. Copies of the orders may be obtained upon request to the Debtors' counsel.

preserving or disposing of such creditor's collateral to the extent of any benefit received. See 11 U.S.C. § 506(c). In connection with the provision of debtor in possession financing, lenders commonly request a waiver of a debtor's ability to surcharge such lender's collateral. Here, the DIP Lenders are lending new money to these estates, thereby benefiting the Loan Parties' estates as a whole. Further, this Court has authorized similar section 506(c) waivers in other instances. See, e.g., In re Lazy Days' R.V. Inc., No. 09-13911 (KG) (Bankr. D. Del. Nov. 6, 2009) (approving 506(c) waiver as part of the debtor in possession financing); In re Source Interlink Cos., No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (same); In re Ritz Camera Centers, Inc., No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27, 2009) (same); In re Tropicana Entm't, LLC, No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (same); In re CMC (formerly Cone Mills Corp., et al.), No. 03-12944 (MFW) (Bankr. D. Del. Oct. 27, 2003) (approving 506(c) waiver as part of debtor in possession financing where debtor was selling all or substantially all of its assets under section 363); In re Pillowtex Corp., No. 03-12339 (PJW) (Bankr. D. Del. Sept. 25, 2003) (same).

43.  Lien Under Section 364(d). The DIP Agreement and Interim Order provide, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all now or hereafter acquired Prepetition Collateral and all proceeds thereof. The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Agent and the Prepetition Secured Lenders (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(a) below)), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition

32

Collateral that were valid and senior to the liens of the Prepetition Agent and the Prepetition Secured.

44.     As described, no prospective third-party lenders were willing to make a loan without either priming the liens of the Prepetition Secured Lenders or without the Loan Parties first having avoided the liens of the Prepetition Secured Lenders.  Accordingly, the Loan Parties agreed to provide the Prepetition Agent (for itself and for the benefit of the Prepetition Secured Lenders) the Adequate Protection Liens to the extent of the Adequate Protection Obligations (if any), subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the DIP Liens, (iii) the Carve Out and (iv) the Lien Avoidance Carve Out.

## IV.     Modification of the Automatic Stay is Warranted

45.     The proposed Interim Order provides that the automatic stay provisions under section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreement, and to take various actions without further order of or application to the Court.  The DIP Agent must, however, provide the Loan Parties and various other parties, including the United States Trustee for the District of Delaware (the "U.S. Trustee"), with three business days' written notice prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.

46.     Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed DIP Orders.

33

## V.  **Interim Approval of $7.5 Million Should be Approved**

47.     It is essential that the Loan Parties immediately stabilize their operations and cash flow, which will maximize the potential for a successful reorganization. Accordingly, the Loan Parties are seeking interim approval to access $7.5 million of the DIP Term Facility to meet their working capital needs, including payments to employees, suppliers, and various governmental taxing and licensing authorities.

48.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

49.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Ames Dep't Stores, 115 B.R. at 36; Simasko, 47 B.R. at 449. Under this standard, the Loan Parties' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. See e.g., In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. Jul. 16, 2008); In re Hilex Poly Holding Co. LLC, Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008) (approving a $150 million postpetition facility and granting first day authorization to refinance a $100 million prepetition facility); In re Holley Performance Prods. Inc., Case No. 08-10256 (PJW) (Bankr. D. Del. Feb. 12, 2008) (approving a $45 million postpetition facility and granting first day authorization to refinance a $40.3 million prepetition facility); In re Remy Worldwide Holdings, Inc., Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007) (approving

34

a $160 million postpetition facility and granting first day authorization to refinance a $158 million prepetition facility); In re Foamex Int'l Inc., Case No. 05-12685 (PJW) (Bankr. D. Del. Sept. 20, 2005) (approving a $325 million postpetition facility and granting first day authorization to refinance all amounts owed under a prepetition facility).

## Request for Final Hearing

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Loan Parties request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than, 25 days following the entry of the Interim Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

## Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the Loan Parties request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Loan Parties have established cause to excuse such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

52.     Notice of the first day hearing on this Motion has been provided to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims; (c) the agent for the proposed postpetition financing agreement; (d) the administrative agent for Local Insight Regatta Holdings, Inc.'s prepetition senior credit facility; (e) the indenture trustee for Local Insight Regatta Holdings, Inc.'s 11% Senior Subordinated Notes due 2017; (f) the *ad hoc* committee of noteholders of Local Insight Regatta Holdings, Inc.'s 11% Senior Subordinated Notes due 2017; (g) Welsh, Carson, Anderson & Stowe; (h) the Banks; (i) the Internal Revenue Service; (j) the Securities and Exchange

Commission; and (k) the Office of the United States Attorney General for the State of Delaware. Following the first day hearing in these cases, the Motion and, any order entered on the Motion, will be given to: (a) the foregoing parties; (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (c) any other persons as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the relief requested, no other or further notice need be provided.

### No Prior Request

53.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein and in the Declaration of Ari Lefkovits in Support of the Motion, attached hereto as **Exhibit C**, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, and Final Order, granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated:  November 18, 2010
        Wilmington, Delaware

Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Curtis A. Hehn (Bar No. 4264)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

- and -

Richard M. Cieri (*pro hac vice* pending)
Christopher J. Marcus (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654-3406
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Proposed Attorneys for the
Debtors and Debtors in Possession