# **EXHIBIT B**

**DIP Agreement**

---

$25,000,000

## CREDIT AND GUARANTEE AGREEMENT

Dated as of November ___, 2010

among

**REGATTA INVESTOR LLC,**
a Debtor and Debtor-in-Possession, as Guarantor,

**LOCAL INSIGHT REGATTA HOLDINGS, INC.,**
a Debtor and Debtor-in-Possession, as Borrower,

**THE OTHER GUARANTORS NAMED HEREIN,**
each a Debtor and Debtor-in-Possession, as Guarantors,

**THE SEVERAL LENDERS FROM TIME TO TIME PARTIES HERETO**

and

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent and as Collateral Agent,

---

**J.P. MORGAN SECURITIES LLC,**
as Sole Arranger and Sole Bookrunner

# TABLE OF CONTENTS

## SECTION 1

### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Definitional Provisions | 25 |
| 1.3 | Accounting Matters | 26 |
| 1.4 | Time References | 26 |

## SECTION 2

### AMOUNT AND TERMS OF COMMITMENTS

| | | |
|---|---|---|
| 2.1 | Commitments | 26 |
| 2.2 | Procedure for Borrowing | 27 |
| 2.3 | Repayment of Loans | 27 |
| 2.4 | [RESERVED] | 27 |
| 2.5 | [RESERVED] | 27 |
| 2.6 | [RESERVED] | 27 |
| 2.7 | [RESERVED] | 27 |
| 2.8 | Repayment of Loans; Evidence of Debt | 27 |
| 2.9 | Commitment Fees, etc. | 28 |
| 2.10 | Termination or Reduction of Commitments | 28 |
| 2.11 | Optional Prepayments | 29 |
| 2.12 | Mandatory Prepayments | 29 |
| 2.13 | Conversion and Continuation Options | 30 |
| 2.14 | Minimum Amounts and Maximum Number of Eurodollar Tranches | 30 |
| 2.15 | Interest Rates and Payment Dates | 31 |
| 2.16 | Computation of Interest and Fees | 31 |
| 2.17 | Inability to Determine Interest Rate | 31 |
| 2.18 | Pro Rata Treatment and Payments | 32 |
| 2.19 | Requirements of Law | 34 |
| 2.20 | Taxes | 35 |
| 2.21 | Indemnity | 38 |

509600-0298-00338-Active.12182817.11

2.22    Illegality .................................................................................................. 38

2.23    Change of Lending Office.......................................................................... 39

2.24    Replacement of Lenders Under Certain Circumstances ............................... 39

2.25    Priority and Liens..................................................................................... 39

2.26    Payment of Obligations ............................................................................ 42

2.27    No Discharge; Survival of Claims ............................................................. 42

2.28    Conflicts .................................................................................................. 42

## SECTION 3

## LETTERS OF CREDIT

3.1    L/C Commitment........................................................................................ 42

3.2    Procedure for Issuance of Letter of Credit ................................................. 43

3.3    Fees and Other Charges............................................................................. 43

3.4    L/C Participations...................................................................................... 43

3.5    Reimbursement Obligation of the Borrower ................................................ 44

3.6    Obligations Absolute................................................................................. 45

3.7    Letter of Credit Payments ......................................................................... 45

3.8    Applications ............................................................................................. 45

3.9    Accounting for Letters of Credit ................................................................ 45

## SECTION 4

## REPRESENTATIONS AND WARRANTIES

4.1    Financial Condition................................................................................... 46

4.2    No Change................................................................................................ 47

4.3    Corporate Existence; Compliance with Law................................................ 47

4.4    Corporate Power; Authorization; Enforceable Obligations .......................... 47

4.5    No Legal Bar, etc. ..................................................................................... 48

4.6    No Material Litigation................................................................................ 48

4.7    No Default................................................................................................ 48

4.8    Ownership of Property; Liens .................................................................... 48

4.9    Intellectual Property.................................................................................. 48

4.10   Taxes ....................................................................................................... 49

4.11   Federal Regulations.................................................................................. 49

4.12   Labor Matters ........................................................................................... 49

4.13 ERISA ...................................................................................... 49

4.14 Investment Company Act; Other Regulations ............................ 50

4.15 Subsidiaries ............................................................................... 50

4.16 Use of Proceeds ......................................................................... 50

4.17 Environmental Matters ............................................................... 51

4.18 Accuracy of Information, etc. ..................................................... 52

4.19 Collateral ................................................................................... 52

4.20 The Orders .................................................................................. 53

4.21 Material Contracts ..................................................................... 53

## SECTION 5

### CONDITIONS PRECEDENT

5.1 Conditions to First Availability Date ......................................... 53

5.2 Conditions to Second Availability Date...................................... 56

5.3 Conditions to Each Extension of Credit...................................... 56

## SECTION 6

### AFFIRMATIVE COVENANTS

6.1 Financial Statements .................................................................. 57

6.2 Certificates; Other Information .................................................. 59

6.3 Payment of Obligations............................................................... 62

6.4 Conduct of Business and Maintenance of Existence, Compliance with Laws, etc........ 63

6.5 Maintenance of Property; Insurance .......................................... 63

6.6 Inspection of Property; Books and Records; Discussions............ 63

6.7 Notices........................................................................................ 64

6.8 Environmental Laws ................................................................... 64

6.9 Update Calls................................................................................ 64

6.10 [Reserved] .................................................................................. 65

6.11 Additional Collateral, etc. .......................................................... 65

6.12 Further Assurances ..................................................................... 66

6.13 Use of Proceeds .......................................................................... 66

6.14 Deposit Accounts ........................................................................ 66

6.15 Post-Closing Covenants .............................................................. 67

## SECTION 7

## NEGATIVE COVENANTS

| 7.1 | Financial Condition Covenants | 67 |
|---|---|---|
| 7.2 | Limitation on Indebtedness | 68 |
| 7.3 | Limitation on Liens | 69 |
| 7.4 | Limitation on Fundamental Changes | 71 |
| 7.5 | Limitation on Disposition of Property | 71 |
| 7.6 | Limitation on Restricted Payments | 72 |
| 7.7 | Limitation on Capital Expenditures | 73 |
| 7.8 | Limitation on Investments | 73 |
| 7.9 | Limitation on Payments and Modifications of Debt Instruments, etc. | 75 |
| 7.10 | Limitation on Transactions with Affiliates | 75 |
| 7.11 | Limitation on Sales and Leasebacks | 75 |
| 7.12 | Limitation on Changes in Fiscal Periods; Amendment of Organizational Documents | 76 |
| 7.13 | Limitation on Negative Pledge Clauses | 76 |
| 7.14 | Limitation on Restrictions on Subsidiary Distributions | 76 |
| 7.15 | Limitation on Lines of Business | 77 |
| 7.16 | Chapter 11 Claims | 78 |

## SECTION 8

## EVENTS OF DEFAULT

| 8.1 | Events of Default | 78 |
|---|---|---|

## SECTION 9

## THE ADMINISTRATIVE AGENT

| 9.1 | Appointment and Authority | 82 |
|---|---|---|
| 9.2 | Nature of Duties | 82 |
| 9.3 | Exculpatory Provisions | 83 |
| 9.4 | Reliance by Administrative Agent and Collateral Agent | 84 |
| 9.5 | Notice of Default | 84 |
| 9.6 | Non-Reliance on Administrative and Other Lenders | 84 |
| 9.7 | Indemnification | 85 |
| 9.8 | Agents in Its Individual Capacity | 85 |

