(a)     the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)     the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Base Rate Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period with respect thereto, to Base Rate Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Credit Facility to Eurodollar Loans.

## 2.18     **Pro Rata Treatment and Payments**.

(a)     Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any Commitment Fee (other than as provided in Section 2.9(a)) or Letter of Credit fee, and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Commitment Percentages of the Lenders.  Each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then owing to the Lenders.

(b)     Each payment (including any prepayment) of the Loans shall be allocated among the Lenders holding such Loans pro rata based on the principal amount of such Loans held by such Lenders.  Amounts repaid or prepaid on account of the Loans may not be reborrowed.  Each payment in respect of Reimbursement Obligations in respect of any Letter of Credit shall be made to the Issuing Lender.

(c)     Within the parameters set forth in this Section 2.18, the application of any payment of Loans shall be made, first, to Base Rate Loans and, second, to Eurodollar Loans.  Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 2:00 P.M. on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds.  Any payment made by the Borrower after 2:00 P.M. on any

- 32 -

Business Day shall be deemed to have been on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Borrower against any Lender, if and when required to do so pursuant to the terms hereof, which fails to make its share of a borrowing available to the Administrative Agent in accordance with the terms hereof.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

509600-0298-00338-Active.12182817.11

## 2.19 **Requirements of Law**.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(ii)     (ii)     shall impose on such Lender any other condition or expenses, or subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Other Connection Taxes on gross or net income, profits or revenue (including value-added or similar Taxes), (C) Excluded Taxes described in clause (c) of the definition of "Excluded Taxes" and (D) changes in the rate of tax on the overall net income of such Recipient) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing is to increase the cost to such Lender or such other Recipient, by an amount which such Lender or other Recipient deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans (or, in the case of clause (ii) above, any Loan) or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall pay such Lender or such other Recipient, within 15 days of demand by such Lender, any additional amounts necessary to compensate such Lender or such other Recipient for such increased cost or reduced amount receivable. If any Lender or other Recipient becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of materially reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then within 15 days of submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction; provided that the Borrower shall not be required to compensate a Lender pursuant to this paragraph for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower

509600-0298-00338-Active.12182817.11

of such Lender's intention to claim compensation therefor; and provided further that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect.

(c)     A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## 2.20   **Taxes**

(a)     <u>Withholding of Taxes; Gross-Up</u>.  Each payment by any Loan Party under any Loan Document shall be made without withholding for any Taxes, unless such withholding is required by any law.  If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by the Loan Party shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the applicable Recipient receives the amount it would have received had no such withholding been made.

(b)     <u>Payment of Other Taxes by the Borrower.</u>  The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     <u>Evidence of Payments.</u>  As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     <u>Indemnification by the Borrower.</u>  Without duplicating any Loan Party's obligations under clause (a), the Loan Parties shall jointly and severally indemnify each Recipient for any Indemnified Taxes that are paid or payable by such Recipient in connection with any Loan Document (including amounts paid or payable under this Section 2.20(d)) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.20(d) shall be paid within 10 days after the Recipient delivers to any Loan Party a certificate stating the amount of any Indemnified Taxes so paid or payable by such Recipient and describing the basis for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.  Such Recipient shall deliver a copy of such certificate to the Administrative Agent.

(e)     <u>Status of Lenders.</u>

(i)      Any Lender that is entitled to an exemption from, or reduction of, any applicable withholding Tax with respect to any payments under any Loan Document shall

- 35 -

deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without, or at a reduced rate of, withholding. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to any withholding (including backup withholding) or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.20(e)(ii)(A) through (E) below) shall not be required if in the Lender's sole reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense (or, in the case of a change in any Requirement of Law, any incremental material unreimbursed cost or expense) or would materially prejudice the legal position of such Lender. Upon the reasonable request of such Borrower or the Administrative Agent, any Lender shall update any form or certification previously delivered pursuant to this Section 2.20(e). If any form or certification previously delivered pursuant to this Section expires or becomes obsolete or inaccurate in any respect with respect to a Lender, such Lender shall promptly (and in any event within 10 days after such expiration, obsolescence or inaccuracy) notify such Borrower and the Administrative Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii)     Without limiting the generality of the foregoing, if the Borrower is a U.S. Person, any Lender with respect to such Borrower shall, if it is legally eligible to do so, deliver to such Borrower and the Administrative Agent (in such number of copies reasonably requested by such Borrower and the Administrative Agent) on or prior to the date on which such Lender becomes a party hereto, duly completed and executed copies of whichever of the following is applicable:

(A) in the case of a Lender that is a U.S. Person, IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B) in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (1) with respect to payments of interest under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (2) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(C) in the case of a Non-U.S. Lender for whom payments under any Loan Document constitute income that is effectively connected with such Lender's conduct of a trade or business in the United States, IRS Form W-8ECI;

(D) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code both (1) IRS Form W-8BEN and (2) a certificate substantially in the form of Exhibit G (a "U.S. Tax Certificate") to the effect

that such Lender is not (a) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (b) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code (c) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (d) conducting a trade or business in the United States with which the relevant interest payments are effectively connected;

(E) in the case of a Non-U.S. Lender that is not the beneficial owner of payments made under any Loan Document (including a partnership or a participating Lender) (1) an IRS Form W-8IMY on behalf of itself and (2) the relevant forms prescribed in clauses (A), (B), (C), (D) and (F) of this paragraph (f)(ii) that would be required of each such beneficial owner or partner of such partnership if such beneficial owner or partner were a Lender; provided, however, that if the Lender is a partnership and one or more of its partners are claiming the exemption for portfolio interest under Section 881(c) of the Code, such Lender may provide a U.S. Tax Certificate on behalf of such partners; or

(F) any other form prescribed by law as a basis for claiming exemption from, or a reduction of, U.S. Federal withholding Tax together with such supplementary documentation necessary to enable the Borrower or the Administrative Agent to determine the amount of Tax (if any) required by law to be withheld.

(iii)    If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Withholding Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.20(e)(iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including additional amounts paid pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid to such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.20(f), in no event will any indemnified party be required to pay any amount to any indemnifying party

- 37 -

pursuant to this Section 2.20(f) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.20(f) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

(g)     Each party's obligations under this Section 2.20 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

(h)     For purposes of Section 2.20(e) and clause (c) of the definition of "Excluded Taxes", the term "Lender" includes any Issuing Lender (and, if the Administrative Agent ceases to be a Lender or Issuing Lender, the Administrative Agent).

2.21    **Indemnity**. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) failure by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans, after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement on the date specified in any such notice, (b) failure by the Borrower in making any prepayment, after the Borrower has given a notice thereof in accordance with the provisions of this Agreement on the date specified in any such notice or (c) the making of a prepayment or conversion of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender containing a reasonably detailed calculation of such amounts shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.22    **Illegality**. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Base Rate Loans to Eurodollar Loans shall forthwith be canceled and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then

- 38 -

current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

2.23 **Change of Lending Office**. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.19, 2.20(a) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; <u>provided</u> that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and <u>provided, further</u>, that nothing in this Section shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a) or 2.22.

2.24 **Replacement of Lenders Under Certain Circumstances**. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.19 or 2.20 or gives a notice of illegality pursuant to Section 2.22 or (b) is a Defaulting Lender, with a replacement financial institution; <u>provided</u> that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) the replacement financial institution shall purchase, at par, all Loans, including accrued interest thereon, accrued fees and all other amounts owing to such replaced Lender on or prior to the date of replacement, (iv) the Borrower shall be liable to such replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (v) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 12.6 (<u>provided</u> that the Borrower or the replacement financial institution shall pay the registration and processing fee referred to therein), (vii) the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

2.25 **Priority and Liens**.

