# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOCAL INSIGHT MEDIA HOLDINGS, INC., et al.,[1] | ) Case No. 10-13677 ( ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DECLARATION OF RICHARD C. JENKINS, THE DEBTORS' INTERIM CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, Richard C. Jenkins, hereby declare under penalty of perjury:

1.     I am the Interim Chief Financial Officer of Local Insight Media Holdings, Inc., a corporation organized under the laws of the State of Delaware, and each of the other 17 debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). In my capacity as an employee of Alvarez & Marsal Private Equity Performance Improvement Group, LLC, I have been engaged by the Debtors since September 17, 2009. In this capacity, I am generally familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records.

2.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents and information supplied to me by other

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are: Local Insight Media Holdings, Inc. (2696); Local Insight Media Holdings II, Inc. (8133); Local Insight Media Holdings III, Inc. (8134); LIM Finance Holdings, Inc. (8135); LIM Finance, Inc. (8136); LIM Finance II, Inc. (5380); Local Insight Regatta Holdings, Inc. (6735); The Berry Company LLC (7899); Local Insight Listing Management, Inc. (7524); Regatta Investor Holdings, Inc. (8137); Regatta Investor Holdings II, Inc. (8138); Regatta Investor LLC; Regatta Split-off I LLC; Regatta Split-off II LLC; Regatta Split-off III LLC; Regatta Holding I, L.P.; Regatta Holding II, L.P.; and Regatta Holding III, L.P. For the purpose of these chapter 11 cases, the service address for all Debtors is: 188 Inverness Drive West, Suite 800, Englewood, CO 80112.

members of the Debtors' management and the Debtors' advisors. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "First Day Motion," and, collectively, the "First Day Motions") filed concurrently herewith. I am familiar with the contents of each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I further believe that the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4. To assist the Court in becoming familiar with the Debtors and the initial relief they seek to stabilize operations and facilities during this restructuring, this Declaration is organized as follows: (a) Part I provides a preliminary overview; (b) Part II provides a summary of the Debtors' corporate history, capital structure and business operations; (c) Part III provides an overview of the events leading to the filing of these chapter 11 cases; and (d) Part IV provides an overview of the relief the Debtors seek at the first two hearings in these chapter 11 cases.

## I.    Preliminary Overview

5. The Debtors, along with their non-Debtor affiliates and subsidiaries (collectively, the "Company"), are the fifth largest Yellow Pages directory publisher in the United States and serve as a leading provider of local search advertising products and services. A chart illustrating the Company's current organizational structure, including identification of the Debtors in these chapter 11 cases.

2

6. The Company operates three different business units, each owned, indirectly, by Debtor Local Insight Media Holdings, Inc. ("Super Holdco"). Super Holdco is majority owned by funds affiliated with private equity firm Welsh, Carson, Anderson & Stowe ("Welsh Carson").

7. The Company's first business unit, shown on the far right of the "Structure Chart," attached hereto as **Exhibit A**, under Debtor Regatta Investor Holdings, Inc., is referred to as "Regatta". The Regatta business sells advertising and coordinates publication and distribution of approximately 870 different print directories for approximately 115 telephone companies and other directory customers nationwide. Regatta also serves as the official directory publisher for Windstream Corporation ("Windstream"). In addition, the Regatta business operates and maintains, and sells advertising for, approximately 30 Internet Yellow Pages directories and offers a variety of other digital products and services.

8. The Regatta business derives substantially all of its revenue from the sale of advertising, which has declined significantly as a result of the recent economic recession. Regatta has also experienced declining demand for its traditional print advertising products. Although Regatta has a strategy for replacing declining print revenue with revenue from digital products and services, it has experienced delays and setbacks in its efforts to implement these new on-line marketing strategies and products. The Regatta Debtors commenced these cases primarily to reduce debt obligations that they can no longer service.

9. The Company's second business unit, shown in the center of the Structure Chart, includes non-Debtor Local Insight Media, Inc. ("LIMI"). LIMI employs most of the Company's senior management and provides management services to Regatta under an intercompany management agreement. LIMI is also the indirect parent company of businesses that own the

3

exclusive right to publish, produce and sell advertising in print and internet directories in Alaska, Hawaii and the Cincinnati metropolitan area using the brand of the incumbent local telephone company in those markets (respectively, Alaska Communications Systems ("ACS"), Hawaiian Telcom and Cincinnati Bell). The businesses that own these directory publication rights participate in a whole business securitization structure (the "WBS"). The WBS entities contract with Regatta for the publication and production of, the sale of advertising in, and (in the case of the WBS companies in Alaska and Hawaii) the distribution of their directories. While neither LIMI, ACS nor the WBS entities are Debtors in these cases, several holding companies above LIMI, ACS and the WBS entities are Debtors and commenced these chapter 11 cases to address debt obligations that they can no longer service.

10.     The Company's third business unit, shown on the left of the Structure Chart, is referred to as "Caribe." Caribe owns publication rights for certain print and internet directories in the Dominican Republic and Puerto Rico, and provides essential back-office support and services to Regatta. At this time, none of the Caribe entities are Debtors in these chapter 11 cases.

## II.     Corporate History, Capital Structure and Business Operations

### A.     Corporate History

11.     The Regatta business is the product of a 2007 split-off (the "Split-Off") by Windstream of its directories business to certain funds affiliated with Welsh Carson. As part of the Split-Off, the Debtors issued approximately $210 million in senior subordinated notes, described in greater detail below.

12.     On April 23, 2008, Regatta acquired substantially all the assets and certain liabilities of the independent line of business division of L.M. Berry and Company ("LM

4

Berry"), a subsidiary of AT&T, Inc. As part of that acquisition, the Debtors entered into their current senior secured credit facility, which is discussed in greater detail below.

**B.    Capital Structure**

**1.  Regatta Capital Structure**

13.    Regatta's capital structure consists of secured revolving and term loans and senior subordinated notes. The primary borrower of Regatta's debt is Debtor Local Insight Regatta Holdings, Inc. ("LIRH"). As of the Petition Date, LIRH's total consolidated funded debt was approximately $558 million, consisting of a secured term loan in the approximate amount of $311 million, a secured revolver drawn in the approximate amount of $26 million and senior subordinated notes in the approximate amount of $221 million.

**a.    Senior Secured Credit Facility**

14.    In connection with LIRH's acquisition of LM Berry, LIRH, as borrower, entered into that certain Credit Agreement, dated as of April 23, 2008 (as amended on May 6, 2008 and June 16, 2008, the "Prepetition Credit Agreement"), with JPMorgan Chase Bank, N.A., ("JPMorgan") as administrative agent (the "Prepetition Agent") for the lender parties thereto (collectively, the "Prepetition LIRH Lenders") and as collateral agent for the secured parties thereto.

15.    The Prepetition Credit Agreement provides for a $335 million senior secured term loan facility (the "Prepetition Term Loan"), of which approximately $311 million is outstanding as of the Petition Date, and a $30 million senior secured revolving loan facility, of which approximately $26 million is outstanding as of the Petition Date (the "Prepetition Revolver Loan," and, together with the Prepetition Term Loan, the "Prepetition Credit Facility").

16.    Pursuant to that certain Guaranty and Collateral Agreement, dated as of April 23,

5

2008, among LIRH, as borrower, and JPMorgan as collateral agent (the "Guaranty and Collateral Agreement") and Supplement No. 1 to the Guaranty and Collateral Agreement, dated as of June 30, 2008 (the "Guaranty and Collateral Agreement Supplement"), the guarantors under the Prepetition Credit Agreement include Debtors The Berry Company LLC ("Berry"), Local Insight Listing Management, Inc. ("LILM"), Regatta Holding I, L.P., Regatta Holding II, L.P., Regatta Holding III, L.P. and Regatta Investor LLC (collectively, the "Prepetition Credit Agreement Guarantors").

17.     The Prepetition Credit Facility is secured by substantially all of the assets of LIRH and the Prepetition Credit Agreement Guarantors as well as pledges of all the issued and outstanding capital stock and other equity interests of LIRH and the Prepetition Credit Agreement Guarantors.

### b.     Senior Subordinated Notes

18.     In connection with the Split-Off, LIRH issued $210.5 million aggregate principal amount of 11% Senior Subordinated Notes due November 30, 2017 (the "Subordinated Notes"), pursuant to an indenture (the "LIRH Indenture") with Windstream Regatta Holdings, Inc.,[2] as issuer, and Wells Fargo Bank, N.A. ("Wells Fargo") as trustee (the "Indenture Trustee"). The Prepetition Credit Agreement Guarantors also guarantee the LIRH Indenture.

19.     In November 2008, LIRH completed an offer to exchange all the Subordinated Notes for 11% Series B Senior Subordinated Notes, due November 30, 2017 (the "Exchange Notes"). The terms of the Exchange Notes are identical in all material respects to the Subordinated Notes, except that the Exchange Notes have been registered under the Securities

---

[2]     On or about November 30, 2007, Windstream Regatta Holdings, Inc. was renamed Local Insight Regatta Holdings, Inc.

