**KIRKLAND & ELLIS LLP**
Richard M. Cieri
Christopher J. Marcus
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Ross M. Kwasteniet
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (212) 446-4900

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
Michael R. Seidl (Bar No. 3889)
Curtis A. Hehn (Bar No. 4264)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Attorneys for the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOCAL INSIGHT MEDIA HOLDINGS, INC., et al.,[1] | ) Case No. 10-13677 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |

## DISCLOSURE STATEMENT OF LOCAL INSIGHT
## MEDIA HOLDINGS, INC., ET AL.

---

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

Dated: August 13, 2011

---

[1] The Debtors, together with the last four digits of each of the Debtors' federal tax identification number (if applicable), are: Local Insight Media Holdings, Inc. (2696); Local Insight Media Holdings II, Inc. (8133); Local Insight Media Holdings III, Inc. (8134); LIM Finance Holdings, Inc. (8135); LIM Finance, Inc. (8136); LIM Finance II, Inc. (5380); Local Insight Regatta Holdings, Inc. (6735); The Berry Company LLC (7899); Local Insight Listing Management, Inc. (7524); Regatta Investor Holdings, Inc. (8137); Regatta Investor Holdings II, Inc. (8138); Regatta Investor LLC; Regatta Split-off I LLC; Regatta Split-off II LLC; Regatta Split-off III LLC; Regatta Holding I, L.P.; Regatta Holding II, L.P.; and Regatta Holding III, L.P. For the purpose of these chapter 11 cases, on or before September 9, 2011, the service address for the Debtors is: 188 Inverness Drive West, Suite 800, Englewood, CO 80112. After September 9, 2011, the service address for the Debtors is: 160 Inverness Drive West, Suite 400, Englewood, CO 80112.

## DISCLAIMER

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT. THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTORS OR ANY OTHER PARTY, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION COMMENTED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, ATTACHED HERETO AS **EXHIBIT C** AND DESCRIBED IN THIS DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED. THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

PLEASE REFER TO ARTICLE X OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS, LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT, NO LATER THAN 5:00 P.M. PREVAILING PACIFIC TIME, ON OCTOBER 27, 2011. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE III OF THIS DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON [___], 2011 AT [___] [A.M./P.M.] PREVAILING EASTERN TIME, BEFORE THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES THAT HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS OCTOBER 27, 2011, AT 5:00 P.M. PREVAILING EASTERN TIME. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN  INTEREST IN ACCORDANCE WITH THE

DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

## TABLE OF CONTENTS

ARTICLE I INTRODUCTION ..................................................................................................1

ARTICLE II OVERVIEW OF THE PLAN ..............................................................................1
    2.1       General Structure of the Plan ..............................................................................1
    2.2       Unclassified Claims ............................................................................................2
    2.3       Classified Claims and Interests ..........................................................................3
    2.4       Liquidation and Valuation Analyses ................................................................11

ARTICLE III VOTING PROCEDURES AND REQUIREMENTS ........................................12
    3.1       Classes Entitled to Vote on the Plan ................................................................12
    3.2       Vote Required for Acceptance by a Class .........................................................12
    3.3       Certain Factors to be Considered Prior to Voting............................................12
    3.4       Classes Not Entitled to Vote on the Plan .........................................................13
    3.5       Solicitation Procedures .....................................................................................13
    3.6       Voting Procedures ............................................................................................14

ARTICLE IV CONFIRMATION ............................................................................................15

ARTICLE V FINANCIAL INFORMATION AND PROJECTIONS .....................................15
    5.1       Introduction.......................................................................................................15
    5.2       Summary of Financial Projections ...................................................................16

ARTICLE VI BUSINESS DESCRIPTIONS ..........................................................................17
    6.1       The Company's Corporate History and Organizational Structure ...................17
    6.2       Employees.........................................................................................................21
    6.3       Directors and Officers ......................................................................................21
    6.4       The Debtors' Prepetition Capital Structure ......................................................25

ARTICLE VII EVENTS LEADING TO THESE CHAPTER 11 CASES ...............................26
    7.1       Challenging Industry Conditions .....................................................................26
    7.2       Commencement of the Chapter 11 Cases to Preserve the Avoidance Action against the Regatta Credit Facility Lenders ...................................................................27

ARTICLE VIII SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES ......................28
    8.1       Interim and Final First-Day Relief....................................................................28
    8.2       Other Important Relief......................................................................................30
    8.3       The Official Committee of Unsecured Creditors .............................................34
    8.4       Filing of the Schedules .....................................................................................34
    8.5       Setting of Bar Dates .........................................................................................34

ARTICLE IX OTHER KEY ASPECTS OF THE PLAN ......................................................34
    9.1       Corporate Governance ......................................................................................34
    9.2       Distributions .....................................................................................................35
    9.3       Treatment of Executory Contracts and Unexpired Leases...............................36
    9.4       Release, Injunction, and Related Provisions ....................................................39
    9.5       Capital Stock of Reorganized Regatta ..............................................................42
    9.6       Incentive Plans and Employee and Retiree Benefits........................................42
    9.7       Management Equity Incentive Program ...........................................................42
    9.8       Subordination....................................................................................................43
    9.9       Vesting of Assets ..............................................................................................43
    9.10     Modification of Plan .........................................................................................43
    9.11     Revocation of Plan............................................................................................43
    9.12     Reservation of Rights........................................................................................44

9.13    Plan Supplement ................................................................................................ 44

**ARTICLE X CERTAIN FACTORS TO BE CONSIDERED** ....................................................... **44**
10.1    General ............................................................................................................... 44
10.2    Certain Bankruptcy Law Considerations ......................................................... 44
10.3    Risk Factors That May Affect Distributions Under the Plan .......................... 46
10.4    Disclosure Statement Disclaimer ..................................................................... 56

**ARTICLE XI IMPORTANT SECURITIES LAW DISCLOSURE** ................................................ **58**

**ARTICLE XII CONFIRMATION PROCEDURES** ................................................................... **59**
12.1    The Confirmation Hearing ................................................................................ 59
12.2    Confirmation Standards .................................................................................... 59
12.3    Best Interests Test/Liquidation Analysis ......................................................... 60
12.4    Valuation Analysis ............................................................................................ 60
12.5    Feasibility .......................................................................................................... 60
12.6    Confirmation Without Acceptance by All Impaired Classes ........................... 60

**ARTICLE XIII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN** .......................................................................................................................... **62**

**ARTICLE XIV CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ............................. **62**

**ARTICLE XV CONCLUSION AND RECOMMENDATION** ...................................................... **62**

**APPENDIX: RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW,
    AND OTHER REFERENCES** ......................................................................................... **1**
15.1    Rules of Interpretation ........................................................................................ 1
15.2    Computation of Time ........................................................................................... 1
15.3    Governing Law ..................................................................................................... 1
15.4    Reference to Monetary Figures ........................................................................... 1
15.5    Reference to the Debtors or the Reorganized Debtors ....................................... 1

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | Joint Chapter 11 Plan of Local Insight Media Holdings, Inc. et al. |
| **Exhibit B** | Signed Disclosure Statement Order |
| **Exhibit C** | Financial Projections |
| **Exhibit D** | Valuation Analysis |
| **Exhibit E** | Liquidation Analysis |
| **Exhibit F** | The Debtors' Organization Structure Chart |

K&E 18402318

# ARTICLE I
## INTRODUCTION

This Disclosure Statement provides information regarding the *Joint Chapter 11 Plan of Local Insight Media Holdings, Inc. et al.*, a copy of which is attached hereto as **Exhibit A**, which the Debtors are seeking to have confirmed by the Bankruptcy Court. The Debtors believe that the Plan is in the best interests of all holders of Claims and Interests. Accordingly, the Debtors urge all such holders entitled to vote on the Plan to vote in favor of the Plan.

**PRESENTLY, THE DEBTORS BELIEVE THE PLAN WILL LIKELY LEAVE THE REORGANIZED DEBTORS WITH A LIQUIDITY SHORTFALL IF ADDITIONAL SOURCES OF LIQUIDITY ARE NOT IDENTIFIED. THOSE ADDITIONAL SOURCES OF LIQUIDITY MAY INCLUDE, AMONG OTHERS, OBTAINING ADDITIONAL FUNDING COMMITMENTS OR REDUCING THE DEBTORS' CASH NEEDS ON EMERGENCE. THE DEBTORS AND THEIR ADVISORS, IN CONSULTATION WITH THE STEERING COMMITTEE AND THE CREDITORS' COMMITTEE, ARE WORKING TO IDENTIFY WAYS TO NARROW OR ELIMINATE THIS POTENTIAL LIQUIDITY SHORTFALL. THE DEBTORS ARE HOPEFUL THAT THIS POTENTIAL LIQUIDITY SHORTFALL WILL BE SUBSTANTIALLY NARROWED OR ELIMINATED BY THE TIME THE DEBTORS APPEAR BEFORE THE BANKRUPTCY COURT SEEKING APPROVAL OF THIS DISCLOSURE STATEMENT. HOWEVER, THERE CAN BE NO ASSURANCES THAT THE DEBTORS WILL BE ABLE TO ADEQUATELY ADDRESS THEIR LIQUIDITY NEEDS. IF THE DEBTORS ARE NOT ABLE TO ADEQUATELY ADDRESS THEIR LIQUIDITY NEEDS, THEY WILL LIKELY NOT BE ABLE TO PROCEED FORWARD WITH THE CURRENT PLAN. IN SUCH AN EVENT, THE DEBTORS MAY PURSUE ALTERNATIVE PLAN OF REORGANIZATION STRATEGIES, WHICH MAY POTENTIALLY INCLUDE MODIFYING THE TERMS OF THE PLAN, PURSUING A SALE OF SOME OR ALL OF THE DEBTORS' ASSETS, OR PURSUING SOME OTHER FORM OF REORGANIZATION OR WIND-DOWN.**

# ARTICLE II
## OVERVIEW OF THE PLAN

## 2.1    General Structure of the Plan

The Plan provides for the discharge of Claims and Interests, primarily, through the: (a) issuance of Reorganized Regatta Common Stock; (b) entry into the First Lien Exit Facility to repay or refinance the DIP Facility; and/or (c) payment of Cash. Certain Claims and Interests will not receive distributions under the Plan.

