### (b) Motion to Pay Employee Wages and Benefits

On November 19, 2010, the Debtors obtained the Bankruptcy Court's authorization on an interim basis to pay certain prepetition wages, salaries, and other compensation, reimbursable employee expenses, and employee medical and similar benefits up to an aggregate amount of $4.95 million. The order also authorized the Debtors to remit any outstanding payroll taxes or deductions to the appropriate third-party or taxing authority. Finally, the order modified the automatic stay, allowing all workers' compensation claims to proceed in the appropriate judicial or administrative forum, whether such Claims arose prepetition and postpetition.

On December 10, 2010, the Bankruptcy Court entered a Final Order approving the relief granted in the interim order. The Final Order also authorized the Debtors to pay prepetition obligations relating to their severance program.

### (c) Motion to Honor Prepetition Customer Obligations and Continue Customer Programs

On November 19, 2010, the Bankruptcy Court entered a Final Order authorizing, among other things, the Debtors to honor certain prepetition obligations to customers up to an aggregate amount of $10.8 million and to continue customer programs and practices. The Debtors utilized, and continue to utilize, a range of programs designed to attract and retain customers, including barter arrangements, a guaranteed advertisement response program, prepaid advertising services, shared-cost marketing programs, and various credits, adjustments, and offsets with customers. The Debtors believed that these payments and programs were necessary to preserve their customer relationships and goodwill for the benefit of their Estates.

### (d) Motion to Provide Utilities with Adequate Assurance of Payment

On November 19, 2010, the Bankruptcy Court entered an interim order prohibiting the Debtors' utility providers from altering, refusing, or discontinuing utility services to the Debtors solely on the basis of the commencement of these Chapter 11 Cases or the Debtors' non-payment of a debt for services rendered before entry of the order for relief. The interim order required the Debtors to escrow $135,000 in an interest-bearing, segregated account for the purpose of providing each utility provider adequate assurance of payment for utility services rendered to the Debtors postpetition. The interim order also established procedures for utility providers to request additional adequate assurance and for the Debtors to challenge such requests. On December 10, 2010, the Bankruptcy Court entered a Final Order approving the relief granted in the interim order.

### (e) Motion to Pay Taxes

On November 19, 2010, the Bankruptcy Court entered an interim order authorizing the Debtors to remit payment for certain taxes in the ordinary course of business, without regard to whether the taxes or fees accrued or arose before the Petition Date, up to an aggregate amount of $21,000 pending a Final Order. On December 10, 2010, the Bankruptcy Court entered a Final Order authorizing the Debtors to remit payment for taxes in the ordinary course of business.

### (f) Motion to Pay Shippers and Warehousemen

In the period immediately prior to the Petition Date, certain of the Debtors' published directories were in transit. The Debtors believed that, unless they were authorized to pay certain shippers, it would have been highly unlikely that the Debtors' customers would have received these directories. Additionally, the Debtors were concerned that the shippers and warehousemen held liens against the goods in their possession and/or the ability to exercise "self-help" remedies to secure payment of their Claims. Consequently, any failure by the Debtors to satisfy outstanding shipping charges could have had a material adverse impact on the Debtors' businesses.

On November 19, 2010, the Bankruptcy Court entered a Final Order authorizing, among other things, the Debtors to pay certain prepetition claims of shippers and warehousemen up to an aggregate amount of $1.35 million.

K&E 18402318

(g)     **Applications to Retain Professionals**

To assist the Debtors in carrying out their duties as debtors in possession and to represent the Debtors' interests in these Chapter 11 Cases, the Debtors with Bankruptcy Court approval retained: Kirkland & Ellis LLP and Pachulski Stang Ziehl & Jones LLP as lead and co-bankruptcy counsel, respectively; Lazard Frères & Co. LLC ("Lazard") as investment bankers and financial advisors; PricewaterhouseCoopers LLP as tax advisors; and Deloitte & Touche LLP as independent auditors. The Debtors also retained Alvarez & Marsal North America, LLC and Alvarez & Marsal Private Equity Performance Improvement Group, LLC (collectively, "A&M") pursuant to section 363 of the Bankruptcy Code to provide the Debtors with an interim chief financial officer, Richard C. Jenkins, a chief restructuring officer, Scott Brubaker, and certain additional personnel. Finally, the Debtors retained Kurtzman Carson Consultants LLC as their claims and noticing agent in connection with these Chapter 11 Cases.

In addition to retaining the above-described professionals, the Bankruptcy Court authorized the Debtors to retain certain "ordinary course professionals" to assist them with certain matters that typically are related to the operation of their businesses. Such ordinary course professionals include, for example, accountants and legal counsel working on specific non-bankruptcy matters for the Debtors.

(h)     **Additional First Day Relief**

In furtherance of the Debtors' efforts to reorganize, the Bankruptcy Court also entered: (1) an order directing the joint administration of the 18 Chapter 11 Cases under a single docket, Case Number 10-13677; (2) an order authorizing the Debtors to continue to operate their cash management system, invest in their investment account, and maintain their existing business forms; and (3) an order establishing procedures for interim compensation and reimbursement of expenses for professionals and members of the Creditors' Committee.

**8.2     Other Important Relief**

(a)     **Designation of Interim President and Chief Executive Officer**

On or about January 27, 2011, Scott A. Pomeroy, then-president and chief executive officer of each of the Debtors (and a director of certain of the Debtors), decided, with the respective boards of directors and managers of Debtor Local Insight Media Holdings, Inc. and each of its subsidiaries (collectively, the "Boards"), to immediately resign all of his positions with the Company. The Debtors determined that it would be detrimental to their ongoing restructuring process and the stability of the Company's operations if the Debtors lacked the guidance of a chief executive officer for any material period of time. Thus, the Boards determined that Scott Brubaker, the Debtors' chief restructuring officer, would be best suited to take on the responsibilities of interim president and chief executive. The Boards authorized retaining Mr. Brubaker, and Mr. Brubaker agreed to serve as interim president and chief executive officer, subject to obtaining the Bankruptcy Court's approval.

On January 31, 2011, the Debtors filed a supplemental application to expand the scope of A&M's retention to designate Scott Brubaker as interim president and chief executive officer. Additionally, the Debtors' application sought approval for Mr. Brubaker to serve as interim president and chief executive officer of the Debtors' non-Debtor affiliates and for Richard Jenkins of A&M, the interim chief financial officer of each of the Debtors, to serve in that same capacity at each of the Debtors' non-Debtor affiliates. On February 11, 2011, the Bankruptcy Court entered an order authorizing the Debtors to expand the scope of A&M's retention. In light of Mr. Brubaker's and Mr. Jenkins' roles at both Debtors and non-Debtor affiliates, A&M informally agreed to provide to the Creditors' Committee detailed monthly reports describing A&M's work at both Debtor and non-Debtor affiliate entities.

(b)     **Extensions of the Debtors' Exclusive Periods**

Section 1121(b) of the Bankruptcy Code provides that a debtor has the exclusive right to propose a chapter 11 plan for the first 120 days of a chapter 11 case. Section 1121(c) of the Bankruptcy Code also provides that the debtor has the exclusive right to solicit votes for its plan for an additional 60 days. Section 1121(d) of the Bankruptcy Code authorizes a bankruptcy court to extend these exclusive periods, for cause shown, to a date that is up to 18 months after the bankruptcy filing date to file a chapter 11 plan and up to 20 months after the bankruptcy filing date to solicit votes.

30

In March 2011, the Debtors filed a motion in the Bankruptcy Court to extend their exclusive periods. At that time, the Chapter 11 Cases were not even four months old, but there had already been numerous negotiations and developments that pointed to and set the stage for the Debtors' overall restructuring. In the time since the Petition Date, the Debtors and their advisors had worked diligently to ensure a smooth transition into chapter 11, including by stabilizing the Debtors' business operations, focusing on vendor and customer relations issues, and preparing and filing Schedules of Assets and Liabilities and Statements of Financial Affairs. Additionally, the Debtors, after extensive negotiations, secured the DIP Facility and obtained interim and final Bankruptcy Court approval thereof. The Debtors' early efforts were complicated by certain employee turnover issues, including, as described previously, the decision by the Debtors' former president and chief executive officer to resign. The Debtors, nonetheless, successfully obtained on an expedited basis Bankruptcy Court approval to designate an interim president and chief executive officer, as well as related relief.

Additionally, prior to filing a motion to extend their exclusive periods, the Debtors had finalized their long-term business plan and financial projections and had presented these materials to the advisors to the Creditors' Committee and to the advisors to the Steering Committee, who are also the lead lenders under the DIP Facility. The completion of this significant step in the reorganization process positioned the Debtors to finalize the restructuring negotiations that they began with their senior lenders prior to their entering chapter 11.

On March 29, 2011, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a plan of reorganization to June 15, 2011 and the Debtors' exclusive period to solicit votes on a plan of reorganization to August 15, 2011.

On June 14, 2011, the Debtors filed a second motion to extend their exclusive periods. After the court's first exclusivity extension order, the Debtors socialized their analysis of the WBS Contracts with the advisors to the Steering Committee and the Creditors' Committee. In early May, the Debtors initiated negotiations with Ambac Assurance Corporation ("Ambac") regarding the WBS Contracts. Under the terms of the WBS transaction, Ambac has certain consent rights with respect to proposed material amendments to the WBS Contracts. Meanwhile, the Debtors prepared and socialized their proposed plan of reorganization with the advisors to the Steering Committee and the Creditors' Committee, which was contingent on the outcome of the negotiations with Ambac.

On July 12, 2011, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a plan of reorganization to August 14, 2011 and the Debtors' exclusive period to solicit votes on a plan of reorganization to October 14, 2011.