9.9 Successor Administrative Agent or Collateral Agent ..................................................... 85

9.10 Other Agents ......................................................................................................... 86

9.11 Taxes .................................................................................................................... 86

9.12 Collateral and Guaranty Matters ............................................................................ 87

## SECTION 10

## GUARANTEE

10.1 Guarantee .............................................................................................................. 88

10.2 Right of Contribution ............................................................................................. 89

10.3 No Subrogation ...................................................................................................... 89

10.4 Amendments, etc. with Respect to the Obligations .................................................. 89

10.5 Guarantee Absolute and Unconditional ................................................................... 90

10.6 Reinstatement ........................................................................................................ 90

10.7 Payments ............................................................................................................... 91

## SECTION 11

## REMEDIES; APPLICATION OF PROCEEDS

11.1 Remedies; Obtaining the Collateral Upon Default ................................................... 91

11.2 Remedies; Disposition of the Collateral .................................................................. 92

11.3 Application of DIP Proceeds ................................................................................... 92

11.4 WAIVER OF CLAIMS ........................................................................................... 93

11.5 Remedies Cumulative ............................................................................................. 94

11.6 Discontinuance of Proceeding ................................................................................ 94

## SECTION 12

## MISCELLANEOUS

12.1 Amendments and Waivers ...................................................................................... 94

12.2 Notices .................................................................................................................. 97

12.3 Waiver; Cumulative Remedies ................................................................................ 98

12.4 Survival of Representations and Warranties ............................................................ 99

12.5 Payment of Expenses ............................................................................................. 99

12.6 Successors and Assigns; Participations and Assignments ....................................... 100

12.7 Adjustments; Setoff ............................................................................................. 105

12.8 Counterparts ........................................................................................................ 105

| 12.9 | Severability | 106 |
| 12.10 | Integration | 106 |
| 12.11 | GOVERNING LAW | 106 |
| 12.12 | Submission to Jurisdiction; Waivers | 106 |
| 12.13 | Acknowledgments | 107 |
| 12.14 | Confidentiality | 107 |
| 12.15 | Accounting Changes | 108 |
| 12.16 | Subordination of Intercompany Debt | 108 |
| 12.17 | Patriot Act Notice | 108 |
| 12.18 | WAIVERS OF JURY TRIAL | 108 |
| 12.19 | No Fiduciary Duty | 109 |
| 12.20 | Exit Financing | 109 |

509600-0298-00338-Active.12182817.11

SCHEDULES:

| | |
|---|---|
| 1.1A | Mortgaged Properties |
| 1.1B | Commitments |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.6 | Litigation |
| 4.9 | Intellectual Property |
| 4.15 | Subsidiaries |
| 4.19 | UCC Filing Jurisdictions |
| 4.21 | Assumed Contracts |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.5(l) | Asset Dispositions |
| 7.8 | Existing Investments |
| 7.10 | Transactions with Affiliates |
| 7.13 | Restrictions on Negative Pledge Clauses |
| 7.14 | Restrictions on Subsidiary Distributions |

EXHIBITS:

| | |
|---|---|
| A | Form of Assignment and Assumption |
| B | Form of Borrowing Notice |
| C | [Reserved] |
| D | Form of Note |
| E | Form of Interim Order |
| F | Form of Interest Election Request |
| G | Form of U.S. Tax Certificate |

509600-0298-00338-Active.12182817.11

**CREDIT AND GUARANTEE AGREEMENT**, dated as of November __, 2010, among **REGATTA INVESTOR LLC**, a Delaware limited liability company ("Regatta Holdings"), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, **LOCAL INSIGHT REGATTA HOLDINGS, INC.**, a Delaware corporation (the "Borrower"), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, each of the other direct and indirect Domestic Subsidiaries (other than the Borrower) of Regatta Holdings signatory hereto (such Subsidiaries, collectively with Regatta Holdings, the "Guarantors" and, collectively with the Borrower, the "Debtors" and each a "Debtor"), each of which Guarantors is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "Case" and, collectively, the "Cases"), the several banks and other financial institutions as are, or may from time to time become, parties to this Agreement (each a "Lender" and, collectively, the "Lenders"), and **JPMORGAN CHASE BANK, N. A.**, a national banking association, as administrative agent for the Lenders hereunder (in such capacity, the "Administrative Agent") and as collateral agent for the Secured Parties (in such capacity, the "Collateral Agent").

## PRELIMINARY STATEMENTS

On November 17, 2010 (the "Petition Date"), the Debtors filed voluntary petitions with the Bankruptcy Court (such term and other capitalized terms used in these preliminary statements being used with the meanings given to such terms in Section 1.01) initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

Pursuant to this Agreement and the Orders, the Lenders are making available to the Borrower a $25,000,000 debtor-in-possession multi-draw term loan and letter of credit facility (the "Facility").

The proceeds of the Loans will be used as set forth in this Agreement.

To provide guarantees for the repayment of the Loans and the payment of the other Obligations of the Loan Parties hereunder and under the other Loan Documents, the Loan Parties are providing to the Administrative Agent and the Lenders, pursuant to this Agreement, the other Loan Documents and the Orders, the following (each as more fully described herein):

(a)     a guarantee from each of the Debtors other than the Borrower of the due and punctual payment and performance of the Obligations of the Borrower hereunder;

(b)     an allowed administrative expense claim entitled to the benefits of Bankruptcy Code Section 364(c)(1) in each of the Cases, having a superpriority claim over any and all administrative expenses, including as specified in Bankruptcy Code Sections 503(b) or 507(b);

(c)     pursuant to Bankruptcy Code Section 364(c)(2) a perfected first priority (subject to permitted exceptions) Lien on all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable Lien on the Petition Date, excluding, in all cases, with respect to the obligations of Loan Parties under any Loan Document, (x) 35% of the issued and outstanding Capital Stock of any new or existing Foreign Subsidiary (including, for

the avoidance of doubt, 100% of the issued and outstanding Capital Stock of any new or existing Foreign Subsidiary not owned directly by a Debtor) and (y) any Capital Stock of any Subsidiary substantially all of whose assets consist of Equity Interests in one or more Foreign Subsidiaries (any Equity Interests so excluded, collectively, the "Excluded Equity Interests");

(d)     pursuant to Bankruptcy Code Section 364(c)(3) a perfected junior Lien on all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable Lien on the Petition Date (other than Liens securing the Debtors' Prepetition Obligations and Liens that are junior to the Liens securing the Debtors' Prepetition Obligations) or a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, excluding, in all cases, any Excluded Equity Interests;

(e)     pursuant to Bankruptcy Code Section 364(d)(1) a perfected first priority (subject to permitted exceptions), senior priming Lien on (x) all present and after-acquired property of the Debtors that is subject to a Lien on or after the Petition Date to secure the Debtors' Prepetition Obligations, excluding, in all cases, the Excluded Equity Interests, (y) all present and after-acquired assets that are presently subject to Liens that are junior to the Liens that secure the Debtors' Prepetition Obligations, excluding, in all cases, any Excluded Equity Interests and (z) the Liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations;

(f)     it being understood and agreed that, to the extent any Liens created prior to the Petition Date on any Collateral are avoided, such Collateral will be automatically subject to the first priority Liens securing the Obligations; and

(g) the foregoing Liens and superpriority claims shall be subject and subordinate to the Carve Out and the Lien Avoidance Carveout.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1

## DEFINITIONS

1.1     **Defined Terms**. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Accounting Change": as defined in Section 12.15.