(a) The Debtors hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Debtors hereunder and under the other Loan Documents, and the obligations of the Debtors pursuant to Section 10, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims in the Cases, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on all Collateral that is otherwise not encumbered by a valid, perfected and non-avoidable Lien as of the Petition Date or a valid Lien perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, excluding claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (it being understood that, notwithstanding such exclusion, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such Lien shall attach to any proceeds thereof),

- 39 -

(iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien upon all Collateral that is subject to (A) valid, perfected and non-avoidable Liens (other than to secure the Debtors' Prepetition Obligations and Liens that are junior to the Liens securing Debtors' Prepetition Obligations) in existence on the Petition Date or valid Liens perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code and (B) other than as provided in clause (iv) below, post-Petition Date Liens permitted hereunder and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority senior priming Lien upon all Collateral (x) that is subject to a Lien or security interest in effect on the Petition Date to secure the Debtors' Prepetition Obligations, (y) that is subject to a Lien granted after the Petition Date to provide adequate protection in respect of the Debtors' Prepetition Obligations or (z) that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Debtors' Prepetition Obligations. It is understood and agreed that to the extent any Liens created prior to the Petition Date on any Collateral are avoided, such Collateral will be automatically subject to the first priority Liens securing the Obligations. The Superiority Claims and the Liens described in clauses (ii) through (iv) are subject and subordinate in each case only to the Carve Out and the Lien Avoidance Carveout.  For purposes hereof, the "Carve Out" shall mean the sum of (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and (B) at any time after the first Business Day after the occurrence and during the continuance of an Event of Default under this Agreement and delivery [hereof] to the United States Trustee and each of the lead counsel for the Debtors and the statutory committee of unsecured creditors (the "Committee") in the Cases (once such Committee is appointed) (the "Carve Out Notice"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms (collectively, the "Professional Persons") retained by the Debtors and the Committee (if any) after the Business Day following delivery of the Carve Out Notice and allowed by the Bankruptcy Court, in an aggregate amount not exceeding $2,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed by the Bankruptcy Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice [__]); provided that (x) except with respect to the Lien Avoidance Carveout (as defined below), the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Administrative Agent, the Lenders, the Prepetition Lenders or the Prepetition Agent, (y) so long as no Event of Default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by Bankruptcy Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code, and (z) nothing in the Orders shall impair the right of any Person to object to any such fees or expenses to be paid by the Debtors' estates.  For the avoidance of doubt and notwithstanding anything to the contrary herein, in the Loan Documents, or in the Prepetition Credit Agreement and related documents and agreements, the Carve Out shall be senior to all liens securing the Obligations, the adequate protection Liens, all claims and any and all other forms of adequate protection, liens or claims securing the Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Lenders.  Upon delivery of a Carve Out Notice, prior to making any distributions, the Loan Parties shall deposit an amount equal to the

Professional Fees incurred and unpaid as of such time, plus an amount equal to the Carve Out Cap in a segregated account to be utilized solely for the payment of Professional Fees, and the Administrative Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders shall not hinder or delay the Loan Parties' compliance with the foregoing deposit requirement. Notwithstanding the foregoing deposit, no portion of the Professional Fees otherwise within the Carve Out shall cease to be within the Carve Out. For purposes hereof, the "<u>Lien Avoidance Carveout</u>" shall mean the amount of $500,000 (subject to increase for cause and approval of the Bankruptcy Court), which sum shall be segregated from the Loan Parties' cash on hand as of the Petition Date. The Lien Avoidance Carveout shall be available only to the Loan Parties in accordance with the provisions of this Agreement and the Orders and only to investigate and, if necessary, prosecute an action to avoid one or more prepetition liens securing the Prepetition Obligations. For the avoidance of doubt and notwithstanding anything to the contrary in the Orders, in the Loan Documents, or in the Prepetition Credit Agreement and related documents and agreements, the Lien Avoidance Carveout shall be senior to all liens securing the Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the Obligations and Prepetition Obligations granted or recognized as valid, including the liens and security interests granted to the Prepetition Lenders.

(b)     As to all Collateral, including without limitation, all cash, Cash Equivalents and real property the title to which is held by any Debtor, or the possession of which is held by any Debtor in the form of a leasehold interest, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Administrative Agent, for the benefit of the Lenders and the other holders of the Obligations, all of the right, title and interest of the Borrower and such Guarantor in all of such Collateral, including without limitation, all cash, Cash Equivalents and owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Borrower and each Guarantor acknowledges that, pursuant to and upon entry of the Orders, the Liens granted in favor of the Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment, subject to the terms and conditions set forth in the Orders. The Borrower and each Guarantor further agrees that (a) the Administrative Agent shall have the rights and remedies set forth in Section 8 and Section 11 and the Orders in respect of the Collateral and (b) if requested by the Administrative Agent, the Borrower and each of the other Debtors shall enter into separate security agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to the Administrative Agent.

(c)     Each Debtor acknowledges and agrees that, pursuant to the terms, and upon the entry, of the Orders, the Prepetition Secured Parties are entitled to, and shall receive, (a) as adequate protection for, and to the extent of, any diminution in the value of the Prepetition Secured Parties' respective interests in their collateral (to the extent of their interests therein), including without limitation, any such diminution resulting from the sale, use or lease by the Loan Parties (or other decline in value) of any of the Prepetition Secured Parties' collateral, including cash collateral, the priming described in Section 2.25(a) above, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, to the extent provided for

- 41 -

under section 507(b) of the Bankruptcy Code (i) a Superpriority Claim junior only to the Carve Out, the Lien Avoidance Carveout and the Superpriority Claim granted to the Administrative Agent and the Lenders in respect of the Obligations; and (ii) a replacement Lien on the Collateral having a priority immediately junior to the priming and other Liens granted in favor of the Administrative Agent and the Lenders hereunder and under the other Loan Documents and the Orders (subject and subordinate to the Carve Out, the Lien Avoidance Carveout and valid and perfected Liens which are senior (after giving effect to the Orders) to the Liens granted to the Administrative Agent and the Lenders pursuant to the Orders); provided that the Bankruptcy Court reserves the right to unwind the protection provided in clauses (i) and (ii), after notice and a hearing, solely in the event that there is a successful challenge by the Loan Parties to the validity, extent, perfection or priority of the Prepetition Secured Parties' prepetition liens and (b) as further adequate protection, the payment on a current basis of the reasonable fees and expenses (including, but not limited to, the reasonable fees and disbursements of counsel (in each relevant jurisdiction) and third-party consultants (including a financial advisor and which may include an additional accounting firm)) incurred by the Prepetition Agent (including any unpaid prepetition fees and expenses). Notwithstanding anything herein to the contrary, such collateral and Liens granted to the Prepetition Secured Parties shall exclude the Facility L/C Cash Collateral.

2.26 **Payment of Obligations**. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations in full in cash without further application to or order of the Bankruptcy Court.

2.27 **No Discharge; Survival of Claims**. Each Debtor agrees that to the extent its Obligations hereunder are not satisfied in full in cash, (a) its Obligations arising hereunder shall not be discharged by the entry of a confirmation order with respect to any Reorganization Plan (and each Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.25 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Section 2.25 shall not be affected in any manner by the entry of a confirmation order with respect to any Reorganization Plan.

2.28 **Conflicts**. To the extent of any conflict between the provisions of this Agreement and provisions contained in the Interim Order (or the Final Order, as applicable), the provisions of the applicable Order shall govern.

# SECTION 3

# LETTERS OF CREDIT

3.1 **L/C Commitment**.

(a) Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Lenders, agrees to issue letters of credit ("Letters of Credit") for the account of the Borrower on any Business Day during the Commitment Period in such form as may be approved from time to time by the Issuing Lender; provided that, after giving effect to

such issuance, (i) the L/C Obligations shall not exceed the L/C Commitment, (ii) the aggregate amount of the Available Commitments shall not be less than zero and (iii) prior to the Second Availability Date the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued shall not exceed $7,500,000. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the first anniversary of the date on which such Letter of Credit is issued.

(b)     The Issuing Lender shall not at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause such Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law.

3.2     **Procedure for Issuance of Letter of Credit**. The Borrower may from time to time request that the Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, with a copy to the Administrative Agent, completed to the satisfaction of the Issuing Lender, and such other certificates, documents and other papers and information as the Issuing Lender may request. Upon receipt of any Application, the Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by the Issuing Lender and the Borrower (but in no event shall the Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto). Promptly after issuance by the Issuing Lender of a Letter of Credit, the Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower. The Issuing Lender shall promptly give notice to the Administrative Agent of the issuance of each Letter of Credit issued by the Issuing Lender (including the amount thereof).

3.3     **Fees and Other Charges**.

(a)     The Borrower will pay a fee on the aggregate drawable amount of all outstanding Letters of Credit at a per annum rate equal to 3.00%, shared ratably among the Lenders in accordance with their respective Loan Percentages and payable monthly in arrears on each L/C Fee Payment Date after the issuance date thereof.