6

Act of 1933, as amended, under a registration statement that was declared effective by the SEC on October 10, 2008.

**c.     Defect in Perfection of Collateral
Under Prepetition Credit Agreement**

20.     When the Debtors entered into the Prepetition Credit Agreement on April 23, 2008, the guarantors of the Prepetition Credit Agreement were Local Insight Yellow Pages, Inc., Local Insight Berry Holdings, LLC and LILM.   On closing, the Prepetition Agent filed UCC financing statements against each of these entities.   On May 23, 2008, Local Insight Berry Holdings, LLC, a New York corporation, was merged into Berry, a Colorado corporation, with Berry being the surviving entity.   On June 30, 2009, Local Insight Yellow Pages, Inc. was merged into Berry, with Berry being the surviving entity.   As a result of these mergers, Berry held substantially all material assets of the Regatta business.   The Prepetition Agent did not record a UCC financing statement against Berry until August 20, 2010.   The Debtors commenced these chapter 11 cases less than 90 days following the August 20, 2010 perfection to preserve the right to avoid the August 20, 2010 perfection against Berry as a preferential transfer.

**2.   LIM Finance Capital Structure**

**d.     Bridge Loans**

21.     On June 20, 2008, Debtor LIM Finance II, Inc. ("LIMF II"), as borrower, entered into that certain Credit Agreement (as amended on October 14, 2009), with JPMorgan as administrative agent and the several lenders party thereto (as amended, the "LIMF II Credit Agreement").  The LIMF II Credit Agreement provided $233,750,000 to refinance indebtedness of certain of LIMF II's subsidiaries and to fund certain other obligations, fees and expenses. On June 9, 2009 (a) $133,750,000 of the amount owing under the LIMF II Credit Agreement was repaid from the proceeds of the LIMF Credit Agreement (as defined below) and (b) Lehman

7

Commercial Paper Inc. became the sole lender under the LIMF II Credit Agreement.

22.     On June 9, 2009, Debtor LIM Finance, Inc. ("LIMF"), as borrower, entered into that certain Credit Agreement (as amended on September 29, 2009 and October 5, 2009, respectively), with JPMorgan as administrative agent and the several lenders party thereto (as amended, the "First LIMF Credit Agreement"). The First LIMF Credit Agreement provided $133,750,000 to pay off a portion of LIMF II's indebtedness under the LIMF II Credit Agreement.

23.     On October 14, 2009, LIMF, as borrower, entered into that certain Credit Agreement with Natixis, New York Branch, as administrative agent, and the several lenders party thereto (the "Second LIMF Credit Agreement," and, together with the LIMF II Credit Agreement, the "Bridge Loans"). The Second LIMF Credit Agreement provided $137,500,000 to refinance the First LIMF Credit Agreement and to fund certain other obligations, fees and expenses.

24.     On November 10, 2010, each of the lenders under the Bridge Loans irrevocably sold and assigned to Welsh, Carson, Anderson & Stowe IX, L.P., Welsh, Carson, Anderson & Stowe X, L.P., and WCAS Management Corporation all of their respective rights and obligations as lenders under the Bridge Loans. As of November 10, 2010, approximately $258 million was outstanding under the Bridge Loans.

### e.     LIMF II Senior Subordinated Notes

25.     On or about June 20, 2008, LIMF II, as issuer, issued $60 million in 10% Notes due June 20, 2014 (the "LIMF II Senior Subordinated Notes") to WCAS Capital Partners IV, L.P. ("WCAS CPIV"). As of the Petition Date, approximately $77 million remains due and owing on account of the LIMF II Senior Subordinated Notes.

DOCS_DE:165489.1

**f.    ACS Subordinated Notes**

26.    On or about November 22, 2006, Pendo Acquisition Holding Inc., renamed ACS Media Holdings LLC, issued $35 million in aggregate principal amount of 10% senior secured notes due 2014 (the "ACS Subordinated Notes") to WCAS CPIV.  As of the Petition Date, approximately $37 million in total principal and interest obligations remains due and owing on account of the ACS Subordinated Notes.

**3.    Debtors' Trade Debt**

27.    In the ordinary course of business, the Debtors have incurred approximately $8 million of trade debt and accrued liabilities which, as of the Petition Date, remains due and owing.

**C.    Regatta's Business Segments**

28.    Regatta offers the following print and digital advertising products and services: (a) print directory advertising; (b) website development, production and maintenance; (c) search engine marketing ("SEM") (including delivery of local advertisements through major search engines such as Google™ ("Google"), Bing™ ("Bing") and Yahoo!® ("Yahoo"); (d) internet Yellow Pages ("IYP") advertising (including through *YellowPages.com*™); (e) internet-based video advertising; and (f) Berry Leads™ ("Berry Leads").  Importantly, Regatta has undertaken considerable efforts to position itself in a market increasingly dominated by electronic media and advertising while maintaining its core print directory services.

**1.    Print Directory Advertising**

29.    Regatta's print directory advertising business offers advertisers a cost-effective medium by which to reach potential customers.  Generally, each of Regatta's directories contain several distinct sections, including:  (a) a Yellow Pages section, which organizes information by

9

product/service headings that contain business listing advertisements; (b) a White Pages section (sometimes printed in a separate directory), which lists the names, addresses and telephone numbers of individuals and businesses in the covered area; (c) a community information section, which provides information such as government offices, schools and hospitals; and (d) a coverage map, which details the approximate geographic area covered by the directory.

### 2. **Website Development**

30.     In addition to Regatta's print directory services, Regatta offers a variety of subscription-based services related to website development, fulfillment and maintenance. For those advertising customers that do not maintain a website, these services enable customers to quickly, effectively and affordably establish a website presence. For advertising customers that do maintain a website, these services provide an economical solution to upgrade and enhance the effectiveness of their online presence.

31.     Specifically, Regatta's website development services include initial consultation and site design, as well as quality review and on-going support and modification. Regatta also provides (a) domain name registration services to develop branding strategies appropriate for the client, (b) a hosting platform complete with secure disk storage, daily backups and a monthly data transfer allotment, and (c) basic services such as webmail compatible with Microsoft Outlook and a unique local or "800" telephone number services. Under Regatta's new business model, website development services are primarily fulfilled by Yodle and Web.com and sold to advertising customers on a "white label" basis under Regatta's "Berry" brand.

32.     During the year ended December 31, 2009, Regatta assisted its customers in developing approximately 4,300 unique websites.

10

### 3.  **Search Engine Marketing**

33.    Regatta also develops cost-effective, online, promotional programs designed to direct consumer traffic to customers' websites and increase their visibility in the result pages of major search engines such as Google, Bing and Yahoo!.  In particular, Regatta offers digital programs such as "Guaranteed Clicks" and "Premium SEM" that are designed to maximize the number of clicks, calls and emails generated by the advertiser's website.  Regatta is also an authorized reseller of Google AdWords, the Google advertising program that offers "pay-per-click" advertising and website-targeted advertising for text and banner ads.[3]  Under Regatta's new business model, SEM services are primarily fulfilled by Yodle and Web.com and sold to advertising customers on a "white label" basis under Regatta's "Berry" brand.

34.    During the year ended December 31, 2009, Regatta sold search engine marketing services to over 3,500 advertisers.

### 4.  **IYP Advertising**

35.    Regatta's electronic and web-based presence also includes IYP advertising services, whereby Regatta is authorized, in all the markets it currently serves, to resell online advertising listings on *YellowPages.com*, a leading national IYP and local search directory.

36.    In addition to serving as a *YellowPages.com* reseller, Regatta operates the *WindstreamYellowPages.com* IYP website, which is marketed to advertisers located in Windtream's main geographic regions.  Regatta also operates IYP directories on behalf of approximately 30 additional telephone companies and other customers, including Regatta's non-Debtor affiliates in Alaska, Hawaii and Cincinnati.  During the year ended December 31, 2009,

---

[3]    Google AdWords enables advertisers to reach people searching on Google itself, as well as the Google Advertising network, which includes search sites (e.g., AOL, Ask.com, Netscape and EarthLink) and content sites (e.g., websites of The New York Times, CNN, The Wall Street Journal and Business Week).

11

the Debtors published approximately 45,000 IYP advertisements.

### 5. Internet-Based Video Advertising

37.     Given the increasing prominence of YouTube™ and other products devoted to online video content, Regatta has updated its products and services to provide on-site video production, editing and post-production services for video advertisements. Specifically, Regatta facilitates the placement of video advertisements on a variety of online distribution platforms, including *YellowPages.com*, other IYP websites, Google, Bing and Yahoo!.

38.     Regatta offers its video services under the "Berry" brand on a subscription basis. During the year ended December 31, 2009, Regatta produced and distributed approximately 140 internet-based video advertisements.

### 6. Berry Leads

39.     In February 2010, Regatta launched the "Berry Leads" business model, designed to ensure that Regatta's advertising customers are able to generate business leads via multiple media platforms. Under this business model, Regatta relies upon the expertise of leading third party vendors to develop, fulfill and support their digital advertising products and services. This approach allows Regatta to minimize up-front investment and allows Regatta to focus on its core competence of sales and marketing.