Specifically, holders of DIP Facility Claims will either be paid in cash in full or voluntarily convert into the First Lien Exit Facility in an amount equal to the amount of such holders' respective DIP Facility Claims on the Effective Date. Reorganized Regatta will issue Reorganized Regatta Common Stock to holders of Regatta Credit Facility Claims and Regatta General Unsecured Claims. Regatta Credit Facility Claims are treated under the Plan as having the same level of priority as Regatta General Unsecured Claims at The Berry Company LLC ("Berry"). This proposed treatment effectively assumes that the Debtors would prevail in an avoidance action to avoid the Regatta Credit Facility Lenders' Lien against the assets of Berry. This potential avoidance action is discussed in more detail in Section 6.4(a). Plan distributions also account for the subordination of Regatta Subordinated Notes Claims to Regatta Credit Facility Claims in accordance with the subordination provisions set forth in Article XII of the Regatta Subordinated Notes Indenture. Additionally, holders of LIM Finance II Term Loan Facility Claims and holders of LIM Finance II General Unsecured Claims will receive on account of such Claims Debtor LIM Finance II, Inc.'s Interests in non-Debtor Affiliates Local Insight Media, L.P. and Local Insight Media, GP LLC. All Interests in the Debtors will be extinguished, except for Interests in Berry Companies, which will be reinstated on the Effective Date. Administrative Claims, Secured Tax Claims, Other Secured Claims, Regatta Convenience Class Claims, Priority Tax Claims, Other Priority Claims, and Professional Claims will be paid in full in Cash from Cash on hand and from the Debtors' existing assets.

1

## 2.2 Unclassified Claims

### (a) Unclassified Claims Summary

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Professional Claims, DIP Facility Claims, or Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in Article III of the Plan. The Claim amounts and recoveries for such unclassified Claims, projected as of October 31, 2011, are set forth below:

| Claim | Plan Treatment | Est. Aggregate Amount of Allowed Claims | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims and Professional Claims | Paid in full in Cash | $37,700,000[2] | 100% |
| DIP Facility Claims | Paid in full through First Lien Exit Facility or through other exit refinancing facility | $[25,000,000] | 100% |
| Priority Tax Claims | Paid in full in Cash | $300,000 | 100% |

### (b) Unclassified Claims Detail

#### (1) Administrative Claims

Unless less favorable treatment is otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (A) on the Effective Date, or as soon as practicable thereafter; (B) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (C) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the holders of such Allowed Administrative Claims.

#### (2) Professional Claims

All final requests for payment of Professional Claims shall be filed no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

In accordance with Section 2.2(c) of the Plan, on the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Estates of the Reorganized Debtors. The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee

---

[2]  The estimate for Allowed Administrative Claims and Professional Claims reflects the Debtors' postpetition accounts payable and accrued liabilities as of June 30, 2011. The estimate does not include amounts paid by the Debtors in the ordinary course of business during the Chapter 11 Cases. Moreover, the estimate excludes any intercompany Claims that may be entitled to administrative priority, which Claims are addressed under the WBS Contracts Settlement and/or the Transition Agreement.

K&E 18402318

Escrow Account when such Professional Claims are Allowed by a Final Order. When all such amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall belong to Reorganized Regatta.

Professionals shall estimate their Professional Claims and other fees and expenses incurred in rendering services to the Debtors prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than five days prior to the Effective Date, provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Claims filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to Section 2.2(c) of the Plan shall comprise the Professional Fee Reserve Amount.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall in the ordinary course of business, and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(3) **DIP Facility Claims**

On the Effective Date, the DIP Facility shall, subject to the express consent of the DIP Facility Lenders, (a) convert into the First Lien Exit Facility or (b) be refinanced in full in Cash by an exit financing facility in form and substance reasonably acceptable to the Debtors and the Steering Committee and on terms no less favorable than the terms set forth on **Exhibit A** to the Plan. All of the Debtors' contingent or unliquidated obligations under Section 12.5 of the DIP Facility Credit Agreement, to the extent any such obligation has not been paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

(4) **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive from the respective Debtor liable for such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized Debtors, as applicable, one of the following treatments on account of such Allowed Priority Tax Claim: (A) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (B) Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## 2.3 Classified Claims and Interests

(a) **Classified Claims and Interests Summary**

The table below summarizes the classification, treatment, voting rights, and estimated recoveries, if any, of the Claims and Interests under the Plan. The projected recoveries are based upon certain assumptions contained in the valuation analysis prepared by the Debtors (the "Valuation Analysis"), including with respect to the amounts of Claims against the Estates and for purposes of deriving the assumed reorganization value of Reorganized Regatta Common Stock through the use of commonly accepted valuation techniques, all as more fully described in **Exhibit D** to the Disclosure Statement. Amounts assumed in the Valuation Analysis, including the value of Reorganized Regatta Common Stock, are estimates only. Additionally, the Financial Projections may be materially less or materially more than estimated. Accordingly, recoveries received by holders of Claims and Interests in the Chapter 11 Cases may differ materially from the projected recoveries listed below.

3

| Class | Claim or Interest | Voting Rights | Treatment | Est. Range of Allowed Claims or Interests | Recovery under the Plan[3] | Recovery in a Liquidation |
|-------|-------------------|---------------|-----------|-------------------------------------------|----------------------------|----------------------------|
| 1 | Secured Tax Claims | Not Entitled to Vote (Presumed to Accept) | Paid in full in Cash | $5,000 to $11,000 | 100% | [___] |
| 2 | Other Secured Claims | Not Entitled to Vote (Presumed to Accept) | Paid in full in Cash | $0 to $100,000 | 100% | [0%] |
| 3 | Other Priority Claims | Not Entitled to Vote (Presumed to Accept) | Paid in full in Cash | $60,000 | 100% | 0% |
| 4 | Regatta Credit Facility Claims | Entitled to Vote | Paid Pari Passu Allocation of Reorganized Regatta Common Stock and Pro Rata Share of Regatta Notes Distribution Property | $339,277,220 | [___]% to [___]%[4] | [___] |
| 5 | Regatta Subordinated Notes Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $221,177,027 | 0% | 0% |
| 6 | Regatta General Unsecured Claims | Entitled to Vote | Paid Pari Passu Allocation of Reorganized Regatta Common Stock | $5,000,000 to $7,000,000[5] | [___]% to [___]% | [___] |
| 7 | Regatta Convenience Class Claims | Not Entitled to Vote (Presumed to Accept) | Paid in full in Cash | $100,000 | 100% | [___] |
| 8 | Regatta Investor General Unsecured Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $0 | 0% | 0% |
| 9 | Super Holdco General Unsecured Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $1,600,000 to $3,900,000 | 0% | 0% |
| 10 | LIM Finance II Term Loan Facility Claims | Entitled to Vote | Paid Pari Passu Allocation of Equity Securities in each of Local Insight Media LP and LIM, GP LLC and Pro Rata | $119,844,488 | [___]% | [___] |

---

[3]    The estimated Claim recoveries provided in this Disclosure Statement do not account for dilution, as applicable, by the Management Equity Incentive Program.

[4]    The estimated recovery for Regatta Credit Facility Claims accounts for the distribution of property to holders of Regatta Credit Facility Claims that otherwise would be distributed to holders of the Regatta Subordinated Notes Claims but for the subordination provisions set forth in Article XII of the Regatta Subordinated Notes Indenture.