### (c) Key Employee Incentive Plan

Following the Petition Date, the Debtors lost a number of senior executives and their employees had endured increased pressures and responsibilities associated with operating in chapter 11. The Debtors, with the help of their financial advisors, designed a key employee incentive plan (the "KEIP") to motivate and retain their most important employees, facilitate a speedy emergence from chapter 11, and maximize the value of their Estates. On March 29, 2011, the Bankruptcy Court entered an order authorizing the Debtors to implement a KEIP that includes: (1) compensation incentives for 38 members of senior and middle management, awarded based on the achievement of targets relating to the Debtors' quarterly adjusted EBITDA and the Debtors' emergence from bankruptcy within a certain timeframe; (2) a retention component for 50 non-executive non-insider employees; and (3) a $50,000 discretionary component to honor a contractual obligation to John Sakys, the Debtors' interim controller and chief accounting officer.

### (d) Unexpired Leases

As of the Petition Date, the Debtors were party to 22 unexpired nonresidential real property leases comprising 370,000 square feet of space across 13 states. The Debtors lease space for directory production, storage and warehousing, and offices. Since the Petition Date, the Debtor made efforts to analyze their liabilities under each of these leases. On February 18, 2011, the Court entered an order extending the period for the Debtors to assume or reject their unexpired leases under section 365(d)(4) of the Bankruptcy Code by 90 days through June 15, 2011. In the months that followed, the Court entered orders allowing the Debtors to reject and assume certain leases. Eventually, the Debtors entered into negotiated stipulations with their remaining lessors to further extend the

31

period to assume or reject their unexpired leases under section 365(d)(4) to certain dates. The Court approved these stipulated extensions on June 15, 2011.

### (e) Publishing Contracts with Non-Debtor Affiliates

Among the Debtors' most significant assets are their publishing contracts, which include the WBS Contracts with non-Debtor affiliates ACS Media, CBD Media, and HYP Media. As described further below, the Debtors obtained Bankruptcy Court approval to enter into extensions of their agreement with each of ACS Media and CBD Media to afford the parties to those contracts time to negotiate longer-term extensions. As discussed in further detail below, after extensive analysis and negotiations with Ambac and the Regatta Credit Facility Lenders, the Debtors have negotiated a settlement that provides for an amendment to the economic terms and contract duration of each of the WBS Contracts.

#### (1) Extension of the ACS Agreement and the ACS IYP Agreement

ACS Media is the exclusive publisher of the "official" yellow pages and white pages directories of ACS Communications Systems Group, Inc., the largest local exchange carrier in Alaska. ACS Media publishes eleven different print directories in Alaska, including directories for Anchorage, Fairbanks, and Juneau. Pursuant to the ACS Agreement, ACS Media outsources to Berry the sale and marketing of directory advertisements in, as well as the printing and distribution of, ACS Media's directories. Berry (and its predecessor) has serviced the directories covered by the ACS Agreement since 2000 and has invested significant time and resources to be able to effectively and efficiently publish and service those directories. The directories covered by the ACS Agreement have staggered publication dates. As compensation for its services under the ACS Agreement, Berry receives a percentage of ACS Media's revenues. The ACS Agreement is one of the Debtors' largest customer contracts in terms of revenue.

As of the Petition Date, the ACS Agreement was due to expire upon publication of the Kodiak directory in February 2011, subject to automatic annual renewal unless either party provided prior written notice of its decision not to renew the ACS Agreement. As of the Petition Date, therefore, ACS Media had the right to terminate the ACS Agreement upon the publication of the Kodiak directory in February 2011. In anticipation of a possible automatic renewal of the ACS Agreement, and as necessitated by the significant lead-time required to prepare a directory for publication, Berry had by December 2010 already commenced preparations relating to its work for the publication of ACS Media directories beyond February 2011. Given the importance of the ACS Agreement, and considering that Berry had already commenced substantial work related to the 2011 directories, both Berry and ACS Media would have been materially prejudiced if the ACS Agreement were not renewed through and including February 28, 2012. Moreover, in light of the Chapter 11 Cases, ACS Media required that the Debtors obtain Bankruptcy Court approval of the renewal of the ACS Agreement, although the Debtors believed the renewal to be an ordinary course transaction permitted under the Bankruptcy Code without Bankruptcy Court authority.

Accordingly, on December 20, 2010, the Debtors obtained Bankruptcy Court approval to extend the term of the ACS Agreement on existing terms for a one-year period through and including February 28, 2012, with successive one-year renewals thereafter unless either party provides prior written notice of its decision not to renew the ACS Agreement. The extension was not an assumption of the ACS Agreement.

Under the ACS IYP Agreement, Berry provides a variety of services relating to ACSYellowPages.com, including website production and maintenance, provision, and maintenance of ACS Media's IYP services, distribution of internet-based advertising content of ACS Media's clients to third party syndicated IYP networks, and sales, solicitation, and customer support services. As of the Petition Date, the ACS IYP Agreement has due to expire on July 31, 2011, subject to automatic annual renewal unless either party provided prior written notice of its decision not to renew the ACS IYP Agreement. Given the importance of the ACS IYP Agreement, both Berry and ACS Media would have been materially prejudiced if the ACS IYP Agreement were not renewed beyond July 31, 2011. Accordingly, the term of the ACS IYP Agreement has been extended on existing terms through and including September 30, 2011, with successive one-year renewals thereafter unless either party provides prior written notice of its decision not to renew the ACS Agreement. The extension was not an assumption of the ACS IYP Agreement.

32

### (2) CBD Agreement Extension

CBD Media is the exclusive publisher of "Cincinnati Bell Directory" branded print and internet yellow pages directories in the greater metropolitan Cincinnati area, including Northern Kentucky. Pursuant to the CBD Agreement, CBD Media outsources to Berry the sale and marketing of advertisements in CBD Media's directories. Berry (and its predecessor) has serviced the directories covered by the CBD Agreement since 2002 and has invested significant time and resources to be able to effectively and efficiently publish and service those directories. Berry has developed considerable knowledge of the markets covered by these directories and has built an employee and resource base designed to service these directories. As compensation for its services under the CBD Agreement, Berry receives a percentage of CBD Media's revenues. The CBD Agreement is one of the Debtors' largest customer contracts in terms of revenue.

As of the Petition Date, the CBD Agreement was due to expire on November 30, 2011, subject to automatic annual renewal unless either party provided prior written notice of its decision not to renew the CBD Agreement. In anticipation of a possible automatic renewal of the CBD Agreement, and as necessitated by the significant lead-time required to prepare a directory for publication, Berry had by February 2011 already commenced preliminary preparations relating to its work for the publication of CBD Media directories beyond November 2011. Additionally, Berry and CBD Media, with active input from the Debtors' DIP lenders, were negotiating a potential long-term extension of the CBD Agreement. Without a three-month extension of the CBD Agreement, CBD Media had informed Berry that it intended to initiate and pursue discussions with other potential vendors to replace Berry upon the expiration of the then-current term of the CBD Agreement on November 30, 2011. The Debtors believed that the initiation of such discussions with other potential vendors may have disrupted the ongoing negotiations between Berry and CBD Media. A three-month extension of the CBD Agreement was therefore agreed upon to afford Berry and CBD Media additional time to reach a mutually agreeable long-term extension of the CBD Agreement.

Accordingly, on March 24, 2011, the Debtors obtained Bankruptcy Court approval to extend the term of the CBD Agreement on existing terms for a three-month period through and including February 28, 2012, with successive one-year renewals thereafter unless either party provides prior written notice of its decision not to renew the CBD Agreement. The extension was not an assumption of the CBD Agreement.

### (3) WBS Contracts Settlement

The WBS Contracts are three of the Debtors' largest contracts. The Debtors and their advisors, in consultation with the Steering Committee and the Creditors' Committee, undertook an extensive analysis of the terms of the WBS Contracts and the role of the WBS Contracts in the Debtors' long-term business plan. Following this analysis, the Debtors engaged in extensive negotiations with the Steering Committee and with Ambac regarding the extension and modification of the terms of the WBS Contracts. These negotiations resulted in agreement in principle to the WBS Contracts Settlement.[14]

The WBS Contracts Settlement provides that the term of the CBD Agreement will be extended to September 2013; the term of the HYP Agreement will be reduced to January 2014; and the term of the ACS Agreement will be extended to June 2014. Additionally, the compensation payable to Berry under each of the WBS Contracts for all print and digital publication rights will be increased 5.75%, effective July 1, 2011. The WBS Contract Settlement provides for LIMI to transfer to Berry certain management personnel and intellectual property needed for the Debtors' operations. Berry is also granted an unsecured claim against LIMI in the amount of $15.5 million on account of certain historical transfers. In exchange, the WBS Contracts Settlement provides that, on the effective date of the Plan, Berry will issue unsecured notes in the aggregate face amount of $3.5 million to two of the WBS Entities as an agreed cure amount for the Debtors' outstanding obligations under the WBS Contracts. Finally, depending on the collective performance of CBD Media, HYP Media and ACS Media, the Debtors may be entitled to a termination fee if the WBS Contracts are not extended for an additional one-year term beyond the new extended termination dates of the WBS Contracts.

---

[14] The summary of the WBS Contracts Settlement in this Disclosure Statement is qualified in its entirety by reference to the WBS Contracts Settlement and the WBS Contracts Settlement Order.

**8.3**     **The Official Committee of Unsecured Creditors**

On December 1, 2010, the United States Trustee for the District of Delaware appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The original members of the Creditors' Committee were: (a) U.S. Bank National Association; (b) Bain & Company, Inc.; (c) Quadgraphics, Inc.; (d) Directory Distributing Associates, Inc.; and (e) Marchex Sales, Inc. Directory Distributing Associates, Inc. voluntarily resigned from the Creditors' Committee effective January 27, 2011. On February 4, 2011, the U.S. Trustee reconstituted the Creditors' Committee to reflect such resignation.

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was originally set for December 29, 2010 at 11:30 a.m. prevailing Eastern Time at the U.S. Federal Building, 844 King Street, Room 5209, Wilmington, DE 19801, and was adjourned to January 25, 2011 at 3:00 p.m. prevailing Eastern Time at the U.S. Federal Building, 844 King Street, Room 5209, Wilmington, DE 19801. In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined under oath by a representative of the United States Trustee and by any attending parties-in-interest), a representative of the Debtors, as well as counsel to the Debtors, attended the meeting and answered questions posed by the U.S. Trustee and other parties-in-interest present at the meeting.