"Administrative Agent":  as defined in the preamble hereto.

"Administrative Questionnaire":  an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or

more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement": this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Margin": a percentage per annum equal to (a) 4.0% with respect to Base Rate Loans and (b) 5.0% with respect to Eurodollar Loans.

"Application": an application, in such form as the Issuing Lender may specify from time to time, requesting the Issuing Lender to issue a Letter of Credit.

"Asset Sale": any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (a), (b), (c), (g), (h), (i), (j) or (k) of Section 7.5).

"Assignee": as defined in Section 12.6(c).

"Assignment and Assumption": an assignment and assumption entered into by a Lender and an Assignee (with the consent of any party whose consent is required by Section 12.6), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignor": as defined in Section 12.6(c).

"Assumption Agreement": a joinder agreement to the Security Agreement executed and delivered by a new Subsidiary Guarantor in accordance with the provisions of Section 6.11(c).

"Available Commitment": with respect to any Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Commitment then in effect over (b) such Lender's Extensions of Credit then outstanding.

"Bankruptcy Code": the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"Bankruptcy Court": the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Cases from time to time.

"Base Rate": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, (c) the Eurodollar Rate for a Eurodollar Loan with a one month Interest Period plus 1% and (d) 4.00%. For purposes hereof, "Prime Rate" shall mean the prime commercial lending rate of the Administrative Agent as publicly announced from time to time by the Administrative Agent as its "prime rate." The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds

Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"Base Rate Loans": Loans for which the applicable rate of interest is based upon the Base Rate.

"Benefited Lender": as defined in Section 12.7(a).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrowing": Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Borrowing Notice": with respect to any request for a borrowing of Loans hereunder, a notice from the Borrower, substantially in the form of, and containing the information prescribed by, Exhibit B, delivered to the Administrative Agent.

"Budget": the consolidated forecasts of the consolidated income statement, cash flows and [(beginning in the first fiscal quarter in 2011) balance sheet] of the Borrower and its Subsidiaries for each fiscal quarter, beginning with fiscal quarter ending December 31, 2010 and ending with the fiscal quarter ending December 31, 2011, including the material assumptions on which such forecasts were based (including, but not limited to, future cost reduction initiatives).

"Business Day": (a) for all purposes other than as covered by clause (b) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Capital Expenditures": for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets, software or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations": with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP;

509600-0298-00338-Active.12182817.11

and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests (including limited liability company interests) in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve Out": as defined in Section 2.25(a).

"Case": as defined in the introductory paragraph to this Agreement.

"Cash Collateral": as defined in Section 363(a) of the Bankruptcy Code.

"Cash Collateral Agreement": the Cash Collateral Agreement to be executed and delivered by the Borrower and the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"Cash Equivalents": (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States (or, in the case of a Foreign Subsidiary, a foreign governmental obligor of the national government in which such Foreign Subsidiary is based), in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof (or, in the case of a Foreign Subsidiary, a foreign governmental obligor of the national government in which such Foreign Subsidiary is based) having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest at least 90% of their assets in those satisfying the requirements of clauses (a) through (f) of this definition.

509600-0298-00338-Active.12182817.11

"Change of Control": the occurrence of any of the following events: (i) the Permitted Investors shall cease to own, directly or indirectly, more than 50% of the amount of voting interests in the outstanding Capital Stock of Borrower; (ii) the Permitted Investors shall cease to have the power (whether or not exercised), directly or indirectly, to elect a Voting Majority of the board of directors (or similar governing body) of Borrower; (iii) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as in effect on the date hereof) (other than the Permitted Investors), of Capital Stock representing more than 25% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of Borrower; or (iv) Regatta Holdings shall cease to own and control, beneficially, 100% of each class of outstanding Capital Stock of the Borrower and of each other Person included within the definition of "Holdings" free of Liens (other than Liens created by the Loan Documents and the Orders and Liens securing the Prepetition Obligations and adequate protection Liens granted in connection therewith); or (v) any Person other than Holdings shall own any Capital Stock of the Borrower. For purposes of the foregoing, a "Voting Majority" means members of the board of directors (or similar governing body) of Borrower entitled to cast a majority of the votes to be cast by all members of the board (or similar governing body).

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied (or waived by the Administrative Agent).

"CMI Management Agreement": the management services agreement, dated as of January 3, 2007, between LIMI and Caribe Media, Inc., as amended, supplemented or otherwise modified as of the date hereof.

["CMI Management Fee": fees received by LIMI under the CMI Management Agreement.]

"Code": the United States Internal Revenue Code of 1986, as amended.

"Collateral": all property of the Loan Parties, now or hereafter acquired, as more particularly described and referred to as "DIP Collateral" in the Orders, and shall include any property upon which a Lien is purported to be created by this Agreement, any Security Document, the Orders or any additional orders of the Bankruptcy Court under the Cases (but shall exclude the Lien Avoidance Carveout and any Excluded Equity Interests).

"Collateral Agent": as defined in the preamble hereto.

"Commitment": as to any Lender, the obligation of such Lender, if any, to make Loans to the Borrower and participate in Letters of Credit hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 1.1B under the caption "Commitment" or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Commitments as of the Closing Date is $25,000,000. Each Lender's Commitment shall be permanently reduced by the amount of Loans made by such Lender. Each Lender's Commitment at anytime shall be deemed

utilized (but not reduced) by an amount equal to such Lender's Commitment Percentage of the L/C Obligation then outstanding.

"Commitment Fee":  as defined in Section 2.9(a).

"Commitment Fee Rate":  0.75% per annum.

"Commitment Percentage":  as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the Total Commitments (or at any time after the Commitments shall have expired or terminated, the percentage which the aggregate amount of such Lender's Extension of Credit then outstanding constitutes of the Total Extension of Credit than outstanding).

"Commitment Period":  the period from and including the Closing Date to but not including the Termination Date.

"Committee":  as defined in Section 2.25(a).

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower or any Subsidiary within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower or any Subsidiary and that is treated as a single employer under Section 414(b) or (c) of the Code.

"Consolidated Cash Receipts":  for any period, all amounts received in cash or cash equivalents by the Borrower and its Subsidiaries in such period (other than proceeds of Indebtedness and Capital Stock).

"Consolidated Operating Cash Flow":  for any period (a) Consolidated Cash Receipts less (b) the aggregate amounts paid in cash or cash equivalents (including payments made to or for the benefit of LIMI) by the Borrower and its Subsidiaries for such period (other than Capital Expenditures, Restructuring Professional Fees and Facility Fees), in each case in this clause (b) paid in cash or cash equivalents for such period.

"Continuing Directors":  the directors of Borrower on the Closing Date and each other director of Borrower, if, in each case, such other director's nomination for election to the board of directors of Borrower is recommended by at least a majority of the then Continuing Directors or such other director was nominated or appointed by a Permitted Investor in his or her election to the board of directors of Borrower.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Investment Affiliate":  as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person or other Person identified in clause (a) above primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct

or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Debtor": as defined in the introductory paragraph to this Agreement.