(b)     In addition to the foregoing fees, the Borrower shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

3.4     **L/C Participations**. (a) The Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk, an undivided interest equal to such L/C Participant's Commitment Percentage in each Issuing Lender's obligations and rights under each Letter of Credit issued by such Issuing Lender hereunder and the amount of each draft paid by

such Issuing Lender thereunder. Each L/C Participant unconditionally and irrevocably agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit issued by such Issuing Lender for which such Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to the Administrative Agent, for the account of the Issuing Lender, upon demand at the Administrative Agent's Payment Office (and thereafter the Administrative Agent shall promptly pay to such Issuing Lender) an amount equal to such L/C Participant's Loan Percentage of the amount of such draft, or any part thereof, that is not so reimbursed.

(b)     If any amount required to be paid by any L/C Participant to the Administrative Agent, for the account of the Issuing Lender, pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is paid to the Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to the Administrative Agent, for the account of the Issuing Lender, on demand (and thereafter the Administrative Agent shall promptly pay to the Issuing Lender) an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Administrative Agent, for the account of the Issuing Lender, by such L/C Participant within three Business Days after the date such payment is due, the Administrative Agent on behalf of the Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to Base Rate Loans under the Facility. A certificate of the Administrative Agent submitted on behalf of the Issuing Lender submitted to any L/C Participant with respect to any such amounts owing under this Section 3.4(b) shall be conclusive in the absence of manifest error.

(c)     Whenever, at any time after an Issuing Lender has made payment under any Letter of Credit and has received from the Administrative Agent or any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by the Issuing Lender), or any payment of interest on account thereof, the Issuing Lender will distribute to the Administrative Agent, for the account of such L/C Participant (and thereafter the Administrative Agent shall promptly pay such L/C Participant), its pro rata share thereof, provided, however, that in the event that any such payment received by the Issuing Lender shall be required to be returned by the Issuing Lender, such L/C Participant shall return to the Administrative Agent, for the account of the Issuing Lender (and thereafter the Administrative Agent shall promptly pay to the Issuing Lender), the portion thereof previously distributed to it.

3.5     **Reimbursement Obligation of the Borrower**. The Borrower agrees to reimburse the Issuing Lender, on the next Business Day after such Issuing Lender notifies the Borrower of the date and amount of a draft presented under any Letter of Credit and paid by the Issuing Lender, for the amount of (a) such draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by the Issuing Lender in connection with such payment (the amounts

- 44 -

described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "Payment Amount"). Each such payment shall be made to the Issuing Lender at its address for notices specified herein in lawful money of the United States of America and in immediately available funds. Interest shall be payable on each Payment Amount from the date of the applicable drawing until payment in full at the rate set forth in (i) until the second Business Day following the date of the applicable drawing, Section 2.15(b) and (ii) thereafter, Section 2.15(c). The Borrower authorizes the Administrative Agent and the Issuing Lender to apply the Facility L/C Cash Collateral against any unpaid Reimbursement Obligations, Payment Amounts, and any fee, cost or expense related to the Letters of Credit without further notice to the Loan Parties or order of the Bankruptcy Court.

   3.6 **Obligations Absolute**. The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of the setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with the Issuing Lender that the Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. The Issuing Lender shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Issuing Lender. The Borrower agrees that any action taken or omitted by the Issuing Lender under or in connection with any Letter of Credit issued by it or the related drafts or documents, if done in the absence of gross negligence or willful misconduct and in accordance with the standards or care specified in the UCC shall be binding on the Borrower and shall not result in any liability of the Issuing Lender to the Borrower.

   3.7 **Letter of Credit Payments**. If any draft shall be presented for payment under any Letter of Credit, the Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of the Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit, in addition to any payment obligation expressly provided for in such Letter of Credit issued by the Issuing Lender, shall be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment appear on their face to be in conformity with such Letter of Credit.

   3.8 **Applications**. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

   3.9 **Accounting for Letters of Credit**. In the case of each draft that is paid under any Letter of Credit issued by the Issuing Lender, the Administrative Agent, on behalf of

the Borrower, shall maintain a register in accordance with Section 12.6(d) of the Issuing Lender's entitlement to payments with respect to such Letter of Credit.

## SECTION 4

## REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, the Loan Parties hereby represent and warrant, to the extent required by Sections 5.1, 5.2 and 5.3, to the Administrative Agent and each Lender that:

### 4.1 **Financial Condition**.

(a)     The (i) audited consolidated balance sheets of the Borrower as at December 31, 2008 and December 31, 2009, and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from Deloitte & Touche LLP for fiscal year 2009 and PricewaterhouseCoopers LLP for fiscal year 2008, present fairly in all material respects the consolidated financial condition of the Borrower as at each such date, and (ii) the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. The unaudited consolidated balance sheet of the Borrower as at September 30, 2010, and the related unaudited consolidated statements of income and cash flows for the nine-month period ended on such date, present fairly the consolidated financial condition of the Borrower as at such date, and the consolidated results of its operations and its consolidated cash flows for the nine-month period then ended (subject to normal year-end audit adjustments). All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). Neither the Borrower nor any of its Subsidiaries has any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

(b)     The Loan Parties have disclosed any material assumptions with respect to the Budget and Initial 26-Week Cash Flow Forecast or Updated 26-Week Cash Flow Forecast, as applicable, and affirm that the Budget and the Initial 26-Week Cash Flow Forecast and each Updated 26-Week Cash Flow Forecast, as applicable, were (or in the case of an Updated 26-Week Cash Flow Forecast, will be) prepared in good faith upon assumptions believed to be reasonable at the time made (it being understood and agreed that the projections contained in the Budget and the Initial 26-Week Cash Flow Forecast and each Updated 26-Week Cash Flow Forecast, as applicable, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that the projections contained in the Budget and the Initial 26-Week Cash Flow Forecast and each Updated 26-Week Cash Flow Forecast, as applicable, will be realized, and that the Budget and the Initial 26-Week Cash Flow Forecast and each Updated 26-Week Cash Flow Forecast, as applicable, are not a

509600-0298-00338-Active.12182817.11

guarantee of financial performance and actual results may differ from the Budget and the Initial 26-Week Cash Flow Forecast or Updated 26-Week Cash Flow Forecast, as applicable, and such differences may be material).

4.2 **No Change**. Since September 30, 2010, there has been no event or condition that has had or could reasonably be expected to have a Material Adverse Effect.

4.3 **Corporate Existence; Compliance with Law**. Each Group Member (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, as applicable, (b) subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and to the terms thereof, has the corporate or other organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other entity and in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Requirements of Law except, in the case of any Debtor, to the extent failure to comply therewith is permitted by Chapter 11 of the Bankruptcy Code.

4.4 **Corporate Power; Authorization; Enforceable Obligations**.

(a) Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and to the terms thereof, each Loan Party has the corporate or other organizational power and authority, and the legal right, to make, deliver and perform its obligations under each of the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder.

(b) Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and to the terms thereof, each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the borrowings on the terms and conditions of this Agreement.

(c) No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority (except, in the case of the Debtors, as required under the Bankruptcy Code and applicable state and federal bankruptcy rules), or any other Person is required in connection with the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement or any of the other Loan Documents or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Orders and the Security Documents, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect.

(d) Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and to the terms thereof, each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. Subject, in the

509600-0298-00338-Active.12182817.11

case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms.

4.5 **No Legal Bar, etc.** The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation (except, in the case of any Debtor, in respect of Contractual Obligations entered into prior to the Petition Date) of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents or the Orders) except to the extent any of the foregoing could reasonably be expected to have a Material Adverse Effect.

4.6 **No Material Litigation**. Except as set forth in Schedule 4.6 and other than the Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Loan Party, threatened by or against any Group Member or against any of their respective properties or revenues, including with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, that in any case, could reasonably be expected to have a Material Adverse Effect.

4.7 **No Default**. (a) No Group Member is in default under or with respect to any of its Contractual Obligations (in the case of a Debtor, entered into after the Petition Date) in any respect that could reasonably be expected to have a Material Adverse Effect and (b) no Default or Event of Default has occurred and is continuing.

4.8 **Ownership of Property; Liens**. Each Group Member has good and valid title in fee simple to, or a valid leasehold interest in, all its real Property, and good title to, or a valid leasehold interest in or right to use, all its other material Property, and none of such Property is subject to any Lien except as permitted by Section 7.3, except to the extent any of the foregoing would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

4.9 **Intellectual Property**. Each Group Member owns, or has a valid right to use, all Intellectual Property necessary for the conduct of its business as currently conducted, or currently anticipated by the Borrower to be conducted, except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. Except as set forth in Schedule 4.9 and except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, to any Loan Party's knowledge: (i) no material claim has been asserted against any Group Member and is pending by any Person challenging or questioning the use of any Intellectual Property by any Group Member or the validity or effectiveness of any Intellectual Property owned or licensed by the Borrower or any of its Subsidiaries and (ii) the use of Intellectual Property by the Group Members does not infringe on the rights of any Person in any material respect.