40.     The Berry Leads model also employs a redesigned sales and marketing approach that comprises: (a) year-round contacts with, and sales to, customers; (b) a sophisticated client segmentation and account prioritization model; (c) demand creation through various media to generate interest in Regatta's products and services; (d) extensive training and talent management for the Regatta's sales organization; and (e) high-quality customer service.

12

## III. Events Leading to these Chapter 11 Cases

41. In recent months, the Debtors have experienced: (a) significant contraction of advertising markets in the wake of the 2008 global financial crisis; (b) a decline in revenues as a result of reduction in the use of print media; and (c) significant competition and saturation in advertising markets, which have placed significant strain on the Debtors' liquidity. Although the Debtors have implemented various cost-cutting and operational restructuring initiatives, these initiatives have not been sufficient to offset declining revenues.

### A. Declining Revenues

42. The recent economic recession and dislocation of credit markets have caused a decline in the Debtors' print advertising sales — the principal source of the Debtors' revenue. According to published industry sources, the print advertising market declined by 20% during the worst phase of the economic downturn. As a result, total revenue for the three and six month periods ended June 30, 2010 were approximately $131,570,000 and $266,142,000 respectively, representing a respective decrease in total revenue of approximately 9.3% and 8.3% from the same periods for the previous year.

43. These revenue weaknesses are also a result of declining consumer usage of print Yellow Pages directories in the United States. This decline is attributable to a number of factors, including increased usage of internet local search and IYP directory products (particularly in business-to-business and retail categories). This decline has significantly depressed the Debtors' advertising sales, which has resulted in less revenue. In addition, the paradigm shift from print to electronic media has discouraged new businesses from purchasing advertising in the Debtors' Yellow Pages print directories. Further, 2010 revenues from the Debtors' Pay4Performance program ("P4P"), a performance-based advertising solution under which advertising clients pay

13

only for qualified inbound phone calls delivered from the advertising client's print Yellow Pages advertisement, failed to deliver expected revenues. Revenue expectations for P4P, a new offering commercially introduced in 2009, were based on certain forecasting assumptions that were not achieved in practice, resulting in an overstatement of projected P4P call volumes.

44. Despite the Debtors' recent forays into electronic advertising, the decline in use of print directories has not been entirely offset by an increase in revenue from the Debtors' IYP, digital and other non-print products and services.

**B.** **Competition**

45. The Debtors' industry is highly competitive. In each of the Debtors' print advertising markets, the Debtors compete with one or more Yellow Pages directory publishers, which are predominantly independent publishers. The Debtors also compete with other incumbent publishers in overlapping and adjacent markets, which affects the Debtors' ability to attract and retain advertisers and to increase advertising rates.

46. Additionally, the Debtors' core print advertising business has come under increasing competition from electronic directories, in addition to increasing competition from local advertising sales in traditional media such as newspapers, magazines, radio, direct mail, telemarketing, billboards and television. Specifically, the Debtors' IYP offerings compete with those of other incumbent directory publishers (such as *SuperPages.com* and *Dexknows.com*) and of independent directory publishers (such as *Yellowbook.com*), and (in some markets) with *YellowPages.com* itself. The Debtors also compete with search engines and portals, such as Google, Yahoo!, Bing and with other internet sites that provide directory information, such as *Citysearch.com* and *Zagat.com*. Although the Debtors have entered into affiliate agreements with many of these companies, such agreements are not exclusive; thus, these companies have

14

entered into similar agreements with other major competing directory publishers. The Debtors also compete with other providers of website development services, search engine marketing services and other emerging technology companies, such as Web.com and Yodle, Clickable, Netopia and ReachLocal, Inc.

### C. Operational Restructuring Initiatives

47.     To address their declining earnings and liquidity, the Debtors have implemented several cost-cutting and restructuring initiatives. These initiatives included several rounds of reductions in the Debtors' workforce (primarily in the areas of operations, sales and field marketing, information technology, and marketing) and a cessation of operations at the Debtors' facilities located in Matthews, North Carolina, effective March 31, 2010, and Erie, Pennsylvania, effective December 31, 2010. Despite these initiatives, the Debtors were unable to offset their declining revenues.

## IV.     Relief Sought in the Debtors' First Day Motions

48.     The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief. I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

### A. Motion of Local Insight Media Holdings, Inc., et al. for the Entry of an Order Directing Joint Administration of their Chapter 11 Cases (the "Joint Administration Motion")

49.     As described above, the Debtors in this case are Local Insight Media Holdings, Inc., Local Insight Media Holdings II, Inc., Local Insight Media Holdings III, Inc., LIM Finance Holdings, Inc., LIM Finance, Inc., LIM Finance II, Inc., Local Insight Regatta Holdings, Inc.,

The Berry Company LLC, Local Insight Listing Management, Inc., Regatta Investor Holdings, Inc., Regatta Investor Holdings II, Inc., Regatta Investor LLC, Regatta Split-off I LLC, Regatta Split-off II LLC, Regatta Split-off III LLC, Regatta Holding I, L.P., Regatta Holding II, L.P., and Regatta Holding III, L.P.

50.　　To the best of my knowledge, given the integrated nature of Debtors' operations, joint administration of the cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will arise in the cases will affect each and every Debtor. The entry of an order directing joint administration will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties in interest to monitor the cases with greater ease and efficiency.

51.　　I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.　　Motion of Local Insight Media Holdings, Inc., et al. for the Entry of an Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue to Invest in the Investment Accounts and (D) Maintain Existing Business Forms (the "Cash Management Motion").**

52.　　The Debtors request entry of an order authorizing the Debtors, in their sole discretion, to (a) continue to operate the Cash Management System (as defined herein), (b) honor certain prepetition obligations related thereto in an amount not to exceed $6,000, (c) continue to

16

invest funds in the Investment Accounts and (d) maintain existing business forms.

53.     In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to (a) collect, transfer and disburse funds generated from their operations; (b) facilitate cash monitoring, forecasting and reporting; and (c) enable the Debtors to maintain control over their bank accounts (collectively, the "Bank Accounts") located at the banks (the "Banks").

54.     The Cash Management System consists of approximately 20 Bank Accounts and is used to receive incoming payments, deposit checks and remit disbursements in the ordinary course of the Debtors' businesses.    The Debtors disburse funds maintained in the Cash Management System through one of three primary methods:    (a) traditional written checks; (b) wire transfers from the Bank Accounts; or (c) automatic clearing house payments ("ACH Payments").[4]

55.     The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors' economic scope and geographic reach. Large, multiple-entity businesses use such systems because of their numerous benefits, including, the ability to (a) quickly create status reports that contain the location and amount of funds, thereby allowing management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds. These controls are particularly important given that, on a monthly basis, a total of approximately $36 million flows through the Debtors' integrated Cash Management System to service the Debtors' operations.

---

[4]    ACH Payments are electronic fund transfers conducted by a third-party administrator, the National Automated Clearing House Association.    ACH Payments are generally used as a substitute for checks and to remit electronic payments of a repetitive nature at a reduced cost as compared to wire transfers.

### 1. **The Bank Accounts**[5]

#### a. **Concentration Accounts**

56. The Debtors' Cash Management System contains two Concentration Accounts (as defined herein), both of which are owned by Berry. The first Concentration Account is a legacy Local Insight Yellow Pages, Inc. account (the "LIYP Concentration Account") maintained at U.S. Bank, N.A. ("U.S. Bank"). The LIYP Concentration Account funds, on average, approximately $5 million per month into a Berry concentration account (the "Berry Concentration Account," and, together with the LIYP Concentration Account, the "Concentration Accounts"). The Debtors maintain the Berry Concentration Account at U.S. Bank. The Concentration Accounts are the backbone of the Cash Management System and serve as the primary repository for the Debtors' cash from which the Debtors fund their other Bank Accounts. Before the Banks' close of business on November 15, 2010, the LIYP Concentration Account held approximately $8.4 million and the Berry Concentration Account held approximately $4.8 million.

#### b. **Investment Accounts**

57. The Debtors maintain two investment accounts at U.S. Bank (the "Investment Accounts"). The Debtors utilize the Investment Accounts to participate in an overnight investment sweep service provided by U.S. Bank. Funds that remain in the Concentration Accounts at the close of each business day are automatically transferred from the Concentration Accounts to the Investment Accounts and then invested in a U.S. Bank Eurodollar overnight

---

[5] As of the Petition Date, all of the Bank Accounts are located in banks that are designated as authorized depositories (the "Authorized Depositories") by the Office of the U.S. Trustee in accordance with the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines" or "Guidelines").

deposit at the U.S. Bank National Association Grand Cayman Branch. The funds in the Eurodollar overnight deposit accounts are then automatically returned to the Investment Accounts, and subsequently the Concentration Accounts, the next business day.