[5]    The estimated range of Allowed Regatta General Unsecured Claims excludes approximately $50.4 million in intercompany Claims against the Debtors that are addressed under the WBS Contracts Settlement and the Transition Agreement. The upper end of the range includes a placeholder estimate of $1 million on account of Executory Contract and Unexpired Lease rejection Claims and a placeholder estimate of $1 million on account of unliquidated Claims.

| Class | Claim or Interest | Voting Rights | Treatment | Est. Range of Allowed Claims or Interests | Recovery under the Plan[3] | Recovery in a Liquidation |
|---|---|---|---|---|---|---|
| | | | Share of LIM Finance II Note Distribution Property | | | |
| 11 | LIM Finance II Senior Subordinated Note Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $80,653,260 | 0% | 0% |
| 12 | LIM Finance II General Unsecured Claims | Entitled to Vote | Paid Pari Passu Allocation of Equity Securities in each of Local Insight Media LP and LIM, GP LLC | $12,527,186 | [___]% to [___]% | [___] |
| 13 | LIM Finance Term Loan Facility Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $138,141,667 | 0% | 0% |
| 14 | LIM Finance General Unsecured Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $6,200,938 | 0% | 0% |
| 15 | Regatta Investor and Regatta Holdings Interests | Not Entitled to Vote (Deemed to Reject) | No recovery | $0 | 0% | 0% |
| 16 | Berry Companies Interests | Not Entitled to Vote (Presumed to Accept) | Reinstated | $[___] | 100% | 0% |
| 17 | Super Holdco Interests | Not Entitled to Vote (Deemed to Reject) | No recovery | $0 | 0% | 0% |
| 18 | LIM Finance Interests | Not Entitled to Vote (Deemed to Reject) | No recovery | $0 | 0% | 0% |
| 19 | Section 510(b) Claims | Not Entitled to Vote (Deemed to Reject) | No recovery | $0 | 0% | 0% |

**(b)**     <u>Classified Claims and Interests Details</u>

    **(1)**     **Class 1 — Secured Tax Claims**

        A.     *Classification*: Class 1 consists of any Secured Tax Claims against any Debtor.

        B.     *Treatment*: Except to the extent that a holder of an Allowed Class 1 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 1 Claim, receive from the respective Debtor liable for such Allowed Class 1 Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

            i.     Cash on the Effective Date, or as soon as practicable thereafter, in an amount equal to such Allowed Class 1 Claim;

            ii.     commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal

5

semi-annual Cash payments in an aggregate amount equal to such Allowed Class 1 Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or the Reorganized Debtors to prepay the entire amount of such Allowed Claim without premium or penalty; or

iii.    regular Cash payments in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

C.    *Voting*: Class 1 is Unimpaired, and holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

**(2)    Class 2 — Other Secured Claims**

A.    *Classification*: Class 2 consists of any Other Secured Claims against any Debtor.

B.    *Treatment*: Except to the extent that a holder of an Allowed Class 2 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 2 Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

i.    have its Allowed Class 2 Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Allowed Class 2 Claim to demand or receive payment of such Allowed Class 2 Claim prior to the stated maturity of such Allowed Class 2 Claim from and after the occurrence of a default;

ii.    receive Cash from the respective Debtor liable for such Allowed Class 2 Claim in an amount equal to such Allowed Class 2 Claim, including any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date, or as soon as practicable thereafter, and the date such Allowed Class 2 Claim becomes an Allowed Class 2 Claim, or as soon as practicable thereafter; or

iii.    receive the collateral securing its Allowed Class 2 Claim and any interest on such Allowed Class 2 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

C.    *Voting*: Class 2 is Unimpaired, and holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

6

(3) **Class 3 — Other Priority Claims**

    A.    *Classification*:  Class 3 consists of any Other Priority Claims against any Debtor.

    B.    *Treatment*:  Except to the extent that a holder of an Allowed Class 3 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 3 Claim, be paid in full in Cash by the respective Debtor liable for such Allowed Class 3 Claim on the later of (i) the Effective Date, or as soon as practicable thereafter, and (ii) the date such Class 3 Claim becomes Allowed, or as soon as practicable thereafter.

    C.    *Voting*:  Class 3 is Unimpaired, and holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class 3 Claims are not entitled to vote to accept or reject the Plan.

(4) **Class 4 — Regatta Credit Facility Claims**

    A.    *Classification*:  Class 4 consists of any Regatta Credit Facility Claims.

    B.    *Allowance*:  On the Effective Date, Class 4 Claims shall be Allowed in the aggregate amount of $339,277,220.

    C.    *Treatment*:  A holder of an Allowed Class 4 Claim shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 4 Claim, receive on the Effective Date its Pari Passu Allocation of the Reorganized Regatta Common Stock and its Pro Rata Share of the Regatta Notes Distribution Property, subject to dilution from the Management Equity Incentive Program.

    D.    *Voting*:  Class 4 is Impaired, and holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

(5) **Class 5 — Regatta Subordinated Notes Claims**

    A.    *Classification*:  Class 5 consists of any Regatta Subordinated Notes Claims.

    B.    *Allowance:*  On the Effective Date, Class 5 Claims shall be Allowed in the aggregate amount of $221,177,028.

    C.    *Treatment*:  The subordination and turn-over provisions of the Regatta Subordinated Notes Indenture shall be enforced for the benefit of Class 4, meaning that any distribution that would have been made to holders of Allowed Class 5 Claims under the Plan in the absence of such subordination and turn-over provisions will be made instead to holders of Allowed Class 4 Claims. Therefore, holders of Class 5 Claims shall not be entitled to and shall not receive and retain any distribution on account of such Claims.

    D.    *Voting*:  Class 5 is Impaired, and holders of Allowed Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 5 Claim are not entitled to vote to accept or reject the Plan.

K&E 18402318

(6)     **Class 6 — Regatta General Unsecured Claims**

      A.    *Classification*: Class 6 consists of any Regatta General Unsecured Claims, other than a Regatta Convenience Class Claim.

      B.    *Treatment*: Except to the extent that a holder of an Allowed Class 6 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 6 Claim, receive on the Effective Date, or as soon as practicable thereafter, its Pari Passu Allocation of the Reorganized Regatta Common Stock, subject to dilution from the Management Equity Incentive Program.

      C.    *Voting*: Class 6 is Impaired, and holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

(7)     **Class 7 — Regatta Convenience Class Claims**

      A.    *Classification*: Class 7 consists of any Regatta Convenience Class Claims.

      B.    *Treatment*: Except to the extent that a holder of an Allowed Class 7 Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 7 Claim, be paid on the Effective Date, or as soon as practicable thereafter, in full in Cash.

      C.    *Voting*: Class 7 is Unimpaired, and holders of Allowed Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class 7 Claims are not entitled to vote to accept or reject the Plan.

(8)     **Class 8 — Regatta Investor General Unsecured Claims**

      A.    *Classification*: Class 8 consists of any Regatta Investor General Unsecured Claims.

      B.    *Treatment*: Holders of Allowed Class 8 Claims shall not receive any distribution on account of such Claims. All Class 8 Claims shall be discharged on the Effective Date.

      C.    *Voting*: Class 8 is Impaired, and holders of Allowed Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

(9)     **Class 9 — Super Holdco General Unsecured Claims**

      A.    *Classification*: Class 9 consists of any Super Holdco General Unsecured Claims.

      B.    *Treatment*: Holders of Allowed Class 9 Claims shall not receive any distribution on account of such Claims. All Class 9 Claims shall be discharged on the Effective Date.

C. *Voting*: Class 9 is Impaired, and holders of Allowed Class 9 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 9 Claims are not entitled to vote to accept or reject the Plan.

(10) **Class 10 — LIM Finance II Term Loan Facility Claims**

A. *Classification*: Class 10 consists of any LIM Finance II Term Loan Facility Claims.

B. *Allowance:* On the Effective Date, Class 10 Claims shall be Allowed in the aggregate amount of $119,844,487 million.

C. *Treatment*: Except to the extent that a holder of an Allowed Class 10 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 10 Claim, receive on the Effective Date, or as soon as practicable thereafter, its Pari Passu Allocation of the Equity Securities in each of Local Insight Media LP and LIM, GP LLC and its Pro Rata Share of the LIM Finance II Note Distribution Property.

D. *Voting*: Class 10 is Impaired, and holders of Allowed Class 10 Claims are entitled to vote to accept or reject the Plan.

(11) **Class 11 — LIM Finance II Senior Subordinated Note Claims**

A. *Classification*: Class 11 consists of any LIM Finance II Senior Subordinated Note Claims.

B. *Allowance:* On the Effective Date, Class 11 Claims shall be Allowed in the aggregate amount of $80,653,260 million.

C. *Treatment*: The subordination provisions of the LIM Finance II Senior Subordinated Note shall be enforced for the benefit of Class 10. Therefore, holders of Allowed Class 11 Claims shall not be entitled to and shall not receive any distribution on account of such Claims.

D. *Voting*: Class 11 is Impaired, and holders of Allowed Class 11 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 11 Claims are not entitled to vote to accept or reject the Plan.

(12) **Class 12 — LIM Finance II General Unsecured Claims**

A. *Classification*: Class 12 consists of any LIM Finance II General Unsecured Claims.

B. *Treatment*: Except to the extent that a holder of an Allowed Class 12 Claim agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Class 12 Claim, receive on the Effective Date, or as soon as practicable thereafter, its Pari Passu Allocation of the Equity Securities in each of Local Insight Media LP and LIM, GP LLC.

9

C. *Voting*: Class 12 is Impaired, and holders of Allowed Class 12 Claims are entitled to vote to accept or reject the Plan.

**(13)    Class 13 — LIM Finance Term Loan Facility Claims**

A. *Classification*: Class 13 consists of any LIM Finance Term Loan Facility Claims.

B. *Allowance*: On the Effective Date, Class 13 Claims shall be Allowed in the aggregate amount of $138,141,666 million.

C. *Treatment*: Holders of Allowed Class 13 Claims shall not receive any distribution on account of such Claims. All Class 13 Claims shall be discharged on the Effective Date.

D. *Voting*: Class 13 is Impaired, and holders of Allowed Class 13 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 13 Claims are not entitled to vote to accept or reject the Plan.

**(14)    Class 14 — LIM Finance General Unsecured Claims**

A. *Classification*: Class 14 consists of any LIM Finance General Unsecured Claims.

B. *Treatment*: Holders of Allowed Class 14 Claims shall not receive any distribution on account of such Claims. All Class 13 Claims shall be discharged on the Effective Date.