**8.4**     **Filing of the Schedules**

On or about December 24, 2010, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

**8.5**     **Setting of Bar Dates**

On January 24, 2011, the Bankruptcy Court entered an order establishing April 4, 2011 as the Bar Date for each Entity other than Governmental Units to file Proofs of Claim and May 16, 2011 as the Governmental Bar Date for Governmental Units to file Proofs of Claim. Subject to certain limited exceptions contained in the Bankruptcy Code, other than Claims arising from the rejection of Executory Contracts and Unexpired Leases after the Bar Date or Governmental Bar Date, as applicable, all Proofs of Claim are required to be filed by the Bar Date, which has passed, or Governmental Bar Date, as applicable.

Kurtzman Carson Consultants LLC mailed written notice of the Bar Date and the Governmental Bar Date to, among others, all known creditors and all parties that filed requests for notice under Bankruptcy Rule 2002 as of the date the bar date order was entered. In addition, the Debtors published notice of the Bar Date and the Governmental Bar Date in *USA Today*, the *Dayton Daily News*, and *The Denver Post*.

The Confirmation Order shall establish the deadline for filing requests for payment of Administrative Claims. As set forth in the Plan, the proposed deadline is 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to (a) Professional Claims, which shall be subject to the provisions of Section 2.2 of the Plan, and (b) claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, which are subject to the Bar Date.

**ARTICLE IX**
**OTHER KEY ASPECTS OF THE PLAN**

**9.1**     **Corporate Governance**

On the Effective Date, the terms of the current members of the board of directors and the appointment of the officers of Regatta Holdings, unless otherwise agreed to by the Required DIP Facility Lenders, shall terminate and the New Regatta Board and the new officers of Regatta Holdings, which shall be subject to the approval of the Required DIP Facility Lenders, shall be appointed. From and after the Effective Date, each director or officer of Reorganized Regatta shall serve pursuant to the terms of the Reorganized Regatta Charter, the Reorganized Regatta Bylaws, or other constituent documents, and applicable state corporation law. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Regatta Board and any Person

proposed to serve as an officer of Reorganized Regatta shall have been disclosed at or before the Confirmation Hearing. On the Effective Date, the terms of the current members of the boards of directors and the appointment of officers of the Debtors other than Regatta Holdings, unless otherwise agreed to by the Required DIP Facility Lenders, shall terminate.

## 9.2 Distributions

One of the key concepts under the Bankruptcy Code is that only Claims and Interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or interest in the Debtors.

Except as otherwise provided in the Plan, including in Article VI of the Plan, a Final Order, or as otherwise agreed to by the relevant parties, on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed, including Claims that become Allowed after the Distribution Record Date, subject to the Reorganized Debtors' right to object to Claims.

### (a) Prosecution of Objections to Claims

Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.14 of the Plan. The Reorganized Debtors shall have the sole authority to file or withdraw objections to Disputed Claims or Interests. The Reorganized Debtors shall have 120 days after the Effective Date to object to Disputed Claims or Interests. All Disputed Claims or Interests not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. After the Effective Date, the Reorganized Debtors shall have the sole authority to: (a) litigate, settle, or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court and (b) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### (b) Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may request at any time that the Bankruptcy Court estimate any Disputed Claim or disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

### (c) Expungement of, or Adjustment to, Paid, Satisfied, or Superseded Claims and Interests

Any Claim or Interest that has been paid, satisfied, or superseded, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (d) No Interest

Unless otherwise specifically provided for in the Plan, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any

35

Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

(e) **Disallowance of Claims or Interests**

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

(f) **Amendments to Claims**

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**9.3   Treatment of Executory Contracts and Unexpired Leases**

(a) **Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date pursuant to section 365 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Assumption Schedule; (b) has been previously assumed or rejected by the Debtors by Final Order or has been assumed or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; or (d) is a contract for the provision of a Debtor's products or services with a customer (including a customer that is a telecommunications company) that is not listed on the Rejection Schedule, all of which such customer contracts shall be assumed on the Effective Date. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates, provided that any such assignment to Affiliates shall be subject to approval of the Required DIP Facility Lenders. For the avoidance of doubt, while the Debtors may file a Rejection Schedule listing Executory Contracts and Unexpired Leases for rejection, such schedule would be for information purposes only. Any Executory Contract or Unexpired Lease not listed in the Rejection Schedule would be deemed rejected unless otherwise assumed or deemed assumed, as set forth in the Plan. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

(b) **Pre-existing Payment and Other Obligations**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any non-bankruptcy law to the contrary, the

36

Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, (1) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (2) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

(c)     **Rejection Damages Claims and Objections to Rejections**

Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases. Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Such Proofs of Claim shall be forever barred, estopped, and enjoined from assertion. Moreover, such Proofs of Claim shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor counterparty thereto.

In addition, any objection to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court no later than seven days after the filing of the Assumption Schedule. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or the next scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed rejection of its Executory Contract or Unexpired Lease will be deemed to have consented to such rejection.

(d)     **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, the Reorganized Debtors shall on the Effective Date assume all of the Executory Contracts and Unexpired Leases listed in the Assumption Schedule or otherwise identified for assumption in the Plan pursuant to section 365 of the Bankruptcy Code. Except as otherwise provided herein or agreed to by the Debtors with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the above-described assumptions.

On the Effective Date, the Cure Notes shall be executed and delivered to HYP Media Finance LLC and CBD Media Finance LLC in respect of the previously-approved assumption of the WBS Contracts in accordance with the WBS Contracts Settlement Order.

(e)     **Cure of Defaults and Objections to Cure and Assumption**

Prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court, and serve upon counterparties to Executory Contracts and Unexpired Leases proposed for assumption, a notice that will (1) include the Assumption Schedule; (2) describe the procedures for filing objections to a proposed assumption or Cure amount; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court. The Debtors will designate for each Executory Contract and Unexpired Lease listed in the Assumption Schedule a

K&E 18402318

proposed Cure, if any, in connection with such contract or lease. A Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the proposed Cure in Cash within 14 days after, or as soon as practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by payment of the proposed Cure or by an agreed-upon waiver of Cure.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts proposed by the Debtors in the Assumption Schedule must be filed with the Claims and Solicitation Agent on or before the Cure Bar Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the proposed Cure amounts listed in the Assumption Schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before the Cure Bar Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**(f)**     **Insurance Policies**

Each insurance policy shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date.

**(g)**     **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a

dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

9.4     **Release, Injunction, and Related Provisions**[15]

      (a)     **Discharge of Claims and Termination of Interests**

            **Except as otherwise provided for in the Plan and effective as of the Effective Date: (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (2) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.**

      (b)     **Releases by the Debtors**

            **Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided for in the Plan or as may be approved under the WBS Contracts Settlement Order or set forth in the Transition Agreement Approval Orders, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, avoidance or recovery of transfers under chapter 5 of the Bankruptcy Code or any similar law of any state, commonwealth, territory, or country, or otherwise, including any derivative Claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Estates, or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in**

---

[15]  As defined in the Plan, "Released Party" means each of the following in its capacity as such: (a) the Debtors; (b) the Local Insight Companies; (c) the DIP Facility Lenders and the DIP Facility Administrative Agent; (d) the Steering Committee, the Regatta Credit Facility Lenders, and the Regatta Credit Facility Administrative Agent; (e) the LIM Finance Term Loan Facility Lenders and the LIM Finance Term Loan Facility Administrative Agent; (f) the LIM Finance II Term Loan Facility Lenders; (g) the LIM Finance II Senior Subordinated Noteholders; (h) holders of Super Holdco Interests; (i) the Creditors' Committee and the members thereof; (j) the WCAS Releasees; and (k) with respect to each of the foregoing Entities in clauses (a) through (i), such Entity's successors and assigns and current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

As defined in the Plan, "Non-Released Parties" means those Entities identified in the Plan Supplement as Non-Released Parties. The Debtors currently expect that the Non-Released Parties will include Scott A. Pomeroy, a former director and executive of the Debtors, and the following additional former executives of the Debtors: Richard L. Shaum, Jr., Linda A. Martin, and Kathleen Geiger-Schwab, but the Debtors reserve the right to determine the list of Non-Released Parties in their sole discretion; provided, however, in no event shall any of the WCAS Releasees be identified as Non-Released Parties except as expressly identified in this sentence.

whole or in part, the Debtors or their Affiliates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including agreements reflecting long-term indebtedness), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than (except with respect to the WCAS Releasees) Claims or liabilities arising out of or related to any contractual or fixed monetary obligation owed to the Debtors or the Reorganized Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in <u>Section 8.2</u> of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by <u>Section 8.2</u> of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any Claim or Cause of Action released by this <u>Section 8.2</u> of the Plan.

Notwithstanding anything contained in the Plan to the contrary, for purposes of <u>Section 8.2</u> of the Plan, no Non-Released Party is a Released Party.

(c)     <u>Releases by Holders of Claims and Interests</u>

Except as may be approved under the WBS Contracts Settlement Order or approved under the Transition Agreement Approval Orders, as of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, avoidance or recovery of transfers under chapter 5 of the Bankruptcy Code or any similar law of any state, commonwealth, territory, or country, or otherwise, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, prepetition contracts and agreements with one or more Debtors (including agreements reflecting long-term indebtedness), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan, including with respect to the DIP Facility as provided in Section 2.3 of the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and does not release any of the WBS Companies from any WBS Note Claim.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in <u>Section 8.3</u> of the Plan, which includes by reference each of

K&E 18402318

the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates, and the Released Parties; (2) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity granting a release under Section 8.4 of the Plan from asserting any Claim or Cause of Action released by Section 8.3 of the Plan.

Notwithstanding anything contained in the Plan to the contrary, for purposes of Section 8.3 of the Plan, no Non-Released Party is a Released Party.