"Debtor Relief Laws": the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default": any of the events specified in Section 8, which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Section 8, would, unless cured or waived, become an Event of Default.

"Defaulting Lender": any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless subsequently cured, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless subsequently cured or (c) has become the subject of a bankruptcy or insolvency proceeding.

"Disposition": with respect to any Property, any sale, lease, sale and leaseback, assignment (other than an assignment for security), conveyance, transfer or other disposition thereof, and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$": lawful currency of the United States of America.

"Domestic Subsidiary": any Subsidiary that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia and that is a not a Foreign Subsidiary.

"Effective Date": the effective date of the Reorganization Plan.

"Environment": ambient air, indoor air, surface water, groundwater, land and subsurface strata and natural resources such as wetlands, flora and fauna.

"Environmental Laws": any and all applicable laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including, without limitation, common law) of any international authority, foreign government, the United States, or any state, commonwealth, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution or protection of the Environment, or of human health (to the extent relating to exposure to Materials of Environmental Concern), or employee health and safety, as has been, is now, or may at any time hereafter be, in effect.

"Environmental Permits": any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

- 8 -

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day, the aggregate (without duplication) of the maximum rates (expressed as a decimal) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR01 as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Reuters Screen LIBOR01, the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent.

"Eurodollar Loans": Loans for which the applicable rate of interest is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period, a rate per annum equal to the greater of (i) 3.00% and (ii) the rate determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche": the collective reference to Eurodollar Loans, the then current Interest Periods of all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Interest": any interest imposed by a relevant taxing authority in excess of underpayment rate described under Section 6621(a)(2) of the Code or similar provisions under the state or local tax laws.

"Excess Net Cash Proceeds": as defined in Section 2.12(b).

"Excluded Equity Interests": as defined in the preliminary statements to this Agreement.

"Excluded Taxes": with respect to any payment made by any Loan Party under any Loan Document, any of the following Taxes imposed on or with respect to a Recipient: (a)

income or franchise Taxes imposed on (or measured by) net income by the United States of America, or by the jurisdiction under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Taxes imposed by any other jurisdiction in which the Borrower is located, (c) with respect to any Lender (other than an assignee pursuant to a request by the Borrower under Section 2.24), any U.S. Federal withholding Taxes (i) resulting from any Requirement of Law in effect (including FATCA) on the date such Lender becomes a party to this Agreement (or designates a new lending office) or (ii) that are attributable to such Lender's failure to comply with Section 2.20(e), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Taxes pursuant to Section 2.20(a) and (d) Other Connection Taxes.

"Extension of Credit": as to any Lender at any time, an amount equal to (a) the aggregate principal amount of all Loans made by such Lender than outstanding and (b) such Lender's Commitment Percentage of the L/C Obligations than outstanding.

"Facility": the Commitments and the Loans made thereunder.

"Facility Fees": all interest, commitment fees and letter of credit fees paid under this Agreement and all upfront fees and Administrative Agent fees paid in connection with this Agreement.

"Facility L/C Cash Collateral": the Cash Collateral delivered to the Administrative Agent pursuant to Section 5.3.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement and any future regulations or official interpretations thereof.

"Fee Letters": the Fee Letters dated November 12, 2010 executed by the Borrower in connection with the Facility.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Final Order": an order of the Bankruptcy Court entered in the Cases, in substantially the form of the Interim Order, with such modifications thereto as are in form and substance reasonably satisfactory to the Debtors and the Administrative Agent and (to the extent of any material changes from the Interim Order) the Required Lenders.

"Final Order Entry Date": the date the Final Order is entered in the Cases.

"Financial Condition Covenant": each covenant set forth in Section 7.1.

"First Availability Date": the first date following the Closing Date that the conditions precedent set forth in Sections 5.1 and 5.3 shall have been satisfied (or waived in accordance with Section 12.1) (which in no event shall be more than five (5) Business Days following the Interim Order Entry Date (or such later date as the Administrative Agent may agree in its sole discretion)).

"Foreign Subsidiary": (a) any direct or indirect Subsidiary of a Person which is (i) organized under the laws of a Non-U.S. Jurisdiction and (ii) a controlled foreign corporation within the meaning of Section 957(a) of the Code (a "CFC") or a Subsidiary of a CFC and (b) any Subsidiary that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia, if all of its material assets consist of stock in entities described in clause (a).

"FTI": FTI Consulting, Inc., a Maryland corporation.

"Funded Debt": with respect to any Person, all Indebtedness of such Person of the types described in clauses (a) through (e) of the definition of "Indebtedness" in this Section.

"Funding Office": the office specified from time to time by the Administrative Agent as its funding office by notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Granting Lender": as defined in Section 12.6(g).

"Group Members": the collective reference to Regatta Holdings and its Subsidiaries.

"Guarantee": the guarantee by each Guarantor set forth in Section 10.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of

509600-0298-00338-Active.12182817.11

the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors": the Subsidiary Guarantors and Holdings, collectively.

"Hedge Agreements": as to any Person, all interest rate swaps, currency exchange agreements, commodity swaps, caps or collar agreements or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates or commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies. For avoidance of doubt, Hedge Agreements shall include any interest rate swap or similar agreement that provides for the payment by the Borrower or any of its Subsidiaries of amounts based upon a floating rate in exchange for receipt by the Borrower or such Subsidiary of amounts based upon a fixed rate.

"Holdings": the collective reference to (i) Regatta Holdings and (ii) Regatta Holdings I LP, Regatta Holdings II LP and Regatta Holdings III LP and each general partner of any thereof.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than (i) trade payables and accrued expenses incurred in the ordinary course of business, (ii) any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person and (iii) liabilities resulting from the application of FAS150), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities in respect of obligations of the kind referred to in clauses (a) through (e), (g) and (h) of this definition, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person prior to 6 months after the Maturity Date, (h) the liquidation value of all preferred Capital Stock of any Subsidiary of such Person; provided that this clause (h) shall not apply to preferred Capital Stock issued by any Subsidiary to the Borrower or any Subsidiary Guarantor, and (i) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (h) above,

(j) all obligations of the kind referred to in clauses (a) through (h) above secured by (or which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation; <u>provided</u> that, if such Person has not assumed or become liable for the payment of such obligation, the amount of such Indebtedness shall be limited to the lesser of (i) the principal amount of the obligations being secured and (ii) the fair market value of the encumbered Property, (k) all obligations of such Person in respect of Hedge Agreements and (l) all Indebtedness of any partnership, unlimited liability company or unincorporated joint venture in which such Person is a general partner, member or a joint venturer, respectively.

"<u>Indemnified Liabilities</u>":  as defined in Section 12.5.

"<u>Indemnified Taxes</u>": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by any Loan Party under any Loan Document and (b) Other Taxes.

"<u>Indemnitee</u>":  as defined in Section 12.5.