- 48 -

4.10     **Taxes**.  Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, the Borrower and each Group Member has filed or caused to be filed all Tax returns that are required to be filed, and has paid all Taxes (whether or not shown to be due and payable on such returns) and has complied with all Tax withholding obligations (other than Taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been provided on the books of the Borrower or the Group Members in accordance with GAAP, as the case may be); and no Tax Lien exists (other than for current Taxes not yet due and payable or for Taxes the validity of which is being contested in good faith by appropriate proceedings if the contest shall have the effect of suspending the enforcement of such Lien and with respect to which adequate reserves have been provided on the books of the Borrower or the Group Members in accordance with GAAP), and no claim is being asserted, with respect to such Taxes (other than any Taxes, the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been provided on the books of the relevant Borrower or Group Member, as the case may be, in accordance with GAAP).

4.11     **Federal Regulations**.  No part of the proceeds of any Loans will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

4.12     **Labor Matters**.  There are no strikes or other labor disputes against any Group Member pending or, to the knowledge of any Loan Party, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payment made to employees of the Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

4.13     **ERISA**.  Except as could not be reasonably expected to have a Material Adverse Effect: (i) neither a Reportable Event (other than the commencement of the Cases) nor a failure to satisfy the minimum funding standard of Section 412 of the Code has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan, and each Plan has complied in all respects with the applicable provisions of ERISA and the Code; (ii) no termination of a Plan has occurred, no Lien in favor of the PBGC or a Plan has arisen and no notice has been received relating to the intuition of the PBGC or a plan administrator to terminate any Plan or to appoint a trustee to administer any Plan, during such five-year period; (iii) the present value of all accrued benefits under each Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits; (iv) neither any Group Member nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in the Borrower being required to make a

509600-0298-00338-Active.12182817.11

payment under ERISA; (v) to the knowledge of the Loan Party, no Group Member nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made; and (vi) no such Multiemployer Plan is in Reorganization or Insolvent.

4.14 **Investment Company Act; Other Regulations**. No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) which limits its ability to incur Indebtedness.

4.15 **Subsidiaries**.

(a) The Subsidiaries listed on Schedule 4.15 constitute all the Subsidiaries of Regatta Holdings and each such Subsidiary is a Loan Party. Schedule 4.15 sets forth as of the Closing Date the name and jurisdiction of incorporation or formation, as applicable, of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party.

(b) There are no outstanding subscriptions, options, warrants, calls, rights or other similar agreements (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of any Subsidiary, except as disclosed on Schedule 4.15. Promptly following the issuance of any subscription, option, warrant, call right or other similar agreement (other than stock options granted to employees or directors and directors' qualifying shares) relating to any Capital Stock of any Subsidiary and otherwise permitted under this Agreement, the Borrower shall promptly provide to the Administrative Agent on behalf of the Lenders an update Schedule 4.15 hereto such that the representation and warranty in the preceding sentence remains true and correct.

4.16 **Use of Proceeds**. The proceeds of the Loans shall be used to fund working capital of the Loan Parties, Capital Expenditures of the Loan Parties, Permitted LIMI Payment Amount and such other expenditures of the Loan Parties as are permitted by the Orders, the Initial 26-Week Cash Flow Forecast or Updated 26-Week Cash Flow Forecast, as applicable, approved by the Administrative Agent and this Agreement (including, without limitation, "Chapter 11 expenses" (or "administrative Costs reflecting Chapter 11 expenses")) and the payment of fees and expenses incurred in connection with entering into this Agreement and the transactions contemplated hereby; provided, that the proceeds of Loans and cash and cash equivalents of the Group Members may not be used to pay interest (current or otherwise) on any Prepetition Obligations or other obligations of the Group Members arising prior to the Petition Date or (other than the use of the Lien Avoidance [Carevout] following any Avoidance Action Default) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lenders (as defined in the Prepetition Loan Documents), the Administrative Agent (as defined in the Prepetition Loan Documents) or any parties to the Prepetition Loan Documents (whether brought by or on behalf of the Debtors, or any formal or ad hoc committee of Creditors of the

Debtors or any other Person and including, without limitation, challenges relating to the subordinated status of the Senior Subordinated Notes); provided further, that proceeds of Loans and cash and cash equivalents of the Group Members (including, without limitation, the Carve Out and the Lien Avoidance Carveout) shall not be used by or on behalf of the Debtors or any formal or ad hoc committee of Creditors of the Debtors or any other Person to investigate (including discovery proceedings), initiate or prosecute any claims, causes of action, adversary proceedings or other litigation against the Lenders or the Administrative Agent.

4.17 **Environmental Matters**. Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a) The Group Members: (i) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (ii) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any Property owned, leased, or otherwise operated by any of them; and (iii) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits.

(b) Materials of Environmental Concern are not present at, on, under, in, or emanating from any Property now or formerly owned, leased or operated by any Group Member, or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of any Group Member under any applicable Environmental Law or (ii) interfere with any Group Member's continued operations.

(c) There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which any Group Member is, or to the knowledge of any Loan Party will be, named as a party that is pending or to the knowledge of any Loan Party, threatened in writing.

(d) No Group Member has received any written request for information, or been notified in writing that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, or any analogous Environmental Law, or with respect to any contamination by or cleanup of Materials of Environmental Concern.

(e) No Group Member has entered into or agreed to any written consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to noncompliance with or liability under any Environmental Law.

509600-0298-00338-Active.12182817.11

(f)     No Group Member has expressly assumed or retained any liabilities under, or noncompliance with, any Environmental Law or with respect to any contamination by or cleanup of Material of Environmental Concern.

(g)     This Section 4.17 contains the sole representations of the Borrower with respect to matters arising under Environmental Law.

4.18    **Accuracy of Information, etc.**  No statement or information (other than the projections and financial information referred to below) contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished to the Administrative Agent, the Lenders or the Bankruptcy Court or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents (as modified or supplemented by other information so furnished, and excluding information of a general economic or industry specific nature), when taken as a whole, contained as of the date such statement, information, document or certificate was so furnished, when taken as a whole, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein in the light of the circumstances in which they were made not misleading.  The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such projections and financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such projections and financial information may differ from the projected results set forth therein by a material amount.

4.19    **Collateral**.

(a)     Subject to the Carve Out and the Lien Avoidance Carveout, the Interim Order is and will be (and the Final Order when entered will be) effective to create in favor of the Lenders legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral described therein.

(b)     Without limitation of the foregoing, the Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest under U.S. law in the Collateral described therein and proceeds thereof to the extent such a security interest may be created under the UCC.  In the case of the Pledged Stock described in the Security Agreement, when any stock certificates representing such Pledged Stock are delivered to and retained by the Administrative Agent, and in the case of the other Collateral described in the Security Agreement, when financing statements in appropriate form are filed in the offices specified on Schedule 4.19 (which financing statements have been duly completed and authorized to be filed by the Administrative Agent) and such other filings as are specified on Schedule II to the Security Agreement have been completed and filed, the Lien created under the Security Agreement upon such Pledged Stock or other Collateral, as the case may be, shall constitute a perfected security interest in all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations (as defined in the Security Agreement) to the extent such a security interest may be perfected by such actions, in each case prior and superior in right to any other Person (except, in

- 52 -

the case of Collateral other than certificated Pledged Stock, Liens having priority over the Administrative Agent's Lien permitted by Section 7.3).

4.20 **The Orders**. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Section 8 and the applicable provisions of the Orders, be entitled to immediate payment in cash of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court. The Interim Order (or the Final Order, as applicable) is in full force and effect.

4.21 **Material Contracts**. The Loan Parties are in material compliance with each material contract entered into by any Loan Party after the Petition Date or entered into prior to the Petition Date and assumed. As of the Closing Date, the Debtors have assumed the contracts entered into prior to the Petition Date and listed on Schedule 4.21.

## SECTION 5

## CONDITIONS PRECEDENT

5.1 **Conditions to First Availability Date**. The agreement of each Lender to make its initial Loan requested to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such Loan on the Closing Date, of the following conditions precedent (subject to Section 6.15):

(a) Loan Documents. The Administrative Agent shall have received (i) counterparts of this Agreement, executed and delivered by a duly authorized officer of each Loan Party, (ii) subject to the terms of Section 2.8, for the account of each Lender requesting a promissory note, a Note executed and delivered by a duly authorized officer of the Borrower and (iii) counterparts of any other Loan Document executed by the duly authorized officers of the parties thereto.