58.    Although the Eurodollar overnight deposits are not insured by the FDIC, because the Investment Accounts are held with the U.S. Bank Cayman Island branch, the deposit is an obligation of U.S. Bank. The financial strength of U.S. Bank is rated Prime-1 by Moody's Short Term Prim Rating System for Taxable Debt & Deposits Globally. Prime-1 is the highest rating in this category and denotes issuers having superior ability for repayment of senior short-term debt obligation.

59.    The Debtors' investment practices allow the Debtors to invest their cash with the primary goal of protecting principal and a secondary goal of maximizing yield and liquidity. The Debtors intend to maintain those same investment goals during these chapter 11 cases. Accordingly, the Debtors seek the authority, in their sole discretion, to continue their prepetition investment practices on a postpetition basis.

### c.    Lockbox and E-Pay Accounts

60.    The Debtors maintain four lockbox accounts (the "Lockbox Accounts"). Two of the Lockbox Accounts are maintained at U.S. Bank and two are maintained with KeyBank, N.A. ("KeyBank"). The Lockbox Accounts receive check or electronic fund transfers from the Debtors' customers. For those customers who have authorized the Debtors to automatically debit their accounts, the Debtors maintain two e-pay accounts (the "E-Pay Accounts") at U.S. Bank.

61.    The Lockbox Accounts maintained at U.S. Bank are zero-balance accounts that are automatically swept at the close of each business day into the appropriate Concentration

19

Account. Approximately $600,000 is swept on a daily basis from the U.S. Bank Lockbox Accounts into the Concentration Accounts. The Lockbox Accounts maintained at KeyBank are manually transferred on a monthly basis into the appropriate Concentration Account. Approximately $1.1 million is transferred from these Lockbox Accounts to the Concentration Accounts on a monthly basis. The Debtors maintain a minimum balance of approximately $110,000, in the aggregate, in the Lockbox Accounts to satisfy any fees, refunds, returns or other miscellaneous obligations.

### d.  Disbursement Accounts

62.    The Debtors maintain seven disbursement accounts, which comprise (a) two payroll disbursement accounts (the "Payroll Accounts"); (b) two accounts payable disbursement accounts (the "Accounts Payable Accounts"); (c) two employee insurance claims accounts (the "Insurance Claim Accounts"); and (d) a direct debit disbursement account (the "Direct Debit Account").

63.    The Debtors transfer approximately $1.8 million from the Concentration Accounts into the Payroll Accounts on a bi-weekly basis in anticipation of payment of their employee payroll. Local Insight Listing Management, Inc. ("LILM"), a debtor, owns one of the Payroll Accounts and Berry owns the other. Both of the Payroll Accounts are maintained at U.S. Bank. Before the Banks' close of business on November 15, 2010, LILM's Payroll Account maintained a balance of approximately $180,000 and Berry's Payroll Account maintained a balance of approximately $925,000.

64.    On an as-needed basis, the Debtors transfer from the Concentration Accounts to the Accounts Payable Accounts an amount equal the total value of checks presented for payment from the Accounts Payable Accounts in a given business day. Both Accounts Payable Accounts

20

are maintained at U.S. Bank and both maintain a zero balance.

65.    The Debtors transfer approximately $85,000 from the Berry Concentration Account into the Insurance Claims Accounts on a weekly basis to satisfy medical and dental claims filed by the Debtors' employees. Both Insurance Claims Accounts are owned by Berry and both are maintained at JPMorgan Chase Bank, N.A. ("JPMorgan"). Before the Banks' close of business on November 15, 2010, the medical Insurance Claim Account maintained a balance of approximately $20,000 and the dental Insurance Claim Account maintained a balance of approximately $25,000.

66.    The Debtors transfer approximately $60,000 from the Berry Concentration Account into the Direct Debit Account on a weekly basis to fund vision benefits, 401K contributions, flexible spending accounts funding and medical premiums. The account is owned by Berry and maintained at U.S. Bank. Before the Banks' close of business on November 15, 2010, the Direct Debit Account maintained a balance of approximately $80,000.

### 2.   The Debtors' Existing Business Forms and Checks

67.    In the ordinary course of business, the Debtors use customized checks and other business forms. To minimize expenses incurred by their estates, the Debtors seek to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms and check stock; provided, however, that after running out of the current stock of forms and checks the Debtors will add new stock stamped with "Debtor in Possession."

68.    The Debtors' businesses and financial affairs are exceedingly complex and

require the collection, disbursement and movement of funds through their numerous Bank Accounts. Indeed, the Debtors have utilized their Cash Management System, as a mainstay of their ordinary, usual and essential business practices for a number of years.

69.     The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

70.     Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors. In addition, the Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors and is designed to achieve efficiency and minimize unnecessary delay and expense.

71.     A certain percentage of the Debtors' customer receipts are received through wire transfer payments. If the Debtors' ability to conduct transactions by debit, wire, ACH Payment or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

72.     The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. The Debtors believe that replacing their existing Bank Accounts with new accounts pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to

preserve the value of their estates and reorganize in an efficient manner.

73.     Before the Petition Date, the Debtors invested funds not needed for the day-to-day operation of the Debtors' businesses in the Investment Accounts. As noted above, funds are periodically transferred from the Concentration Accounts into the Investment Accounts to maximize income, which movement and investment is an integral component of the Debtors' Cash Management System.

74.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

C.     **Motion of Local Insight Media Holdings, Inc., et al. for the Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing Certain of the Debtors to Obtain Secured Postpetition Financing on Super-Priority Priming Lien Basis, Granting Adequate Protection for Priming and Modifying the Automatic Stay, (B) Authorizing Certain of the Debtors to use Cash Collateral of Prepetition Secured Lenders and Granting Adequate Protection for the Use Thereof, and (C) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing (the "DIP/Cash Collateral Motion")**

75.     The Debtors request that the Court approve the "DIP Agreement" and "DIP Orders" containing the following material terms:[6]

| | |
|---|---|
| **Interest Rate** | Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin. |
| | Each Base Rate Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for such |

---

[6]     Capitalized terms used but not defined in this section have those meanings ascribed to them in the DIP/Cash Collateral Motion.

23

day plus the Applicable Margin.

| | |
|---|---|
| **Maturity** | The first anniversary of the closing date. |
| **Events of Default** | Usual and customary Events of Default for financing of this kind. |
| **Liens** | All property of the Loan Parties, now or hereafter acquired, as more particularly described and referred to as "<u>DIP Collateral</u>" in the DIP Orders, and shall include any property upon which a Lien is purported to be created by the DIP Agreement, any Security Document, the orders or any additional orders of the Bankruptcy Court under the Cases (but shall exclude the Carve Out, the Lien Avoidance Carve Out and any Excluded Equity Interests). |
| **Borrowing Limits** | Prior to the entry of the final order and the satisfaction of the conditions in section 5.2, the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued will not exceed $7,500,000, (ii) Loans may not be borrowed on more than four separate Borrowing Dates and (iii) the aggregate amount of Loans made on any Borrowing Date after the First Availability Date shall not exceed $5,850,000. |
| **Borrowing Conditions** | Usual and customary borrowing conditions for financing of this kind. |
| **364(c) Liens** | The DIP Agreement provides for the following benefits under section 364(c) of the Bankruptcy Code: (a) an allowed administrative expense entitled to super-priority over any and all other administrative expenses, pursuant to section 364(c)(1); (b) a perfected first priority (subject to permitted exceptions) lien on all present and after-acquired property (and all proceeds thereof) not subject to an existing, valid, perfected and non-avoidable Lien, pursuant to section 364(c)(2); and (c) a perfected junior lien on all present and after-acquired property (and all proceeds thereof) that is otherwise subject to a valid, perfected and non-avoidable Lien (other than Liens of the Prepetition Secured Lenders), pursuant to section 364(c)(3). |
| **364(d) Liens** | The DIP Agreement provides, pursuant to Bankruptcy Code section 364(d)(1) a perfected first priority (subject to permitted exceptions), senior priming Lien on (x) all present and after-acquired property (and all proceeds thereof) of the Loan Parties that is subject to a Lien to secure the Loan Parties' Prepetition Obligations, excluding, in all cases, the Excluded Equity Interests, (y) all present and after-acquired assets (and all proceeds thereof) that are presently subject to Liens that are junior to the Liens that secure the Loan Parties' Prepetition Obligations, excluding, in all cases, any Excluded Equity Interests and (z) the Liens |

24

|                              |                                                                                                                                                                                                                                                              |
| ---------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                              | granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations.                                                                                                                                                     |
| **Waiver of Automatic Stay** | The DIP Agreement contemplates that the interim order will, among other things, provide for the modification of the automatic stay to permit the creation and perfection of Liens on the DIP Collateral and to permit the DIP Lenders to exercise remedies if an Event of Default occurs subject to the terms of the interim order. |
| **Letters of Credit**        | Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Lenders, agrees to issue letters of credit ("Letters of Credit") for the account of the Borrower on any Business Day during the Commitment Period in such form as may be approved from time to time by the Issuing Lender; provided that, after giving effect to such issuance, (i) the L/C Obligations shall not exceed the L/C Commitment, (ii) the aggregate amount of the Available Commitments shall not be less than zero, (iii) each such letter of credit shall be fully cash collateralized and (iv) prior to the Second Availability Date the aggregate principal amount of the Loans that may be borrowed and Letters of Credit that may be issued shall not exceed $7,500,000. |
| **Section 506(c) Waiver**    | The final order shall contain a waiver of the Loan Parties' rights under section 506(c) of the Bankruptcy Code.                                                                                                                                                |
| **Lien on Proceeds of Avoidance Action** | The final order shall provide the DIP Lenders with a lien on the proceeds of claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.             |

76.     I believe that the relief requested in the DIP/Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the DIP/Cash Collateral Motion should be approved.