C. *Voting*: Class 14 is Impaired, and holders of Allowed Class 14 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 14 Claims are not entitled to vote to accept or reject the Plan.

**(15)    Class 15 — Regatta Investor and Regatta Holdings Interests**

A. *Classification*: Class 15 consists of any Regatta Investor and Regatta Holdings Interests.

B. *Treatment*: Holders of Allowed Class 15 Interests are not entitled to receive a distribution, such Interests shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors, and the obligations of the Debtors and Reorganized Debtors in respect thereof shall be discharged.

C. *Voting*: Class 15 is Impaired, and holders of Allowed Class 15 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 15 Interests are not entitled to vote to accept or reject the Plan.

**(16)    Class 16 — Berry Companies Interests**

A. *Classification*: Class 16 consists of any Berry Companies Interests.

B. *Treatment*: Class 16 Interests shall be reinstated on the Effective Date.

K&E 18402318

C.   *Voting*: Class 16 is Unimpaired, and holders of Allowed Class 16 Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class 16 Interests are not entitled to vote to accept or reject the Plan.

**(17)   Class 17 — Super Holdco Interests**

A.   *Classification*: Class 17 consists of any Super Holdco Interests.

B.   *Treatment*: Holders of Allowed Class 17 Interests are not entitled to receive a distribution, such Interests shall be deemed cancelled as soon as practicable after the Effective Date, and the obligations of the Debtors and Reorganized Debtors in respect thereof shall be discharged.

C.   *Voting*: Class 17 is Impaired, and holders of Allowed Class 17 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 17 Interests are not entitled to vote to accept or reject the Plan.

**(18)   Class 18 — LIM Finance Interests**

A.   *Classification*: Class 18 consists of any LIM Finance Interests.

B.   *Treatment*: Holders of Allowed Class 18 Interests are not entitled to receive a distribution, such Interests shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors, and the obligations of the Debtors and Reorganized Debtors in respect thereof shall be discharged.

C.   *Voting*: Class 18 is Impaired, and holders of Allowed Class 18 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 18 Interests are not entitled to vote to accept or reject the Plan.

**(19)   Class 19 — Section 510(b) Claims**

A.   *Classification*: Class 19 consists of any Section 510(b) Claims against any Debtor.

B.   *Treatment*: Holders of Allowed Class 19 Claims shall not receive any distribution on account of such Claims. All Class 19 Claims shall be discharged on the Effective Date.

C.   *Voting*: Class 19 is Impaired, and holders of Allowed Class 19 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Allowed Class 19 Claims are not entitled to accept or reject the Plan.

**2.4   Liquidation and Valuation Analyses**

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Debtors' primary assets are publishing contracts that would have a substantially reduced value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case; (c) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; and (d) the negative impact on the market for the Debtors' assets caused by attempting to sell

11

a large number of assets in a short time frame, each of which likely would also diminish the value of the Debtors' assets available for distributions.

As more fully described in Sections 12.3 and 12.4 below, the Debtors have prepared a liquidation analysis, attached hereto as **Exhibit E** (the "Liquidation Analysis"), and the Valuation Analysis, attached hereto as **Exhibit D**, to assist holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected Creditor recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis and Valuation Analysis are based upon the value of the Debtors' assets and liabilities as of a certain date and incorporate various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, each analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis. Also, the actual total enterprise value and reorganization equity value of the Reorganized Regatta could vary materially from the estimates contained in the Valuation Analysis.

## ARTICLE III
## VOTING PROCEDURES AND REQUIREMENTS

### 3.1     <u>Classes Entitled to Vote on the Plan</u>

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 4 | Regatta Credit Facility Claims | Impaired |
| 6 | Regatta General Unsecured Claims | Impaired |
| 10 | LIM Finance II Term Loan Facility Claims | Impaired |
| 12 | LIM Finance II General Unsecured Claims | Impaired |

If your Claim or Interest is not included in any of these Classes, you are not entitled to vote and you will not receive a solicitation package, including a ballot setting forth detailed voting instructions, with this Disclosure Statement. If your Claim is included in one of these Classes, you should read your ballot and carefully follow the listed instructions. Please use only the ballot that accompanies this Disclosure Statement.

### 3.2     <u>Vote Required for Acceptance by a Class</u>

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, as a percentage of the Allowed Claims that have voted. Acceptance requires an affirmative vote of more than one-half in number of total Allowed Claims and an affirmative vote of at least two-thirds in dollar amount of the total Allowed Claims that have voted.

### 3.3     <u>Certain Factors to be Considered Prior to Voting</u>

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

12

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "Voting Classes") or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

**3.4    Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no property under the Plan. Accordingly, the following Classes are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 5 | Regatta Subordinated Notes Claims | Impaired | Deemed to Reject |
| 7 | Regatta Convenience Class Claims | Unimpaired | Presumed to Accept |
| 8 | Regatta Investor General Unsecured Claims | Impaired | Deemed to Reject |
| 9 | Super Holdco General Unsecured Claims | Impaired | Deemed to Reject |
| 11 | LIM Finance II Senior Subordinated Note Claims | Impaired | Deemed to Reject |
| 13 | LIM Finance Term Loan Facility Claims | Impaired | Deemed to Reject |
| 14 | LIM Finance General Unsecured Claims | Impaired | Deemed to Reject |
| 15 | Regatta Investor and Regatta Holdings Interests | Impaired | Deemed to Reject |
| 16 | Berry Companies Interests | Unimpaired | Presumed to Accept |
| 17 | Super Holdco Interests | Impaired | Deemed to Reject |
| 18 | LIM Finance Interests | Impaired | Deemed to Reject |
| 19 | Section 510(b) Claims | Impaired | Deemed to Reject |

**3.5    Solicitation Procedures**

**(a)    Claims and Solicitation Agent**

The Debtors retained Kurtzman Carson Consultants LLC to act, among other things, as Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**(b)    Solicitation Package**

The following materials shall constitute the solicitation package (the "Solicitation Package") distributed to holders of Claims entitled to vote to accept or reject the Plan:

13

- the notice of the hearing to consider Confirmation;

- the appropriate ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;

- the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan);

- the *Order Approving (A) the Disclosure Statement; (B) the Voting Record Date, Voting Deadline, and Other Dates; (C) Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan; and (D) the Manner and Forms of Notice and Other Related Documents* (the "Disclosure Statement Order"), attached hereto as **Exhibit B**, without exhibits except for Exhibit 1 thereto, once approved by the Bankruptcy Court;

- a letter from the Debtors to the Voting Classes recommending that holders of Claims in such Classes vote to accept the Plan; and

- any supplemental solicitation materials the Debtors may file with the Bankruptcy Court.

(c)     **Distribution of the Solicitation Package and Plan Supplement**

Through the Claims and Solicitation Agent, the Debtors intend to distribute the Solicitation Packages within five Business Days after entry of the Disclosure Statement Order; a date approximately 30 days in advance of the Voting Deadline.

The Solicitation Package will be distributed in accordance with the solicitation procedures contained within the Disclosure Statement Order (the "Solicitation Procedures"). The Solicitation Package (except the ballots and master ballots) may also be obtained from the Claims and Solicitation Agent by: (1) calling the Debtors' restructuring hotline at (877) 660-6697 within the U.S. or Canada or, outside of the U.S. or Canada, by calling (732) 645-4114; (2) visiting the Debtors' restructuring website at: http://www.kccllc.net/localinsight; and/or (3) writing to Local Insight Media Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for free by visiting the Debtors' restructuring website or for a fee via PACER at http://www.deb.uscourts.gov.

Prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement, which includes, among other things, the Assumption Schedule, the Rejection Schedule, and a description of retained Causes of Action. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website; and/or (3) writing to Local Insight Media Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

3.6     **Voting Procedures**

September 20, 2011, the voting record date, shall be the date for determining: (a) which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (b) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim. This voting record date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

Under the Plan, holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. In order for the holder of a Claim in the Voting Classes to have such holder's ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered by using the return

14

envelope provided by: (a) first class mail; (b) courier; or (c) personal delivery to Local Insight Balloting Center c/o Kurtzman Carson Consultants LLC 2335 Alaska Avenue, El Segundo, CA 90245, so that such holder's ballot or the master ballot incorporating the vote cast by such ballot, as applicable, is **actually received** by the Claims and Solicitation Agent by the Voting Deadline.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE IV
## CONFIRMATION

Pursuant to section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to approve Confirmation. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Confirmation Hearing will commence on [____], 2011 at [____] [a.m./p.m.] prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice pursuant to Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The deadline to file Plan objections is 5:00 p.m. prevailing Eastern Time on October 27, 2011. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the deadline to file such objections.

## ARTICLE V
## FINANCIAL INFORMATION AND PROJECTIONS

### 5.1    Introduction

This section provides summary information concerning the Debtors' recent financial performance and projections for the calendar years 2011 through 2015. In connection with the planning and development of the Plan, the projections were prepared by the Debtors to present the anticipated impact of the Plan. The projections assume

that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of the Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects.

The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and this Disclosure Statement. Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan, the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in the Debtors' publicly filed quarterly and annual reports, as applicable, and any other recent report to the Securities and Exchange Commission. These filings are available by visiting the Securities and Exchange Commission's website at http://www.sec.gov or Local Insight Regatta Holdings, Inc.'s website at http://www.localinsightregattaholdings.com.