(d)     Exculpation

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or the liability of any Debtor or Reorganized Debtor not exculpated under the Transition Agreement in connection with Claims arising thereunder; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything contained in the Plan to the contrary, for purposes of Section 8.4 of the Plan, no Non-Released Party is an Exculpated Party.

(e)     Preservation of Rights and Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. . For the avoidance of doubt, the Plan does not release any Causes of Action that the Debtors or the Reorganized Debtors have or may have now or in the future against any Non-Released Party.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized

41

Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(f)     **Injunction**

**Except as otherwise provided in the Plan or for obligations issued pursuant thereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.2 or Section 8.3 of the Plan, discharged pursuant to Section 8.1 of the Plan or are subject to exculpation pursuant to Section 8.4 of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.**

**Notwithstanding anything contained in the Plan to the contrary, for purposes of Section 8.5 of the Plan, no Non-Released Party is an Exculpated Party or a Released Party.**

**9.5     Capital Stock of Reorganized Regatta**

The authorized capital of Reorganized Regatta will consist of shares of Reorganized Regatta Common Stock, par value of $0.01 per share.

**9.6     Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein or in the Plan, on and after the Effective Date, subject to any Final Order, including the Final KEIP Order, the Reorganized Debtors shall (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. For the avoidance of doubt, the Debtors' obligations under the KEIP will be assumed by Reorganized Regatta from and after the Effective Date.

**9.7     Management Equity Incentive Program**

On or following the Effective Date, the New Regatta Board shall adopt and implement the Management Equity Incentive Program. Not less than 8% and not more than 10% of the Reorganized Regatta Common Stock shall be reserved for the Management Equity Incentive Program.

K&E 18402318

## 9.8    Subordination

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be recognized and implemented by the Plan. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. In particular, and without limiting the foregoing, the subordination of Regatta Subordinated Notes Claims to Regatta Credit Facility Claims under the Plan conforms to and implements the subordination and turn-over rights set forth in Article XII of the Regatta Subordinated Notes Indenture, and such rights shall be recognized in and implemented by the Plan. When Regatta Holdings entered into the Regatta Credit Facility, it represented that the Regatta Credit Facility Claims were "senior indebtedness" within the meaning of the Regatta Subordinated Notes Indenture, meaning that the Regatta Credit Facility Claims rank senior to the Regatta Subordinated Notes Claims. Regatta Holdings re-affirmed this position in connection with the DIP Facility. Regatta Holdings' stipulation regarding subordination of the Regatta Subordinated Notes Claims to the Regatta Credit Facility Claims will be binding on the Creditors' Committee and the indenture trustee under the Regatta Subordinated Notes Indenture unless those parties commence an adversary proceeding within 120 days after the date of the appointment of the Creditors' Committee or such later date agreed to in writing by the Regatta Credit Facility Administrative Agent challenging the subordination of the Regatta Subordinated Notes Claims to the Regatta Credit Facility Claims and unless an order is entered by a court of competent jurisdiction that becomes a final non-appealable order sustaining such challenge. The Debtors have been advised that the Creditors' Committee or the indenture trustee under the Regatta Subordinated Notes Indenture may challenge Regatta Holdings' stipulation regarding the subordination of the Regatta Subordinated Notes Claims to the Regatta Credit Facility Claims. The Debtors do not believe that any such challenge has merit and do not believe any such challenge would be successful.

## 9.9    Vesting of Assets

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Local Insight Media Holdings, Inc. will transfer all property, licenses, and intellectual property rights selected by Local Insight Regatta Holdings, Inc. to either Reorganized Regatta or The Berry Company LLC without compensation.

## 9.10    Modification of Plan

Effective as of the date of the Plan and subject to the limitations and rights contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Any modification of the Plan shall be subject to the consent of the Steering Committee, which shall not be unreasonably withheld.

## 9.11    Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any

K&E 18402318

manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**9.12    Reservation of Rights**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, except as expressly set forth in the Plan. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**9.13    Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (1) calling the Debtors' restructuring hotline at one of the telephone numbers set forth above; (2) visiting the Debtors' restructuring website; and/or (3) writing to Local Insight Media Holdings, Inc., c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**ARTICLE X**
**CERTAIN FACTORS TO BE CONSIDERED**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

**10.1    General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to object to Confirmation, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**10.2    Certain Bankruptcy Law Considerations**

**(a)    Parties-in-Interest May Object to the Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created 19 Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion with respect to classification.

44

**(b)      The Debtors May Not Be Able to Satisfy the Voting Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation. If the Plan does not receive the required support from Classes 4, 6, 10, and 12, the Debtors may elect to amend the Plan, seek Confirmation regardless of the rejection, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

**(c)      The Debtors May Not Be Able to Secure Confirmation**

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan.

There can be no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determines that the Disclosure Statement is appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that confirmation of such Plan is not likely to be followed by a liquidation or a need for further financial reorganization.

Confirmation is also subject to certain conditions as described in the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any Class, as well as of any Classes junior to such Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**(d)      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(e)      Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether such Effective Date will, in fact, occur.

**(f)      Contingencies May Affect Distributions to Holders of Allowed Claims**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to holders of Allowed Claims under the Plan.

**(g)      Risk of Not Meeting Closing Conditions of the First Exit Facility**

The Plan contemplates the Debtors obtaining the First Lien Exit Facility. The Debtors cannot guarantee that the closing conditions with respect to the First Lien Exit Facility will be met.

K&E 18402318

**10.3    Risk Factors That May Affect Distributions Under the Plan**

      (a)      **Failure to Reach Digital Business Revenue Targets**

      In recent years, the Debtors have placed a growing emphasis on their digital business, and such digital business continues to represent a growing portion of the Debtors' revenue. Thus, the Debtors expect that an increase in revenue from digital products and services can help to offset a decrease in revenue from the Debtors' print directory business. In the event the Debtors are unable to achieve their projected revenue targets with respect to their digital business, the Debtors' overall business and financial condition could be adversely affected.

      (b)      **Failure to Implement Berry Leads Successfully; Failure of P4P to Deliver Projected Revenues.**

      Since February 2010, Regatta has introduced its new business model, Berry Leads, in all its markets. Regatta's new business model may not deliver expected revenue. The Debtors' business, financial condition, and results of operations could be adversely affected if the new business model does not deliver expected results, including projected revenue from digital, IYP, and other non-print products and services.

      During 2010, P4P, a performance-based advertising solution under which advertising clients pay only for qualified inbound phone calls delivered from the advertising client's print Yellow Pages advertisement, failed to deliver projected revenues. To date in 2011, P4P revenue has continued to underperform compared to Regatta's projections. P4P may continue to fail to meet projections; any such failure could adversely affect the Debtors' business, financial condition, and results of operations.

      (c)      **The Debtors Are Highly Dependent on Key Customer Agreements.**

      In connection with the Split-Off, Regatta entered into several agreements with Windstream, including a publishing agreement that expires on November 30, 2057 and a billing and collection agreement that expires on November 30, 2012. Under the publishing agreement, Windstream, among other things, appointed Regatta as the exclusive official publisher of Windstream-branded print directories in substantially all its local service areas. Regatta is also party to significant customer contracts with ACS Media, CBD Media, HYP Media, Frontier Communications Corporation ("Frontier"), and CenturyTel, Inc. ("CenturyTel").

      Each of these agreements may be terminated prior to its stated term under specified circumstances, some of which may be beyond the Debtors' reasonable control or which may require extraordinary efforts or the incurrence of material costs by the Debtors to avoid breach of the applicable agreement. The termination of Regatta's publishing agreement or billing and collection agreement with Windstream, or the failure by Windstream to satisfy its obligations under those agreements, could have a material adverse effect on the Debtors' business, financial condition, and results of operations. In addition, the termination or nonrenewal of Regatta's agreements with ACS Media, CBD Media, HYP Media, CenturyTel, or Frontier, or the failure by those companies to satisfy their obligations under the agreements to which it is a party, would negatively affect the Debtors' revenue and could have a material adverse effect on the Debtors' business, financial condition, and results of operations. Under the WBS Contracts Settlement, the terms of the WBS Contracts with ACS Media, CBD Media, and HYP Media continue through June 2014, September 2013, and January 2014, respectively. Any further modification to any of the WBS Contracts (including any extension of their respective terms) will require the prior written consent of Berry and the manager of the WBS structure. In addition, any further modification to any of the WBS Contracts that is reasonably likely to have a material adverse effect on ACS Media, CBD Media or HYP Media is subject to the consent of Ambac. The term of Regatta's directory service agreement with CenturyTel continues through May 1, 2012 (subject to automatic renewals for successive one-year terms unless either party notifies the other of its decision not to so extend the term of that agreement). The term of Regatta's master publishing agreement with Frontier continues through December 31, 2012.

      (d)      **Bankruptcy Proceedings Brought by or Against Certain Critical Third Parties.**

      Regatta is party to a publishing agreement and other commercial contracts with Windstream, and directory publishing agreements with ACS Media, CBD Media, HYP Media, CenturyTel, Frontier, and other

customers. If a bankruptcy case were to be commenced by or against any of these companies, it is possible that all or part of these agreements could be considered an executory contract and could therefore be subject to rejection by that party or by a trustee appointed in a bankruptcy case. In addition, protections for certain types of intellectual property licenses under the Bankruptcy Code are limited in scope and do not presently extend to trademarks. Accordingly, Regatta could lose its rights to use the trademarks it licenses in connection with these agreements should the party from whom Regatta licenses these rights become subject to a bankruptcy case. If one or more of these agreements were rejected, the applicable agreement might not be specifically enforceable. The loss of any rights under Regatta's agreements with Windstream would have a material adverse effect on the Debtors' business, financial condition, and results of operations. The loss of any rights under any of Regatta's directory publishing agreements with ACS Media, CBD Media, HYP Media, CenturyTel, Frontier, or its other customers could materially harm the Debtors' business, financial condition, and results of operations.