"<u>Initial 26-Week Cash Flow Forecast</u>":  a 26-week cash flow projection of the Borrower and its Subsidiaries covering the 26-week period ending May [7], 2011, which shall be in form reasonably satisfactory to the Initial Lenders and certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such cash flow forecast which is false or misleading in any material respect or (y) any omission of information which causes such cash flow forecast to be false or misleading in any material respect (it being understood and agreed that any forecasts contained in the Initial 26-Week Cash Flow Forecast is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that such forecasts will be realized and that the Initial 26-Week Cash Flow Forecast is not a guarantee of financial performance and actual results may differ from the Initial 26-Week Cash Flow Forecast and such differences may be material). [FINAL VERSION TO BE AGREED]

"<u>Initial Lenders</u>":  JPMorgan Chase Bank, N.A. and GSO Capital Partners LP or any of their Affiliates.

"<u>Initial Lender Exposure</u>":  as to Initial Lenders at any time, the percentage which such Initial Lenders' aggregate Commitments then constitutes of the Total Commitments (or at any time after the Commitments shall have expired or terminated, the percentage which the aggregate amount of the Initial Lenders' Extensions of Credit then outstanding constitutes of the Total Extensions of Credit then outstanding).

"<u>Insolvency</u>":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"<u>Insolvent</u>":  pertaining to a condition of Insolvency.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, patents, trademarks, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Debt": as defined in Section 12.16.

"Interest Election Request": a request by the Borrower to convert or continue a borrowing of Loans or a borrowing of Loans in accordance with Section 2.13(a), substantially in the form of Exhibit F.

"Interest Payment Date": (a) as to any Base Rate Loan, commencing on December 31, 2010, the last day of each calendar month to occur while such Loan is outstanding and the final maturity date of such Loan and (b) as to any Eurodollar Loan, the last day of each consecutive 30 day period running from the commencement of the Interest Period applicable to such Loan and the last day of such Interest Period.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto or such other period that is three months or less as requested by the Borrower and consented to by all of the Lenders; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto or such other period that is three months or less as requested by the Borrower and consented to by all of the Lenders; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(1)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(2)     any Interest Period that would otherwise extend beyond the Maturity Date or beyond the date final payment is due on any Loans, as the case may be, shall end on the Maturity Date or such due date, as applicable; and

(3)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

509600-0298-00338-Active.12182817.11

"Interim Order": an order of the Bankruptcy Court entered in the Cases granting interim approval of the transactions involving the Debtors contemplated by this Agreement and the other Loan Documents and granting the Liens on the Collateral and the Superpriority Claims described in the preliminary statements to this Agreement in favor of the Administrative Agent and the Lenders, substantially in the form of Exhibit H hereto, and otherwise in form and substance reasonably satisfactory to the Debtors and to the Administrative Agent and (to the extent of any material changes from Exhibit E) the Required Lenders.

"Interim Order Entry Date": the date the Interim Order is entered in the Cases.

"Investments": as defined in Section 7.8.

"IRS": the United States Internal Revenue Service.

"Issuing Lender": JPMCB, in its capacity as issuer of Letters of Credit hereunder. The Issuing Lender may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Lender, in which case the term "Issuing Lender" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"JPMCB": JPMorgan Chase Bank, N.A., together with its successors and/or assigns.

"Junior Financing": as defined in Section 7.9.

"Junior Financing Documentation": any documentation governing any Junior Financing.

"L/C Cash Collateral": the Facility L/C Cash Collateral.

"L/C Commitment": $5,000,000.

"L/C Fee Payment Date": the last Business Day of each calendar month and the last day of the Commitment Period.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": with respect to any Letter of Credit, the collective reference to all the Lenders other than the Issuing Lender.

"Lead Bookrunner": J.P. Morgan Securities LLC, acting in its capacity as sole bookrunner for the Facility.

"Lead Arranger": J.P. Morgan Securities LLC, acting in its capacity as sole arranger for the Facility.

509600-0298-00338-Active.12182817.11

"**Lenders**": as defined in the preamble hereto.

"**Letters of Credit**": as defined in Section 3.1(a).

"**LIBOR**": London Interbank Offered Rate for the corresponding deposits of U.S. dollars.

"**Lien**": any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including, without limitation, any conditional sale or other title retention agreement and any capital lease). For the avoidance of doubt, "Lien" shall not be deemed to include any license or sublicense of Intellectual Property.

"**Lien Avoidance Carveout**": as defined in Section 2.25.

"**LIMI**": Local Insight Media, Inc., a Delaware corporation.

"**Liquidity**": on any date of determination (a) the sum, without duplication, of (i) the cash and Cash Equivalents which are not subject to any Liens (other than Liens permitted pursuant to Section 7.3(h) or (o)) held by the Borrower and its Subsidiaries on such date plus (ii) the aggregate Available Commitments on such date (provided that such amount shall be deemed to be zero if a Default or Event of Default has occurred and is continuing on such date) less, to the extent included in clause (a) above, (b) the sum, without duplication, of (i) the aggregate amount of cash and Cash Equivalents held as Cash Collateral for the Letters of Credit pursuant to Section 5.3 and the Cash Collateral Agreement and (ii) the Lien Avoidance Carveout.

"**Loan**": any loan made by any Lender pursuant to this Agreement.

"**Loan Documents**": this Agreement, the Fee Letters, the Security Documents, the Notes, the Letters of Credit, any Assumption Agreement and all other agreements, documents, certificates and instruments executed and delivered to the Administrative Agent or any Lender in their capacity as such by any Loan Party in connection therewith.

"**Loan Parties**": the Borrower and each Guarantor and each of their respective Subsidiaries.

"**Material Adverse Effect**": a material adverse effect on (a) the business, assets, property or financial condition of the Borrower and its Subsidiaries taken as a whole (other than (i) any events leading up to the filing of the Cases disclosed to the Lenders, (ii) the filing of the Cases and (iii) those events which customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and other events ancillary thereto), (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder or (c) the ability of the Loan Parties to perform any of their material payment obligations under the Loan Documents.

"Material Environmental Amount": an amount or amounts payable by the Borrower and/or any of its Subsidiaries, that are in the aggregate in excess of $2,500,000 for costs to comply with any Environmental Law; costs of any investigation, and any remediation, of any Material of Environmental Concern; and compensatory damages (including, without limitation, damages to natural resources, punitive damages, fines, and penalties) pursuant to any Environmental Law.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, mold, radioactivity, and any other substances, materials, chemicals, wastes, compounds or constituents in any form that are regulated pursuant to or would give rise to liability under any Environmental Law.

"Maturity Date": the first anniversary of the Closing Date.

"Moody's": Moody's Investors Service, Inc.

"Mortgaged Properties": the real properties listed on Schedule 1.1A, as to which the Collateral Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages or the Orders.

"Mortgages": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, in a form to be reasonably agreed by the Collateral Agent and the Borrower, as the same may be amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan": a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, any Subsidiary or any Commonly Controlled Entity is obligated to contribute.

"Net Cash Proceeds": (a) in connection with any Asset Sale or Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of attorneys' fees, accountants' fees, investment banking fees, amounts provided as a reserve, in accordance with GAAP, or held in escrow (in each case, provided that, to the extent and at the time any such proceeds are released from such reserve, such amounts shall constitute Net Cash Proceeds), amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien securing the Obligations or which is junior to the Liens securing the Obligations) but only to the extent the holders of such Indebtedness are not required to turn over any such proceeds to any or all of the Lenders and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions during current period and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock, debt securities or instruments, the incurrence of loans or any capital contribution, the cash proceeds received from such issuance,

sale, incurrence or contribution, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-U.S. Lender":  a Lender that is not a U.S. Person.