(b) Fees and Expenses. The Administrative Agent and the Lead Arranger shall have received all fees required to be paid to each of them or on behalf of the Lenders, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Administrative Agent), on or before the Closing Date.

(c) Lien Searches. The Administrative Agent shall have received the results of a recent UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien search in the jurisdiction where each chief executive office is located and each of the jurisdictions in which UCC financing statement or other filings or recordations should be made to evidence or perfect security interests in all assets and property of the Loan Parties, and such search shall reveal no liens on any of the assets or property of any Loan Party, except for Liens permitted by Section 7.3 or Liens that shall be released or terminated on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(d)     Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of a Responsible Officer of each Loan Party, dated the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent, as to the incumbency and signature of their respective officers executing each Loan Document to which it is a party, together with satisfactory evidence of the incumbency of such Responsible Officer, (ii) a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors (or the executive committee or other governing authority thereof) of each Loan Party authorizing the execution, delivery and performance of each Loan Document to be entered into on the Closing Date to which it is a party, (iii) a certificate of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, attaching the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party and (iv) a good standing certificate for each Loan Party from its jurisdiction of organization.

(e)     Legal Opinions.  The Administrative Agent shall have received an opinion of Kirkland & Ellis LLP, special counsel for the Loan Parties, dated the Closing Date and addressed to the Administrative Agent and the Lenders, in form and substance reasonably acceptable to the Administrative Agent, and such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(f)     Pledged Stock, Stock Powers, Pledged Notes.  The Administrative Agent shall have received (i) all of the certificates evidencing Capital Stock of the Borrower and its Subsidiaries to the extent required to be pledged under the Interim Order and (ii) each promissory note required to be pledged pursuant to the Interim Order indorsed (without recourse) in blank (or accompanied by an executed transfer form in blank satisfactory to the Administrative Agent) by the pledgor thereof.

(g)     Filings, Registrations and Recordings.  Subject to Section 6.15(c), each document (including, without limitation, any UCC financing statement) required by the Security Documents to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien under U.S. law on the Collateral described therein, but in any event subject to the terms and provisions of the Security Agreement, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 7.3(g)), shall have been filed, registered or recorded or shall have been delivered to the Administrative Agent and be in proper form for filing, registration or recordation (if and to the extent that a Lien may be perfected under U.S. law by filing UCC financing statements and intellectual property security agreements with the United States Patent and Trademark Office and United States Copyright Office); provided, however, that additional filings may be required in the United States Patent and Trademark Office and/or the United States Copyright Office to perfect the Lien in favor of the Collateral Agent in respect of any Collateral consisting of Intellectual Property acquired after the date hereof.

509600-0298-00338-Active.12182817.11

(h)     Insurance. The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 6.5 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured, in form and substance reasonably satisfactory to the Administrative Agent.

(i)     [Reserved].

(j)     [Reserved].

(k)     Financial Statements; Budget; Initial 26-Week Cash Flow Forecast. The Lenders shall have received (i) the financial statements described in Section 4.1, (ii) the Budget, in form and substance reasonably satisfactory to the Initial Lenders, accompanied by a certificate of a Responsible Officer of the Borrower stating that the Budget is based on estimates, information and assumptions believed by management of the Borrower to be reasonable on the Closing Date and that such Responsible Officer (not in his or her individual capacity, but solely as a Responsible Officer) has no reason to believe that the projections set forth therein are incorrect or misleading in any material respect (it being understood and agreed that the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Responsible Officer and that no assurance can be given that any of the projections will be realized, and that the Budget is not a guarantee of financial performance and actual results may differ from the Budget and such differences may be material) and (iii) the Initial 26-Week Cash Flow Forecast.

(l)     Interim Order. At the time of the making of the initial extension of credit, and in any event no later than five (5) Business Days after the Petition Date (or such later date agreed to by the Administrative Agent in its sole discretion (provided that the consent of the Required Lenders shall be required to extend such date by more than five (5) Business Days)), the Administrative Agent shall have received a certified copy of the Interim Order, which Interim Order shall (i) be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Required Lenders and (ii) authorize extensions of credit to the Borrower in amounts not in excess of $7,500,000 (the "Interim Availability Amount").

(m)     Compliance With Interim Order. The Debtors shall be in compliance in all respects with the Interim Order pursuant to the terms therein. No trustee or examiner shall have been appointed with respect to the Loan Parties or their respective properties.

(n)     Orders; Pre-Petition Date Indebtedness. All motions and orders submitted to the Bankruptcy Court on or about the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent.

509600-0298-00338-Active.12182817.11

(o)     [Reserved].

(p)     Patriot Act. The Administrative Agent shall have received at least three days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, requested by such Person.

5.2     **Conditions to Second Availability Date**. The obligation of each Lender to make extensions of credit on and after the Second Availability Date requested to be made by it is subject to satisfaction or waiver of the following conditions prior to or concurrently with the making of such extension of credit:

(a)     Final Order. (i) Except to the extent set forth in the Final Order, the Interim Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect; (ii) the Administrative Agent shall have received a certified copy of the Final Order which, in any event, shall have been entered by the Bankruptcy Court no later than forty-five (45) days after the Petition Date (or such later date agreed to by the Required Lenders) and at the time of any such extension of credit the Final Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any material respect without the prior written consent of the Administrative Agent and the Required Lenders; (iii) if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of the making of such extensions of credit, the grant of Liens and Superpriority Claims pursuant to Section 2.25 or otherwise hereunder or the performance by the Borrower or any Guarantor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; and (iv) the Loan Parties shall be in compliance with the Final Order in accordance with the terms therein.

(b)     Cash Flow Forecasts. The Administrative Agent and the Lenders shall have received periodic Updated 26-Week Cash Flow Forecasts and variance reports as required pursuant to Sections 6.2(g) and (h), each in form reasonably satisfactory to the Administrative Agent.

(c)     Fees and Expenses. The Administrative Agent and the Lead Arranger shall have received all fees required to be paid to each of them or on behalf of the Lenders, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Administrative Agent), on or before the Second Availability Date.

5.3     **Conditions to Each Extension of Credit**. The agreement of each Lender to make any extension of credit requested to be made by it hereunder on any date is subject to the satisfaction of the following conditions precedent:

(a)     Representations and Warranties. At the time of each extension of credit and also after giving effect thereto, each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all

material respects to the extent such covenant or other agreement is not already subject to a "materiality" or "Material Adverse Effect" qualifier with the same effect as though such representations and warranties had been made on and as of the date of such extension of credit (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date and except to the extent that a particular representation or warranty is already qualified by materiality, in which case such representation or warranty shall be true and correct).

(b) <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(c) <u>Additional Condition to each Loan</u>. Immediately prior to the making of each Loan (other than on the First Availability Date) consolidated cash and Cash Equivalents of the Loan Parties shall be $7,500,000 or less (excluding L/C Cash Collateral and the Lien Avoidance Carveout).

(d) <u>Additional Condition to each Letter of Credit</u>. Immediately prior to the issuance of each Letter of Credit and any amendment that increases the drawable amount of a Letter of Credit the Borrower shall have delivered cash collateral to the Administrative Agent in an amount equal to 105% of the face amount of the Letter of Credit to be issued or amended to secure the Borrower's reimbursement and other obligations related to the Letters of Credit.

Each borrowing by, and issuance of Letter of Credit on behalf of, the Borrower hereunder after the Closing Date shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.3 have been satisfied.