> **D.** **Motion of Local Insight Media Holdings, Inc., et al. for the Entry Of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition (A) Wages, Salaries and Other Compensation, (B) Reimbursable Employee Expenses and (C) Employee Medical and Similar Benefits (the "Wages and Benefits Motion")**

77.     The Debtors seek (a) entry of the interim order authorizing the Debtors to pay

prepetition claims and honor obligations in the ordinary course of business relating to: (i) Unpaid Compensation, Deductions and Unremitted Payroll Taxes, and Contract Worker Compensation; (ii) Reimbursable Expenses; and (iii) Employee Benefits (each as defined herein, and collectively, the "Employee Obligations"), excluding the Severance Program (as defined herein), and (b) setting a Final Hearing to authorize the Debtors to pay prepetition claims and honor obligations in the ordinary course of business relating to the Severance Program.

78. In addition, to the extent that any of the Debtors' Employees (as defined herein) are asserting claims under the Workers' Compensation Programs (as defined herein), the Debtors request that the Court authorize the Debtors, in their sole discretion, to modify the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to allow these Employees to proceed with their claims under the Workers' Compensation Programs. To effectuate the aforementioned modification of the Automatic Stay, the Debtors request that the Court waive the stay of a judgment under Bankruptcy Rule 7062 and the requirements under Bankruptcy Rule 9014 relating to contested matters, solely with respect to claims under the Workers' Compensation Programs.

79. As of the Petition Date, the Debtors employ approximately 729 individuals (the "Employees"), approximately 724 on a full-time basis and approximately five on a part-time basis. In addition, the Debtors retain between approximately 120 to 170 temporary workers and independent contractors (collectively, the "Contract Workers"). None of the Employees are represented by a labor union.

80. The Employees and Contract Workers perform a variety of critical functions, including sales, customer service, purchasing, publishing and a variety of administrative, accounting, legal, finance, management, technology, supervisory and other related tasks. Their

26

valuable skills, institutional knowledge and understanding of the Debtors' operations make them essential to the Debtors' business operations. Without the Employees and Contract Workers' continued services, an effective reorganization will not be possible.

81.     Furthermore, just as the Debtors depend on their Employees and Contract Workers to operate their businesses on a daily basis, those individuals also depend on the Debtors. Indeed, the vast majority of these individuals rely exclusively on payments received from the Debtors for their basic living necessities.

### 1. Wages, Salaries and Compensation

#### a.     Wage and Commission Obligations

82.     The Debtors typically pay the Employees on a bi-weekly basis, one week in arrears. Employees' gross compensation, including wages, salary, vacation time and severance, but excluding commissions (the "Wages"), equals approximately $1.1 million per pay period.

83.     Although the Debtors have paid their prepetition Wage obligations in accordance with its ordinary compensation schedule, as of the Petition Date, certain prepetition Wage obligations have accrued and remain unpaid. Further, certain Employees may be entitled to unpaid compensation because (a) discrepancies may exist between the amounts actually paid by the Debtors and the amounts that the Debtors were required to pay and (b) some checks issued to Employees before the Petition Date may not have been presented for payment or may not have cleared the banking system. Accordingly, the Debtors may not have honored and paid these amounts as of the Petition Date. The Debtors estimate that, as of the Petition Date, they owe approximately $900,000 on account of prepetition Wages.

84.     In addition to Wages, the Debtors offer certain Employees, including sales representatives, sales managers and account managers, various types of commissions (the

27

"Commissions"). These Commissions include: (a) sales-related Commissions that reward increases in revenue on particular customer accounts; (b) Commissions for customer contract renewals; and (c) Commissions for signing up new customers. Approximately 550 employees are eligible to earn Commissions as part of their compensation package. The Debtors pay Commissions on a rolling basis, as earned by Employees, in the Employees' bi-weekly pay. The Debtors estimate that, as of the Petition Date, they owe Employees approximately $500,000 on account of Commissions.[7]

85. The Debtors estimate that, as of the Petition Date, they owe approximately $1.5 million on account of prepetition Wages and Commissions (collectively, the "Unpaid Compensation").[8] The Debtors do not believe that, as of the Petition Date, they owe any one Employee Unpaid Compensation in excess of the $11,725 cap set forth in section 507(a)(4) of the Bankruptcy Code.

**b.    Gross Pay Deductions,
Governmental Withholdings and Payroll Taxes**

86. The Debtors routinely deduct certain amounts from the Employees' compensation, including garnishments, child support and similar deductions, and other pre-tax

---

[7]    The Debtors are not seeking the authority to pay non-salary compensation to any "insiders" (as that term is defined in section 101(31) of the Bankruptcy Code). To the extent the Debtors propose to make such payments to any insiders, the Debtors will seek approval, in a separate motion, prior to making any such payments. Moreover, most of the Debtors' senior executives are employed and paid by a non-Debtor affiliate, LIMI, and perform managerial functions both for the Debtors and for non-Debtor affiliates. Even though LIMI is not a Debtor, the Debtors and LIMI will, out of an abundance of caution, act as though section 503(c) applies to these individuals and will seek the Court's approval, in a separate motion, of any incentive compensation or severance payments to these individuals.

[8]    The Debtors pay approximately 95% of their Employees by direct deposit and approximately 5% by check. The Debtors use Automatic Data Processing, Inc., (the "Payroll Processor") to process the direct deposit transfers and administer payroll checks to Employees. The Payroll Processor calculates the payroll and tax obligations for each Employee and the Debtors then transfer these amounts to the Payroll Processor in advance of the end of the applicable payroll period. On average, the Debtors pay approximately $31,000 per month to the Payroll Processor for the payroll-related services they provide to the Debtors. As of the Petition Date, the Debtors do not believe that they owe any amounts to the Payroll Processor.

and after-tax deductions payable pursuant to certain employee benefit plans (collectively, the "Deductions").

87.     On a bi-weekly basis, the Debtors deduct approximately $175,000 from the Employees' paychecks. The Deductions represent earnings that judicial authorities or the Employees have designated for deduction from the Employees' paychecks. Given that the Debtors have no legal interest in the Deductions and forward these deducted amounts to various third-party recipients, the Deductions do not constitute property of the Debtors' estates. As of the Petition Date, the Debtors have collected, but not yet remitted, approximately $140,000 in Deductions.

88.     Additionally, the law requires the Debtors to withhold from Employees' paychecks amounts related to federal, state and local income taxes, Social Security, state disability insurance, school district taxes and Medicare taxes (collectively, the "Withheld Amounts"). Further, federal and state laws require the Debtors to deduct additional amounts on account of federal and state unemployment insurance (the "Employer Payroll Taxes," and, together with the Withheld Amounts, the "Payroll Taxes"). The Payroll Processor deducts the Payroll Taxes on behalf of the Debtors, then remits the Payroll Taxes to the appropriate federal, state or local authority. On a bi-weekly basis, the Payroll Processor deducts approximately $450,000 in Payroll Taxes on behalf of the Debtors.

89.     As of the Petition Date, the Debtors estimate that they do not owe any amount on account of prepetition Payroll Taxes. There exists the possibility, however, that the Payroll Processor may not have forwarded certain of the Payroll Taxes to the appropriate third-party recipients prior to the Petition Date (the "Unremitted Payroll Taxes").

29

### c.     **Contract Worker Compensation**

90.     The Debtors employ Contract Workers as independent contractors and hired through various staffing vendors. While the Debtors pay independent contractors directly, with respect to the individuals hired through a staffing vendor, the Debtors remit compensation to the appropriate staffing vendor, which in turn pays the respective Contract Workers (the "Contract Worker Compensation").

91.     Many of the Contract Workers have worked for the Debtors for an extended period of time and have acquired significant institutional knowledge regarding the Debtors' operations. Also, many of the Contract Workers are highly skilled, such as database analysts and software architects. Consequently, the Contract Workers cannot easily be replaced and their departure would cause a significant disruption to the Debtors' operations. Accordingly, the Debtors believe that it is prudent to pay to Contract Workers the prepetition amounts owed to them, whether paid directly to the Contract Worker (whom is likely to stop performing services for the Debtors if put in a precarious financial position) or through a staffing vendor (that is likely to stop providing staff to the Debtors and withdraw workers already on-site if not paid outstanding prepetition amounts). On average, the Debtors pay a total of approximately $625,000 per month on account of Contract Workers.