## 5.2    Summary of Financial Projections

The Debtors' Financial Projections for the calendar years 2011 through 2015 as of August 13, 2011, are attached hereto as **Exhibit C**. The projections account for management's assumptions and initiatives, as further set forth in **Exhibit C**. For purposes of the Financial Projections, the Debtors have assumed an Effective Date of October 31, 2011. The table below summarizes the Debtors' Financial Projections:

*Projected Pro Forma Consolidated Statements of Operations*
(Unaudited; Dollars in Thousands)

| INCOME STATEMENT | | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015** |
| **Revenue** | **$429,483** | **$415,049** | **$442,600** | **$485,079** | **$512,749** |
| Operating Expenses | | | | | |
| Cost of Revenue (Excluding D&A) | (99,492) | (110,806) | (131,832) | (156,706) | (173,979) |
| Publishing Rights | (184,062) | (166,558) | (172,212) | (183,248) | (191,452) |
| Selling, General and Administrative Expense | (156,967) | (114,224) | (112,036) | (112,482) | (114,331) |
| Loss on Advances to Affiliates | (14,000) | -- | -- | -- | -- |
| Depreciation and Amortization | (10,338) | (11,053) | (12,867) | (6,135) | (7,354) |
| Total Operating Expenses | (464,859) | (402,641) | (428,947) | (458,571) | (487,116) |
| **Operating (Loss) Income** | **($35,376)** | **$12,408** | **$13,653** | **$26,508** | **$25,633** |
| Reconciliation to EBITDA | | | | | |
| Plus: Loss on Advances to Affiliates | 14,000 | -- | -- | -- | -- |
| Plus: Depreciation and Amortization | 10,338 | 11,053 | 12,867 | 6,135 | 7,354 |
| Plus: Addbacks for One-time Items | 32,181 | -- | -- | -- | -- |
| **Adjusted EBITDA** | **$21,143** | **$23,461** | **$26,520** | **$32,643** | **$32,987** |

16

## ARTICLE VI
## BUSINESS DESCRIPTIONS

**6.1**     <u>The Company's Corporate History and Organizational Structure</u>

The Debtors and their non-Debtor Affiliates and subsidiaries (the "<u>Company</u>") are the fifth largest Yellow Pages directory publisher, and a leading provider of local search advertising products and services, in the United States. The Company has operations in 41 states as well as Puerto Rico and the Dominican Republic. The Company operates three principal business units, each owned, indirectly, by Debtor Local Insight Media Holdings, Inc. The majority of the equity of Local Insight Media Holdings, Inc. is owned by funds affiliated with private equity firm WCAS. A chart illustrating the Company's current organizational structure, including identification of the Debtors in these Chapter 11 Cases, is attached hereto as **Exhibit F**.

### (a)     **The Regatta Business**

The Company's first business unit consists of all Entities under Debtor Regatta Investor Holdings, Inc. (collectively, "<u>Regatta</u>"), and is shown on the far right of the organizational structure chart attached hereto as **Exhibit F**. The Regatta business is the product of a 2007 split-off (the "<u>Split-off</u>") by Windstream Corporation ("<u>Windstream</u>") of its directories business to certain funds affiliated with WCAS. As part of the Split-off, Regatta issued $210.5 million in senior subordinated notes, as described in greater detail below. On April 23, 2008, Regatta acquired substantially all the assets and certain liabilities of the independent line of business division in LM Berry and Company, a subsidiary of AT&T, Inc. As part of that acquisition, Regatta entered into its current senior secured credit facility, which is also discussed in greater detail below. Regatta's principal operating subsidiary is Berry.

Regatta derives substantially all its revenue from the sale of advertising in print and internet-based directories. In addition to serving as the exclusive official publisher of Windstream-branded print and internet directories, Regatta is the largest provider of outsourced print directory sales, marketing, production, and related services in the United States. Regatta sells advertising in, and coordinates the publication and distribution of, 218 Windstream-branded print directories and 630 print directories on behalf of 119 telephone companies and other customers. In addition, Regatta offers the following digital products and services: (1) Internet Yellow Pages ("<u>IYP</u>") advertising; (2) website development, production, and maintenance; (3) search engine marketing ("<u>SEM</u>"), including delivery of local advertisements through major search engines; and (4) internet-based video advertising.

In February 2010, Regatta launched Berry Leads[TM] ("<u>Berry Leads</u>"), a new business model that Regatta has since implemented in all its markets. Berry Leads was developed to enhance Regatta's ability to service its advertising clients by enabling them to generate business leads efficiently from multiple media platforms. The key elements of the Berry Leads business model include: (1) a comprehensive array of high-quality products and services (as described below); (2) reliance on strategic outsourcing relationships with leading third-party vendors to develop, fulfill, and support Regatta's digital advertising products and services; and (3) a redesigned sales and marketing approach comprising (A) year-round contact with, and sales to, customers, (B) a sophisticated client segmentation and account prioritization model, (C) use of a variety of media platforms to generate interest in Regatta's products and services, (D) extensive training and talent management for Regatta's sales organization, and (E) high customer service standards.

Regatta's product and service offerings are described below.

### (1)     **Print Advertising Directory**

Regatta's print directory advertising business offers advertisers a cost-effective medium by which to reach potential customers. Generally, each of Regatta's directories contains several distinct sections, including: (A) a Yellow Pages section, which organizes information by product/service headings that contain business listing advertisements; (B) a White Pages section (sometimes printed in a separate directory), which lists the names, addresses, and telephone numbers of individuals and businesses in the covered area; (C) a community information section, which provides information such as government offices, schools, and hospitals; and (D) a coverage map, which details the approximate geographic area covered by the directory.

K&E 18402318

### (2) IYP Advertising

Regatta offers subscription-based IYP services to its advertising clients. Regatta is authorized, in all the markets it currently serves, to resell online advertising listings on *YellowPages.com*, a leading national IYP and local search directory. In addition to serving as a *YellowPages.com* reseller, Regatta operates the *WindstreamYellowPages.com* website, which is marketed to advertisers located in Windstream's main geographic regions. Regatta also operates and maintains, and sells advertising for, IYP directories on behalf of approximately 34 additional telephone companies and other customers, including Regatta's non-Debtor affiliates in Alaska, Hawaii, and Cincinnati.

### (3) Website Development

Regatta offers a variety of subscription-based services related to website development, fulfillment, and maintenance. For those advertising customers that do not maintain a website, these services enable customers to quickly, effectively, and affordably establish a website presence. For advertising customers that do maintain a website, these services provide an economical solution to upgrade and enhance the effectiveness of their online presence.

Regatta's website development services include: (A) initial consultation and site design; (B) website optimization and quality review; (C) on-going support and website modification; (D) domain name registration; (E) a managed hosting platform complete with secure disk storage, daily backups, and a monthly data transfer allotment; and (F) basic services such as webmail compatible with Microsoft® ("Microsoft") Outlook and a unique local or "800" telephone number service. Under Regatta's new Berry Leads business model, website development services are sold to advertising customers on a "white label" basis under Regatta's "Berry" brand.

### (4) Search Engine Marketing

Regatta also develops cost-effective, online, promotional programs designed to direct consumer traffic to customers' websites and increase their visibility in the result pages of major search engines such as Google, Bing, and Yahoo. Regatta offers digital programs, such as "Guaranteed Clicks" and "Premium SEM," that are designed to maximize the number of clicks, calls, and emails generated by the advertiser's website. Regatta is also an authorized certified reseller of Google AdWords, the Google advertising program that offers "pay-per-click" advertising and website-targeted advertising for text and banner ads. Under Regatta's new business model, SEM services are primarily fulfilled by Yodle and *Web.com* and sold to advertising customers on a "white label" basis under Regatta's "Berry" brand.

### (5) Internet-Based Video Advertising

Given the increasing prominence of YouTube and other products devoted to online video content, Regatta has updated its products and services to provide on-site video production, editing, and post-production services for video advertisements. Regatta facilitates the placement of video advertisements on a variety of online distribution platforms, including YellowPages.com, other IYP websites, Google, Bing, and Yahoo. Regatta offers its video services under the "Berry" brand on a subscription basis.

### (b) The LIMI Business

The Company's second business unit, shown in the center of the organizational structure chart attached hereto as **Exhibit F**, includes non-Debtor Local Insight Media, Inc. ("LIMI"). LIMI provides for most of the Company's senior management and provides executive, operational, finance and accounting, treasury, legal, human resource, integration, and administrative services to Regatta and Caribe Media, Inc. ("CMI") under intercompany management services agreements. LIMI is also the indirect parent company of the following three operating companies:

- CBD Media Finance LLC ("CBD Media"), the exclusive publisher of "Cincinnati Bell Directory" branded yellow pages and the leading publisher of print and IYP directories in the greater

18

Cincinnati metropolitan area. CBD Media manages 17 print publications, with approximately 12,150 advertising customers and approximately 2.6 million print directories circulated.

- ACS Media Finance LLC ("ACS Media"), the leading publisher of print and IYP directories in the State of Alaska. As the exclusive publisher of the "official" print directories of Alaska Communications Systems Group Inc., the largest local exchange carrier in Alaska, ACS Media has approximately 9,100 advertising customers. ACS Media manages ten print publications with a total circulation of approximately 844,500 directories.

- HYP Media Finance LLC ("HYP Media"), the leading publisher of print and IYP directories in the State of Hawaii. As the exclusive publisher of the "official" print directories of Hawaiian Telcom, Inc., HYP Media has contracts with approximately 11,350 advertising customers and publishes eleven print directories with a total circulation of approximately 1.9 million.