In addition, ACS Media, CBD Media, and HYP Media are parties to publishing and other agreements with the local exchange carriers ("LECs") in the markets they serve (Alaska Communications Systems Group, Inc. in the case of ACS Media, Cincinnati Bell Telephone Company LLC in the case of CBD Media, and Hawaiian Telcom, Inc., in the case of HYP Media). Substantially all the obligations of ACS Media, CBD Media, and HYP Media under those publishing agreements are outsourced to Regatta. If a bankruptcy case were commenced by or against any of these LECs, it is possible that all or part of the publishing or other agreements with that LEC could be considered an executory contract and could therefore be subject to rejection by that LEC or a trustee appointed in a bankruptcy case. The loss by ACS Media, CBD Media, or HYP Media of its rights under its publishing or other agreements with the relevant LEC could result in a decrease or cessation of payments to Regatta under its directory service agreements with that company, which could have a negative effect on the Debtors' business, financial condition, and results of operations.

(e)     **Declining Usage of Print Yellow Pages Directories.**

In recent years, overall usage of print Yellow Pages directories in the United States has continued to decline. The Debtors believe this decline was attributable to increasing consumer usage of a variety of digital information services, including search engines, IYP directory products, industry-specific websites, mobile applications, and social networks. The Debtors expect that over the next several years, usage of print Yellow Pages directories will continue to experience a decline as users increasingly turn to digital and interactive media delivery devices for local commercial search information.

Further declines in usage of the Debtors' print directories would:

- exacerbate downward pressure on the Debtors' advertising prices;

- reduce advertising sales in the Debtors' Yellow Pages directories, resulting in lower revenue; and

- discourage new businesses from purchasing advertising in the Debtors' Yellow Pages directories.

Further declines in the usage of the Debtors' print directories may not be offset in whole or in part by an increase in revenue from the Debtors' IYP, digital, and other non-print products and services. Any of the factors that may contribute to a decline in usage of the Debtors' print directories, or a combination of them, would impair the Debtors' revenue and could materially harm the Debtors' business, financial condition, and results of operations.

(f)     **The Debtors' Conversion To The 3L Software Platform**
**And Their Integration Of Information Technology Systems.**

The Debtors are in the process of migrating from their legacy process management, billing, and collection and production systems to the 3L Media AB ("3L") software platform. In addition, the Debtors are in the process of integrating and changing information technology systems and processes. The conversion and integration process is complicated and has been, and may continue to be, more time-consuming and expensive than originally anticipated. During the conversion and integration process, the Debtors have experienced significant disruption (and may continue to experience disruption) to their operations. The conversion and integration process has also affected the Debtors' ability to accurately and timely bill and/or collect from their clients, which could harm the Debtors'

47

client relations, reputation, and business. There can be no assurances that the 3L software platform will be successfully implemented or that it will fully meet the Debtors' expectations. In addition, the Debtors may not be able to realize the anticipated cost savings from their conversion to the 3L software platform and their integration of information technology systems and processes. Continued failure to successfully convert to the 3L software platform or to integrate the Debtors' information technology systems and processes could have a negative effect on the Debtors' business, financial condition, and results of operations.

(g)    **The Continued Economic Downturn.**

The economic recession that began in 2008 continued into 2009 and did not abate through most of 2010. As the global financial crisis broadened and intensified, a severe and prolonged recession took hold from which business conditions have still not fully recovered. Business activity across a wide range of industries and regions has substantially declined, and many companies, including SMBs, are in serious financial difficulty due to the lack of consumer spending, reduced access to credit, cash flow shortages, deterioration of their businesses, and lack of liquidity in the capital markets. Moreover, the economic downturn has led to substantially reduced consumer and business spending, which may continue or worsen in the foreseeable future.

The Debtors derive substantially all their revenue from the sale of local advertising to SMBs. As a result of recent economic conditions, overall advertising spending by the Debtors' advertising clients has declined and customer attrition has increased. In turn, the Debtors have experienced declining revenue and increasing collection costs and bad debt expense. A continuation or worsening of the current economic conditions is likely to lead to reduced demand for the Debtors' products and services and cause advertising clients to reduce, delay, or cancel their advertising with the Debtors. This in turn would result in lower revenue. The current economic conditions are also expected to result in continued difficulty in collecting accounts receivable due to financial difficulty among advertisers, as well as a further increase in collection costs and bad debt expense.

Challenging economic and market conditions may also result in:

- increased price competition, which may adversely affect the Debtors' revenue and gross margins;

- the bankruptcy or insolvency of some of the Debtors' LEC customers, the Debtors' advertising clients and/or their suppliers; and

- difficulty in forecasting, budgeting and planning due to limited visibility into economic conditions and the spending plans of the Debtors' advertising clients.

A "double dip" economic recession, or other events that have produced or could produce major changes in shopping and spending patterns, such as the housing market crisis, the credit crisis, or a terrorist attack, would have a material adverse effect on the Debtors' business, financial condition, and results of operations.

(h)    **The Debtors Face Significant Competition From Competitors With Greater Resources Than the Debtors.**

The directory advertising industry is highly competitive. Approximately 75% of total U.S. directory advertising sales are attributable to incumbent publishers, or publishers that are either owned by incumbent LECs (such as AT&T Inc.) or by companies that have agreements to publish directories for incumbent LECs (such as SuperMedia and Dex One). Independent Yellow Pages directory publishers operating in the United States, such as Yellowbook, compete with incumbent publishers (including the Debtors) and represent the remaining market share.

In all of the Debtors' directory publishing markets, the Debtors compete with one or more Yellow Pages directory publishers, which are predominantly independent publishers. There are, on average, four print directory competitors in each of the Debtors' markets. Given the mature state of the directory advertising industry, independent competitors are typically focused on aggressive pricing to gain market share. Independent publishers may commit more resources to certain markets than the Debtors are able to commit, thus limiting the Debtors' ability to compete effectively in those areas. In some markets, the Debtors also compete with other incumbent publishers in overlapping and adjacent markets, which affects the Debtors' ability to attract and retain advertisers

48

and to increase advertising rates. The Debtors also compete for local advertising sales with other traditional media, including newspapers, magazines, radio, direct mail, telemarketing, billboards, and television. Many of these incumbent and independent publishers and traditional media competitors are larger and have greater financial resources than the Debtors. The Debtors may not be able to compete effectively with these companies for advertising sales in the future, which could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

The Debtors also face significant competition from IYP directory publishers, internet-based local search companies, search engines, and other providers of online products and services. The Debtors compete with major search engines, such as Google, Yahoo!, and Bing. In addition, the Debtors compete with a growing number of online local shopping-related company, including industry-specific verticals such as *FindLaw.com*, user-generated content sites such as *Yelp.com* and *Kudzu.com*, and internet sites that provide classified directory information, such as and *Citysearch.com* and *Zagat.com*. The Debtors' IYP offerings compete with those of other incumbent directory publishers (such as *SuperPages.com* and *Dexknows.com*) and of independent directory publishers (such as *Yellowbook.com*), and (in some markets) with *YellowPages.com* itself. The Debtors also compete with other providers of website development services, SEM services, and other emerging technology companies focused on the SMB market, such as *Web.com* and Yodle (both of which are vendors to Regatta), Clickable, Netopia, and ReachLocal, Inc. The Debtors' failure to compete effectively with these companies, many of which are larger and have greater financial and technical resources than the Debtors, could materially harm the Debtors' business, financial condition, and results of operations.

(i)     **Increased Competition in Local Telephone Markets Could Reduce the Benefits of Using the Windstream and Other Incumbent LEC Brand Names.**

The opening of local telecommunications to competition, local number portability, advances in communications technology (such as wireless devices and voice over internet protocol), and demographic factors (such as shifts by younger generations away from wireline telephone communications towards wireless and other communications technologies) has eroded the market position of Windstream and other incumbent LECs with which the Debtors have contracts. As a result, it is possible that some or all of these incumbent LECs will not remain the primary local telephone services providers in their local service areas. In that event, the Debtors' right to be the exclusive publisher in that market and to use an incumbent LEC's brand name on its directories in that market may not be as valuable as the Debtors presently anticipate, which could adversely affect the Debtors' business, financial condition, and results of operations.

(j)     **Changes in Technology and User Preferences.**

The internet has emerged as a significant medium for local advertisers. Advances in technology have brought and likely will continue to bring new participants, new products, and new channels to the local search industry, primarily as a result of user preferences for electronic delivery of traditional directory information and electronic search engines and services. The Debtors expect the use of the wired and wireless internet–capable devices by consumers as a means to transact commerce and obtain information about advertisers to continue to result in new technologies being developed and services being provided that will compete with the Debtors' products and services. Several other companies are developing technologies that allow advertisers to tailor their messages to consumers based on detailed and individualized consumer information and to track and report this individualized information to advertisers to allow them to further refine their advertising initiatives.

The Debtors' growth and future financial performance depends on their ability to develop and market new products and services and create new distribution channels, while enhancing existing products, services, and distribution channels, to incorporate the latest technological advances and accommodate changing user preferences. The Debtors may not be able to develop their digital products and services in a manner that suits client needs and expectations more quickly and effectively than their competitors, or at all. In addition, the Debtors' digital products and services may not be able to compete successfully with those offered by other providers of digital, IYP, or wireless products and services. The Debtors' failure to anticipate or respond adequately to changes in technology and user preferences or inability to finance the capital expenditures necessary to respond to such changes, could adversely affect the Debtors' business, financial condition, and results of operations.

49

(k)  **The Debtors' Dependence on Third-Party Vendors
for Certain Essential Products, Services, and Technologies.**

The Debtors rely on third-party vendors for certain essential products, services, and technologies. The Debtors depend on the ability of these third parties to perform key operations on its behalf in a timely manner and in accordance with agreed service levels. The Debtors rely on third party vendors to print, bind, and distribute their directories; to fulfill their website development and SEM offerings; to fulfill the IYP advertising listings they sell; to fulfill their internet-based video services; to provide finished graphics work; to perform billing and collection services; and to provide other important services (including call and performance tracking services). Because of the Debtors' large print volumes and the specialized nature of binding print directories, there are only a limited number of companies capable of servicing the Debtors' needs for printing, graphics, distribution, digital fulfillment, production, and billing and collection services.