"Note":  any promissory note evidencing any Loan.

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations) the Loans, the Reimbursement Obligations and all other obligations and liabilities of each Loan Party to the Administrative Agent, the Collateral Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Letters of Credit or any other Loan Document, or the Orders, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent, the Collateral Agent or to any Lender that are required to be paid by any Loan Party pursuant hereto or the Orders) or otherwise.

"Orders": the collective reference to the Interim Order and the Final Order.

"Other Connection Taxes":  with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising solely from such Recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Document, sold or assigned an interest in any Loan Document pursuant to Section 2.24 of this Agreement, or changed its lending office pursuant to Section 2.23).

"Other Taxes":  any present or future stamp, court, documentary, intangible, recording, filing or similar excise or property Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the registration, receipt or perfection of a security interest under, or otherwise with respect to this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment under Section 2.24).

"Participant":  as defined in Section 12.6(b).

"Participant Register":  as defined in Section 12.6(b).

"Patriot Act":  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Payment Amount":  as defined in Section 3.5.

"Payment Office":  the office specified from time to time by the Administrative Agent as its payment office by notice to the Borrower and the Lenders.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Investors":  the collective reference to the Welsh Parties and their Control Investment Affiliates.

"Permitted LIMI Expenses":  expenses incurred in the ordinary course of business by LIMI for management and other services and investments related thereto, including without limitation, for marketing, advertising, promotions and Capital Expenditures, for personnel expenses, professional fees, contract labor, travel and entertainment, information technology, facilities and office expenses and insurance[, in any event not to exceed $300,000 for any such expenses incurred prior to the Petition Date].

"Permitted LIMI Payment Amount":  calculated on a trailing two-week basis, the sum of Permitted LIMI Expenses [less the sum of (a) the WBS Management Fee and (b) the CMI Management Fee]; provided that, notwithstanding anything in this Agreement to the contrary, the aggregate amount of the [WBS Management Fee and CMI Management Fee] shall [not] be [less than] $5,000,000 on an annual basis (assumed to be paid in equal bi-weekly installments).]

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the preliminary statements to this Agreement.

"Plan":  at a particular time, any employee benefit plan (other than a "multiemployer plan," as defined in Section 3(37) of ERISA) that is covered by ERISA and in respect of which the Borrower, any Subsidiary or, solely with respect to an employee benefit plan subject to  Title IV of ERISA or the minimum funding standards of Section 412 of the Code, a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Stock":  as defined in the Security Agreement.

"Prepetition Agent":  JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Prepetition Lenders.

"Prepetition Cash Management Agreement":  the "Cash Management Agreement" (as defined in the Prepetition Credit Agreement) existing on the Petition Date.

"Prepetition Credit Agreement":  the Credit Agreement, dated as of April 23, 2008, among Holdings, the Borrower, the lenders and agents party thereto and JPMorgan Chase

Bank, N.A., as administrative agent, as amended, supplemented, waived or otherwise modified from time to time.

"Prepetition Hedge Agreements": the "Hedge Agreements" (as defined in the Prepetition Credit Agreement) existing on the Petition Date.

"Prepetition Lenders": the several banks and other financial institutions and entities from time to time parties to the Prepetition Credit Agreement.

"Prepetition Letters of Credit": the "Letters of Credit" (as defined in the Prepetition Credit Agreement) outstanding under the Prepetition Credit Agreement on the Petition Date.

"Prepetition Loan Documents": the Prepetition Credit Agreement, the Loan Documents (as defined in the Prepetition Credit Agreement), the Prepetition Hedge Agreements and the Notes (as defined in the Prepetition Credit Agreement) and any amendment, waiver, supplement or other modification to any of the foregoing.

"Prepetition Obligations": all of the Group Members' obligations incurred under, pursuant to or in connection with the Prepetition Credit Agreement, the Prepetition Hedge Agreements, the Prepetition Cash Management Agreements and all of the collateral and ancillary documents executed and delivered in connection therewith.

"Prepetition Secured Parties": the Prepetition Agent, the Prepetition Lenders and any other holder of Prepetition Obligations and any "Secured Parties" (as defined in the Guarantee and Collateral Agreement described in the Prepetition Credit Agreement).

"Prime Rate": as defined in the definition of "Base Rate".

"Prohibited Claim": other than the Avoidance Action Default, any action or objection with respect to (a) claims of the Prepetition Secured Parties against the Debtors or any or all of the Liens which secure the Prepetition Obligations or the status of the Prepetition Obligations as Senior Indebtedness (as defined in the Senior Subordinated Note Indenture), (b) the Superpriority Claims or Liens granted to the Administrative Agent and the Lenders pursuant to Section 2.25(a) and (b), or (c) the Superpriority Claims or Liens granted to the Prepetition Secured Parties pursuant to 2.25(c).

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"Recipient": as applicable, (a) the Administrative Agent, (b) any Lender and (c) the Issuing Lender.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"Regatta Holdings": as defined in the preamble hereto.

"Register": as defined in Section 12.6(d).

"Regulation S-X": Regulation S-X promulgated under the Securities Act.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Regulation X": Regulation X of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse the Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit issued by the Issuing Lender.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by the Borrower or any of its Subsidiaries in connection therewith that are not applied to prepay the Loans pursuant to Section 2.12(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer stating that (i) in the case of an Asset Sale, no Default or Event of Default has occurred and is continuing and (ii) in the case of a Recovery Event, no Event of Default has occurred and is continuing, and, in each case, that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use (or enter into a binding agreement to use) all or a specified portion of the Excess Net Cash Proceeds of an Asset Sale or Recovery Event to acquire (or restore) assets necessary, used or useful in its business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire (or restore) assets necessary, used or useful in the Borrower's business or otherwise permitted in the definition of Reinvestment Notice.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (a) the date occurring 180 days after the receipt of the Net Cash Proceeds in respect of such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or restore assets necessary, used or useful in the Borrower's business or otherwise specified in the Reinvestment Notice, with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Fund": with respect to any Lender, any fund that (x) makes, purchases, holds or otherwise invests in commercial loans and similar extensions of credit and (y) is managed or advised by the same investment advisor as such Lender or an Affiliate of such investment advisor, by such Lender or by an Affiliate of such Lender.

"Related Parties":  with respect to any Person, such Person's Affiliates and the partners, directors, officers, agents, advisors, successors and permitted assigns of such Person and of such Person's Affiliates (such a Related Party not to be deemed a Related Party solely by virtue of being an Assignee or a Participant with respect to a Loan or Commitment under Section 12.6).

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reorganization Plan": a plan of reorganization in the Cases with respect to one or more of the Loan Parties.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty-day notice period is waived.

"Required Lenders": the Initial Lenders so long as the Initial Lender Exposure is greater or equal to 75%.  If the Initial Lender Exposure is less than 75%, the "Required Lenders" shall mean at any time the holders of more than 50% of Total Commitments then in effect or, if the Commitments have been terminated, the Total Extensions of Credit then outstanding; provided that (x) the Extensions of Credit held by, and the unused Commitments of, any Lender that is a Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders for so long as such Lender shall remain a Defaulting Lender.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and Bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer":  the chief executive officer, president or chief financial officer of the Borrower, but in any event, with respect to financial matters, the chief financial officer or director of treasury operations of the Borrower.