## SECTION 6

## AFFIRMATIVE COVENANTS

Each Loan Party hereby agrees that, until the expiration or termination of the Commitments, all Letters of Credit have been terminated (or cash collateralized or subject to another arrangement in each case in a manner reasonably acceptable to Administrative Agent and the Issuing Lender) and so long as any Obligations (other than contingent indemnification obligations for which no claim has been made) are owing to any Lender, the Administrative Agent or Collateral Agent hereunder, such Loan Party shall and shall cause each of its Subsidiaries to:

6.1 **Financial Statements**. Furnish to the Administrative Agent:

(a) not later than 90 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated and unaudited consolidating balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated and consolidating statements of income and of cash flows for

509600-0298-00338-Active.12182817.11

such year, setting forth in each case in comparative form the figures as of the end of and for the previous year by Deloitte & Touche LLP, another "Big Four" firm of independent certified public accountants or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Administrative Agent;

(b)     not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated and consolidating balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated and consolidating statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments and the absence of footnotes);

(c)     not later than 30 days after the end of each fiscal month (or 45 days after the end of the third, sixth, ninth and twelfth fiscal months in each fiscal year), commencing with the fiscal month ended November 30, 2010, the unaudited consolidated [and consolidating balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such fiscal month (in the case of the balance sheet, beginning with the January 2011 fiscal month) and the related unaudited consolidated and consolidating] statements of income [and of cash flows] for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year and setting forth in each case in comparative form the figures from the statements of income set forth in the Budget for such month and the figures for the previous year;

all such financial statements delivered pursuant to Sections 6.1(a) and (b) to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or Responsible Officer, as the case may be, and disclosed therein). Any financial statement required to be delivered pursuant to this Section 6.1 shall be deemed to have been delivered on the date on which such financial statement is delivered in a manner contemplated by Section 6.2. If any financial statement required to be delivered pursuant to this Section 6.1, or any other information, notice or report required to be delivered pursuant to Section 6 of this Agreement, shall be required to be delivered on any date that is not a Business Day, such financial statement may be delivered to the Administrative Agent the next succeeding Business Day after such date.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Lead Bookrunner will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Company Materials") by posting the Company Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender"). The Borrower hereby agrees that at the Administrative Agent's request it will use commercially reasonable efforts to identify that portion of the Company Materials that may be

distributed to the Public Lenders and that (w) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Company Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lead Bookrunner and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States federal and state securities laws (*provided, however,* that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 12.14); (y) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and the Lead Bookrunner shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."; provided that, notwithstanding anything to the contrary in Section 8, no Default or Event of Default shall result from the failure of Borrower to comply with this paragraph.

Each Lender acknowledges that each of Administrative Agent and Borrower may, from time to time, make available syndicate-level information (which may contain material non-public information) as required by the terms of, and in the course of administering, the Credit Facilities to the credit contacts identified in such Lender's Administrative Questionnaire delivered to the Administrative Agent or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Assumption, in such Assignment and Assumption. Such credit contacts shall be able to receive and use all syndicate-level information in accordance with recipient's compliance policies and contractual obligations as well as applicable law, including federal and securities laws.

6.2     **Certificates; Other Information**.  Furnish to the Administrative Agent, or, in the case of clause (k), to the relevant Lender:

(a)     concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default in the performance of Section 7, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accountants cover in such certificates pursuant to their professional standards and customs of the profession and shall no longer be required to be delivered if the Borrower's certified public accountants no longer provide such a certificate as a matter of policy);

(b)     concurrently with the delivery of any financial statements pursuant to Section 6.1(a) or (b), (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed, in all material respects to the extent such covenant or other agreement is not already subject to a "materiality" or "Material Adverse Effect" qualifier, all of its covenants and other agreements, and satisfied, in all material respects (to the extent such condition is not already subject to a "materiality" or "Material Adverse Effect" qualifier), every condition, contained in this Agreement and the other Loan Documents to which it

509600-0298-00338-Active.12182817.11

is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate, and (ii) in the case of quarterly or annual financial statements, (x) to the extent not previously disclosed to the Administrative Agent, a listing of any material registrations for Intellectual Property acquired by any Loan Party since the date of the most recent list delivered pursuant to this clause (x) (or, in the case of the first such list so delivered, since the Closing Date), (y) any UCC financing statements or other filings specified in such Compliance Certificate as being required to be delivered therewith and (z) to the extent not previously disclosed to the Administrative Agent, each location of real Property where material Collateral is located but is not owned by the applicable Loan Party (whether such real Property is leased or otherwise);

(c)     (i) together with the delivery of the financial statements pursuant to Sections 6.1(a) and (b), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries (including, without limitation, with respect to Asset Sales, cost savings, facility closures, litigation, contingent liabilities and other matters as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request) for such fiscal quarter, and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, in each case, as compared to the portion of the Budget covering such periods and (ii) simultaneously with the delivery of the financial statements referred to in Section 6.1(c), updates to the most recently delivered narrative discussion and analysis described in clause (i) above with respect to Asset Sales, cost savings, facility closures, litigation contingent liabilities and restructuring costs (in the form and substance as prepared for use by the Borrower's chief financial officer);

(d)     [RESERVED]

(e)     within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(f)     as soon as possible and in any event within five days of obtaining knowledge thereof: notice of any development, event or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in the payment by the Group Members, in the aggregate, of a Material Environmental Amount not contained in the business plan of the Borrower delivered to the Lenders;

(g)     no later than Friday of every other calendar week, commencing December 3, 2010, an Updated 26-Week Cash Flow Forecast, which shall be certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such cash flow forecast which is false or misleading in any material respect

- 60 -

or (y) any omission of information which causes such cash flow forecast to be false or misleading in any material respect (it being understood and agreed that any forecasts contained in each Updated 26-Week Cash Flow Forecast is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that such forecasts will be realized, and that the Updated 26-Week Cash Flow Forecast is not a guarantee of financial performance and actual results may differ from the Updated 26-Week Cash Flow Forecast and such differences may be material); provided, that such certification shall only be required with respect to every other Updated 26-Week Cash Flow Forecast so delivered;

(h) no later than Friday of every other calendar week, commencing December 3, 2010, a variance report in form reasonably satisfactory to the Administrative Agent, showing on a line item basis the percentage and dollar variance of actual cash disbursements and cash receipts for each of the prior two weeks from the amounts set forth for each such period in the most recent Updated 26-Week Cash Flow Forecast and a narrative analysis of each material variance for the prior two week period;

(i) (x) beginning no later than the fifth Friday following the Closing Date and continuing on every fourth Friday thereafter, a certificate of a Responsible Officer of the Borrower containing all information and calculations necessary for determining compliance with Section 7.1 and Section 7.7 as of the close of business on Friday of the previous calendar week and (y) concurrently with the delivery of any financial statements pursuant to Section 6.1(a) and (b), a certificate of a Responsible Officer of the Borrower containing all information and calculations necessary for determining compliance with Section 7.7;

(j) [Reserved];

(k) unless required to be filed under seal (provided that the Debtors shall use commercially reasonable efforts to permit the Administrative Agent and each Lender, to the extent requested by the Administrative Agent or/and such Lender, to become parties to reasonable and customary protective orders to permit the Administrative Agent and such Lender to receive such sealed documents or materials), contemporaneously upon such filing or distribution, copies of all orders, pleadings and motions, applications, judicial information, financial information, plan of reorganization or liquidation and/or any disclosure statement related to such plan and other documents to be filed by or on behalf of any Group Member with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of any Group Member to any Committee (other than (i) pleadings, motions applications or other filings which would reasonably expected to be immaterial to the Administrative Agent and the Lenders, (ii) emergency pleadings, motions or other filings where, despite such Debtor's best efforts, such contemporaneous delivery is impracticable, which shall be delivered as soon as practicable after the filing or distribution thereof and (iii) copies of pleadings and motions in connection with the Facility or the Cash Collateral, which shall be delivered as soon as practicable in advance of the filing or distribution thereof); provided, however, notwithstanding any of the foregoing to the contrary, the Loan Parties' obligations in this

clause (k) will be deemed satisfied if and to the extent any of such information and documents is publicly available; and

(l) promptly, such additional financial and other information concerning any Group Member as any Lender may from time to time reasonably request; provided that no such information shall be required to be so provided if the provision thereof would (x) cause any Group Member to lose attorney-client privilege or (y) violate a confidentiality agreement (unless such confidentiality agreement allows disclosure to those parties who agree to be bound by such agreement and such Lender shall agree to be bound by the confidentiality provisions of such agreement) or if such information is not reasonably available; provided, further, that the foregoing restrictions in the preceding clause (y) of the proviso to the extent not inconsistent with the confidentiality agreement shall not prevent the Administrative Agent or any Lender from disclosing any such information (i) upon the demand of any Governmental Authority having jurisdiction over it or (ii) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law.

Documents required to be delivered pursuant to Section 6.1 or Section 6.2 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Section 12.2 or on the SEC's website or (ii) on which such documents are posted on the Borrower's behalf on an Internet or Intranet website, if any, to which the Administrative Agent has access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver copies (which may be electronic) of such documents to the Administrative Agent which it so requests until a written request to cease delivering copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent (and each Lender if there is at the time no incumbent Administrative Agent) of the posting of any such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents referred to in this proviso. Furthermore, if any financial statement, certificate or other information required to be delivered pursuant to Section 6.1 or 6.2 shall be required to be delivered on any date that is not a Business Day, such financial statement, certificate or other information may be delivered to the Administrative Agent on the next succeeding Business Day after such date.