92.     As of the Petition Date, the Debtors estimate that they owe approximately $900,000 for services performed by Contract Workers.

### 2.    **Reimbursable Expenses**

93.     In the ordinary course of business, the Debtors directly reimburse, or pay credit card invoices on behalf of, Employees for certain approved, reasonable expenses incurred in the scope of their employment and for which they have an expectation of being reimbursed. The

30

Debtors also reimburse non-employee directors for reasonable out-of-pocket expenses incurred in connection with board meeting attendance (collectively, the "Reimbursable Expenses").[9] Specifically, Reimbursable Expenses include, among other things, business-related travel expenses, including meals, hotels, flights, mileage, car rentals and wireless communication equipment for certain employees. As of the Petition Date, the Debtors estimate they owe approximately $270,000 on account of outstanding prepetition Reimbursable Expenses.

### 3. Employee Benefits

94.    In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including medical, dental and vision plans, workers' compensation benefits, paid time-off, 401(k) retirement savings plans, life insurance, accidental death and dismemberment insurance, short- and long-term disability insurance, relocation programs, tuition reimbursement programs, adoption assistance programs, relocation assistance programs, employee referral programs and severance programs (collectively, the "Employee Benefits").[10]

### a.    Medical, Vision and Dental Plans

95.    All Employees are eligible for health-care coverage beginning on the first day of the month commencing employment. The Debtors provide Employees with medical insurance, including prescription drug benefit coverage, dental insurance, vision insurance and flexible spending accounts (collectively, the "Health Care Plan"). Certain of the plans are self-insured, in

---

[9]    Employees that regularly incur Reimbursable Expenses may have Debtor-endorsed American Express corporate credit cards issued to them. American Express invoices the Debtors directly for the expenses charged by Employees to the corporate credit cards. Once the Debtors have determined that the charges are for legitimate Reimbursable Expenses, they pay American Express directly. In the aggregate, Employees incur, on average, $360,000 per month on account of Reimbursable Expenses that are charged to American Express corporate credit cards.

[10]    The Employee Benefits are available to Employees only, subject to any eligibility requirements described herein. Contract Workers do not participate in the Employee Benefits.

31

which case the Debtors pay a third-party administrator to administer the plan, and the Debtors absorb the costs of related Employee claims. Other plans are fully-insured, meaning that the Debtors pay the insurance carrier a set premium on a monthly basis, and the insurance carrier pays the Employees' claims based on the applicable policy terms.

96. Enrollment in the dental plan and vision plan are optional. Employees may select any of the medical plans they are eligible for, or, alternatively, they may waive enrollment, in which case they receive a monthly medical waiver payment funded into a Flexible Spending Account ("FSA"). The Debtors fund the FSA at the rate of $125 per month. The FSAs can only be used to reimburse qualified, non-reimbursable health care expenses subject to FSA plan provisions and regulations. The Debtors' average monthly FSA obligations are approximately $10,000. As of the Petition Date, outstanding FSA obligations and administrative costs related to the FSA were approximately $8,800 and $1,200, respectively.

97. Debtor-sponsored health and welfare benefits continue until the end of the month in which employment ends. The Employee and his or her eligible dependents have the right to continue (as defined by law) medical, dental and vision coverage under COBRA.

98. As of the Petition Date, the Debtors estimate that they owe in the aggregate approximately $52,000 on account of the Health Care Plan.

### b. Workers' Compensation

99. The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state (the "Insured WC Policy"). The Insured WC Policy is fully-insured through Chubb Group. The Debtors' monthly premium for the Insured WC Policy is approximately $15,000. The Debtors have financed the premiums through February 1, 2011 pursuant to an agreement with AICCO, Inc. Thus, as of the Petition Date, the Debtors do not

DOCS_DE:165489.1

believe they owe any prepetition amounts on account of the Insured WC Policy.

100. In addition, in Ohio, in accordance with applicable state law, the Debtors make certain payments to provide workers' compensation coverage to their Employees pursuant to a state-administered workers' compensation program (the "Ohio WC Policy," and, together with the Insured WC Policy, the "Workers' Compensation Program"). The Debtors pay a third-party administrator, CompManagement, Inc., approximately $2,000 per month to administer the Ohio WC Policy. As of the Petition Date, the Debtors owe approximately $7,000 on account of the Ohio WC Policy, and thus, under the Workers' Compensation Program.

### c. Vacation

101. The Debtors provide paid vacation time and sick leave to most of their Employees through a paid time-off benefit program incorporating traditional vacation, sick days and personal days into one consolidated benefit ("Vacation Time"). Eligibility for Vacation Time begins 30 days after an Employee is hired.

102. Vacation Time is available to Employees who work at least 20 hours per week, although Employees working less than 40 hours per week earn Vacation Time on a pro-rata basis relative to a 40-hour workweek. Vacation Time accrues at the end of every pay period up to a maximum annual accrual of 14 to 20 days, and in the case of one employee, 40 days, depending on the Employee's position. Employees generally receive their regular daily rate of pay when utilizing Vacation Time.[11] The Debtors pay Employees for all accrued Vacation Time upon termination. Such payouts are mandatory under the laws of many of the Employees' states. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Vacation Time is

---

[11] The Debtors' original Vacation Time policy allowed for unlimited carry-over of unused vacation time. It was modified as of January 1, 2010 to provide for only 40 hours of carry-over. The Debtors recently amended the policy to again permit unlimited carry-over in recognition of the extraordinary dedication of their Employees, many of whom have sacrificed Vacation Time to further the Debtors' restructuring efforts.

33

approximately $1.6 million.[12]

### d.    Retirement Savings Plans

103.    The Debtors maintain a retirement savings plan for the benefit of all eligible Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). In addition to deducting amounts for the 401(k) Plan from Employees' paychecks, the Debtors contribute a 100% match on the first 4% of annual salary invested by each Employee (the "Matching Obligation"). This is subject to an end-of-year true-up. All Employees are entitled to the Matching Obligations upon hiring. The 401(k) Plan is a fully-vested program. Therefore, an Employee's contributed funds, as well as the Debtors' matching funds and interest earned, belong to the Employee. As of the Petition Date, the Debtors estimate they owe approximately $200,000 on account of Matching Obligations.

### e.    Life, Disability and Accident Insurance

104.    The Debtors provide a number of different types of additional insurance benefits to their Employees, including basic life and accidental death and dismemberment, voluntary life and accidental death and dismemberment, short-term disability and long-term disability (collectively, the "Insurance Plans"). The Insurance Plans, with the exception of the standard short-term disability plan, are fully funded. The Debtors estimate that, as of the Petition Date, they owe approximately $20,000 in the aggregate on account of the Insurance Plans.

### f.    Tuition Assistance

105.    The "Tuition Assistance Program" reimburses Employees who work more than 20 hours per week for certain tuition and educational expense costs. As of the Petition Date,

---

[12] The Vacation Time policy applies only to non-insider Employees. To the extent the Debtors desire to pay any insider Employee benefits for accrued Vacation Time, the Debtors will seek such relief in a separate motion.

approximately ten Employees participated in the Tuition Assistance Program, which cost the Debtors approximately $11,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $4,000 on account of the Tuition Assistance Program.

### g. Adoption Assistance

106. The "Adoption Assistance Program" assists Employees who work more than 20 hours per week with adoption-related expenses up to $5,000. Specific eligible expenses include reasonable and necessary adoption fees, court costs, legal fees, travel expenses, required medical examination fees for an eligible child and other expenses that directly relate to the legal adoption of an eligible child. As of the Petition Date, the Debtors do not believe that they owe any prepetition amounts on account of the Adoption Assistance Program.

### h. Relocation Program

107. The Debtors currently provide relocation expenses for Employees that have relocated at the Debtors' request (the "Relocation Program"). Of these Employees, those that relocated to Alaska or Hawaii are also entitled to a living allowance. The aggregate average monthly cost of the Relocation Program is approximately $12,500. As of the Petition Date, the Debtors estimate that they owe approximately $11,000 on account of the Relocation Program.

### i. Employee Referral Program

108. The Debtors provide cash incentives to Employees who refer personnel to fill vacant employment positions (the "Employee Referral Program"). Pursuant to the Employee Referral Program, participating Employees are eligible for an initial payment if the Debtors hire the person the Employee referred and a subsequent payment if the referred person remains employed with the Debtors for at least one year. Payments under the Employee Referral Program range from $100 to $1,000. The average monthly cost of the Employee Referral

35

Program is approximately $2,000. As of the Petition Date, the Debtors estimate that they owe approximately $1,000 on account of the Employee Referral Program.

### j.    Severance Program

109.    The Debtors provide Employees with severance according to the eligibility criteria and terms and conditions set forth in the Debtors' severance policy (the "Severance Program"). To be eligible for coverage under the Severance Policy, an Employee must satisfy a series of criteria, including continuous prior employment for at least 12 months prior to termination.