CBD Media, ACS Media, and HYP Media are parties in a whole business securitization ("WBS") financing structure. Each of CBD Media, ACS Media, and HYP Media is party to a contract with Berry for the publication and production of, the sale of advertising in and (in the case of ACS Media and HYP Media) the printing and distribution of their directories (collectively, the "WBS Contracts"). Berry also provides all services necessary to host and sell advertising for the WBS entities' IYP directories: *CBYP.com, ACSYellowPages.com,* and *HTYellowPages.com*. Berry's directory publishing agreements with CBD Media, ACS Media, and HYP Media are Berry's largest contracts. The Debtors contemplate that these contracts, as amended, will be assumed, subject to unwinding as set forth in the motion to approve the WBS Contracts Settlement, pursuant to section 365 of the Bankruptcy Code before confirmation of the Plan as part of the WBS Contracts Settlement. The WBS Contracts Settlement is discussed in greater detail in Section 8.2(e).

### (1) CBD Media Directory Services Agreement

Under a Directory Services Agreement by and between Berry and CBD Media, dated September 1, 2002, as amended (the "CBD Agreement"), Berry is the exclusive advertising sales agent for local advertising for CBD Media's Yellow Pages directories and is responsible for all Yellow and White Pages pre-press services. Berry's pre-press services include advertising design and production, page layout, pagination, advertising inventory control, client acknowledgement preparation and mailing, quality review of final page proofs, production scheduling, and provisioning and forwarding of completed directory products to the printer. In addition, Berry manages a separate sales channel to serve the national advertising sale process for the directories under this agreement. CBD Media compensates Berry for its services on a revenue-sharing commission basis, consisting of a base commission and incentive commission, and pays an annual pre-press fee. Berry also provides all services necessary to host and sell advertising for CBD Media's IYP directory, *CBYP.com*

### (2) ACS Media Directory Services Agreement and the ACS IYP Agreement

Under an Agreement for Directory Publishing Services by and between Debtor Berry and ACS Media, dated August 10, 2000, as amended (the "ACS Agreement"), Berry distributes ACS Media's directories and provides a range of specified marketing services and is responsible for costs associated with maintaining a professional sales, management, and customer service work force relating to ACS Media's directories and the composition and printing of all ACS Media directories. Under the ACS Agreement, ACS Media has final approval authority over any directory changes, including rate increases, changes in scope of the directories, new items, or changes in the issue dates.

Pursuant to the ACS Agreement, Berry manages a separate sales channel to serve ACS Media's national advertisers. For the national sales function, Berry manages order processing, updates and maintains advertising rates, supports certified marketing representative relationships, and generates sales reports and analyzes national advertising sales performance.

Under an agreement for the provision of IYP Services between Berry and ACS Media (the "ACS IYP Agreement"), Berry provides a variety of services relating to *ACSYellowPages.com*, including website production and maintenance, provision, and maintenance of ACS Media's IYP services, distribution of internet-based

19

advertising content of ACS Media's clients to third party syndicated IYP networks, and sales, solicitation, and customer support services.

### (3) HYP Media Directory Services Agreement

Berry and HYP Media are parties to a Directory Services Agreement dated February 5, 2005, as amended (the "HYP Agreement"). Under the HYP Agreement, Berry provides and performs all services necessary to publish, print, and distribute HYP Media's directories, including sales and sales management, database maintenance, directory production, composition, pagination, graphics, printing, and distribution, as well as providing certain customer service and billing and collection services. Berry also provides all services necessary to host and sell advertising for, and drive traffic to, *HTYellowPages.com*, HYP Media's IYP website. Berry also manages a separate sales channel to serve HYP Media's national advertisers, including order processing, updating and maintaining advertising rates, supporting certified marketing representative relationships, and generating sales reports and analyzing national advertising sales performance.

While neither LIMI nor the WBS entities are Debtors in these cases, several holding companies above LIMI and the WBS entities in the corporate structure are Debtors and commenced Chapter 11 Cases to address debt obligations that they can no longer service. The CBD Agreement, the ACS Agreement, and the HYP Agreement will be treated under the WBS Contracts Settlement Order.

### (c) The Caribe Business

The Company's third business unit, shown on the left of the organizational structure chart attached hereto as **Exhibit F**, includes: (A) CMI, which is a 100% indirectly owned subsidiary of Debtor Local Insight Media Holdings, Inc.; (B) Axesa Servicios de Información, S. en C. ("Axesa"), which is a 60% owned subsidiary of CMI; and (C) Caribe Servicios de Información Dominicana, S.A. ("Caribe Servicios"), which is a 100% owned subsidiary of CMI.

CMI, a holding company, is party to an intercompany management services agreement with LIMI pursuant to which LIMI provides management, accounting, strategy, sales and marketing, human resources, and legal support to CMI.

Axesa is the leading Yellow Pages publisher in Puerto Rico and the official publisher for Puerto Rico Telephone Company, Inc. ("PRT"), the incumbent local exchange carrier in Puerto Rico. With the exclusive right to publish directories under the PRT brand, Axesa publishes 20 print directories with a total circulation of approximately 3.2 million. Axesa serves approximately 16,300 advertising clients.

Caribe Servicios is the official publisher for Compañía Dominicana de Teléfonos, S.A. ("Codetel"), the largest telecommunications provider in the Dominican Republic, with the exclusive right to publish under the Codetel's "Claro" brand. Caribe Servicios is the incumbent and largest directory publisher in the Dominican Republic, with 15 print publications, approximately 40,400 advertising customers, and a total circulation of approximately 1.6 million print directories. Further, Caribe Servicios is party to a contract with Berry (the "Berry Outsourcing Contract") pursuant to which Caribe Servicios agreed to perform a wide variety of services related to Berry's print and IYP directories, including service order processing, publishing, production, graphics, pagination, information technology, and commission calculation. Caribe Servicios has subcontracted substantially all its obligations under such contract to non-Debtor Local Insight Media Dominicana SRL ("LIMD"), as described in greater detail below.

On May 3, 2011, CMI and its direct parent, CII Acquisition Holding Inc., commenced chapter 11 cases in the Bankruptcy Court (the "Caribe Chapter 11 Cases"), which are separate from the Chapter 11 Cases and which are being jointly administered under Case No. 11-11387 (KG). Neither Axesa nor Caribe Servicios is a Debtor in either the Caribe Chapter 11 Cases or these Chapter 11 Cases.

The Caribe Chapter 11 Cases were filed in part to preserve certain potential avoidance actions against the Debtors, WCAS, and their affiliates based on approximately $44.2 million of dividends paid to CII by CMI between May 2009 and September 2010 that CII then distributed to its parent company, Local Insight Media Holdings III,

Inc. (the "Dividend Payments"). The funds were then transferred through a series of affiliated entities and ultimately contributed to non-Debtor affiliate LIMI. After discussions with the Caribe Debtors' senior lenders regarding potential avoidance actions, the Caribe Debtors retained Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel. The Caribe Debtors, along with certain affiliates and the agent for their secured lenders, filed proofs of claim number 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 371, 372, 373, 375, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 434, and 439 in the Chapter 11 Cases against certain Debtors believed to be transferees, subsequent transferees, or beneficiaries of the Dividend Payments, as well as on account of certain other intercompany claims.

### (d) LIMD

In addition to its indirect ownership of Regatta, LIMI, and CMI, Debtor Local Insight Media Holdings, Inc. also indirectly owns non-Debtor LIMD. As described above, Caribe Servicios has subcontracted substantially all its obligations under the Berry Outsourcing Contract to LIMD. The plan of reorganization filed in connection with the Caribe Chapter 11 Cases contemplates that: (i) LIMD will become a wholly owned subsidiary of Berry on or before the Effective Date; (ii) the Berry Outsourcing Contract will be assumed, as modified by the terms of the Transition Agreement, if approved; and (iii) LIMD will enter into an agreement with Berry to provide directly the services which it currently provides indirectly through Caribe Servicios.

#### (1) The Transition Agreement

*[To Come]*

## 6.2 Employees

As of the Petition Date, the Debtors employed approximately 729 individuals, approximately 724 on a full-time basis and approximately five on a part-time basis, none of whom is represented by a labor union. In addition, the Debtors retained between approximately 120 to 170 temporary workers and independent contractors. The Debtors' employees, temporary workers, and independent contractors perform a variety of critical functions, including sales, customer service, purchasing, publishing and a variety of administrative, accounting, legal, finance, management, technology, supervisory, and other related tasks.

## 6.3 Directors and Officers

The directors and officers of the Debtors are as follows:

*[The remainder of this page is intentionally left blank]*

K&E 18402318

| Director[6] | Local Insight Media Holdings, Inc. | LIM Finance, Inc. and Other Local Insight Media Holdings Entities[7] | Regatta Holdings | Local Insight Listing Management, Inc., Regatta Investor Holdings, Inc., and Regatta Investor Holdings II, Inc. |
|---|---|---|---|---|
| Marilyn B. Neal (Executive Chairman) | X | | | |
| Darren C. Battistoni | X | X | | |
| F. Stephen Larned | X | | | |
| Richard E. Newsted | X | | | |
| Anthony J. de Nicola | X | | | |
| Douglas A. Myers | | | X | X |
| Allan R. Spies | | | X | X |
| Frederick F. Brace | | | X | |

---

[6]   Berry, Regatta Investor LLC, Regatta Split-off I LLC, Regatta Split-off II LLC, Regatta Split-off III LLC, Regatta Holdings I, LP, Regatta Holdings II, LP, and Regatta Holdings III, LP have no directors. Local Insight Regatta Holdings, Inc. is the sole member and manager of Berry. Regatta Investor Holdings II, Inc. is the sole member and manager of Regatta Investor LLC. Regatta Investor LLC is the sole member and manager of Regatta Split-off I LLC, Regatta Split-off II LLC, and Regatta Split-off III LLC, which are the respective general partners of Regatta Holdings I, LP, Regatta Holdings II, LP, and Regatta Holdings III, LP.