If the Debtors were unable to maintain their current relationships with one or more of these third parties, they would be required either to hire sufficient staff to perform the provider's services in-house or to find an alternative vendor. In most cases, it would be impracticable for the Debtors to perform the function internally on a cost-effective basis. The Debtors may not be able to find an alternative vendor in time to avoid a disruption of its business or at all. Accordingly, the inability or unwillingness of the Debtors' third party vendors to perform their obligations under their agreements with the Debtors, or the termination of one or more of the Debtors' vendor relationships, could materially harm the Debtors' business, financial condition, and results of operations.

Further, Berry relies on Caribe Servicios, a non-Debtor affiliate, to perform a wide variety of services related to Berry's print and IYP directories, including service order processing, publishing, production, graphics, pagination, information technology, and commission calculation. The agreement between Berry and Caribe Servicios, which was entered into as part of the Debtors' on-going cost control efforts, seeks to take advantage of lower labor and other costs in the Dominican Republic, while still maintaining a high level of quality in the production services outsourced to Caribe Servicios. Caribe Servicios has subcontracted substantially all its obligations under its agreement with Berry to Local Insight Media Dominicana SRL ("LIMD"), a non-Debtor affiliate. In the course of implementing this agreement, Caribe Servicios and LIMD have encountered certain quality control and other issues relating to the performance of its services under the agreement, which has resulted in increased costs and significant disruption to Berry's operations. The plan of reorganization filed in connection with the Caribe Chapter 11 Cases contemplates that: (i) LIMD will become a wholly owned subsidiary of Berry on or before the Effective Date; (ii) the Berry Outsourcing Contract will be assumed, as modified by the terms of the Transition Agreement, if approved; and (iii) LIMD will enter into an agreement with Berry to provide directly the services which it currently provides indirectly through Caribe Servicios. The continued failure of Caribe Servicios or LIMD to provide outsourced services to Berry at expected levels of quality, or LIMD's failure to successfully assume the obligation to provide such outsourced services, could result in further disruption to Berry's operations; could result in an increased level of claims and adjustments expense due to complaints from advertising customers; could lead to increased costs as errors are remediated; could lead to an increase in bad debt expense; could damage the perceived value of Berry's print directories; and could have a negative effect on Berry's relationships with its LEC and other customers. The failure of Caribe Servicios or LIMD to provide outsourced services at expected levels of quality, or LIMD's failure to successfully assume the obligation to provide such outsourced services, could therefore have a negative effect on the Debtors' business, financial condition and results of operations.

(l)  **SMB Advertising Preferences.**

Large internet-based local search companies such as Google, Yahoo!, and Bing offer online advertising products and services through self-service platforms. As advertisers become more familiar with and experienced in working with these platforms, they may opt to actively manage their own internet presence, in which case demand for the Debtors' digital products and services may decrease, which in turn could have a negative effect on the Debtors' business, financial condition, and results of operations.

(m)  **Enforceability of Certain Non-Competition Provisions.**

Regatta's publishing agreement with Windstream contains a non-competition agreement pursuant to which Windstream has generally agreed, among other things, not to publish tangible or digital media directory

K&E 18402318

products consisting principally of wireline listings and classified advertisements of subscribers in substantially all Windstream's local service areas. In addition, BellSouth Advertising and Publishing Corporation and AT&T Yellow Pages Holdings, LLC have agreed, through April 23, 2013, not to compete with Regatta in the business of providing independent outsourced sales forces to LECs for local sales of paid advertisements in the geographic areas Regatta served as of April 23, 2008.

Under applicable law, enforcement of a covenant not to compete may be limited if:

- it is not necessary to protect a legitimate business interest of the party seeking enforcement;

- it unreasonably restrains the party against whom enforcement is sought; or

- it is contrary to the public interest.

If these non-competition agreements were ever challenged, their enforceability would be determined by a court based on all of the facts and circumstances of the specific case at the time enforcement is sought. For this reason, it is not possible to predict with certainty whether, or to what extent, a court would enforce these non-competition agreements in Regatta's favor. If a court were to determine that any of these non-competition agreements are unenforceable, the Debtors' business, financial condition and results of operations could be harmed.

### (n)     Debtors' Agreements with Google, Yahoo!, And Microsoft.

Nearly all the search engine click advertising the Debtors purchase is from Google, Yahoo!, and Microsoft and a substantial majority of such advertising is from Google. The Debtors' success depends to a significant extent on their ability to purchase search engine click advertising from these major internet search companies at reasonable prices. Increased competition or other factors may cause the cost of the search engine click advertising that Regatta purchases from Google, Yahoo!, and Microsoft to rise. If clients' advertising increasingly migrates to the internet, the price of media may increase substantially. An increase in the cost of search engine click advertising could result in an increase in the Debtors' costs, an increase in the prices Regatta must charge its advertising clients, or a decrease in Regatta's ability to fulfill its advertising clients' service expectations. In addition, the internet search companies that offer the search engine click advertising that Regatta purchases may change their operating rules, bidding procedures, and commercial terms in ways that prevent Regatta from purchasing media at reasonable prices or at all. Any change in the Debtors' ability to provide effective online marketing campaigns to their advertising clients, or any termination or modification of the Debtors' agreements with these companies, may adversely affect the Debtors' ability to attract and retain clients.

### (o)     Results of Ongoing Cost Optimization Efforts.

Since mid-2008, the Debtors have implemented a number of initiatives to reduce costs, including the outsourcing to Caribe Servicios of a broad range of production and other functions relating to the print and IYP directories that Regatta publishes. Other force reductions and facility closures may occur in the future. The Debtors continue to actively assess and pursue opportunities to reduce costs through measures such as outsourcing and other cost-cutting measures. If the Debtors are unsuccessful in achieving the savings that are expected to result from their cost optimization efforts, or if the parties to which the Debtors outsource certain functions fail to perform at expected cost and quality levels, the Debtors' business, financial condition, and results of operations could be adversely affected.

### (p)     The Debtors' Computer and Communications Systems.

The Debtors' business activities rely to a significant degree on the efficient and uninterrupted operation of their computer and communications systems and those of third parties. The Debtors rely on third party vendors for various aspects of the communications systems used in connection with their business, including data center, internet connectivity, and bandwidth providers. Any disruption in or failure of current or, in the future, new systems could impair the Debtors' or their third party service providers' collection, processing, or storage of data and the day-to-day conduct of the Debtors' business. Any financial or other difficulties the Debtors' vendors face may have negative effects on the Debtors' business. In addition, the Debtors exercise little control over these third party vendors, which increases the Debtors' vulnerability to problems with the services provided by these vendors.

51

Any failures, interruptions, or delays experienced with the Debtors computer and communications systems and those of third parties could materially harm the Debtors' business, financial condition, and results of operations.

The Debtors' computer and communications systems, and those of third party service providers, are vulnerable to damage or interruption from a variety of sources. Despite precautions the Debtors have taken, a natural disaster or other unanticipated problems that led to outages or the corruption or loss of data at the Debtors' facilities could materially harm the Debtors' business, financial condition, and results of operations.

(q) **The Debtors' Reliance on SMBs.**

SMBs constitute a substantial majority of the Debtors' client accounts. In the ordinary course of business, the Debtors extend credit to SMB advertisers by allowing them to pay for their advertising purchases in installments. SMBs, however, tend to have fewer financial resources and higher failure rates than large businesses. In addition, full or partial collection of delinquent accounts can take an extended period of time. In part because of the Debtors' reliance on small businesses, the Debtors recorded $41.3 million in bad debt expense for 2010 (compared to $26.6 million in 2009). Small businesses have been adversely affected by the recent economic downturn, which has seen a decline in consumer spending, reduced access to credit, cash flow shortages, and the lack of liquidity in the capital markets. The Debtors believe these trends are a significant contributing factor to advertisers in any given year choosing not to renew their advertising in the following year. Consequently, the Debtors' business, financial condition, and results of operations could be adversely affected by their dependence on, and extension of credit to, SMBs.

Moreover, the success of Berry Leads depends on the willingness of a significant number of SMBs to outsource website development, SEM, internet-based video advertising, and other online business solutions. The market for these products and services is relatively new and untested. SMBs may fail to adopt Regatta's portfolio of digital products and services. Further, if SMBs determine that having an online presence is not giving their businesses a competitive advantage, they would be less likely to purchase Regatta's digital products and services. If the market for website development, SEM, and internet-based video advertising fails to grow or grows more slowly than the Debtors currently anticipate, or if Regatta's digital services and products are not competitive or fail to achieve widespread client acceptance, the Debtors' business, financial condition, and results of operations would be adversely affected.

(r) **Sales of Advertising to National Accounts By Third Parties.**

For the year ended December 31, 2010, the sale of advertising to national or large regional chains that purchase advertising in several of the directories that the Debtors publish accounted for approximately 13.1% of total revenue. Substantially all the revenue derived from national accounts is serviced through certified marketing representatives ("CMRs"), which are independent third parties that act as agents for national companies and design their advertisements, arrange for the placement of those advertisements in directories, and provide billing services. As a result, the Debtors' relationships with national advertisers depend significantly on the performance of these third party CMRs, which the Debtors do not control. A number of the CMRs with which the Debtors do business have experienced financial difficulty as a result of the current economic downturn. In early 2011, the largest CMR with which the Debtors do business, TMP Directional Marketing LLC, started to wind down its business (as a result of which the Debtors do not expect to collect on the $4.65 million owing to them from that company). The Debtors' ability to generate revenue from their national accounts could be materially impaired if additional CMRs go out of business, if some or all of these CMRs are unable or unwilling to do business with the Debtors, or if their performance declines.