"Restricted Payments":  as defined in Section 7.6.

"Restructuring Professional Fees":  professional fees, costs and expenses incurred by persons or firms retained by the Debtor and the Committee (if any) in connection with the Cases.

"S&P":  Standard & Poor's Ratings Services.

"SEC":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Second Availability Date":  the first date following the Final Order Entry Date that the conditions precedent set forth in Sections 5.1, 5.2 and 5.3 shall have been satisfied.

"Secured Parties":  as defined in the Security Agreement.

"Security Agreement": the Security Agreement to be executed and delivered by Regatta Holdings, the Borrower and each Subsidiary Guarantor thereof, in form and substance reasonably satisfactory to the Administrative Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"Security Documents": the collective reference any Mortgages, the Security Agreement, the Cash Collateral Agreement, security agreements, pledge agreements, and all other security documents delivered to the Administrative Agent granting a Lien on any Property of any Person to secure the Obligations of any Loan Party under any Loan Document (including pursuant to Section 2.25(h)). The Security Documents shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"Senior Subordinated Note Documents": collectively, the Senior Subordinated Notes, the Senior Subordinated Note Indenture and all other documents executed and delivered with respect to the Senior Subordinated Notes or the Senior Subordinated Note Indenture.

"Senior Subordinated Note Indenture": any indenture or similar agreement pursuant to which the Senior Subordinated Notes are issued as in effect on the date hereof and thereafter amended from time to time subject to the requirements of this Agreement.

"Senior Subordinated Notes": the Borrower's 11.0% Senior Subordinated Notes due 2017 issued pursuant to the Senior Subordinated Note Indenture in an aggregate principal amount of $210.5 million and any registered notes issued by the Borrower in exchange for, and as contemplated by, such notes with substantially identical terms as such notes.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"SPC": has the meaning specified in Section 12.6(g).

"Spectrum Parties": has the meaning specified in the definition of "Sponsor".

"Sponsor": each of (i) Welsh, Carson, Anderson & Stowe VIII, L.P., a Delaware limited partnership, Welsh, Carson, Anderson & Stowe IX, L.P., a Delaware limited partnership, Welsh Carson, Anderson & Stowe X, L.P., a Delaware limited partnership, WCAS Capital Partners III, L.P., a Delaware limited partnership, WCAS Capital Partners IV, L.P., a Delaware limited partnership, [WCA] Management Corporation, a Delaware corporation, Welsh Carson, LLC, WCAS Management Corporation, a Delaware corporation (collectively, the "Welsh Parties") and (ii) Spectrum Equity Investors III, L.P., SEI III Entrepreneurs' Fund, L.P., Spectrum III Investment Managers' Fund, L.P., Spectrum IV Investment Managers' Fund, L.P., Spectrum Equity Investors IV, L.P., and Spectrum Equity Investors Parallel IV, L.P., and each or their respective affiliates and related investment funds (collectively, the "Spectrum Parties").

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the

management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower. For purposes of the Loan Documents, references to a "Subsidiary" or to "Subsidiaries" shall be deemed to exclude any Unrestricted Subsidiary.

"Subsidiary Guarantor": each Subsidiary of the Borrower (other than any Foreign Subsidiary).

"Superpriority Claim": a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses, including of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"Taxes": any present or future taxes, levies, imposts, duties, assessments, charges, fees, deductions or withholdings (including additions to tax, penalties and interest applicable thereto) imposed by any Governmental Authority.

"Termination Date": the earliest to occur of (a) the Maturity Date, (b) November 23, 2010 (or such later dated as the Administrative Agent and the Required Lenders may agree in their sole discretion) if the Interim Order has not been entered prior thereto, (c) that date that is forty five (45) days (or such later date as the Administrative Agent and the Required Lenders may agree in their sole discretion) after the Petition Date if the Final Order has not been entered prior thereto, (d) the Effective Date and (e) the acceleration of the Loans and, in connection therewith, the termination of the unused Commitments in accordance with the terms hereof.

"Test Date": [the fourth Friday following the Closing Date] and each fourth Friday thereafter.

"Test Period": any period beginning on November 21, 2010 and ending on a Test Date.

"Total Commitments": at any time, the aggregate amount of the Commitments then in effect.

"Total Extension of Credit": at any time, the aggregate amount of the Extension of Credit outstanding at such time.

"Transferee": as defined in Section 12.14.

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"UCC": the Uniform Commercial Code as in effect from time to time in the applicable state or jurisdiction.

"Updated 26-Week Cash Flow Forecast": a 26- week cash flow projection of the Borrower and its Subsidiaries substantially in the form of the Initial 26-Week Cash Flow Forecast which shall be in form and substance reasonably satisfactory to the Administrative

Agent and certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such cash flow forecast which is false or misleading in any material respect or (y) any omission of information which causes such cash flow forecast to be false or misleading in any material respect (it being understood and agreed that any forecasts contained in any Updated 26-Week Cash Flow Forecast is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that such forecasts will be realized and that any Updated 26-Week Cash Flow Forecast is not a guarantee of financial performance and actual results may differ from such Updated 26-Week Cash Flow Forecast and such differences may be material).

"U.S. Person": a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Certificate": as defined in Section 2.20(e)(ii)(D).

"WBS Contracts": the contracts listed under numbers 3, 4, 5 and 6 on Schedule 7.10 hereto.

"WBS Management Agreement": the management agreement, dated as of October 18, 2007, between LIMI and Local Insight Media Finance LLC, ACS Media Finance LLC, CBD Media Finance LLC and HYP Media Finance LLC (by means of joinder dated July 25, 2008), as amended, supplemented or otherwise modified as of the date hereof.

["WBS Management Fee": fees in an amount equal to $3,000,000.]

"Welsh Parties": as defined in the definition of "Sponsor".

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares or other nominal shareholdings as required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withholding Agent": Any Loan Party and the Administrative Agent.

1.2     **Other Definitional Provisions**.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios

- 25 -

referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Regatta Holdings or any of its Subsidiaries at "fair value", as defined therein.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3     **Accounting Matters**.  Subject to Section 12.15 and unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of the Borrower delivered to the Lenders.

The Borrower shall deliver to the Administrative Agent and each Lender at the same time as the delivery of any annual or quarterly financial statements given in accordance with the provisions of Section 6.1(a) or (b), (a) a description in reasonable detail of any Accounting Change, and (b) to the extent practicable, a good faith estimate of the effect such Accounting Change could potentially have on the financial statements.

1.4     **Time References**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## SECTION 2

## AMOUNT AND TERMS OF COMMITMENTS

2.1     **Commitments**.  Subject to the terms and conditions hereof (including Section 5), the Lenders severally agree to make Loans to the Borrower from time to time during the Commitment Period in an aggregate principal amount at any one time outstanding for each Lender which, when added to such Lender's Extensions of Credit then outstanding, does not exceed the amount of such Lender's Commitment; provided that (i) prior to the entry of the Final Order and the satisfaction of the other conditions in Section 5.2 the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued will not exceed $7,500,000, (ii) Loans may not be borrowed on more than four separate Borrowing Dates and (iii) the aggregate amount of Loans made on any Borrowing Date after the First Availability Date shall not exceed $5,850,000.  The Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.13; provided that no Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Termination Date; provided, further, that the Loans made on the each Borrowing Date may only consist of Base Rate Loans.