6.3 **Payment of Obligations**. Except in accordance with the Bankruptcy Code or by an applicable order of the Bankruptcy Court, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, (i) all its post-petition material Taxes and other material obligations of whatever nature that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases, except, so long as no material property (other than money for such obligation and the interest or penalty accruing thereon (or property with a value not in excess of such amounts)) of any Loan Party is in danger of being lost or forfeited as a result thereof, no such obligation need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings and any

- 62 -

required reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Debtor and (ii) all material obligations arising from Contractual Obligations entered into after the Petition Date or from Contractual Obligations entered into prior to the Petition Date and assumed and which are permitted to be paid post-petition by order of the Bankruptcy Court that has been entered with the consent of (or non-objection by) the Required Lenders.

6.4 **Conduct of Business and Maintenance of Existence, Compliance with Laws, etc.** (a) (i) Preserve, renew and keep in full force and effect its corporate or other existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect and (b) subject to the effect of the Cases, comply with all Contractual Obligations and Requirements of Law, except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.5 **Maintenance of Property; Insurance**. Except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect, (a) keep all tangible material Property and systems useful and/or necessary in its business (other than Property referenced in Section 6.4(a)(ii)) in good working order and condition, ordinary wear and tear (and damage caused by casualty) excepted, _provided_ that this Section 6.5(a) shall not prevent the Borrower or any Subsidiary from discontinuing any maintenance if such discontinuance is, in the judgment of the Borrower or the Subsidiary, as the case may be, desirable in the conduct of its business, (b) maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks as are prudent in its reasonable business judgment (but including in any event public liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business and (c) with respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent may from time to time require if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

6.6 **Inspection of Property; Books and Records; Discussions**. (a) Keep books of records and account in accordance with GAAP in which full, true and correct entries in all material respects and in any event in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent, the Collateral Agent or any Lender to (i) at the expense of the Borrower visit, upon reasonable prior notice and during normal business hours, and inspect any of its properties and examine and make abstracts from any of its books and records at a mutually agreeable reasonable time and as often as may reasonably be desired; and (ii) discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants (subject to the consent of such accountants); _provided_, _however_, that

a representative of the Borrower shall be given the opportunity to be present for any communication with the independent accountants.

6.7 **Notices**. Promptly give notice to the Administrative Agent of:

(a) the occurrence of any Default or Event of Default;

(b) any default or event of default under any Loan Document that, if not cured, could reasonably be expected to have a Material Adverse Effect;

(c) any litigation or proceeding affecting the Borrower or any of its Subsidiaries in which the amount involved is $1,000,000 or more, and not covered by insurance or in which material injunctive or similar relief is sought and, in either case, which has a reasonable likelihood of being adversely determined to the Borrower or any Subsidiary;

(d) the following events within 30 days after a Responsible Officer of the Borrower obtains knowledge thereof: (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required contribution to a Single Employer or Multiemployer Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan; and

(e) any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

6.8 **Environmental Laws**. Comply in all material respects with, and use commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all respects with and maintain any and all Environmental Permits, in each of the foregoing cases to the extent the failure to do so could reasonably be expected to result in a Material Adverse Effect.

6.9 **Update Calls**. As and when requested by the Administrative Agent (but no more frequently than once per month) at such times as the Borrower and the Administrative Agent shall agree, the Borrower shall host a conference call (with a question and answer period) with the chief financial officer of the Borrower and such other members of senior management of the Borrower as the Borrower deems appropriate and the Administrative Agent and the Lenders and their respective representatives and advisors to discuss the performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

509600-0298-00338-Active.12182817.11

6.10    [Reserved].

6.11    **Additional Collateral, etc.**

(a)    With respect to any Property that is acquired by any Loan Party after the Closing Date that is intended to be subject to the Lien created by the Security Agreement (and in any event excluding real Property), promptly, if reasonably requested by the Collateral Agent (x) execute and deliver to the Collateral Agent such amendments to the Security Agreement or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest under U.S. law in such Property pursuant to the terms and subject to the conditions and limitations set forth in the Security Agreement and (y) take all actions reasonably necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest under U.S. law in such Property pursuant to the terms and subject to the conditions and limitations set forth in the Security Agreement, including, without limitation, the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or as otherwise may be reasonably requested by the Collateral Agent.

(b)    With respect to any fee interest in any real Property having a value (together with improvements thereof) of at least $500,000 acquired after the Closing Date by any Loan Party (other than any such real Property subject to a Lien expressly permitted by Section 7.3(g)), promptly (i) execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real Property, (ii) if requested by the Collateral Agent, provide the Lenders with (A) title and extended coverage insurance covering such real Property in an amount at least equal to the purchase price of such real Property (or such other amount as shall be reasonably specified by the Collateral Agent) as well as a current ALTA survey thereof (or any equivalent documentation applicable under local law in the jurisdiction where such real Property is located), together with a surveyor's certificate and (B) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent, and (iii) if requested by the Collateral Agent, deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent.

(c)    With respect to any new Subsidiary created or acquired after the Closing Date by any Loan Party, promptly and in any event within 30 days (i) with respect to each such Subsidiary directly owned by a Loan Party, deliver to the Collateral Agent any certificates representing (if the Capital Stock of the applicable Subsidiary is certificated) (A) with respect to any such Domestic Subsidiary, 100% of the issued and outstanding Capital Stock of such Domestic Subsidiary and (B) with respect to any such Foreign Subsidiary, 65% of the issued and outstanding Capital Stock of such Foreign Subsidiary, in each case together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Subsidiary, as the case may be, or take such other actions as may be required under applicable law to perfect the security interests in such Capital Stock and (ii) cause each such Subsidiary that is a Domestic Subsidiary to become a party to this Agreement as a Guarantor and the Security Agreement and take all actions necessary to perfect the security interest of the Collateral Agent

- 65 -

in such Subsidiary's Collateral (subject to the conditions and limitations set forth in the Loan Documents).

(d)     Subject to the Orders, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and take or cause to be taken such further actions which may be required by law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Security Documents and the Orders, all at the expense of the Loan Parties.

Notwithstanding anything in this Agreement to the contrary, the Loan Parties shall have no obligation to perfect the Collateral Agent's or other Secured Parties' interests in Intellectual Property outside of the United States unless perfected by the Orders. The Collateral Agent may (but has no obligation) in its discretion (in each case by agreeing in writing) lengthen the foregoing time periods and otherwise modify (with the Borrower's consent) the foregoing requirements to the extent it deems it reasonable and prudent to do so and may (but has no obligation) waive the foregoing requirements to the extent that the cost of obtaining a security interest in the foregoing Property is excessive (as reasonably determined by the Collateral Agent) in relation to the benefits to the Lenders, or if the granting of a security interest in any such Property would be prohibited by contract or applicable law.

6.12   **Further Assurances**.  With respect to any additional Collateral acquired after the Closing Date, from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property or assets hereafter acquired by the Borrower or any Subsidiary which may be deemed to be part of the Collateral) pursuant (and in any event subject to the conditions and limitations) hereto or thereto.  Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from the Borrower or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

6.13   **Use of Proceeds**.  The Borrower shall use the proceeds of the Loans only for the purposes set forth in Section 4.16 and request the issuance of Letters of Credit only for purposes reasonably satisfactory to the Issuing Lender.

6.14   **Deposit Accounts**.  Except as set forth in Section 6.15, maintain at all times all of the cash and Cash Equivalents of the Loan Parties (other than cash and Cash Equivalents not exceeding $500,000 in the aggregate) at an account or accounts (a) with the Administrative Agent or any other financial institution that has entered into a control agreement

with respect to such account(s) in form and substance reasonably satisfactory to the Administrative Agent or (b) at an account the entire balance of which is swept at least once every three (3) Business Days to an account described in clause (a) above.

6.15 **Post-Closing Covenants**.

(a)     Deliver account control agreements required by Section 6.14 as soon as practicable but in any event within 60 days after the Closing Date, as such compliance period may be extended by the Administrative Agent in the exercise of its reasonable discretion if the Loan Parties are diligently pursuing delivery thereof;

(b)     deliver the evidence of insurance and related certificates and endorsements required by Section 5.1(h) as soon as practicable but in any event within 60 days after the Closing Date, as such compliance period may be extended by the Administrative Agent in the exercise of its reasonable discretion if the Loan Parties are diligently pursuing delivery thereof; and

(c)     deliver the executed Cash Collateral Agreement and Security Agreement and the documents and other items and filings required by Section 5.1(c), [(e) (with respect to collateral security and related matters)], (f) and (g) as soon as practicable but in any event within 60 days after the Closing Date, as such compliance period may be extended by the Administrative Agent in the exercise of its reasonable discretion if the Loan Parties are diligently pursuing delivery thereof.