110.    All eligible Employees are entitled to receive a lump-sum severance payment (the "Severance Payment") equal to two weeks of regular pay for each year of service, capped at 26 years. In addition, employees who are critical to ensure an adequate transition of responsibilities may, at the Debtors' discretion also receive a lump sum productivity or retention payment to remain with the Debtors through the transition period.

111.    As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Severance Program. The Debtors seek authority, subject to entry of the final order, to make both prepetition and postpetition Severance Payments to non-insider Employees in the ordinary course of business. To the extent the Debtors propose to provide Severance Payments during the Chapter 11 Cases to any insiders, the Debtors will seek approval from this Court prior to making such payments.

112.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be

36

approved.

**E.** **Motion of Local Insight Media Holdings, Inc., et al. for the Entry of an order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Continue Prepetition Customer Programs and Practices in the Ordinary Course Of Business (the "Customer Programs Motion")**

113. The Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to maintain and administer in the ordinary course of business the Customer Programs (as defined herein) and to honor prepetition commitments in connection therewith, in an aggregate amount not to exceed $10.8 million.

114. The Debtors publish both print and online directories for numerous third-party telephone companies as well as certain non-Debtor affiliates, including CBD Media LLC (formerly Cincinnati Bell Directory), ACS Media LLC (the largest provider of print and electronic directory advertising in Alaska) and HYP Media LLC (the official publisher for Hawaiian Telcom in Hawaii) (collectively, the "Publishing Customers"). The Publishing Customers each own publication rights to specific local markets and pay the Debtors to sell advertising space and publish and distribute their directories. The Debtors market and sell print and electronic directory advertising services to the businesses that serve the geographic areas covered by the various directories (the "Advertising Customers," and, together with the Publishing Customers, the "Customers," and, each a "Customer"). The Debtors and the Publishing Customers divide advertising revenue from Advertising Customers according to the terms of the Publishing Customer's agreement.

115. The Debtors utilize a range of programs and practices designed to attract and retain Customers (the "Customer Programs"). These Customer Programs include: (a) barter arrangements, whereby the Debtors exhange advertising space for services from Advertising Customers; (b) a guaranteed advertisement response program, whereby the Debtors guarantee the

37

Advertising Customers a minimum number of telephone calls in response to their advertisements; (c) prepaid advertising services, whereby certain Advertising Customers pay in advance for advertising space; and (d) shared-cost marketing programs with certain Publishing Customers, whereby the Debtors agree to expend a certain amount of money promoting certain Publishing Customers' directories. The Debtors also occasionally issue rebates or credits to compensate for billing errors or problems with an Advertising Customer's published advertisement. Finally, as a result of the complex manner in which the Debtors and their Publishing Customers share and collect advertising revenue, the Debtors and their Publishing Customers engage in a payments offsetting program whereby the parties periodically reconcile and offset amounts they owe each other under their agreements.

116.    The purpose of these Customer Programs is to generate goodwill, remain competitive and ensure Customers' satisfaction. Failure to honor the prepetition obligations under the Customer Programs or to continue the Customer Programs postpetition would impede the Debtors' ability to continue to provide outstanding customer service, hinder the Debtors' ability to remain competitive and impair the Debtors' reorganization prospects.

### 1.  Barter Agreements

117.    Certain Advertising Customers compensate the Debtors for advertising space in a directory through the barter of goods or services instead of monetary payments (the "Barter Arrangements"). For example, in exchange for free advertising space, a hotel Customer may agree to exclusively feature the Debtors' directory in the hotel's rooms; or, in exchange for free advertising space to the owner of a stadium, the Debtors may receive free advertising space in the stadium. The Barter Arrangements are valuable to the estate because they permit the Debtors to advertise to a captive audience for very little cost. As of the Petition Date, the Debtors'

outstanding obligations on account of Barter Arrangements are approximately $20,000.

## 2. **Guaranteed Advertising Program**

118.     Pursuant to the Debtors' Guaranteed Advertising Program ("GAP"), the Debtors guarantee certain Advertising Customers a minimum number of telephone calls from the Customers' advertising placements. Call-tracking vendors monitor the number of calls received by an Advertising Customer on account of certain advertisements. If the Advertising Customer does not receive the minimum guaranteed number of calls during the specified period set forth in the agreement, such Customer receives a credit that reduces outstanding advertising charges, or, if no charges are outstanding, the Advertising Customer receives a refund. As of the Petition Date, the Debtors estimate that Advertising Customers have earned approximately $150,000 of prepetition GAP credits or refunds that they have not yet received.

## 3. **Prepaid Advertising Services**

119.     Certain Advertising Customers, typically those the Debtor views as a credit risk, pay the Debtors for advertising space in advance of publication (the "Prepaid Advertising"). The Debtors believe they have one directory in production for which they have received Prepaid Advertising. The Debtors wish to honor these Prepaid Advertising obligations, as removing Prepaid Advertising from the directory would be costly and inefficient. As of the Petition Date, the Debtors estimate that they have received approximately $20,000 in prepayments from Advertising Customers for advertising services.

## 4. **Marketing Commitments**

120.     Certain Publishing Customer agreements require the Debtors to spend a certain amount of money promoting these Publishing Customers' directories; typically about 1% of advertising revenue (the "Marketing Commitments"). As of the Petition Date, the Debtors

39

estimate that they owe approximately $300,000 on account of outstanding Marketing Commitments.

### 5. Credits and Adjustments

121. In the ordinary course of business, despite the Debtors' commitment to deliver high-quality services to their Customers and to provide accurate and timely billing information, Customers sometimes dispute invoices (the "Customer Claims"). The Debtors diligently review each Customer Claim as it arises through a formal process. If warranted, the Debtors provide the Customer with a credit against future advertising purchases, a bill adjustment, or, in rare instances, a rebate. As of the Petition Date, the Debtors are in the process of evaluating approximately 3,600 Customer Claims on account of which the Debtors anticipate issuing credits or adjustments of approximately $1.71 million. In addition, the Debtors estimate that as of the Petition Date there are approximately $2.6 million in approved credits and adjustments to be applied against future Advertising Customer revenue.

### 6. Payment Offsets

122. Most of the Publishing Customers are local telephone companies. Most of the Advertising Customers are small businesses that have telephone service accounts with the Publishing Customers. When the Debtors sell advertising services to an Advertising Customer, the Publishing Customer bills the Advertising Customer for those advertising services as part of the Advertising Customer's telephone bill. Upon collecting advertising revenue from an Advertising Customer, the Publishing Customer pays the Debtors their percentage of such revenues. Occasionally, an Advertising Customer will not have a telephone service account with the relevant Publishing Customer. In those instances, the Debtors bill the Advertising Customer, and, upon collection, the Debtors pay the Publishing Customer its percentage of such revenues.

123. For ease of administration, the Debtors and Publishing Customers typically offset amounts they owe each other (the "Payment Offsets"), including both revenue-sharing payments as well as amounts the Debtors owe to the Publishing Customer for telephone services and amounts the Publishing Customers owe for publication costs. Because the Publishing Customers typically collect far more advertising revenues than the Debtors collect, in virtually every instance the net result of the Payment Offsets is that the Debtors receive payments from the Publishing Customers.

124. As of the Petition Date, the Debtors estimate that they owe approximately $6 million to Publishing Customers on account of advertising revenue collected by the Debtors prior to the Petition Date.

125. I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**F.** **Motion of Local Insight Media Holdings, Inc., et al. for the Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Claims of Shippers and Warehousemen (the "Shippers Motion")**

126. The Debtors seek the authority to pay, in the ordinary course of business, and in their business judgment, prepetition amounts owed to Shippers (as defined herein) in an aggregate amount not to exceed $1.2 million.

127. In addition, any Shipper that accepts payment from the Debtors on account of all or a portion of a prepetition claim pursuant to the order granting this Motion shall be deemed to: (a) agree to the terms and provisions of the order; (b) have waived, to the extent so paid, any and

41

all prepetition claims, of any type, kind or priority, against the Debtors, their assets and properties; and (c) release any liens the Shipper may have in the Debtors' goods.

128. The Debtors publish Yellow Pages directories for customers throughout the United States. Once published, the Debtors rely on a network of third-party shippers, distribution vendors and warehousemen (collectively, the "Shippers") to transport the directories to their customers or end users pursuant to the terms of the Debtors' publishing contracts. [13]

129. The Debtors rely on three line-haul trucking companies to transport their directories to their general destinations (the "Line-Haul Carriers"). The Debtors typically pay the Line-Haul Carriers on a spot-contract basis, based on number of trailers utilized and mileage travelled. As of the Petition Date, the Debtors owe the Line-Haul Carriers approximately $240,000 for outstanding delivery charges.

130. Depending on the terms of the Debtors' publishing contracts, the Line-Haul Carriers either deliver the directories directly to the Debtors' publishing customer or deliver the directories to a select group of distribution vendors (the "Distribution Vendors") who then deliver the directories to end users. Distribution Vendors typically take receipt of the directories from the Line-Haul Carriers at a warehouse maintained by the Distribution Vendor in the local market prior to delivering the directories to the end users. As of the Petition Date, the Debtors owe Distribution Vendors approximately $960,000 for outstanding delivery charges.

131. Under each publishing agreement, the Debtors must deliver the directories in the predetermined month of publication. Failure to meet the foregoing delivery threshold results in the Debtors' forfeiture of 1/12th of the annual sales amount for that directory for each month of delay. Additionally, if distribution of a directory were delayed, the Debtors would have to grant

---

[13] The Debtors distribute some of their directories via prepaid bulk mail arrangements.

credits or adjustments to their advertising customers, leading to an additional decrease in revenue.

132. As of the Petition Date, the Debtors estimate that the Line-Haul Carriers and Distribution Vendors hold approximately $1.7 million worth of directories in transit (the "Pending Deliveries") for which delivery has not yet occurred.

133. I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be approved.

**G.** **Motion of Local Insight Media Holdings, Inc., et al. for the Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

134. The Debtors seek the entry of an interim order and a final order (a) determining that the Utility Providers (as defined herein) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' Proposed Adequate Assurance (as defined herein) and Adequate Assurance Procedures (as defined herein) governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or any perceived inadequacy of the Debtors' proposed adequate assurance, pending entry of the final order; (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion, pending entry of the final order; and (e) setting a final hearing on the Debtors' Proposed Adequate Assurance.

135. In connection with the operation of their businesses and management of their

properties, the Debtors obtain gas, water, waste, recycling, electric, telecommunications and other utility services from approximately 90 utility companies (collectively, the "Utility Providers"). On average, the Debtors spend approximately $270,000 each month on utility costs. As of the Petition Date, the Debtors estimate that approximately $405,000 in utility costs may have accrued and remain outstanding. The Debtors do not believe that they owe any past due amounts to the Utility Providers.

136. Utility services are important to the Debtors' ongoing business operations and the success of their reorganization. Thus, it is critical that utility services continue uninterrupted during these chapter 11 cases.

137. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**H.** **Motion of Local Insight Media Holdings, Inc., et al. for the Entry Of Interim and Final Orders Authorizing the Debtors to Remit Certain Prepetition Taxes (the "Taxes Motion")**

138. The Debtors seek the authority, in their sole discretion and to the extent that the Debtors determine in their business judgment that failure to remit such amount will not result in immediate and irreparable harm, to remit approximately $16,000 of the approximately $290,000 in prepetition Taxes on an interim basis. The Debtors further seek the authority, on a final basis, to remit the balance of any prepetition Taxes, as well as any Taxes that become due, without regard to whether such obligations accrued before or after the Petition Date.

139. In the ordinary course of business, the Debtors incur and collect sales, use, franchise, commercial activity, business and occupation, and various other taxes (collectively,

the "Taxes")[14] on behalf of numerous taxing authorities (collectively, the "Authorities"). The Debtors remit the Taxes to the respective Authorities in the ordinary course of business and in accordance with all applicable laws and regulations. As of the Petition Date, the Debtors believe that they have timely filed all applicable returns for the Taxes.

140. The Debtors estimate that the total amount of prepetition Taxes owing to the various Authorities as of the Petition Date is approximately $290,000. Of this amount, approximately $16,000 is or will become due and payable within 21 days of the Petition Date and before a final hearing on this Motion.

141. A majority of the Debtors' outstanding tax liabilities constitute "trust fund" taxes that the Debtors have collected and hold in trust for the benefit of the applicable Authority. The Debtors believe that such funds do not constitute property of the estate and could not otherwise be used by the Debtors. In addition, if the Taxes are not paid, some, if not all, of the Authorities may cause the Debtors to be audited, which would unnecessarily divert the Debtors' attention from their reorganization efforts. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that could harm the Debtors, their creditors and other parties in interest. In consideration of the foregoing, failure to remit the Taxes will likely have a material adverse impact on the Debtors' ability to continue operating their businesses and make a smooth transition into chapter 11.

### 1. Sales and Use Taxes

142. In the ordinary course of business, the Debtors incur and remit sales and use taxes for business conducted in various states (the "Sales and Use Taxes"). Typically, the Debtors' vendors invoice the Sales and Use Taxes and remit such Taxes to the appropriate Authorities.

---

[14] The Debtors have a taxable presence in approximately 33 states.

On occasion, however, certain vendors neglect to self-assess a tax charge and fail to request such amount from the Debtors. In those instances, the Debtors conduct an analysis to determine whether they are directly responsible for remitting such Sales and Use Taxes.

143. As of the Petition Date, the Debtors estimate that approximately $8,000 in Sales and Use Taxes have accrued and remain unpaid as a result of services provided by vendors for which no tax was charged and for which the Debtors are directly responsible (the "Unpaid Sales and Use Taxes"). The Unpaid Sales and Use Taxes are or will become due and owing to the respective Authorities within 21 days of the Petition Date.

### 2. Franchise Taxes

144. In addition to the Sales and Use Taxes, in the ordinary course of business, the Debtors incur and remit franchise taxes (the "Franchise Taxes"). Although the Debtors believe that they are current with respect to payment of their Franchise Taxes, they estimate that approximately $42,000 in Franchise Taxes have accrued and remain unpaid as of the Petition Date (the "Unpaid Franchise Taxes"). The Debtors do not anticipate that any of the Unpaid Franchise Taxes will become due and owing within 21 days of the Petition Date.

### 3. Commercial Activity Tax

145. In the ordinary course of business, the Debtors incur and remit a commercial activity tax related to business conducted in the State of Ohio (the "Commercial Activity Tax"). The Commercial Activity Tax is similar to a gross receipts tax, the value of which is based on the Debtors' products, gross proceeds from the sale of such products or gross income of the Debtors' businesses. Although the Debtors believe that they are current with respect to payment of their Commercial Activity Tax, they estimate that approximately $6,000 of the Commercial Activity Tax has accrued and remains unpaid as of the Petition Date (the "Unpaid Commercial

46

Activity Tax"). The Debtors do not anticipate that any of the Unpaid Commercial Activity Tax will become due and owing within 21 days of the Petition Date.

### 4. Business and Occupation Tax

146.    In addition to the Commercial Activity Tax, the Debtors remit a business and occupation tax for the right to do business in the State of Washington (the "Business and Occupation Tax"). The Business and Occupation Tax, like the Commercial Activity Tax, is a type of gross receipts tax. Although the Debtors believe that they are current with respect to the payment of their Business and Occupation Tax, they estimate that approximately $14,000 has accrued and remains unpaid as of the Petition Date (the "Unpaid Business and Occupation Tax"). The Debtors estimate that approximately $8,000 of the Unpaid Business and Occupation Tax is or will become due and owing within 21 days of the Petition Date.

### 5. Miscellaneous Taxes

147.    On or about April 23, 2008, Berry acquired L.M. Berry & Company ("L.M. Berry"), a subsidiary of AT&T Inc. Since such time, the Debtors have been remitting Taxes on account of L.M. Berry's operations in the same manner in which L.M. Berry remitted Taxes before the acquisition.

148.    Although the Debtors are not responsible for any pre-acquisition taxes that L.M. Berry may have accrued, the Debtors believe, based on a historical analysis, that Berry may be liable for additional post-acquisition, prepetition tax charges that have yet to be identified (the "Miscellaneous Taxes"). The Debtors estimate that, to the extent the Miscellaneous Taxes have accrued, the related prepetition liability totals approximately $220,000 (the "Unpaid Miscellaneous Taxes"). The Debtors do not anticipate that any of the accrued Miscellaneous Taxes is or will become due and owing within 21 days of the Petition Date.

47

149.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**I.      Application of Local Insight Media Holdings, Inc., et al. for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (the "KCC Retention Application")**

150.     The Debtors seek entry of an order authorizing the employment and retention of KCC as the notice and claims agent in these chapter 11 cases, subject to that certain services agreement, dated November 3, 2010, by and between KCC and Regatta Investor Holdings, Inc., effective *nunc pro tunc* to the Petition Date.

151.     The thousands of creditors and other parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens on this Court and the Office of the Clerk of the Court (the "Clerk's Office"). To relieve the Clerk's Office of these burdens, the Debtors seek an order appointing KCC as the notice and claims agent in these chapter 11 cases pursuant to both 28 U.S.C. § 156(c) and Local Bankruptcy Rules 2002-1(f) and 9013-1(m). The Debtors' selection of KCC to act as the official claims agent has satisfied the Court's protocol for the retention of a notice and claims agent, where the Debtors have obtained and reviewed engagement proposals from other court-approved claims agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that KCC would provide the most cost effective and efficient service as a claims agent for these chapter 11 cases.

152.     The Debtors anticipate that there will be in excess of 6,000 entities to be noticed

in these chapter 11 cases. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of an outside claims agent is both necessary and in the best interests of the Debtors' estates, creditors and parties in interest.

153.    I believe that the relief requested in the KCC Retention Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the KCC Retention Application should be approved.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 18, 2010

Respectfully submitted,

Richard C. Jenkins
Interim Chief Financial Officer