[7]   These Debtors consist of Local Insight Media Holdings II, Inc., Local Insight Media Holdings III, Inc., LIM Finance Holdings, Inc., LIM Finance, Inc., and LIM Finance II, Inc.

K&E 18402318

| Officer | Position | Local Insight Media Holdings, Inc. and Regatta Holdings | LIM Entities and Other Local Insight Media Holdings Entities[8] | Berry | Local Insight Listing Management, Inc. | Regatta Investor Entities[9] | Regatta Split-Off and Regatta Holdings Entities[10] |
|---|---|---|---|---|---|---|---|
| Scott Brubaker[11] | Interim President, Chief Executive Officer and Chief Restructuring Officer | X | X | X | X | X | X |
| Richard C. Jenkins | Interim Chief Financial Officer | X | X | X | X | X | X |
| John S. Fischer | General Counsel and Secretary | X | X | X | X | X | X |
| Kevin J. Payne | Senior Vice President, Client Services | X | | | X | | |
| Pedro Cabrera | Senior Vice President, Publishing | X | | | X | | |
| Michael Askew | Interim Chief Information Officer | X | | | X | | |
| John Sakys | Interim Controller and Chief Accounting Officer | X | | | X | | |
| Douglas A. Myers | Vice President, Business | X | | | X | | |

---

[8]   These Debtors comprise Local Insight Media Holdings II, Inc., Local Insight Media Holdings III, Inc., LIM Finance Holdings, Inc., LIM Finance, Inc., and LIM Finance II, Inc.

[9]   These Debtors comprise Regatta Investor Holdings, Inc., Regatta Investor Holdings II, Inc., and Regatta Investor LLC.

[10]   These Debtors comprise Regatta Split-off I LLC, Regatta Split-off II LLC, Regatta Split-off III LLC, Regatta Holdings I, LP, Regatta Holdings II, LP, and Regatta Holdings III, LP.

[11]   Scott Brubaker, Richard C. Jenkins, and Michael Askew are each employees of A&M.

K&E 18402318

| Officer | Position | Local Insight Media Holdings, Inc. and Regatta Holdings | LIM Entities and Other Local Insight Media Holdings Entities[8] | Berry | Local Insight Listing Management, Inc. | Regatta Investor Entities[9] | Regatta Split-Off and Regatta Holdings Entities[10] |
|---|---|---|---|---|---|---|---|
| | Development | | | | | | |
| Kathryn Tecosky | Vice President, Training and Organizational Development | X | | X | | | |
| Jessica Pruss | Vice President, Operations | X | | X | | | |
| Mitchell Vander Vegt | Vice President, Client Loyalty | X | | X | | | |
| Michael Brugman | Vice President, Publishing | X | | X | X[12] | | |
| Karen Payne | Vice President, Marketing | X | | X | | | |
| Randy Preble | Vice President, Business Performance Intelligence | X | | X | | | |

---

[12]  Michael Brugman serves as Vice President, Marketing at Local Insight Listing Management Inc.

K&E 18402318

**6.4**     **The Debtors' Prepetition Capital Structure**

The Debtors' capital structure consists of secured revolving and term loans and senior subordinated notes owed by Regatta Holdings, bridge loans owed by LIM Finance, Inc. ("LIM Finance") and LIM Finance II, Inc. ("LIM Finance II") and senior subordinated notes owed by LIM Finance II. As of the Petition Date: (A) Regatta Holdings' total consolidated funded debt was approximately $560 million, consisting of a secured term loan in the approximate amount of $313 million, a secured revolver drawn in the approximate amount of $26 million, and senior subordinated notes in the approximate amount of $221 million; (B) the total funded debt at LIM Finance was approximately $149 million, consisting of a bridge loan; and (C) the total funded debt at LIM Finance II was approximately $209 million, consisting of a bridge loan in the approximate amount of $128 million and senior subordinated notes in the approximate amount of $81 million.

    (a)     **Regatta Credit Facility**

In connection with Regatta Holdings' acquisition of substantially all the assets of LM Berry and Company, Regatta Holdings, as borrower, entered into the Regatta Credit Facility on April 23, 2008. The Regatta Credit Facility provides for a $335 million senior secured term loan facility, of which approximately $313 million was outstanding as of the Petition Date, and a $30 million senior secured revolving loan facility, of which approximately $26 million was outstanding as of the Petition Date.

Pursuant to the Guaranty and Collateral Agreement and Supplement No. 1 to the Guaranty and Collateral Agreement, dated June 30, 2008, the guarantors under the Regatta Credit Facility include Debtors Berry, Local Insight Listing Management, Inc., Regatta Holding I, L.P., Regatta Holding II, L.P., Regatta Holding III, L.P., and Regatta Investor LLC (collectively, the "Regatta Credit Facility Guarantors"). The Regatta Credit Facility is secured by substantially all of the assets, as well as pledges of all the issued and outstanding capital stock and other Interests, of Regatta Holdings and the Regatta Credit Facility Guarantors.

Upon the closing of the Regatta Credit Facility, Uniform Commercial Code financing statements were filed against each of the then-Regatta Credit Facility Guarantors. On May 23, 2008, Local Insight Berry Holdings, LLC, a New York limited liability company, was merged into Berry, a Colorado limited liability company, with Berry being the surviving entity. On June 30, 2009, Local Insight Yellow Pages, Inc., an Ohio corporation, was merged into Berry, with Berry being the surviving entity. As a result of these mergers, Berry held substantially all the material assets of the Regatta business.

    (b)     **Regatta Subordinated Notes**

In connection with the Split-Off, Regatta Holdings issued $210.5 million aggregate principal amount of 11% senior subordinated notes due November 30, 2017, pursuant to the Regatta Subordinated Notes Indenture with Windstream Regatta Holdings, Inc.,[13] as issuer, and Wells Fargo Bank, N.A., as trustee.

In November 2008, Regatta Holdings completed an offer to exchange all of these subordinated notes for the Regatta Subordinated Notes. The terms of the Regatta Subordinated Notes are identical in all material respects to those of the notes they replaced, except that the Regatta Subordinated Notes were registered under the Securities Act under a registration statement that was declared effective by the Securities and Exchange Commission on October 10, 2008. The Regatta Subordinated Notes are guaranteed by the Regatta Credit Facility Guarantors.

In July 2009, U.S. Bank National Association replaced Wells Fargo Bank, N.A. as trustee under the Regatta Subordinated Notes Indenture. On January 3, 2011, Regatta Holdings terminated the registration of the Regatta Subordinated Notes under the Securities Exchange Act of 1934, as amended. As of the Petition Date, approximately $221 million in total principal and interest obligations was due and owing on account of the Regatta Subordinated Notes.

---

[13]   On or about November 30, 2007, Windstream Regatta Holdings, Inc. was renamed Local Insight Regatta Holdings, Inc.

K&E 18402318

(c)     **Bridge Loans**

On June 20, 2008, Debtor LIM Finance II, as borrower, entered into the LIM Finance II Term Loan Facility. The LIM Finance II Term Loan Facility provided $233,750,000 to pay off certain indebtedness of LIM Finance II's subsidiaries and to fund certain other obligations, fees, and expenses.

On June 9, 2009, Debtor LIM Finance, as borrower, entered into that certain credit agreement (as amended on September 29, 2009 and October 5, 2009, respectively), with JPMorgan as administrative agent and the several lenders party thereto, the proceeds of which were used to pay off $133,750,000 of LIM Finance II's indebtedness under the LIM Finance II Term Loan Facility. In further refinancing this debt, on October 14, 2009, LIM Finance, as borrower, entered into the $137,500,000 LIM Finance Term Loan Facility (together with the LIM Finance II Term Loan Facility, the "Bridge Loans").

On November 10, 2010, each of the lenders under the Bridge Loans irrevocably sold and assigned to Welsh, Carson, Anderson & Stowe IX, L.P., Welsh, Carson, Anderson & Stowe X, L.P., and WCAS Management Corporation all of their respective rights and obligations as lenders under the Bridge Loans. As of the Petition Date, approximately $277 million was outstanding under the Bridge Loans.

(d)     **LIM Finance II Senior Subordinated Notes**

On or about June 20, 2008, LIM Finance II, as issuer, issued $60 million in the LIM Finance II Senior Subordinated Notes to WCAS Capital Partners IV, L.P. As of the Petition Date, approximately $81 million was due and owing on account of the LIM Finance II Senior Subordinated Notes.

## ARTICLE VII
## EVENTS LEADING TO THESE CHAPTER 11 CASES

### 7.1     Challenging Industry Conditions

In the months leading up to the Petition Date, the Debtors experienced: (a) declines in advertising sales due to the economic recession, dislocation of credit markets, increased bad debt expense, and declining consumer usage of print directory products and (b) significant competition and saturation in advertising markets, which placed significant strain on the Debtors' liquidity. Although the Debtors have implemented various cost-cutting and operational restructuring initiatives, these initiatives were insufficient to offset declining revenues.

(a)     **Economic Recession, Dislocation of Credit Markets, and Declining Consumer Usage**

The economic recession that began in 2008 and the accompanying dislocation of credit markets have caused a decline in the Debtors' print advertising sales—the principal source of the Debtors' revenue. The recession significantly reduced business spending among small and medium-sized businesses ("SMBs"), which constitute a substantial majority of the Debtors' advertising clients. Recent economic conditions have also resulted in higher collection costs and bad debt expense due to increased difficulty in collecting accounts receivable from advertising clients in financial difficulty. According to published industry sources, the print advertising market declined by 20% during the worst twelve-month-period of the economic downturn. As a result, total revenue for the three and twelve-month periods ended March 31, 2011 were approximately $111.2 million and $481.4 million, respectively, representing a decrease in total revenue of approximately 17.3% and 15.2%, respectively, from the same periods for the previous year.

These revenue weaknesses are also a result of declining consumer usage of print Yellow Pages directories in the United States. This decline is attributable to a number of factors, including increased usage of internet local search and IYP directory products (particularly in business-to-business and retail categories). This decline has significantly depressed the Debtors' advertising sales, which has resulted in less revenue. In addition, the shift from print to electronic media has discouraged new businesses from purchasing advertising in the Debtors' Yellow Pages print directories. Further, the Debtors' Pay4Performance program ("P4P"), a performance-based advertising solution under which advertising clients pay only for qualified inbound phone calls delivered from the advertising client's print Yellow Pages advertisement, failed to deliver projected revenues in 2010. Revenue

26

expectations for P4P, a new offering commercially introduced in 2009, were based on certain forecasting assumptions that were not achieved in practice, resulting in an overstatement of projected P4P call volumes.

The decline in the Debtors' print revenue has not been offset by an increase in revenue from the Debtors' IYP, digital, and other non-print products and services.

**(b)     Competition**

The Debtors' industry is highly competitive. In each of the Debtors' print advertising markets, the Debtors compete with one or more Yellow Pages directory publishers, which are predominantly independent publishers. The Debtors also compete with other incumbent publishers in overlapping and adjacent markets, which affects the Debtors' ability to attract and retain advertisers and to increase advertising rates. There are, on average, four print directory competitors in each of the Debtors' markets.

Additionally, the Debtors' core print advertising business has come under increasing competition from IYP directories and internet-based local search companies, as well as from local advertising sales in traditional media such as newspapers, magazines, radio, direct mail, telemarketing, billboards, and television. Specifically, the Debtors' IYP offerings compete with those of other incumbent directory publishers (such as SuperPages.com and Dexknows.com) and of independent directory publishers (such as Yellowbook.com), and (in some markets) with YellowPages.com itself. The Debtors also compete with search engines and portals, such as Google, Yahoo, Bing and with other internet sites that provide directory information, such as Citysearch.com and Zagat.com. Although the Debtors have entered into affiliate agreements with many of these companies, such agreements are not exclusive in most instances. Thus, these companies compete directly with the Debtors and have entered into similar agreements with other major competing directory publishers. The Debtors also compete with other providers of website development services, search engine marketing services, and other emerging technology companies, such as Web.com and Yodle (both of which are vendors to the Debtors), Clickable, Netopia, and ReachLocal, Inc.

**(c)     Operational Restructuring Initiatives**

To address their declining earnings and liquidity, the Debtors have implemented several cost-cutting and restructuring initiatives. These initiatives included several rounds of reductions in the Debtors' workforce (primarily in the areas of operations, sales and field marketing, information technology, and marketing) and a cessation of operations at the Debtors' facilities located in Matthews, North Carolina, effective March 31, 2010. Despite the costs savings resulting from these initiatives, the Debtors were unable to offset their declining revenues.

**7.2     Commencement of the Chapter 11 Cases to Preserve the Avoidance Action against the Regatta Credit Facility Lenders**

In the fall of 2010, in the months leading up to the Petition Date, the Debtors commenced restructuring negotiations with the Steering Committee and an ad hoc group of holders of the Regatta Subordinated Notes (the "Prepetition Ad Hoc Bondholder Group"). The Steering Committee and the Prepetition Ad Hoc Bondholder Group both engaged legal and financial advisors. The Debtors and their advisors met in person on several occasions with the Steering Committee, the Prepetition Ad Hoc Bondholder Group, and their respective advisors. The Debtors and their advisors also participated in numerous telephone conferences with these constituents and provided these constituents with a great deal of information, including access to an on-line data room. The Debtors' goal was to negotiate the terms of a balance-sheet restructuring and to effectuate the restructuring on an out-of-court basis, or, if necessary, to file for chapter 11 with agreement on a pre-packaged or pre-arranged plan of reorganization. Toward that end, the Debtors and their advisors made preliminary restructuring proposals to both the Steering Committee and the Prepetition Ad Hoc Bondholder Group and commenced negotiations with those parties.

At approximately the same time that the Debtors began these restructuring negotiations, the Debtors learned that the Regatta Credit Facility Lenders filed a UCC-1 financing statement in Colorado against Berry on August 20, 2010. A major factor behind the timing of the Debtors' chapter 11 filings was the goal of preserving the avoidance action against the Regatta Credit Facility Lenders as a result of the UCC-1 financing statement filed in August 2010. Although the Regatta Subordinated Noteholders are subject to a subordination provision in the

K&E 18402318

Regatta Subordinated Notes Indenture in favor of the Regatta Credit Facility Lenders, the Debtors believed the Estates and other general unsecured creditors could otherwise benefit from preserving the avoidance action against the Regatta Credit Facility Lenders. The Debtors therefore decided that if they could not quickly reach agreement on the terms of a comprehensive restructuring, they would need to file for chapter 11 by November 17, 2010, to preserve the avoidance action.

While the Debtors attempted to negotiate the terms of a comprehensive restructuring that would have allowed them to avoid or forestall the need to file for chapter 11, given the short time available to reach consensus with multiple parties on a restructuring and the pending deadline for the avoidance action against the Regatta Credit Facility Lenders, the Debtors were not successful. In late October 2010, the Debtors determined that a chapter 11 filing would likely be necessary to preserve the avoidance action against the Regatta Credit Facility Lenders and began to prepare in earnest for chapter 11 filings, including exploring debtor in possession financing alternatives.

As described above, the Debtors believe that the Regatta Subordinated Noteholders are contractually subordinated to the Regatta Credit Facility Lenders. Thus, any avoidance action would bring no benefit to the Regatta Subordinated Noteholders because they cannot receive a recovery until the Regatta Credit Facility Lenders are paid in full, regardless of whether the Regatta Credit Facility Lenders have a valid security interest in the Berry's assets. The Debtors entered into the Regatta Subordinated Notes Indenture on November 30, 2007. The Indenture states that in the event of liquidation or restructuring, the holders of "Senior Indebtedness" of the Company are entitled to payment in full in cash before the Regatta Subordinated Noteholders are entitled to any payment. The Debtors can only incur "Indebtedness" under the Indenture if they meet certain leverage ratio requirements. On April 30, 2008, the Debtors entered into the Regatta Credit Facility. In connection with the transaction, the Debtors executed a support certificate that provided the Debtors had satisfied the leverage ratio requirement and the Regatta Credit Facility was "Senior Indebtedness" under the Indenture. In November 2008, the Debtors completed an exchange of these notes for the Regatta Subordinated Notes, which was declared effective by the Securities and Exchange Commission on October 10, 2008. The prospectus filed with the SEC reiterates that the Regatta Subordinated Notes are junior to the Regatta Credit Facility. Nonetheless, certain Regatta Subordinated Noteholders have asserted that the subordination clause is invalid.

## ARTICLE VIII
## SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES

### 8.1    Interim and Final First-Day Relief

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilize their operations, preserve and restore their relationships with vendors, customers, and employees, and facilitate the administration of these Chapter 11 Cases.

#### (a)    Motion to Obtain Secured Postpetition Financing

On the Petition Date, the Debtors filed a motion for approval of the DIP Facility, a secured postpetition financing on a super-priority priming lien basis, and to approve the Debtors' use of cash collateral securing the Regatta Credit Facility. The DIP Facility provides the Debtors with $25 million in postpetition liquidity and the continued use of the Regatta Credit Facility Lenders' cash collateral. Additionally, the DIP Facility is unique in that it preserves the Debtors' right to commence the avoidance action against the Regatta Credit Facility Lenders, as well as provides the Debtors access to $500,000 to prosecute any such action. The DIP Facility also provides the Debtors the right to continue to use Regatta Credit Facility Lenders' cash collateral for a period of at least 60 days following the commencement of the avoidance action against the Regatta Credit Facility Lenders.

On November 19, 2010, the Bankruptcy Court approved the proposed DIP Facility, as well as the use of the cash collateral, on an interim basis. On December 8, 2010, a member of the Creditors' Committee, the trustee under the Regatta Subordinated Notes Indenture, filed a limited objection to the Debtors' financing motion primarily focused on the Debtors' potential avoidance action against the Regatta Credit Facility Lenders. The Debtors ultimately resolved the Creditors' Committee's objection, and on December 29, 2010, the Bankruptcy Court entered a Final Order approving the DIP Facility.

28