(s) **Loss of or Litigation Involving Important Intellectual Property Rights.**

The Debtors rely on a combination of copyright and trademark laws as well as contractual arrangements to establish and protect their intellectual property rights. Regatta owns The Berry Company and Berry Leads trademarks and the *www.TheBerryCompany.com* domain name. In connection with the Split-Off, Regatta received an exclusive, royalty-free 50-year license to use the Windstream trademark in connection with its publication, marketing, and distribution of directory products and related marketing materials in Windstream's service areas. Regatta also received an exclusive, royalty-free 50-year license to use the

52

*WindstreamYellowPages.com* domain name. In addition, Regatta holds a 10-year, non-exclusive license to use the *YellowPages.com* trademark in connection with its activities under a local advertising reseller agreement with YellowPages.com LLC. Regatta's ability to continue to use licensed marks is subject to its compliance with the terms and conditions of the respective licenses. These intellectual property rights are important to the Debtors' business as their advertising sales depend to a large extent on the ability to develop and maintain strong brand recognition in the markets the Debtors serve, in particular the Windstream brand and the *WindstreamYellowPages.com* and *YellowPages.com* domain names. Consequently, the loss or significant limitation of the rights to use, or injury to the goodwill associated with, the trademarks the Debtors license or own could diminish their brand and impair their ability to generate advertising revenue in affected markets.

Regatta licenses other key trademarks it currently uses from its LEC customers. Because Regatta licenses, and do not own, these trademarks, Regatta does not control their prosecution, maintenance, or enforcement. Although provisions in the license agreements limit the actions the LECs may take with regard to the trademarks, Regatta's inability to control the prosecution, maintenance, or defense of the trademarks could result in decisions adverse to it with regard to these trademarks, including the elimination of Regatta's rights to use a trademark. In addition, not all of the trademarks that Regatta licenses from LECs are subject to state or federal trademark protection. This lack of protection may make it more difficult for the relevant LEC to defend against potential infringers and thus could decrease the value of the licensed trademarks to Regatta. A loss of rights with regard to these trademarks, or a decrease in the value of the trademarks, could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

The Debtors may be required from time to time to bring lawsuits against third parties to protect the Debtors' rights in the trademarks that they own or license. Similarly, from time to time, the Debtors may be party to proceedings whereby third parties challenge the Debtors' rights to these trademarks. Any such lawsuits or other actions that the Debtors bring may not be successful, and the Debtors may be found to have infringed or be infringing upon the intellectual property rights of third parties. Although the Debtors are not aware of any material infringements of any trademark rights that are significant to the Debtors' business, any lawsuits, regardless of the outcome, or threatened litigation could result in substantial costs and diversion of resources, including costs associated with obtaining additional licenses to continue to use such intellectual property rights, and could materially harm the Debtors' business, financial condition, and results of operations.

(t)     **Pending and Potential Litigation.**

Various lawsuits and other claims typical for a business of the Debtors' size and nature are pending against the Debtors or may be threatened against the Debtors from time to time, including general commercial and employment-related matters. In some instances, plaintiffs allege that they have suffered damages from errors or omissions in their advertising or improper listings, in each case, contained in directories published by the Debtors. The Debtors are also exposed to claims relating to their extension from time to time of the 12-month publication life of certain of the Debtors' print directories (although the Debtors' standard terms and conditions specifically allow such extensions) and to defamation, breach of privacy claims and other litigation matters relating to the Debtors' business, as well as methods of collection, processing and use of personal data. The subjects of the Debtors' data collection and users of the data collected and processed by the Debtors could also have claims against the Debtors if the data were found to be inaccurate, or if personal data stored by the Debtors were improperly accessed and disseminated by unauthorized persons. The defense of these claims and an adverse outcome of any such lawsuit could be costly, could harm the Debtors' reputation with their clients and otherwise divert the attention of the Debtors' management.

In addition, from time to time the Debtors receive communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which the Debtors operate. Any potential judgments, fines or penalties relating to these matters may harm the Debtors' results of operations in the period in which they are recognized.

Except as relates to the matter addressed in the following paragraph, the Debtors believe, based on the Debtors' review of the latest information available, that the Debtors' ultimate liability in connection with pending or threatened legal proceedings will not have a material adverse effect on the Debtors' business, financial condition, or results of operations.

In July 2010, a complaint was filed against a number of telecommunications and local search companies, including two with which Regatta has a commercial relationship. The complaint alleges that the defendants' local search websites infringe a patent held by the plaintiff. The local search websites of the two companies with which Regatta has a commercial relationship are owned (in one case) or managed and hosted (in the other case) by Regatta. Regatta has agreed to assume these two companies' defense in this matter and to indemnify them from and against any losses they may suffer as a result of this lawsuit. In turn, Regatta has asserted rights of indemnification against one of its third party vendors in connection with this matter. Given the early stage of this litigation, Regatta has not been able to develop an assessment of its rights, of the merits of the plaintiff's claims or of Regatta's potential liability in this matter.

(u)     **Legislative Initiatives Directed at Waste Management.**

A number of state and local municipalities have considered, and are expected to continue considering, legislative initiatives that would limit or restrict the Debtors' ability to distribute print directories in the markets they serve. The most restrictive initiatives would prohibit the Debtors from distributing print directories unless residents "opt-in," that is, affirmatively request to receive the Debtors' print products. Other, less restrictive "opt out" initiatives would allow residents to request not to receive the Debtors print products. Although opt-in and opt-out legislation has been proposed in certain states in which the Debtors operate, such legislation has not been adopted in any locality in which the Debtors distribute directories. The Debtors have adopted voluntary measures to permit consumers to share with the Debtors their preferences with respect to the delivery of the Debtors' various print and digital products. If opt-in or opt out legislation were adopted in the Debtors' markets, advertisers may perceive that the Debtors' value proposition has diminished, as the audience that is being reached may decrease. In addition, some states are considering legislative initiatives that would shift the costs and responsibilities of waste management for discarded directories to the producers of the directories. If these or other similar initiatives are passed into law, they would increase the Debtors' costs to distribute print products, reduce the number of directories that are distributed, and negatively affect the Debtors' ability to market their advertising to new and existing clients.

(v)     **Future Changes in Applicable Laws and Regulations.**

Future changes in federal and state communications laws and regulations applicable to directory publishing obligations could change the competitive landscape or create significant compliance costs for the Debtors, which in turn could affect the Debtors' profitability. In addition, as the internet industry develops, specific laws relating to the provision of internet services and the use of digital and internet-related applications may affect the Debtors. Regulation of the internet and internet-related services is itself still developing both formally by, for instance, statutory regulation, and also less formally by, for instance, industry self regulation. Regulations on the use of data and with respect to data security are also still developing. If the regulatory environment becomes more restrictive, including by increased internet regulation, restrictions on the use of data and requirements for the protection of data, the Debtors' business, financial condition, and results of operations could be adversely affected.

(w)     **Changes in the Regulatory Obligation of the Debtors' LEC Customers to Publish White Pages.**

State public utilities commission requirements generally obligate incumbent LECs, including Windstream and other incumbent LECs for which the Debtors publish directories, to publish and distribute White Pages directories to substantially all residences and businesses in the geographic areas they serve. The legal and regulatory provisions also generally require incumbent LECs, in specified cases, to include information relating to the provision of telephone service provided by that LEC and other carriers in the service area, as well as information relating to local and state governmental agencies. Incumbent LECs are also generally required to publish and distribute White Pages directories under interconnection agreements they maintain with other LECs and resellers of local exchange services. The costs of publishing, printing, and distributing these directories are included in the Debtors' operating expenses.

Under the terms of Regatta's publishing agreement with Windstream and Regatta's agreements with other incumbent LECs, Regatta is generally required to fulfill the LEC's regulatory and contractual obligations to publish White Pages directories in its service areas. If any additional legal requirements are imposed with respect to these obligations, Regatta would be obligated to comply with these requirements, even if this were to increase its

publishing costs. Regatta's LEC customers generally would not be obligated to reimburse Regatta for any increase in its costs of publishing directories that satisfy their publishing obligations. Regatta's ability to effectively compete with directory publishers that do not have those obligations could be adversely affected if it were not able to increase its revenue to cover any of these unreimbursed compliance costs.

In January 2008, the Public Utilities Commission of Ohio issued an order allowing Cincinnati Bell Telephone Company LLC relief from a state regulatory requirement that obligates LECs to provide their customers with directory information either through a printed directory or free directory assistance. As a result of this decision, Cincinnati Bell Telephone customers may now be provided with an online, electronic version of the White Pages in lieu of a printed directory, although a printed White Pages directory must still be provided to customers on request. In May 2010, Alaska Communications Systems Group, Inc., the incumbent LEC in Alaska, filed a petition with the Regulatory Commission of Alaska seeking a waiver of the regulatory requirement to deliver directory information to residences in Alaska. Other states and localities in which the Debtors operate have adopted or considered, or are considering, similar measures that would reduce or eliminate the requirement that printed White Pages directories be distributed to substantially all residences and business in LEC service areas. The effect of these initiatives will likely be to reduce the number of printed White Pages directories that are distributed, which could negatively affect the Debtors' ability to market their paid White Pages advertising products to new and existing clients and could lessen the predictability and related demand for the Debtors' Yellow Pages directories, which are typically co-bound with White Pages directories, each of which would negatively affect the Debtors' revenue.

(x)     **Applicability of New or Existing State and Local Jurisdictional Sales and Use Taxes to the Debtors' Print and Digital Offerings.**

The Debtors generally charge and/or pass through sales and use taxes on their products and certain services. In the future, states and local jurisdictions may seek to impose sales, use, or other transaction-tax obligations on those of the Debtors' products and services with respect to which the Debtors do not currently charge sales and use taxes. A successful assertion by any state or local jurisdiction in which the Debtors do business that they should collect sales, use, or other transaction taxes on the sale of their products or services could result in substantial tax liabilities related to past sales, create increased administrative burdens or costs, and discourage clients from purchasing products or services from the Debtors in the future.

(y)     **Loss of Key Personnel or the Debtors' Inability to Attract and Retain Highly Qualified Individuals.**

The Debtors depend on the continued services of key personnel, including the experienced senior management team of Regatta, as well as the Debtors' regional sales management personnel. The Debtors' ability to achieve their operating goals depends to a significant extent on the Debtors' ability to identify, hire, train and retain qualified individuals. The Debtors' ability to attract and retain qualified personnel depends on numerous factors, some of which the Debtors cannot control (such as conditions in the local markets in which the Debtors operate). The loss of key personnel could harm the Debtors' business, financial condition and results of operations.

The Debtors' ability to maintain and grow revenue depends on the quality and size of the Debtors' local sales force. Competition for sales representatives can be intense, and the Debtors may not be able to attract, integrate and retain additional qualified sales personnel in the future. In addition, a loss of a significant number of experienced sales representatives would likely result in fewer advertising sales in the Debtors' directories and could adversely affect the Debtors' business. The Debtors ability to attract and retain qualified sales personnel depends on numerous factors outside of their control, including conditions in the local employment markets in which the Debtors operate.

In addition, the Debtors' ability to achieve their objectives will depend, in large part, on the Debtors' success in effectively training sufficient sales personnel. New hires require significant training and in some cases may take several months before they achieve full productivity, if they ever do. As part of the planning for the commercial introduction of Regatta's new business model, the Debtors' redesigned the training process for their sales representatives. If the Debtors' training programs are ineffective, the Debtors' sales representatives may not be in a position to effectively sell their portfolio of products and services, which could harm the Debtors' business, financial condition, and results of operations.

(z)     **Union Organizing Activity.**

None of the Debtors' employees is currently represented by a union. The Debtors are not currently aware of any union organizing activity at any of their facilities. The Debtors, however, cannot guarantee that relations with their workforce will remain positive, or that union organizers will not be successful should they attempt to organize employees at the Debtors' facilities in the future. If some or all of the Debtors' employees were to become unionized and they were to engage in a strike, work stoppage, or other slowdown, the Debtors could experience a significant disruption of their operations and higher ongoing labor costs. In addition, if some or all of the Debtors' employees were to become unionized, the Debtors could face higher labor costs in the future as a result of severance or other charges associated with layoffs, shutdowns, or reductions in the size and scope of the Debtors' operations.

(aa)    **Fluctuations in the Price or Availability of Paper.**

The principal raw material that the Debtors use is paper. In 2010, the Debtors did not obtain paper directly from paper mills. Rather, the Debtors' two third party printing vendors, which print and bind all the Debtors' print directories, purchased the paper on the Debtors' behalf at market prices and then charged them to the Debtors under the contracts with these providers. Under these printing contracts, the Debtors have the right to purchase paper directly rather than through third party printers. In 2011 and beyond, the Debtors intend to purchase paper either directly or through their third party printers, depending on which option offers the lowest price. The price of paper may fluctuate significantly in the future. Changes in the supply of, or demand for, paper could affect delivery times and cause prices to fluctuate. The Debtors' third-party print service providers may not be able to continue to purchase paper at reasonable prices and any increases in the cost of paper could adversely affect the Debtors' business, financial condition, and results of operations.

(bb)    **Environmental Compliance Costs and Liabilities.**

The Debtors' operations, as well as the properties that the Debtors own and lease for their business, are subject to stringent laws and regulations relating to environmental protection. The Debtors' failure to comply with applicable environmental laws, regulations or permit requirements, or the imposition of liability related to waste disposal or other matters arising under these laws, could result in civil or criminal fines, penalties or enforcement actions, third-party claims for property damage, and personal injury, or requirements to clean up property or other remedial actions. Some of these laws provide for "strict liability," which can render a party liable for environmental or natural resource damage without regard to negligence or fault on the part of the party.

In addition, new environmental laws and regulations, new interpretations of existing laws and regulations, increased governmental enforcement or other developments could require the Debtors to make additional unforeseen expenditures. Many of these laws and regulations are becoming increasingly stringent, and the cost of compliance with these requirements can be expected to increase over time. To the extent that the costs associated with meeting any of these requirements are substantial and not adequately provided for, they could harm the Debtors' business, financial condition, and results of operations.

**10.4    Disclosure Statement Disclaimer**

(a)     **Information Contained Herein is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)     **Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

Although a copy of this Disclosure Statement was served on the Securities and Exchange Commission. This Disclosure Statement was not filed with the Securities and Exchange Commission. The Securities and Exchange Commission was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it. Neither the Securities and Exchange Commission nor any state

regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the Exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(c) **Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- growth opportunities for existing products and services;

- financing plans;
- results of litigation;

- competitive position;
- disruption of operations;

- business strategy;
- contractual obligations;

- budgets;
- projected general market conditions;

- projected cost reductions;
- plans and objectives of management for future operations; and

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;
- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(d) **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(e) **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

57

(f)    **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors reserve the right to continue to investigate Claims and file and prosecute objections to Claims and Interests.

(g)    **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(h)    **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)    **Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)    **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee, and the U.S. Trustee.

**ARTICLE XI**
**IMPORTANT SECURITIES LAW DISCLOSURE**

Pursuant to the Plan and section 1145 of the Bankruptcy Code, Reorganized Regatta will issue, on the Effective Date, shares of Reorganized Regatta Common Stock for the benefit of holders of Allowed Claims in Classes 4 and 6 on account of their Claims, subject to dilution by the Management Equity Incentive Program. All such shares will be duly authorized, validly issued, fully paid, and non-assessable.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of section 5 of the Securities Act, or similar federal, state, local, or foreign laws. In addition, under section 1145 of the Bankruptcy Code, any Securities issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the

time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (1) purchases a Claim against, an Interest in, or a Claim for an administrative expense against the debtor, if that purchase is with a view to distributing any Security received in exchange for such a Claim or Interest; (2) offers to sell Securities offered under a plan of reorganization for the holders of those Securities; (3) offers to buy those Securities from the holders of the Securities, if the offer to buy is (a) with a view to distributing those Securities; and (b) under an agreement made in connection with the plan of reorganization or with the offer or sale of Securities under the plan of reorganization; or (4) is an "issuer" with respect to the Securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that Entities who receive Reorganized Regatta Common Stock are deemed to be "underwriters," resales by such Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those Entities would, however, be permitted to sell Reorganized Regatta Common Stock without registration if they are able to comply with the provisions of Rule 144 under the Securities Act. **YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER".**

## ARTICLE XII
## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### 12.1 The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

### 12.2 Confirmation Standards

Among the requirements for the Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization. The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the Debtor, or by a Person issuing Securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in a joint Plan with the Debtor or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## 12.3  Best Interests Test/Liquidation Analysis

*[To Come]*

## 12.4  Valuation Analysis

*[To Come]*

## 12.5  Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections described in ARTICLE V. These financial projections, together with the assumptions on which they are based, are attached hereto as **Exhibit C**. Based upon such projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, Confirmation is not likely to be followed by liquidation or the need for further reorganization.

## 12.6  Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a Class of Claims or Interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

K&E 18402318

(a)     **No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair".

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)     **Fair and Equitable Test**

This test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims in such Class. As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors: Each holder of a Secured Claim either (1) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the Effective Date of the chapter 11 plan, of at least the Allowed amount of such Claim, (2) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (3) receives the "indubitable equivalent" of its Allowed Secured Claim.

- Unsecured Creditors: Either (1) each holder of an Impaired unsecured Claim receives or retains under the chapter 11 plan property of a value equal to the amount of its Allowed Claim or (2) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the chapter 11 plan.

- Equity Interests: Either (1) each holder of an Interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the Interest or (2) the holder of an Interest that is junior to the non-accepting Class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 5 (Regatta Subordinated Notes Claims), 8 (Regatta Investor General Unsecured Claims), 9 (Super Holdco General Unsecured Claims), 11 (LIM Finance II Senior Subordinated Note Claims), 13 (LIM Finance Term Loan Facility Claims), 14 (LIM Finance General Unsecured Claims), 15 (Regatta Investor and Regatta Holdings Interests), 17 (Super Holdco Interests), 18 (LIM Finance Interests), 19 (Section 510(b) Claims) are deemed to reject the Plan, because, as to such Classes, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.[16]

---

[16]   Regatta Subordinated Notes Claims are subordinated to Regatta Credit Facility Claims as discussed in Section 6.4(a)

61

## ARTICLE XIII
## ALTERNATIVES TO
## CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Debtors' Plan cannot be confirmed, they may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors' is described in the Liquidation Analysis attached hereto as **Exhibit E**.

## ARTICLE XIV
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

*[To Come]*

## ARTICLE XV
## CONCLUSION AND RECOMMENDATION

The Plan preserves for Reorganized Regatta the value of, among other assets, the Debtors' publishing contracts with non-Debtor affiliates and provides Reorganized Regatta a stronger balance sheet with which to operate post-emergence from bankruptcy. Moreover, in the Debtors' opinion, the Plan is preferable to any alternative chapter 11 plan or restructuring transaction because it gives the greatest recovery to the Debtors' Creditors. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than proposed under the Plan. The Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots and master ballots so they will be received by the Claims and Solicitation Agent no later than 5:00 p.m. prevailing Pacific Time on October 27, 2011.

K&E 18402318

Dated:  August 13, 2011

Respectfully submitted,

LOCAL INSIGHT MEDIA HOLDINGS, INC.
(on behalf of itself and the other Debtors)

By: _Scott Brubaker_____
Scott Brubaker
Interim President, Chief Executive Officer
and Chief Restructuring Officer

Prepared by:

**KIRKLAND & ELLIS LLP**
Richard M. Cieri
Christopher J. Marcus
601 Lexington Avenue
New York, New York  10022-4611
Telephone:        (212) 446-4800

Ross M. Kwasteniet
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000

*Attorneys for the Debtors and Debtors in Possession*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Michael R. Seidl
Curtis A. Hehn
919 North Market Street, 17th Floor
Wilmington, Delaware  19899-8705
Telephone:        (302) 652-4100

# APPENDIX:
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### 15.1    Rules of Interpretation

For purposes of the Disclosure Statement: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to any particular portion of the Disclosure Statement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

### 15.2    Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### 15.3    Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 15.4    Reference to Monetary Figures

All references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### 15.5    Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Disclosure Statement to the contrary, references in the Disclosure Statement to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.