2.2 **Procedure for Borrowing**. The Borrower may borrow under the Commitments on any Business Day during the Commitment Period; provided that the Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 1:00 P.M. (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of Base Rate Loans). Each borrowing of Loans shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple of $50,000 in excess thereof (or, if the then aggregate Available Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $1,000,000 or a whole multiple of $50,000 in excess thereof. Upon receipt of any such Borrowing Notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof. Each Lender will make its Commitment Percentage of the amount of each borrowing of Loans available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 2:00 P.M. on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent.

2.3 **Repayment of Loans**. The Loans of each Lender shall mature on the Termination Date.

2.4 **[RESERVED]**.

2.5 **[RESERVED]**.

2.6 **[RESERVED]**.

2.7 **[RESERVED]**.

2.8 **Repayment of Loans; Evidence of Debt**.

(a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender, the then unpaid principal amount of each Loan on the Termination Date. The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c) The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 12.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount

of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(c) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)     The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note of the Borrower evidencing any Loans of such Lender, substantially in the forms of Exhibit D (a "Note"), with appropriate insertions as to date and principal amount; provided that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans on the Closing Date.

2.9     **Commitment Fees, etc.**

(a)     The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee ("Commitment Fee") for the period from and including the Closing Date to the last day of the Commitment Period, computed at the Commitment Fee Rate on the average daily amount of the Available Commitment of such Lender during the period for which payment is made, payable monthly in arrears on the last Business Day of each calendar month beginning December 31, 2010 and on the Termination Date, commencing on the first of such dates to occur after the date hereof; provided, that the Borrower shall not be obligated to pay a Commitment Fee to any Defaulting Lender as long as such Lender is a Defaulting Lender.

(b)     The Borrower agrees to pay the fees in the amounts and on the dates set forth in the Fee Letters and from time to time agreed to in writing by the Borrower and the Administrative Agent.

2.10     **Termination or Reduction of Commitments**.  The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Commitments or, from time to time, to reduce the aggregate amount of the Commitments; provided that no such termination or reduction of Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Loans made on the effective date thereof, the aggregate outstanding Exposure would exceed the Total Commitments.  Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.  A notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, or the occurrence of any other event specified therein, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to one Business Day before the specified effective date) if such condition is not satisfied.

2.11 **Optional Prepayments**. The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty (except as otherwise provided herein), upon irrevocable notice delivered to the Administrative Agent at least three Business Days prior thereto in the case of Eurodollar Loans and at least one Business Day prior thereto in the case of Base Rate Loans, which notice shall specify the date and amount of such prepayment and whether such prepayment is of Eurodollar Loans or Base Rate Loans; provided that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $500,000 or a whole multiple of $50,000 in excess thereof; provided further that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, or the occurrence of any other event specified therein, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

2.12 **Mandatory Prepayments**.

(a) Unless the Required Lenders shall otherwise agree, if any Capital Stock or Indebtedness shall be issued or incurred by any Group Member (excluding any Indebtedness incurred in accordance with Section 7.2), then no later than 5 Business Days after such Group Member receives the Net Cash Proceeds therefrom, of such incurrence, the Loans shall be prepaid by an amount equal to 100% of the amount of the Net Cash Proceeds from such issuance or incurrence. The provisions of this Section 2.12(a) do not constitute a consent to the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness not permitted by Section 7.2.

(b) Unless the Required Lenders shall otherwise agree, if on any date any Group Member shall receive Net Cash Proceeds from any Asset Sale or Recovery Event, in each case in excess of $150,000 (the Net Cash Proceeds in excess of such threshold, the "Excess Net Cash Proceeds"), then, unless a Reinvestment Notice shall be delivered in respect thereof, within five Business Days of the date of receipt by such Group Member of such Excess Net Cash Proceeds, the Loans shall be prepaid by an amount equal to the amount of such Excess Net Cash Proceeds; provided that (i) on each Reinvestment Prepayment Date, the Loans shall be prepaid by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event as set forth in Section 2.18(b)(iii); provided further that, notwithstanding the foregoing, the aggregate Net Cash Proceeds that may be excluded from the prepayment of Loans required by this Section 2.12(b) by reinvestment pursuant to this Section 2.12(b) shall not exceed $500,000 in the aggregate during the term of this Agreement for all Asset Sales and Recovery Events (except that, in addition, up to $100,000 in the aggregate from Recovery Events may be reinvested pursuant to the foregoing procedures to replace or repair the affected property). The provisions of this Section 2.12(b) do not constitute a consent to the consummation of any Disposition not permitted by Section 7.5.

- 29 -

(c)     Unless the Required Lenders shall otherwise agree, if on any date any Group Member shall receive any tax refund in cash in the excess of $50,000 (in a single transaction or series of related transactions), then no later than five Business Days after such Group Member receives such refund, the Loans shall be prepaid by an amount equal to 100% of the amount of such refund.

### 2.13     **Conversion and Continuation Options**.

(a)     The Borrower may elect from time to time to convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent an Interest Election Request at least one Business Day prior to the date of such election; provided that any such conversion of Eurodollar Loans may be made only on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent an Interest Election Request at least three Business Days' prior to the date of such election (which notice shall specify the length of the initial Interest Period therefor); provided that no Base Rate Loan may be converted into a Eurodollar Loan in excess of one month (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Required Lenders have, determined in its or their sole discretion not to permit such conversions or (ii) after the date that is one month prior to the Termination Date.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     The Borrower may elect to continue any Eurodollar Loan as such upon the expiration of the then current Interest Period with respect thereto by giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans; provided that no Eurodollar Loan in excess of one month may be continued as such at the end of the applicable Interest Period (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Required Lenders have, determined in its or their sole discretion not to permit such continuations or (ii) after the date that is one month prior to the final scheduled termination or maturity date of the Facility; and provided further that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be converted automatically to Base Rate Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

### 2.14     **Minimum Amounts and Maximum Number of Eurodollar Tranches**.
Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $100,000 in excess thereof and (b) no more than six Eurodollar Tranches shall be outstanding at any one time.

509600-0298-00338-Active.12182817.11

2.15 **Interest Rates and Payment Dates**.

(a)     Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Each Base Rate Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for such day plus the Applicable Margin.

(c)     Upon the occurrence and during the continuance of an Event of Default, (i) the principal amount of each Loan or Reimbursement Obligation (to the extent legally permitted) shall bear interest at a rate per annum that is equal to (x), in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to Base Rate Loans plus 2%, and (ii) any interest payable on any Loan or Reimbursement Obligation or any Commitment Fee or other amount payable hereunder or under any other Loan Document shall bear interest at a rate per annum equal to the rate then applicable to Base Rate Loans plus 2% (or, in the case of any other amounts, the rate then applicable to Base Rate Loans plus 2%), in each case, with respect to clauses (i) and (ii) above, from the date of such Event of Default until such amount is paid in full (after as well as before judgment).

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.16 **Computation of Interest and Fees**.

(a)     Interest, fees, commissions payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans on which interest is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a).

2.17 **Inability to Determine Interest Rate**. If prior to the first day of any Interest Period