## SECTION 7

## NEGATIVE COVENANTS

Each Loan Party hereby agrees that, until the expiration or termination of the Commitments, all Letters of Credit have been terminated (or cash collateralized or subject to another arrangement in each case in a manner reasonably acceptable to Administrative Agent and the Issuing Lender) and so long as any Obligations (other than contingent indemnification obligations for which no claim has been made) are owing to any Lender, the Administrative Agent or the Collateral Agent hereunder, such Loan Party shall not, and shall not permit any of its Subsidiaries to, in each case directly or indirectly:

7.1 **Financial Condition Covenants**.

(a)     Cumulative Consolidated Operating Cash Flow. (i) [Permit Consolidated Operating Cash Flow for any Test Period ending prior to May 15, 2011 to be less than the amount of Consolidated Operating Cash Flow for such period set forth in the Initial 26-Week Cash Flow Forecast (for any such period, the "Baseline Consolidated Operating Cash Flow") by more than the greater of (w) 25% of the Baseline Consolidated Operating Cash Flow for such period and (x) $4,000,000. In the event that the Loan Parties breach the foregoing for either of the first two Test Periods, there shall be no Default or Event of Default pursuant to this Section 7.1(a) if the Consolidated Cash Receipts for such Test Period are no less than the amount of Consolidated Cash Receipts for such period set forth in the Initial 26-Week Cash Flow Forecast

(for either such period, the "Baseline Consolidated Cash Receipts") by more than the greater of (y) 25% of the Baseline Consolidated Cash Receipts for such period and (z) $6,000,000.]

(ii) [Permit Consolidated Operating Cash Flow for any Test Period ending after May 15, 2011 to be less than the amount for such Test Period determined pursuant to this paragraph (ii). No later than the 10th Business Day following receipt by the Lenders of the first Updated 26-Week Cash Flow Forecast covering the November [_], 2011 Test Date, the Administrative Agent acting in its sole discretion shall determine the minimum cumulative Consolidated Operating Cash flow covenant amount for each Test Period ending after May 15, 2011 through and including the Test Period ending on the November [_], 2011 Test Date.]

(b)     Minimum Liquidity. [Permit Liquidity to be less than $15,000,000 for any Test Date up to and including January 9, 2011, $12,500,000 for the Test Date on February 6, 2011, $10,000,000 for any Test Date from and including March 6, 2011 through and including July 30, 2011 and $12,500,000 for any Test Date after July 30, 2011.]

7.2     **Limitation on Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary;

(c)     Indebtedness (including, without limitation, Capital Lease Obligations and purchase money Indebtedness) of the Borrower and its Subsidiaries secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed $2,000,000 at any one time outstanding;

(d)     Indebtedness outstanding on the Petition Date and listed on Schedule 7.2(d);

(e)     Guarantee Obligations made in the ordinary course of business by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor created after the Petition Date;

(f)     Indebtedness arising solely as a recharacterization of operating leases existing on the Petition Date as Capital Lease Obligations in accordance with GAAP;

(g)     obligations in respect of performance, bid, appeal and surety bonds and completion guarantees and similar obligations provided by the Borrower or any Subsidiary in connection with Borrower's and its Subsidiaries' business;

(h)     [RESERVED;]

(i)     [RESERVED;]

- 68 -

(j)     Indebtedness in respect of netting services or overdraft protection or in connection with deposit accounts or securities accounts maintained with financial institutions or from any arrangement relating to the provision of treasury, depositary or cash management services or automated clearinghouse transfer of funds, in each case incurred in the ordinary course of business;

(k)     Indebtedness arising in connection with the endorsement of negotiable instruments for deposit and/or collection in the ordinary course of business; and

(l)     Indebtedness consisting of the financing of insurance premiums arising in the ordinary course of business.

7.3     **Limitation on Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)     Liens for Taxes, assessments or other governmental charges or levies on its Property if the same shall not at the time be delinquent or thereafter can be paid without penalty, or are being contested in good faith by appropriate proceedings and for which adequate reserves with respect thereto are maintained on the books of the Borrower or the relevant Group Member in conformity with GAAP, which proceedings or orders entered in connection with such proceedings have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)     Liens imposed by law, such as carriers', warehousemen's, landlords', vendors', laborers', mechanics', materialmen's, repairmen's or other like Liens, arising in the ordinary course of business which are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(c)     Liens arising out of pledges or deposits in connection with workers' compensation, unemployment insurance, old-age pensions and other social security or retirement benefits or similar legislation;

(d)     deposits to secure performance of payment bonds, bids, tenders, franchises, trade contracts (other than for borrowed money), leases, statutory obligations, surety appeal and custom bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances on real Property of the Borrower or any Subsidiary that, individually or in the aggregate, do not materially interfere with the occupation, use or enjoyment by the Borrower or any Subsidiary, as the case may be, of the Property or assets encumbered thereby in the normal course of business and which do not in any case materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

- 69 -

(f)     Liens in existence on the Petition Date listed on Schedule 7.3(f), and renewals thereof; provided that no such Lien is spread to cover any additional Property after the Closing Date or secures a greater principal amount of Indebtedness than is secured on the Petition Date;

(g)     Liens securing Indebtedness of the Borrower or any other Subsidiary incurred pursuant to Section 7.2(c) to finance the acquisition of fixed or capital assets; provided that (i) such Liens shall be created substantially simultaneously with (or otherwise within 90 days of) the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, (iii) the amount of Indebtedness secured thereby is not increased and (iv) the amount of Indebtedness initially secured thereby is not less than 80%, or more than 100% of the purchase price of such fixed or capital asset;

(h)     Liens created pursuant to the Security Documents and/or the Orders;

(i)     any interest or title of a lessor or sublessor or under any lease entered into by the Borrower or any other Subsidiary in the ordinary course of its business and covering only the assets so leased thereby;

(j)     with respect to any Mortgaged Property, Liens expressly permitted by the applicable Mortgage;

(k)     attachment and/or judgment Liens (i) that do not give rise to an Event of Default under Section 8.1(h), (ii) that are being contested in good faith by appropriate proceedings diligently prosecuted and (iii) for which adequate reserves (if any) have been established in conformity with GAAP;

(l)     Liens securing renewals, extensions, modifications and replacement of any Indebtedness secured by a Lien permitted under Section 7.3(g) so long as (i) such Indebtedness is not increased, (ii) such renewal, extension, modification or replacement is not secured by additional assets, and (iii) such Lien otherwise complies with all stated conditions applicable thereto under this Section 7.3 (with any such Lien under this clause (l) being deemed also a utilization under the clause pursuant to which such Lien was originally incurred);

(m)     [RESERVED;]

(n)     [RESERVED;]

(o)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(p)     Liens on insurance policies and the proceeds thereof incurred in the ordinary course of business in connection with the financing of insurance premiums;

509600-0298-00338-Active.12182817.11

provided that such Liens shall limited only to the insurance policies and proceeds of such insurance premiums;

(q)     Liens on goods arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(r)     Liens on deposit accounts or securities accounts in connection with over-draft protection and netting services;

(s)     Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Borrower or any Subsidiary in the ordinary course of business;

(t)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business; or

(u)     Liens on cash collateral securing the Prepetition Letters of Credit or any letters of credit replacing such Prepetition Letters of Credit in an aggregate amount not to exceed the face amount of the Prepetition Letters of Credit (less the amount of cash collateral applied to the reimbursement of any such letters of credit (net of any such amounts returned by the beneficiary thereof in respect thereof)).

7.4     **Limitation on Fundamental Changes**.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

(a)     any Subsidiary Guarantor may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any Subsidiary Guarantor; and

(b)     any Subsidiary Guarantor of the Borrower may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any Subsidiary Guarantor (it being understood that a liquidation, winding up or dissolution of a Subsidiary Guarantor shall be treated as if such Subsidiary Guarantor had Disposed of all of its assets).

Notwithstanding the foregoing, the Persons constituting Holdings shall not engage any Disposition of Capital Stock or corporate restructurings.

7.5     **Limitation on Disposition of Property**.  Dispose of any of its Property (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person (other than to the Borrower or to a Subsidiary Guarantor which is a Subsidiary of the Borrower), except: